**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **LARRY A. KATZ** | : | |
| **And KENNETH M. RAFTERY,** | : | **CIVIL ACTION NO.** |
| | : | **302 CV 02201 (AWT)** |
| **Plaintiffs,** | : | |
| | : | |
| **V.** | : | |
| | : | |
| **THE SEPARATION PAY PLAN** | : | |
| **OF TEXACO, INC.** | : | |
| **And TEXACO, INC.,** | : | |
| | : | **JUNE 29, 2004** |
| **Defendants.** | : | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

**<u>*PRELIMINARY STATEMENT*</u>**

Larry A. Katz and Kenneth M. Raftery bring this action against Texaco, Inc. and the

Separation Pay Plan of Texaco under the Employee Retirement Income Security Act of 1974, as

amended ("ERISA"), 29 U.S.C. §1001, *et seq.*, seeking payment of enhanced change-in-control

benefits pursuant to ERISA §502(a)(1)(B) of said Act, 29 U.S.C. §1132(a)(1)(B). In response, and

in an effort to avoid reimbursing plaintiffs for legal fees under the terms of the Plan, defendants

assert a single counterclaim seeking a declaratory judgment by the Court that plaintiffs' claims are

frivolous. Accordingly, pursuant to Rule 56 of the Rules of Federal Procedure and Local Rule 56,

plaintiffs Larry A. Katz and Kenneth M. Raftery move for summary judgment on defendants' single

counterclaim alleging frivolity.

In the counterclaim asserted, defendants seek a declaratory judgment ruling[1] that plaintiffs'

claims are frivolous, thus attempting to justify their refusal to reimburse plaintiffs for legal fees and

---

[1] A counterclaim like that asserted by defendants which seeks only a clarification of one's obligations under an ERISA Plan is not a suit to "enforce" the terms of a plan for purposes of establishing federal subject matter jurisdiction. <u>Connecticut General Life Ins. Co. of New York v.</u>

expenses incurred in this case, as required by the Separation Pay Plan of Texaco. (See Exhibit A to Plaintiffs' Appendix of Exhibits filed herewith (hereafter "A.Ex."), at p.18 "Expenses & Fees Reimbursement.") As set forth in detail below, defendants must meet an extremely high burden in order to establish frivolity, and they simply cannot meet this burden. Accordingly, there are no genuine issues of material fact involving the issue of whether plaintiffs' claims are frivolous, and plaintiffs are entitled to summary judgment in their favor on defendants' counterlcaim.

### *STATEMENT OF FACTS*

*1.*    *OVERVIEW.*

Plaintiffs Larry A. Katz and Kenneth M. Raftery are former employees of Fuel and Marine Marketing, LLC ("FAMM"), a subsidiary of defendant Texaco, Inc., and are both participants in and beneficiaries of the severance pay plan adopted by FAMM, namely defendant The Separation Pay Plan of Texaco, Inc., as defined by ERISA, 29 U.S.C. §§1002(7) and (8).  The Separation Pay Plan of Texaco, Inc. (hereinafter the "Plan") is an unfunded welfare benefit plan as defined by ERISA, 29 U.S.C. §1002(1), with benefits payable from the Plan sponsor's general assets. (See Requests for Admission Nos. 1-4 and Answers thereto (A.Ex. B).) Texaco, Inc. is also a defendant in this action because at all relevant times hereto, Texaco, Inc. was a sponsor of the defendant Plan and was the administrator of said Plan.  Moreover, Texaco, Inc. exerted such control and influence through its Senior Vice President, Vice President and Secretary, and Vice President of Human Resources (the "Change-of-Control Committee") over the administration of said Plan so as to be accountable to plaintiffs the same as the Plan administrator. See, e.g., Daniel v. Eaton Corp., 839 F.2d 263, 266 (6th Cir.), cert denied, 488 U.S. 826 (1988).

---

Cole, 821 F.Supp. 193, 197 (S.D.N.Y. 1993). Although no basis for jurisdiction is asserted by defendants, and it is not clear if jurisdiction exists for the counterclaim pursuant to ERISA, many courts have established federal jurisdiction in similar circumstances pursuant to The Declaratory Judgment Act, 28 U.S.C. §2201(a), which provides that federal jurisdiction in a declaratory

This case is about defendants' failure to pay the plaintiffs certain enhanced benefits totaling over $850,000 they allege they were entitled to under the Separation Pay Plan of Texaco. (See enhanced benefits calculation (A.Ex. C).) Defendants contend that an employee's position grade is the sole factor in determining whether an employee is entitled to the "enhanced" benefits sought here by plaintiffs. (Excerpt of defendants' interrogatory responses, Response Nos. 2 and 5 (A.Ex. D); administrative record (A.Ex. E at Bates Nos. Texaco 0033 and 0006).) However, defendants' argument fails to take into account that plaintiffs are *not* Texaco employees and do not hold *Texaco* position grades. Indeed, in a memorandum issued by *Texaco*, it states that the enhanced benefits are for members of "our management group" and then defines that term as "position grade 20 or above." (See June 2, 1999 memorandum (A.Ex. E at Bates No. Texaco 0100).) However, no such memo was initially circulated to FAMM employees, and no such definition was provided for or used to define FAMM's "management group." (Id. (A.Ex. E at Texaco 0100); Deposition of Peter M. Meade taken February 5, 2004 (hereinafter "Meade Depo."), P51 L13 -- Page 52 L14[2] (A.Ex. F).) The undisputed testimony demonstrates that both plaintiffs were key members of FAMM's management group and key members of FAMM's leadership team. (Deposition of C. Michael Bandy taken April 1, 2004 (hereinafter "Bandy Depo."), P17 L7-12 (A.Ex. G); Deposition of Michele Swanson taken March 31, 2004 (hereinafter "Swanson Depo."), P20 L5-10, P26 L9-21 (A.Ex. H); FAMM management listing and letters to Raftery referring to him as a member of FAMM's management team (all part of A.Ex. I).) Indeed, defendants admit that plaintiffs were both Officers of FAMM. (Requests for Admission Nos. 5-6 and Answers thereto (A.Ex. B).) Moreover, as set forth in detail below, the undisputed evidence reveals that while plaintiffs may have been graded a FAMM position grade 19, their duties, responsibilities and compensation far exceeded those of employees holding a *Texaco* position grade 19. What becomes clear after a perfunctory review of the evidence, and what was

---

judgment action exists if the party against whom declaratory judgment is sought could have brought a coercive action in federal court to enforce his rights. Id.

never even analyzed at either level of Texaco's claims review process, is that FAMM's position grading system and Texaco's position grading system were not one in the same. However, in order to establish that the position grading systems of Texaco and FAMM were not analogous, it is necessary to review the history of FAMM, its relationship with Texaco, and the employment history of plaintiffs.

**2.     _FAMM's HISTORY._**

Texaco, Inc., until November 1998, had a division of its company that was referred to at "T-FAMM," standing for Texaco Fuel and Marine Marketing. (Swanson Depo. P13 L3-8 (A.Ex. H); Bandy Depo. P9 L6-23 (A.Ex. G).) Texaco, Inc. and Chevron then created a joint venture that combined their respective Fuel and Marine Marketing divisions and called this company "FAMM," standing for Fuel and Marine Marketing. (Swanson Depo. P13 L2-8 (A.Ex. H); FAMM description from SEC website (A.Ex. J).) In November 1998, FAMM was created as a stand-alone, independent company. (A.Ex. J.) Both plaintiffs became employed by FAMM in November 1998; Larry Katz as Treasurer and Kenneth Raftery as Comptroller. (Meade Depo P24 L6-23 (A.Ex. F).)

Plaintiff Larry Katz had previously been employed at Texaco from 1991 until he started at FAMM in 1998. (Deposition of Larry Katz taken April 29, 2004 ("Katz Depo."), P8 L6-16 (A.Ex. K.) Indeed, from approximately 1993 through 1995, Mr. Katz was employed in the T-FAMM division of Texaco. (Katz Depo. P8 L25 -- P9 L2 (A.Ex. K).) Similarly, Mr. Raftery began his employment with Texaco in 1990 as an accountant in the alternate energy and eventually became assistant manager of Texaco International Manufacturing and Marketing. (Deposition of Kenneth Raftery taken April 30, 2004 ("Raftery Depo."), PP6-7 (A.Ex. L).) In approximately September 1998, Mr. Raftery also joined T-FAMM as manager of accounting. (Raftery Depo. P11 L16-19 (A.Ex. L).)

---

[2] "P___ L___" refers to page and line number.

Eventually, upon the creation of FAMM as the joint venture between Texaco and Chevron, Mr. Raftery was offered and accepted a position as Comptroller of FAMM (Raftery Depo. PP7-8 (A.Ex. L)), while Mr. Katz accepted the position of Treasurer for FAMM (Katz Depo. P10 L7 (Ex. K)). The duties and responsibilities for both plaintiffs increased significantly upon accepting offers to work at FAMM. (Raftery Depo. P11 L20 -- P12 L1 (A.Ex. L).) The difference in T-FAMM versus FAMM was immense, as FAMM was the combination of both Texaco's and Chevron's Fuel and Marine Marketing divisions and the business increased significantly. (Raftery Depo. P12 L24-25 (A.Ex. L).) FAMM was now a stand-alone entity with two parent companies. (Raftery Depo. P13 L4-8 (App Ex. L).) Indeed, FAMM's total revenues as a stand-alone company totaled about $4.3 billion, while T-FAMM's gross revenue had been less by at least a billion. (Meade Depo. P21 L6-21 (A.Ex. F); Bandy Depo. P9 L17 – P10 L1 (A.Ex. G).) Moreover, it is undisputed that upon being hired by FAMM, both Mr. Katz and Mr. Raftery were made part of the management group of FAMM. (Swanson Depo. P20 L5-10 (A.Ex. H).)

### 3. *ACRIMONIOUS RELATIONSHIP BETWEEN TEXACO AND FAMM.*

From the inception of FAMM, there was animosity and even hostility between Texaco and FAMM. (Bandy Depo. P18 L20 -- P19 L13 (A.Ex. G); Meade Depo. P56 L4-25 (A.Ex. F).) FAMM was being run as an entrepreneurial entity striving to remain independent and to create its own compensation and benefit schemes that would be separate and apart from those of Texaco. (Bandy Depo. P14 L14-25 (A.Ex. G).) As a result, the executive compensation board at Texaco no longer had control over FAMM or its employees. (Bandy Depo. P19 L4-13 (A.Ex. G); Meade Depo. P56 L4-25 (A.Ex. F).) This caused a great deal of resentment. Indeed, Stephen Pennacchio, the Vice President of Executive Compensation for Texaco, made it clear that he was not happy with the manner in which FAMM was being run. According to Michelle Swanson who was in charge of FAMM's executive compensation, Stephen Pennacchio resented the fact that FAMM was an independent company and that he did not have complete fiduciary responsibility over FAMM

employees. (Swanson Depo. P26 L1-16 (A.Ex. H).)[3] Moreover, Ms. Swanson testified that she continually faced resistance from Mr. Pennacchio in connection with FAMM compensation issues. (Swanson Depo. P26 L14-16 (A.Ex. H).) Michael Bandy, President of FAMM, also experienced resistance from Texaco in his pursuit to create a different pay structure and different benefits plans for FAMM employees. (Bandy Depo. P19 L4-13 (A.Ex. G); Swanson Depo. P22 L9 -- P23 L1 (A.Ex. H).) The executive compensation groups of both Texaco and Chevron were very reluctant to have FAMM create something in terms of its compensation programs that were significantly different than either the Chevron or Texaco plans. (Bandy Depo. P19 L4-13 (A.Ex. G).) As set forth in further detail below, this hostility had a devastating effect on Texaco's interpretation of the Separation Pay Plan of Texaco and whether plaintiffs were eligible for the enhanced benefits.

### 4. *POSITION GRADING SYSTEMS OF TEXACO AND FAMM WERE NOT ANALOGOUS.*

Shortly after commencing work with FAMM, both plaintiffs received position grades of FAMM 19 and maintained those position grades until they left FAMM's employ in 2002. (Raftery Depo. P9 L4 (A.Ex. L); Katz Depo. P11 L12 (A.Ex. K).) Both plaintiffs reported to Mr. Peter Meade, who accepted the position of Vice President and CFO of FAMM and held a position grade of FAMM 20. (Meade Depo. P30 L13-14 (A.Ex. F).) Prior to becoming employed by FAMM, Mr. Meade held a position grade at Texaco of 20, and this grade was not changed upon commencing employment at FAMM despite the fact that his duties significantly increased. (Meade Depo. P30

---

[3] Ms. Swanson testified as follows:
Q: Did Mr. Pennacchio explain to you why he was resistant?
A: Yes, he did.
Q: And what did he tell you?
A: He felt that as the Texaco vice president of executive compensation, that he had a fiduciary responsibility for the actions of FAMM.
Q: So he wanted to be in charge of what FAMM employees received by way of benefits?
A: Correct.
Q: And did he resent the fact that you were in charge of that and not beholden to him?
A: Correct.

L13-19 (A.Ex. F).) Indeed, Mr. Meade testified that if he had the duties he assumed at FAMM while he was still employed at Texaco, he would have certainly held a position grade higher than a Texaco position grade 20. (Meade Depo. P30 L20-23 (A.Ex. F).) In fact, Mr. Meade held the same position grade for over a decade, despite the tremendous advances he made in terms of his duties and compensation. (Swanson Depo. P32 L11 -- P33 L6 (A.Ex. H).) FAMM, as a general matter, simply did not focus on position grades, but rather focused on an individual employee's function and responsibility within the organization. (Meade Depo. P89 L19-21 and P90 L5-14 (A.Ex. F).)

While initially adopting the position grading system of Texaco, the system did not evolve with FAMM and it became distorted over time and simply did not maintain equivalence with that of Texaco over the years. Peter Meade, Vice President and CFO of FAMM, testified that as far as position grades were concerned, he "didn't really care what was happening at Texaco," he just analyzed his leadership team and made sure that everyone was fully and fairly compensated. (Meade Depo. P99 L3-10 (A.Ex. F).) The president of FAMM testified that upon becoming employed by FAMM, he no longer had a pay grade at Texaco because FAMM was a separate company. (Bandy Depo. P11 L1-8 (A.Ex. G).) Mr. Bandy further testified that the position grades initially adopted from Texaco "were pretty much irrelevant because FAMM was creating its own compensation system, which was significantly different from Texaco's." (Bandy Depo. P12 L13-19 (A.Ex. G).)

When asked whether the Texaco and FAMM position grades were similar, Ms. Swanson, head of FAMM's executive compensation, stated that FAMM was a totally different company, so it is difficult to compare the position grades of FAMM employees to those of Texaco employees, FAMM was an independent organization. (Swanson Depo. P80 L11-20 (A.Ex. H).) In Mr. Meade's case, his position grade was totally inconsistent with Texaco's position grade for the job that he performed. (Swanson Depo. P81 L9-14 (A.Ex. H).) And plaintiffs both worked directly for Mr. Meade. (Swanson Depo. P81 L15-17 (A.Ex. H).)

---

(Swanson Depo. P26 L1-16 (A.Ex. H).)

During this time, FAMM was in fact attempting to establish totally different compensation schemes than those of Texaco. FAMM viewed itself as an independent, small, entrepreneurial enterprise. And while FAMM may have "set up the initial transition, just kind of on the mirror of Texaco, [FAMM was] really striving to develop [its] own independent plans and pay scales and all that kind of thing." (Bandy Depo. P14 L14 -- P15 L5 (A.Ex. G).)[4]

Position grades simply were not focused on within the FAMM organization, and if they were, it would have quickly become apparent that individuals holding a FAMM position grade 19 were part of FAMM's management team and as such were eligible for all the executive perks that only individuals in the Texaco organization who held a Texaco position grade of 20 or above were entitled to.[5] Indeed, plaintiffs were perceived as being part of FAMM's management group. (Bandy Depo. P17 L7-12 (A.Ex. G); Swanson Depo. P20 L5-10 (A.Ex. H) and P26 L9-21; see also A.Ex. I.) They were afforded benefits reserved only for Texaco employees holding a position grade 20 or above. (Deposition of Carolyn Sellers taken April 1, 2004 ("Sellers Depo."), PP13-15 (A.Ex. M).) Peter Meade testified that individuals holding a FAMM position grade 19 received benefits that

---

[4] Due in part to FAMM's abandonment of Texaco's position grading scheme and in part to Texaco's resistance in connection with FAMM's compensation issues, The Hay Group was hired to conduct a compensation study for FAMM and its employees. The purpose of the study was to conclude if FAMM employees were paid commensurate with similarly-situated employees in the marketplace. (Swanson Depo. P16 L1-4 (A.Ex. H).) Michelle Swanson, who was in charge of coordinating the study, testified that because FAMM was a stand-alone company, a comparison of FAMM's compensation plans with that of Texaco and other companies was necessary. (Swanson Depo. P16 L8-13 (A.Ex. H).) As a result of the Hay Group Study, FAMM wanted to establish global salary grades for all FAMM employees, but this was never accomplished due to the merger between Chevron and Texaco in 2001. (Swanson Depo. P21 L17-24 (A.Ex. H).) Indeed, there was again resistance and hostility from Texaco in connection with conducting the compensation study in the first instance. (Swanson Depo. P25 L16-21 (A.Ex. H).) Had FAMM's position grading and compensation schemes been identical with those of Texaco, there would have been no need for the Hay Group study.

[5] Indeed, instead of using a position grade demarcation for its benefit plans, FAMM required that an individual employee be part of FAMM's "management team" to be eligible for certain plan benefits such as the cash bonus plan. (Swanson Depo. P40 L7-12 (A.Ex. H).)

someone holding a Texaco position grade 19 simply would not be entitled to. (Meade Depo. P99 L11-19 (A.Ex. F).)

The undisputed evidence also supports that fact that Mr. Raftery's position, as Comptroller of FAMM, was demonstrably the equivalent of a Texaco position grade 20. After the merger between Texaco and Chevron, the position of Comptroller for FAMM was to be relocated to Houston, Texas. Although Mr. Raftery was offered the position, he did not want to relocate his family and declined the position. A Texaco employee by the name of Scott Hannen was chosen to take over the position of Comptroller for FAMM in Houston, Texas. (Raftery Depo. P18 L15-20 (A.Ex. L); Swanson Depo. P63 L4-7 (A.Ex. H).) The duties and responsibilities of the Houston position were less in scope than Mr. Raftery's position. ("FAMM Treasurer/Comptroller Positions, Justification for Enhanced Benefits" (A.Ex. E at Texaco 0031).) For example, the Houston position was only a divisional position rather than being Comptroller of stand-alone LLC; external audits and other stand-alone filings were no longer required; many of the complex accounting matters were to be handled by ChevronTexaco's corporate division; and a majority of the treasury functions would be the responsibility of other ChevronTexaco divisions, such as ChevronTexaco Credit, ChevronTexaco Risk Management and ChevronTexaco Treasury. (Id. (A.Ex. E at Texaco 0031).) Despite the substantial decrease in duties and responsibility, the Houston position was accorded a ChevronTexaco position grade 27, which is the equivalent to a Texaco position grade 20. (See "Chevron Texaco Structure Conversion," memo from Katz to Tilton dated 12/6/01 re: "HR Appeal – FAMM," and "Position Summary, GO-400" (all A.Ex. N); Swanson Depo. P63 L4-17 (A.Ex. H).)[6]

---

[6] In this regard, Michelle Swanson, head of FAMM's Human Resources Department, testified as follows:
Q: Mr. Raftery's position as comptroller was, after the merger, given to gentleman by the name of Scott Hannen; correct?
A: Correct.
Q: Mr. Hannen was a Chevron 27, was he not, pay grade?
A: He was a Texaco employee?

Moreover, despite giving Scott Hannen a higher position grade than that of Mr. Raftery, Mr. Hannen, unlike Mr. Raftery, was not a CPA, and therefore had less credentials than Mr. Raftery. (A.Ex. E at Texaco 0031.)

A brief review of the difference in executive perks afforded to employees holding a FAMM position grade 19 as compared to individuals holding a Texaco position grade 19 also aptly demonstrates that the two systems were not analogous.

### A.    *Annual Cash Bonus Plan.*

As an example, individuals holding a FAMM position grade 19 were eligible to participate in FAMM's Annual Cash Bonus Plan. ("FAMM 2001 Annual Cash Bonus Program" A.Ex. O).) As a Texaco employee, one had to be a position grade 20 to be eligible for the Cash Bonus Plan. (Swanson Depo. P39 L6-16 and P40 L25 (A.Ex. H); Sellers Depo. P13 L16 – P14 L3 (A.Ex. M).) FAMM's Annual Cash Bonus plan was targeted toward "key" individuals within the FAMM organization whose performance was critical to the success of the business. (Meade Depo. P43 L1-13 (A.Ex. F).) The President and CEO of FAMM testified that "the only people that had entitlements to the Cash Bonus Program were the executive counsel, senior leadership and officers." (Bandy Depo. P18 L4-15 (A.Ex. G).) Further, Ms. Swanson testified that in determining eligibility for cash bonus benefits, FAMM used the term "management team." (Swanson Depo. P40 L7-12 (A.Ex. H).) Mr. Katz and Mr. Raftery were both participants of this Plan. (Meade Depo. P43 L11-13 (A.Ex. F).)

---

Q: Okay.  Well, when he took the position he became a Chevron employee; correct?
A: Correct, ChevronTexaco employee.
Q: As a 27?
A: Correct.
Q: And that equates to a 20 at Texaco?
A: Correct.
(Swanson Depo. P63 L4-17 (A.Ex. H).)

### B.     *Deferred Compensation Plan.*

FAMM's Deferral Plan (A.Ex. P) provided that certain "key" employees were guaranteed to be eligible for a deferred payment of any or all of their cash bonus award. (A.Ex. Q.)  However, this option was only available to twelve FAMM employees, identified as part of FAMM's "key management." (Swanson Depo. P52 L3—P53 L2 (A.Ex. H); Meade Depo. P44 L22-25 (A.Ex. F); A.Ex. R.) Mr. Katz and Mr. Raftery were identified as "key management" and both eligible to defer the payment of their cash bonus awards. (Meade Depo. P45 L1-3 (A.Ex. F).)

Although Texaco had a similar plan, utilizing similar eligibility criteria (*to wit:* "key employees"), the benefits of that plan were limited to those individuals holding Texaco position grades 20 or above. (Swanson Depo. P42 L8-16 and P52 L22 -- P53 L2 (A.Ex. H); Meade Depo. P45 L7-13; Deposition of Scott D.H. Jeffery taken December 16, 2003 (hereinafter "Jeffery Depo.") P9 L5-10 (A.Ex. S).)

### C.     *Supplemental Retirement Plan.*

Similarly, both plaintiffs participated in the Supplemental Bonus Retirement Plan, despite the fact that *Texaco* "has never recognized PG 19 for this plan even if they received a bonus (sometimes as high as 40k plus)… ." (A.Ex. T.) Indeed, as a Texaco employee, one had to hold a Texaco position grade of at least a 20 to be eligible for the Supplemental Retirement Plan. (Sellers Depo. P15 L3-23 (A.Ex. M).) The Plan language specifically reserves this benefit for "certain management or highly compensated employees." (App. Exs. U and V.)

As part of FAMM's management group, plaintiffs participated in the Supplemental Bonus Retirement Plan.

### D.     *Long-Term Incentive Plan.*

The Long-Term Incentive Plans are no different. As a Texaco employee, one had to hold a Texaco position grade of at least a 20 to be eligible to participate in the Long-Term Incentive Plan. (Sellers Depo. P15 L3-23 (A.Ex. M); Jeffrey Depo. P33 L23-25 (A.Ex. S).) Again, FAMM did not

use a position grade identifier as a demarcation for benefits. FAMM concentrated on an employee's status or position within the management group. (Katz Depo. P83 L6-22 (A.Ex. K).) Accordingly, despite the fact that plaintiffs held position grades of FAMM 19, they both participated in the Long-Term Incentive Plan. (Meade Depo. P47 L18-10 (A.Ex. F).)

###### E.    _Total Compensation._

Plaintiffs were also compensated at a much higher rate than Texaco employees holding a Texaco position grade 19. (Swanson Depo. P34 L3-11 (A.Ex. H).) Mr. Katz testified that he was paid at least $100,000 more than Texaco employees holding a position grade 19. (Katz Depo. P82 L15-22 (A.Ex. K).) Mr. Jeffrey, a Texaco employee on the FAMM Board of Directors, testified that when he held a Texaco position grade 19, his total compensation, including bonuses and benefits, was approximately $130,000 annually. (Jeffrey Depo. P7 L14-21 (A.Ex. S).) Moreover, in 2001, Mr. Jeffrey had a manager working under him that held a Texaco position grade 19 whose total compensation was approximately $145,000 annually. (Jeffrey Depo. P8 L19 -- P9 L1 (A.Ex. S).) Compare this to plaintiffs who both received annual compensation of approximately $200,000 - $250,000 as FAMM position grade 19s. (A.Ex. W.) Indeed, Mr. Jeffery, a Texaco employee, testified that annual compensation of approximately $250,000 would be high for a Texaco employee holding a position grade 19. (Jeffrey Depo. P40 L1-12 (A.Ex. S).)

Accordingly, it is clear after a perfunctory review of the compensation and benefits afforded to individuals holding a FAMM position grade 19, that they were not treated the same as Texaco position grade 19 employees. FAMM's plans were based not on position grade, but rather on an individual's function within the management group. (Katz Depo. P83 L6-22 (A.Ex. K); Meade Depo. P.99 L11-19 (A.Ex. F).) To simply draw a line at position grade 20, without any further analysis, despite the fact that two independent companies are involved, is unreasonable.

*5.* ___THE SEPARATION PAY PLAN OF TEXACO.___

In approximately October of 2000, Texaco and Chevron announced that the two companies were going to merge and become ChevronTexaco. (Katz Depo. P15 L7-16 (A.Ex. K).) The result of the merger would mean that FAMM would cease to exist as a joint venture, but would rather become a wholly owned subsidiary of ChevronTexaco. (Katz Depo. PP15-16 (A.Ex. K).) The merger took place in October 2001. (Katz Depo. P17 L13-14 (A.Ex. K).) In approximately 1998, Texaco drafted the Separation Pay Plan of Texaco entitling employees who lost their positions as a result of a change in control to receive separation pay. (A.Ex. A.) However, consistent with the hostility evidenced by Texaco from the inception of FAMM, Mr. Pennacchio, Vice President of Executive Compensation for Texaco, attempted to have FAMM employees excluded from participating in the Separation Pay Plan of Texaco. (Bandy Depo. P21 L3-20 (A.Ex. G); Swanson Depo. P54 L7 -- P55 L11 (A.Ex. H).) It took negotiations between Deval Patrick, in-house counsel for Texaco, and Peter Bijur, Texaco's CEO, to ultimately allow FAMM employees to participate in the Plan. (Bandy Depo. P21 L3-20 (A.Ex. G); Swanson Depo. P54 L7 -- P55 L11 (A.Ex. H).) That, however, was not the end of the battle.

In anticipation of the merger between Texaco and Chevron, Texaco drafted an enhancement to the severance provisions of The Separation Pay Plan of Texaco. Despite the direct instruction in 1998 to include FAMM in the Separation Pay Plan of Texaco, upon drafting the memo regarding the enhancement to the Plan (A.Ex. E at Texaco 0100), Mr. Pennacchio again attempted to exclude FAMM employees from the enhancement. Indeed, Mr. Pennacchio did not circulate this memo to *any* FAMM employees (regardless of position grade) and did not advise any FAMM employees of the informational meeting regarding the enhanced severance options. (Swanson Depo. P56 L18 -- P57 L11 (A.Ex. H); Meade Depo. P51 L13 -- P52 L14 (A.Ex. F).) Indeed, Ms. Swanson testified that she "felt that Mr. Pennacchio was being vindictive and Texaco was having a great enhanced

program and that he was trying to exclude FAMM from that enhanced package." (Swanson Depo. P55 L19-22 (A.Ex. H).)

Shortly after the merger was announced, plaintiffs became aware that their positions were being moved from White Plains, New York to Houston, Texas. (Katz Depo. P18 L2-3 (A.Ex. K).) Although offered positions in Houston, Texas, plaintiffs decided not to relocate. (Katz Depo. P18 L4-7 (A.Ex. K).) About this same time, plaintiffs became aware that the Separation Pay Plan of Texaco existed and that employees of FAMM were participants under that plan. (Katz Depo. P19 L18-23 (A.Ex. K); Raftery Depo. P19 L23 – P20 L2 (A.Ex. L).) It was understood that under this plan, employees would receive one month of separation pay for each year of service up to a maximum of 24 months. (Katz Depo. P20 L19-25 (A.Ex. K).) Plaintiffs also became aware that there was an enhancement made to the Separation Pay Plan. (Katz Depo. P21 L20-22 (A.Ex. K).) The Plan was amended in 1998 to enhance the change-of-control benefits under the Plan for those employees in "our management group" which, for *Texaco employees*, was defined as position grade 20 and above. (A.Ex. E at Texaco 0100.) No such limitation to the term "management group" was provided for FAMM employees. (A.Ex. E at Texaco 0100.)

Accordingly, as part of FAMM's management group, plaintiffs were of the understanding that that they would receive all three of the benefits set forth in the Pennacchio memo (A.Ex. E at Texaco 0100).[7] Mr. Katz testified that: "The enhancement under The Separation Pay Plan was for the Texaco management group. FAMM was a separate company participating in The Separation Pay Plan, and as a member of FAMM's management group that received every FAMM executive perk, I had no reason to believe that I wouldn't receive this executive perk for FAMM's management group." (Katz Depo. P30 L8-15 (A.Ex. K).) Indeed, defendants have never asserted, despite its failure to initially include FAMM employees as stated above, that the enhanced separation pay

---

[7] They, in fact, received two of the three benefits listed therein; the two being the immediate vesting of all stock and the immediate vesting of their deferred compensation.

benefits were not available to FAMM employees. Accordingly, plaintiffs raised the issue of their entitlement to the enhanced severance with FAMM's CFO, Peter Meade, who then raised the issue with Michelle Swanson, the director of FAMM's Human Resources. The issue was then reviewed by Michelle Swanson with Texaco's executive compensation board who advised her that plaintiffs would not be afforded the enhanced severance. (Katz Depo. P32 L10-19 (A.Ex. K).) It was soon revealed that Texaco's reason for denying the enhanced severance was solely because plaintiffs did not hold a Texaco position grade 20. (Katz Depo. P34 L7-13 (A.Ex. K).) Indeed, Michelle Swanson testified that Texaco's position was that plaintiffs had to have a position grade of 20 or above to be eligible for enhanced benefits, and Texaco let FAMM know in no uncertain terms that this was their position. (Swanson Depo. P78 L13-23 (A.Ex. H).) Moreover, after discussions with Texaco, Ms. Swanson stated that Texaco performed no analysis to determine plaintiffs' entitlement to enhanced severance; they just drew the line at position grade 20 and that was it. (Swanson Depo. P81 L4-8 (A.Ex. H).)

One initial step plaintiffs took in an attempt to receive the enhanced severance was simply to seek being promoted to FAMM position grade 20s, believing that this would simply do away with the problem. Mr. Michael Bandy, the President and CEO of FAMM, was in favor of ensuring that plaintiffs received the enhanced severance, and he brought the issue of promoting plaintiffs to the FAMM Board of Directors. (Katz Depo. P37 L16-24 (A.Ex. K).) However, no formal proposal was ever presented, and the FAMM Board of Directors never voted on whether to promote plaintiffs to a position grade 20. (Swanson Depo. P75 L25 -- P76 L5; A.Ex. X.)[8]

---

[8] Interestingly, in order to promote plaintiffs, their superior, Peter Meade who had been a position grade 20 for over a decade, would have to be promoted to a position grade 21. (Swanson Depo. P72 L6-25 (A.Ex. H).) Unlike plaintiffs, the promotions of Mr. Meade and another FAMM employee, Eric Reider, were formally put before the Board, voted on and affirmed. Because Mr. Meade and Mr. Reider had already maxed out in terms of their severance payouts, their promotions would not affect Texaco's bottom line in terms of severance payments. (Meade Depo. P63 L21-25 (A.Ex. F).) Indeed, Mr. Scott Jeffrey, a Texaco employee and member of the FAMM Board of Directors

### 6.    PLAINTIFFS' INITIAL CLAIM TO BENEFITS CENTER CHANGE OF CONTROL COMMITTEE.

Ultimately, plaintiffs submitted a claim to the Benefits Center Change of Control Claims Committee.[9] Plaintiffs' submittal comprised of a letter outlining their position, together with "point sheet." (A.Ex. E at Texaco 0030-31.) In response to their submittal, plaintiffs each received a one page letter from the Benefits Change of Control Claims Committee dated April 22, 2002, stating in one sentence the reason for denying the enhanced benefits, *to wit:* "The Claims Committee has determined that your status as a position grade 19 makes you ineligible for the enhanced benefits available for position grade 20 individuals." No further reasoning was provided, despite the information provided to the Committee in the original submittal regarding an inequality in the position grading schemes of Texaco and FAMM. (A.Ex. E at Texaco 0033.)

Moreover, through the testimony of members of the Committee, it is clear that no analysis of whether the position grading of FAMM was equivalent to that of Texaco was undertaken. Indeed, John Goldsby, the Chairman of the Benefits Center Change of Control Claims Committee, testified that plaintiffs' claims were rejected because "The committee's position was that they were in Position Grade 19 and felt that the plan was clear that you had to be in Position Grade 20. (Deposition of John W. Goldsby taken April 2, 2004 (hereinafter "Goldsby Depo.") P27 L14-16 and P36 L4-10 (A.Ex. Y).) In fact, the plan documents make no such distinction (see A.Ex. A) and, at best, the eligibility criteria set forth in the Pennacchio letter is ambiguous, as it does not refer to FAMM employees, nor, as stated above, was it originally distributed to them. (A.Ex. E at Texaco 0100; Meade Depo. P51 L13 -- P52 L14 (A.Ex. F).)

---

testified that the Board was aware of the fact that there would be financial ramifications in the form of enhanced severance payments should plaintiffs be promoted. (Jeffrey Depo. P28 L12-23 (A.Ex. S); Meade Depo. P63 L21-25 (A.Ex. F).)

[9] The Benefits Center Change of Control Claims Committee consisted soley of the following Texaco and former Texaco employees:  John Goldsby as chairman, Carolyn Sellers, Glenn Phillips, Kwame

Similarly, Ms. Carolyn Sellers, another member of the Benefits Center Change of Control Claims Committee, recalls that plaintiffs were not eligible for additional change of control benefits because they were pay grade 19s and that was the main determining factor for her and the consensus of the committee. (Sellers Depo. PP31-33 (A.Ex. M).) Moreover, she only recalls reviewing the submittal letter presented by plaintiffs. She has no recollection of even reviewing the "point sheet" attached thereto or any other documents in connection with analyzing plaintiffs' claims. (Sellers Depo. P27 L24 -- P28 L9).) Similarly, Mr. Goldsby only recalls reviewing plaintiffs' letter requesting benefits, a copy of the Separation Pay Plan (A.Ex. A) and possibly a copy of the Pennacchio letter (A.Ex. E at Texaco 0100). (Goldsby Depo. P14 L7 -- P16 L3 (A.Ex. Y).) Mr. Goldsby admits that he never personally investigated plaintiffs' claims (Goldsby Depo. P19 L23-25 (A.Ex. Y)) nor did he have any discussions with any FAMM employees with regard to plaintiffs' claims. (Goldsby Depo. P40 L5-7 (A.Ex. Y).) As Chairman of the Committee, Mr. Goldsby does not recall looking at any documents in making a determination that a FAMM position grade 19 was the same as a Texaco position grade 19. Moreover, neither Mr. Goldsby nor Ms. Sellers can recall if John Burgess, an investigator allegedly employed by the committee on occasion, conducted an investigation in connection with plaintiffs and, if he did, what he did or said on the issue. (Goldsby Depo. P20 L7-13 and P31 L3-11 (A.Ex. Y); Sellers Depo. P32 L9-23 (A.Ex. M).) It is also interesting to note that there is no mention of Mr. Burgess anywhere in the administrative file, there are no notes or minutes from any investigation he conducted, and he never contacted plaintiffs to discuss their claims, nor are plaintiffs aware of Mr. Burgess contacting any other FAMM employee as part of any "investigation." (A.Ex. E.)

Moreover, at the time Mr. Goldsby voted in favor of denying the enhanced benefits, he was of the understanding that the issue of plaintiffs' promotion had formally been considered and denied

---

Satchell, Rebecca Roberts, Richard Loving, Ron Boilla, Linda Ryan (who resigned from committee). (Goldsby Depo. P9 L4-23 (A.Ex. Y).)

by the FAMM Board of Directors. (Goldsby Depo. P35 L10-12 (A.Ex. Y).) It has been demonstrated that such was not the case. (A.Ex. X); Swanson Depo. P76 L3-5 (A.Ex. H); Jeffrey Depo. P20 L24 -- P21 L2 and P24 L20-23 (A.Ex. S).)

**7.    *PLAINTIFFS' APPEAL TO THE CHANGE OF CONTROL COMMITTEE.***

Upon receiving notice of the denial of benefits by the Benefits Center Change of Control Claims Committee, plaintiffs retained the undersigned firm to aid them in the process of appealing the initial decision to the Change of Control Committee. (Katz Depo. P58 L22 -- P59 L19 (A.Ex. K).)[10] As part of the appeal, plaintiffs submitted a packet of information through their attorney, together with a cover letter dated June 18, 2002. (See A.Ex. E at Texaco 0009-0033.) In response, plaintiffs received a letter dated August 26, 2002 from the Change of Control Committee advising them that "The Committee concurs with the earlier decision by the Claims Committee that as a Position Grade 19 employee, you are not eligible for the enhanced benefits made available to Position Grade 20 employees." (A.Ex. E at Texaco 0095.) Interestingly, this letter is signed "Ron G. Boilla On Behalf of Janet L. Stoner." Mr. Boilla was not a member of the Change of Control Committee, but rather a member of the Benefits Center Change of Control Claims Committee, the Committee that made the initial denial of benefits. (Goldsby Depo. P25 L1-25 (A.Ex. Y).) Accordingly, the degree of "independent" review conducted by this appellate committee is immediately suspect. Moreover, Mr. Patrick Lynch, a member of the Change of Control Committee, testified that after rejecting a claim, the Benefits Center Change of Control Claims Committee would

---

[10] The second tier or appellate committee was identified as the "Change of Control Committee" and the members comprised, Janet Stoner as Chairman, Patrick Lynch, Michael Rudy, John Bethancourt and Rosemary Moore. (Lynch Depo. P9 L6-18 (A.Ex. Z.) The Plan requires that this committee be composed of individuals who held the offices of Senior Vice President of Texaco, Inc., Vice President and Secretary of Texaco, Inc., and the Vice President of the Human Resources Department of Texaco, Inc. at any time during the 12-month period immediately before the change of control. (A.Ex. A at p. 16.) The Change of Control Committee does not comply with this requirement. Indeed, the only individual who ever held one of these positions was Janet Stoner. (Lynch Depo. P24

"brief" his committee as to the rationale employed in rejecting the claim. (Deposition of Patrick J. Lynch taken April 28, 2004 (hereinafter "Lynch Depo.") P14 L17-21 (A.Ex. Z); Goldsby Depo. P25 L1-16 (A.Ex. Y).)

It also appears from testimony that the decision to affirm the ruling of the Benefits Center Change of Control Claims Committee and again deny plaintiffs' claims had been made well before the Change of Control Committee ever met. For example, despite the fact that he was not on any of the claims committees, in April 2002 Tom Lynch, head of executive compensation for Texaco, informed Michael Bandy that plaintiffs' claims were a "slam dunk" for Texaco. In fact, Pat Lynch, Tom Lynch's brother, was on the Change of Control Committee (the appellate committee), and that Committee had not yet reviewed plaintiffs' claims. (Bandy Depo. P44 L5 -- P45 L10 (A.Ex. G); A.Ex. AA.)

Indeed, as Patrick Lynch has virtually no memory whatsoever of reviewing any documents in connection with plaintiffs' claims, or what if any discussions he had with the Committee or anyone else regarding plaintiffs' claims, it raises the question of whether there was ever a full and fair review by the Change of Control Committee. (Lynch Depo. P20 L10 -- P21 L23 (A.Ex. Z).)[11]

---

L12 – P26 L10 (A.Ex. Z).) Accordingly, it is respectfully submitted that the Change of Control Committee never had authority as it existed at the time to make a determination on plaintiffs' claims.
[11] Mr. Lynch testified as follows:
Q: Do you know what documents the change of control committee considered vis-à-vis the claims of Mr. Raftery and Mr. Katz?
A: Not specifically, no.
Q: Do you recall whether any documents were specifically looked at by the committee?
A: No, I do not.
Q: Do you know whether you, yourself, looked at any documents in deciding the claim of Mr. Katz and Mr. Raftery?
A: No, I do not.
Q: So you have no recollection at all?
A: No.
….
Q: Do you recall any discussions with any members of the change of control committee about Mr. Katz and Mr. Raftery's claims?
A: No.

Moreover, Mr. Lynch confirmed that the Committee kept no recordings, minutes or notes of its meetings. (Lynch Depo. P15 L6-13 (A.Ex. Z).)

More disturbing, however, is the fact that incident to the appeal to the Change of Control Committee, Ron Boilla, Chairman of the initial committee that denied plaintiffs' claims, simply forwarded his complete file to Kwame Satchell, Esq., Texaco's General Counsel. Although Mr. Satchell was a member of that initial committee, Mr. Boilla's note indicates that this is for Mr. Satchell's "further handling." (A.Ex. E at Texaco 0007-0033.) Mr. Satchell then forwarded the file on to Alan Preston in Texaco Human Resources Department and to Richard Remley and William G. Duck, two senior members of ChevronTexaco's legal department. (A.Ex. E at Texaco 0007-0033.)[12] This was nearly two months prior to any decision by the Change of Control Committee. It becomes clear that Texaco was gearing up for impending litigation, as it knew at that time, two months before a decision by Boilla, ostensibly on behalf of the Change of Control Committee, that plaintiffs' claims would ultimately be denied.

Ignorant of their predetermined fate, plaintiffs attempted to contact members of the Change of Control Committee to support their case, however, they were substantially ignored. Moreover, no one from the Committee ever *initiated* contact with the plaintiffs, nor with any other employee of FAMM to discuss plaintiffs' eligibility for the enhanced severance. (Katz Depo. PP61-64 (A.Ex. K); Goldsby Depo. P40 L5-7 (A.Ex. :Y).) Indeed, no committee members ever contacted Michelle Swanson concerning her view or opinions as to whether plaintiffs were entitled to enhanced severance. (Swanson Depo. P87 L1 -- P89 L21 (A.Ex. H).) Nor did any committee members ever contact Michael Bandy concerning his view or opinions as to whether plaintiffs were entitled to

---

(Lynch Depo. P20 L10 -- P21 L23 (A.Ex. Z).) Moreover, he has no recollection of ever reviewing plaintiffs' letter submission or the June 18, 2002 letter from plaintiffs' attorney. (Lynch Depo. PP21-22 (A.Ex. Z).)

[12] Indeed, in an internet search conducted by counsel, Richard Remley was identified as "Senior Counsel" for ChevronTexaco and William G. Duck was identified as "top litigation attorney" for ChevronTexaco.

enhanced severance. (Bandy Depo. P49 L12-14 (A.Ex. G).) Similarly, no one identifying themselves as from a claims committee ever spoke to Mr. Meade about Mr. Katz or Mr. Raftery, despite the fact that he was their direct supervisor. (Meade Depo. P78 L10-6 (A.Ex. F).) Had any of the committee members made contact with Mr. Bandy, who was the CEO and President of FAMM, Mr. Meade, who was the VP and CFO of FAMM, or Michelle Swanson, who was the head of Human Resources and Executive Compensation at FAMM, they would have been told that each of these individuals believed that plaintiffs were key members of FAMM's management team, were performing work equivalent to that of a Texaco position grade 20 or above, and should have been afforded the enhanced benefits at issue here. (Meade Depo. P67 L15-17 and P68 L12-14 (A.Ex. F); Swanson Depo. P75 L9-11 (A.Ex. H).)

## 8.    *REIMBURSEMENT OF PLAINTIFFS' LEGAL EXPENSES.*

After exhausting all of their administrative remedies, plaintiffs initiated the present federal litigation. On October 21, 2002, plaintiffs sent a letter to the Change of Control Committee requesting reimbursement of legal fees at that time totaling $1,846.67 pursuant to Texaco's Change of Control provision of The Separation Pay Plan. (A.Ex. BB.) In a letter dated November 6, 2002, the "Change of Control Claims Committee" (sic) refused to reimburse plaintiffs for their expenses, despite the clear requirement of The Separation Pay Plan. (A.Ex. E at Texaco 0085.) Again this letter is signed by Mr. Boilla who was not a member of that Committee. Furthermore, Mr. Patrick Lynch, who was a member of the Change of Control Committee, testified that he had "no recollection of dealing with legal fees at *any* of the committee meetings." (Lynch Depo. P34 L23 -- P35 L3 (A.Ex. Z) (emphasis added).)

Defendants now attempt to justify their continued refusal to reimburse plaintiffs as required by the terms of the Plan by seeking a ruling by this Court that plaintiffs' claims are frivolous. In view of the facts set forth above and the law herein, it is clear that plaintiffs' claims are not frivolous and regardless of the ultimate determination on their claims (on which plaintiffs fervently believe

they will be successful), plaintiffs are entitled to have their legal fees reimbursed pursuant to The Separation Pay Plan of Texaco.

## *ARGUMENT*

### I.      *STANDARD OF REVIEW FOR SUMMARY JUDGMENT.*

A motion for summary judgment will be granted if the court determines that the case presents no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It is the substantive law governing the case that identifies those facts which are material on motions for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether there is a genuine issue of material fact, the court is required to resolve ambiguities and draw factual inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255.

Rule 56(c) "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. A "genuine" dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. Id.

The movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied. Once that burden has been established, the burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. Anderson, 477 U.S. at 250; Fed. R. Civ. P. 56(e). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. Id. at 249. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986); <u>Dister v. Continental Group, Inc.</u>, 859 F.2d 1108 (2d Cir. 1988); <u>Sunderlin v. First Reliance Standard Life Ins. Co.</u>, 235 F.Supp.2d 222 (W.D.N.Y. 2002).

As set forth below, there are no material issues of fact surrounding the issue of whether plaintiffs' claims are frivolous. The undisputed facts reveal that plaintiffs' claims are not frivolous, and summary judgment should be granted in plaintiffs' favor on defendants' counterclaim.

## II.    _STANDARD USED TO DETERMINE FRIVOLOUSNESS._

Pursuant to the provisions of the Separation Pay Plan of Texaco, defendants are obligated to reimburse plaintiffs for any and all reasonable attorneys fees expended in securing their rights, so long as their claims are not deemed frivolous by a court of law. The plan specifically provides:

> "Reimbursement of all reasonable attorney's fees, costs and other expenses incurred by you in enforcing your rights under this plan, unless a court of competent jurisdiction determines that your cause of action is frivolous."

(<u>See</u> A.Ex. A p. 19.) Accordingly, in an attempt to justify their repeated refusal to reimburse plaintiffs for their legal expenses, defendants, in their only counterclaim, seek a declaratory ruling by this Court that plaintiffs' claims are frivolous.

Although, no definition of "frivolous" is provided in the Plan documents, in analyzing the standards employed under Federal Rule of Civil Procedure 11, it is clear that the claims asserted by the plaintiffs in the present action do not rise to the standards set forth therein. Indeed, it is the exceptional case that is deemed frivolous by a court of law and the undisputed facts of this case do not lead to such a determination.

The general standard used to determine whether a claim is frivolous is found in the Federal Rules of Civil Procedure. Applying a test of objective reasonableness, the courts will hold a claim frivolous where it is clear that: (1) a reasonable inquiry into the basis for a pleading has not been made; (2) under existing precedents there is no chance of success; and (3) no reasonable argument has been advanced to extend, modify or reverse the law as it stands. Cross & Cross Properties, Ltd., v. Everett Allied Co., 886 F.2d 497, 504 (2d Cir. 1989).

The standard set forth in Federal Rule of Civil Procedure 11 for determining whether an action is frivolous is the standard that is generally applied in ERISA cases as well. See Shofer v. Stuart Hack Co., 753 F.Supp. 587, aff'd, 970 F.2d 1316 (4th Cir. 1992); see also Tolson v. Avondale Industries, Inc., 141 F.3d 604 (5th Cir. 1998). Rule 11 applies only if it is patently clear that a claim has absolutely no chance of success. K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co., 61 F.3d 123, 131 (2d Cir. 1995). Defendant must show that plaintiff's action in instituting the action was "so completely without merit ... that [the action] must have been undertaken for some improper purpose ...." Salovaara v. Eckert, 222 F.3d 19, 35 (2d Cir. 2000).

Indeed, in a case involving ERISA issues, the Rule 11 standard for which a cause of action may be deemed frivolous was distinctly higher. "Something is frivolous only when (a) we've decided the very point, and recently, against the person reasserting it, or (b) 99 of 100 practicing lawyers would be 99 percent sure that the position is untenable, and the other 1 percent would be 60 percent sure its untenable. Either one is a pretty stiff test." Smith v. Blue Cross & Blue Shield United of Wisconsin, 724 F.Supp. 618, 623, aff'd, 959 F.2d 655 (7th Cir. 1992).

The case law supports the strict standard set forth above. As can be seen from the cases below, courts are hesitant to deem actions frivolous, even when they are teetering right on the edge.

In Shofer v. Stuart Hack Co., 753 F.Supp. 587 (D.Md. 1991), plaintiff's action pursuant to ERISA §1132(a)(1)(B), although barred by the ERISA statute of limitations, was not held frivolous pursuant to the Federal Rules of Civil Procedure Rule 11. The plaintiff's attorney, while conceding

that his cause of action was time barred by the ERISA statute of limitations, brought his claim relying on what the court found to be the sole, yet inapplicable, reported case dealing with tolling limitations under ERISA. The court explained that an *arguable basis* for an attorney to attempt a tolling argument, given the relied-upon case, was justified regardless of whether or not that argument ultimately succeeded. The court therefore held that plaintiff's case was not frivolous and refused to impose sanctions pursuant to Federal Rule of Civil Procedure Rule 11.

Similarly, in County, Mun. Employees' Supervisors and Foreman's Union Local No. 1001v. Laborers' Pension Fund, 240 F.Supp.2d 827 (N.D. Ill. 2003), the court held that the imposition of Rule 11 sanctions on the plaintiff union was not warranted, despite plaintiff's clear abandonment of set precedent. The court found that plaintiff had "cobbled together [an argument] that passes the straight-face test, though barely." Accordingly, the court there held that although plaintiff's counsel ultimately lost the action "they were able to assemble some snippets of authority that enabled [the] Union's position to pass muster as nonfrivolous." Id. Accordingly, although the plaintiff union blatantly ignored ERISA's definition of "participant" and flagrantly ignored set precedent, the court still did not deem the action frivolous and refused to levy sanctions.

Additionally, in Skretvedt v. E.I. Dupont de Nemours and Co., 2000 WL 33341051 (D. Del. 2000) (attached hereto as Exhibit CC), the defendants requested sanctions under Rule 11 for what they charged was a baseless theory for reconsideration. Although the court held that the plaintiff did not provide an appropriate evidentiary basis in support of his motion and described his argument as "specious sophistry," the court, in denying defendants' request for sanctions under Rule 11, did not hold that plaintiff's motion was without meritorious intent, instead asserting that it is only the "exceptional circumstance" that an action is deemed frivolous.

Accordingly, the burden necessary to prove that an action is "frivolous" is extremely high. As set forth below, the undisputed facts reveal that plaintiffs' claims have merit and are certainly not frivolous. Accordingly, as there are no material questions of fact which need to be determined by a

fact finder in order to arrive at this conclusion, summary judgment should be granted for plaintiff on defendants' counterclaim.

### III.    *STANDARDS OF REVIEW APPLIED IN ERISA CASES.*

In order to determine whether plaintiffs' claims are frivolous pursuant to the standards set forth above, it is necessary to analyze how the Court will review defendants' decision to deny plaintiffs the benefits they sought pursuant to the Separation Pay Plan of Texaco.

> The Supreme Court has held that "a denial of benefits under [ERISA] § 1132(a)(1)(B) must be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." . Firestone Tire Rubber Co. v. Bruch, 489 U.S. 101 (1989); see also Masella v. Blue Cross & Blue Shield of Conn., Inc., 936 F.2d 98, 102 (2d Cir.1991); O'Sullivan v. Prudential Ins. Co., 2001 WL 727033 (S.D.N.Y. June 28, 2001). Where a written plan confers upon an administrator the discretionary authority to determine eligibility, a court must view its decisions with a "strong measure of deference" and may reverse only if the administrator's ultimate conclusions are "arbitrary and capricious." Pagan v. NYNEX Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995).

Armstrong v. Liberty Mut. Life Assur. Co. of Boston, 273 F.Supp.2d 395 (S.D.N.Y. 2003).

In the present case, the plan documents do confer discretion upon the plan administration. (A.Ex. A.) That, however, is not the end to this line of inquiry. Although where discretionary authority is afforded a plan administrator denial of plan benefits is generally reviewed under an "arbitrary and capricious" standard of review, there are exceptions. See, e.g., Pulvers v. First Unum Life Ins. Co., 210 F.3d 89, 92 (2d Cir. 2000); I.V. Services of America, Inc. v. Trustees of American Consulting Engineers Council Ins. Trust Fund, 136 F.3d 114 (2d Cir. 1998). The exceptions arise where (1) the eligibility criteria of a plan is ambiguous; or (2) a plan administrator is acting under a conflict of interest, and has in fact been influenced by the conflict of interest. Pulvers, supra, 210 F.3d 89, 92 (2d Cir. 2000); I.V. Services of America, Inc., supra, 136 F.3d 114 (2d Cir. 1998). In such cases, de novo review is appropriate. Id.; see also Wagner v. First Unum Life Ins. Co., 2003 WL 21960997 (SDNY 2003) (App. Ex. DD); Sullivan v. LTV Aerospace and Defense Co., 82 F.3d

1251, 1255-56 (2d Cir. 1996); <u>Bergquist v. Aetna U.S. Healthcare</u>, 289 F.Supp.2d 400 (S.D.N.Y. 2003).

    **A.**    ***De Novo Review Is The Appropriate Standard Of Review.***

        **1.**    ***Eligibility criteria is ambiguous mandating de novo review.***

Courts grant de novo review even where discretion was clearly and expressly reserved, if the eligibility criteria or coverage clauses are ambiguous. <u>I.V. Services of America, Inc.</u>, <u>supra</u>, 136 F.3d 114 (2d Cir. 1998). The court in <u>I.V. Services of America</u> held that the ambiguity in that plan's language made it susceptible to two or more reasonable interpretations and therefore the denial should have been reviewed de novo and not under the arbitrary and capricious standard. <u>Id.</u> at 120.

There is no question in the present case that the eligibility criteria for receiving the enhanced change of control benefits is ambiguous. As an initial matter, the Plan document itself does not include any provisions for the enhanced benefits or who is or is not eligible to receive such enhanced benefits. (<u>See</u> A.Ex. A.) The amendment to the Plan was announced to *Texaco* employees holding a position grade 20 or above via a Texaco memorandum dated June 2, 1999 from Stephen Pennacchio. (<u>See</u> A.Ex. E at Texaco 0100.) In that memorandum, it states that "the purpose of this letter is to provide you with information regarding … an enhancement to the Plan for members of *our* management group (position grade 20 and above)." (A.Ex. E at Texaco 0100 (emphasis added).)

In view of the fact that the position grading systems of FAMM and Texaco were not analogous (<u>see</u> Section 4 of the Statement of Facts, above), and in view of the fact that it is undisputed that plaintiffs were both key members of FAMM's management group, plaintiffs assert that they were indeed eligible for the enhanced benefits. (Bandy Depo. P17 L7-12 (A.Ex. G): FAMM's President and C.E.O., Michael Bandy, identified both Mr. Katz and Mr. Raftery as a "key member[s] of FAMM's management team".)

Accordingly, at best, the criteria set forth in Mr. Pennacchio's letter is ambiguous as it pertains to FAMM employees and it is clearly susceptible to more than one reasonable interpretation.

One logical and clear interpretation is that the enhanced benefits are available to members of FAMM's "management group" of which there is no dispute plaintiffs were a part. Moreover, such an interpretation is compelling considering that when reviewing the eligibility requirements of an ERISA plan, any ambiguity in the plan's language must be construed against the defendants. Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 251-52 (2d Cir. 1999).

In view of the foregoing, applying a de novo standard of review of defendants' denial of benefits is, therefore, appropriate in the present case. Ambiguity in the eligibility requirements, however, is not the only factor leading to a de novo review. If it is found that the administrator of the Plan had a conflict of interest, de novo review is also appropriate.

**2.    *The plan administrator had a conflict of interest that influenced the denial of benefits mandating de novo review.***

**(a)    *A conflict of interest exits.***

A conflict of interest may be found where there is an unfunded plan and the administrator is an employee of the sponsoring company. Firestone Tire Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed. 2d 80 (1989). In such situations, the administrator has conflicting fiduciary duties to the plan sponsor, his employer, and the participants as plan beneficiaries. Sullivan v. LTV Aerospace and Defense Co., 82 F.3d 1251, 1255-56 (2d Cir. 1996); Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995).

There is no question that the plan at issue is an unfunded welfare plan. Indeed, The Separation Pay Plan of Texaco specifically provides that the plan is an "unfunded welfare plan," that the Plan Sponsor is Texaco, Inc., and that benefits are paid from the company's general assets. (A.Ex. A at p. 25; Requests for Admission Nos. 1-4 and Answers thereto (A.Ex. B).) Upon a finding of such a conflict, many courts automatically invoke a de novo review. Indeed, other circuits have held that once evidence of a financial conflict is presented, even if the plan administrator has discretion under the plan, the standard of review, instead of being simply arbitrary and capricious,

becomes a sliding scale of deference. <u>See</u>, <u>e.g.</u>, <u>Brown v. Blue Cross and Blue Shield of Alabama, Inc.</u>, 898 F.2d 1556 (11th Cir. 1990). The Second Circuit appears, however, to require plaintiff to bear the additional burden of showing that the conflict actually influenced the denial of benefits. <u>Sullivan</u>, <u>supra</u>, 82 F.3d 1251, 1255-56 (2d Cir. 1996).[13] Although plaintiffs respectfully submit that uncontested evidence of a conflict should automatically mandate a de novo review by the court, there is sufficient evidence to show that the conflict actually influenced the administrator's decision. <u>Id.</u>; <u>Pagan</u>, <u>supra</u>, 52 F.3d 438, 442 (2d Cir. 1995). Accordingly, a de novo review remains the appropriate standard for the court to employ. <u>See also</u> <u>Locher v. Unum Life Ins. Co. of America</u>, 126 F.Supp.2d 769, 773 (S.D.N.Y. 2001); <u>Keiser v. CDC Inv. Management Corp.</u>, 160 F.Supp.2d 512, 518 (S.D.N.Y. 2001).

### (b)    *The conflict actually influenced the denial of benefits.*

It is difficult to imagine a set of facts which more aptly supports the conclusion that the conflict of interest present in this case actually influenced the administrator's denial of benefits to the plaintiffs. The evidence as set forth in Section 3 of the Statement of Facts, above, reveals that there was animosity and hostility aimed at FAMM by Texaco from FAMM's inception and that this hostility focused primarily on issues of compensation and benefits.

In terms of plaintiffs' particularly, the evidence of the financial self-dealing reared its head during the FAMM Board of Directors meeting and influenced the discussions concerning the issue of promoting plaintiffs to FAMM position grade 20s. Mr. Scott Jeffrey, a Texaco employee on the FAMM Board of Directors, testified that the Board (which was comprised of two Texaco employees, two Chevron employees and one non-voting FAMM employee (Meade Depo. P62 L21 -- P63 L9

---

[13] Interestingly, in <u>DeFelice v. American Intern. Life Assur. Co. of New York</u>, 112 F.3d 61 (2d Cir. 1997), the Second Circuit opined that although it was bound by <u>Sullivan v. LTV Aerospace and Defense Co.</u>, 82 F.3d 1251, 1255-56 (2d Cir. 1996), it preferred the reasoning set forth in <u>Brown</u>, which shifted the burden to the fiduciary to show that it was not tainted by self-interest.

(A.Ex. F)) recognized that should plaintiffs be successful in their attempt to be promoted to FAMM position grades 20, there would be financial ramifications in the form of enhanced severance payments. (Jeffrey Depo. P28 L12-23 (A.Ex. S).) Solidifying that Texaco was influenced by its financial self-interests is the fact that Mr. Peter Meade and Mr. Eric Reider, two other FAMM employees, were being considered for promotions at the same time as plaintiffs. Unlike plaintiffs, these promotions were formally put before the Board, voted on and affirmed. Interestingly, as Mr. Meade and Mr. Reider had already maxed-out in terms of their severance payouts, their promotions would not affect Texaco's bottom line in terms of severance payments. (Meade Depo. P63 L21-25 (A.Ex. F); Swanson Depo. P73 L1-10 (A.Ex. H).) This was not so for Mr. Katz and Mr. Raftery. Indeed, Mr. Meade, VP and CFO of FAMM, testified that he believed it was a "strong possibility" that the cost that ChevronTexaco might pay in additional benefits to plaintiffs was a factor in the Board's consideration of their promotions. (Meade Depo. P94 L24 -- P96 L1 (A.Ex. F).)

Such conduct reveals that Texaco was protecting its own employees at the expense of FAMM employees. As a fiduciary, Texaco was obligated to administer The Separation Pay Plan of Texaco fairly and equitably to all participants. ERISA defines a fiduciary as one who "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. 1002(21)(A)(i). A fiduciary has "authority to control and manage the operation and administration of the plan," §1102(a)(1), and must provide a "full and fair review" of claim denials, 29 U.S.C. §1133(2). Firestone Tire Rubber Co., supra, 489 U.S. 101, 113 (1989). As a fiduciary, the fact that benefits will be paid from the company's general assets should not come into play, and if it does, the decision is tainted. Cleary, here the financial well-being of Texaco was a major, if not primary, concern in both Committees' interpretation of The Separation Pay Plan. Indeed, in May 2002, after the decision by the Benefits Center Change of Control Claims Committee denied plaintiffs' claims, but before plaintiffs filed their appeal to the Change of Control Committee, there is an e-mail exchange (which

is sent to multiple members of *both* Committees) that advises everyone to be "***careful how you handle this one as you could set a precedent for others....***" (A.Ex. E at Texaco 0034-0036 (emphasis added).)[14]

Moreover, the self-dealing nature of Texaco is evident when considering that Texaco exclusively provided approximately twenty of its officers with an additional severance deal, above and beyond that contained in The Separation Pay Plan of Texaco or the Pennacchio letter (A.Ex. E at Texaco 0100). (Goldsby Depo. P16 L4-7; A.Ex. EE.) No such deals were provided for officers of FAMM.

This self-interest is also present throughout the claims process that took place before the Benefits Center Change of Control Claims Committee and the Change of Control Committee. Indeed, it appears questionable that any meaningful investigation of plaintiffs' claims took place at either level of review. There appear to be no notes or minutes of any Committee meeting regarding plaintiffs' claims (Goldsby Depo. P22 L3-6 (A.Ex. Y); Sellers Depo. P24 L2-9 (A.Ex. M)) and the deposition testimony of Committee members reveals that no one can quite remember what, if anything, the Committees did to review plaintiffs' claims. (Goldsby Depo. P14 L7 -- P16 L3, P20 L7-13, and P31 L3-11 (A.Ex. Y); Sellers Depo. P27 L24 -- P28 L9 and P32 L9-23 (A.Ex. M).) Moreover, and most disturbing, is the fact that after the initial denial of benefits, but ***before*** any review by the Change of Control Committee took place, defendants involved senior members of Texaco's legal department, including one attorney recently identified as ChevronTexaco's "top litigation attorney." (See footnote 15.) This type of action indicates that defendants knew well before the Change of Control Committee ever met that plaintiffs' claims would again be denied and that

---

[14] Appendix Exhibit E at Texaco 0034-0036 again erroneously indicates that plaintiffs were actually considered and rejected for promotion to a FAMM position grade 20. Mr. Jeffrey's testimony and FAMM's Board of Directors Minutes establish that no such proposal was ever put before the Board and no action was taken. Accordingly, the representation in this e-mail that the FAMM board did not "approve" plaintiffs' promotions is simply not accurate.

litigation was likely to ensue. Accordingly, it appears there was no "full and fair review" as required by 29 U.S.C. §1133(2).

In view of the foregoing, it is clear that a conflict of interest existed and that conflict actually influenced the defendants' decision to deny plaintiffs the benefits they sought. Accordingly, the court should apply a de novo standard of review in this case. As set forth below, when applying such a standard, it becomes clear that plaintiffs' claims are not frivolous.

### c.    The Court is not limited to the evidence in the administrative record.

Even if the Court finds that plaintiffs have not established that the conflict of interest actually influenced the denial of benefits (which plaintiffs believe they have), merely establishing that a conflict of interest exists opens the door allowing the Court to consider evidence outside that contained in the administrative record. DeFelice v. American Intern. Life Assur. Co. of New York, 112 F.3d 61, 66 n.3 (2d Cir. 1997). In fact, the court in DeFelice held:

> The policy … that district courts should not become 'substitute plan administrators' is inappropriate where such a blatant conflict exists at the administrative level.  In such circumstances, courts *must* exercise fully their power to review de novo and be substitute administrators.  Plaintiffs are utterly helpless against the whim of the conflicted body's interpretation of the facts.  The normal scope of limited "de novo" review is inappropriate where the fairness of the ERISA appeals process cannot be established using only the record before the administrator.
> …
> In this situation, the district court may assume an active role in order to ensure a comprehensive and impartial review of the case.

Id. at 66 (emphasis in original).

In view of the foregoing, it is clear that a de novo review is the appropriate standard to apply not only because the eligibility requirement of the Separation Pay Plan of Texaco is ambiguous, but because a clear conflict of interest has been established and that conflict influenced the denial of plaintiffs' claims.

### B.    In The Alternative, The Court Applies An "Arbitrary and Capricious" Standard of Review.

In reviewing the claims administrator's decision under the arbitrary and capricious standard of review, the court must grant significant deference to the claims administrator's determination. See Schwartz v. Newsweek, Inc., 827 F.2d 879 (2d Cir. 1987). Yet "deference, even great deference, is not the equivalent of no review at all. A fiduciary must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Lister v. Stark, 942 F.2d 1183, 1189 (7th Cir. 1991); Reilly v. Blue Cross and Blue Shield United of Wisconsin, 846 F.2d 416, 420 (7th Cir. 1988); Motor Vehicle Mfrs. Ass'n of U.S., Inc.v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Indeed, an administrator's decision to deny benefits may be overturned if it was, "without reason, unsupported by substantial evidence or erroneous as a matter of law." See, e.g., Kinstler v. First Reliance Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999); Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995). Substantial evidence has been defined by the courts as being such evidence that a "reasonable mind might accept as adequate to support the conclusion reached by the [decision maker and] requires more than a scintilla but less than a preponderance." Miller v. United Welfare Fund, 72 F.3d 1066 (2d Cir. 1995); Billinger v. Bell Atlantic, 240 F.Supp.2d 274 (S.D.N.Y. 2003). A committee's interpretation of an ERISA plan will not pass muster under this reasonableness standard when the evidence of record demonstrates that the committee "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before it." Lister, supra, 942 F.2d 1183, 1189 (7th Cir. 1991). Moreover, if the court finds that the administrator "overlooked something important" when rendering its denial of benefits, the decision may be overturned even under the arbitrary and capricious standard of review. See, e.g., Wahlin v. Sears, Roebuck & Co., 78 F.3d 1232, 1235 (7th Cir. 1996).

Courts in this circuit have denied defendants' motions for summary judgment in which the arbitrary and capricious standard was utilized when there was a dispute as to whether the plaintiff's claim was appropriately investigated prior to the denial of benefits. See Sparkes v. Morrison & Foerster Long-Term Disability Ins. Plan, 129 F.Supp.2d 182, 188 (NDNY 2001) (the court denied a motion for summary judgment holding that there were "significant disputes as to whether or not [plaintiff]'s claim was appropriately investigated by [defendant] prior to [the adverse decision relating to] benefits.").

Moreover, even under the arbitrary and capricious standard of review, the existence of an alleged conflict must become a factor in determining whether the decision by the administrator was arbitrary and capricious. Ullrich v. Linotype-Hell Co., 187 F.Supp.2d 68 (E.D.N.Y. 2002). Indeed, the court "should closely scrutinize an employer's interpretation of a benefit plan when the employer has avoided a large outlay as a result of its decision. Adams v. Avondale Industries, Inc., 905 F.2d 943, cert. denied, 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990).

## IV.   UNDER EITHER A DE NOVO STANDARD OF REVIEW OR AN ARBITRARY AND CAPRICIOUS STANDARD OF REVIEW, PLAINTIFFS' CLAIMS CANNOT BE DEEMED FRIVOLOUS.

### A.   Plaintiffs' Claims Are Not Frivolous When Applying De Novo Review.

A de novo review by the court proceeds as if there had been no review by the administrator and the review begins anew. See Slave Regina College v. Russell, 499 U.S. 225, 238 (1991). Accordingly, when conducting a de novo review, it is necessary for the court to review all of the facts and evidence plaintiffs presented to the plan administrator in order to determine whether or not plaintiffs are entitled to the enhanced severance they sought. However, plaintiffs at this stage are only seeking summary judgment on defendants' counterclaim which seeks a ruling that plaintiffs' claims are frivolous. By conducting a brief overview of the evidence that the court would consider if undertaking a complete de novo review, it becomes clear not only that plaintiffs' claims are not frivolous, but that plaintiffs have a high likelihood of succeeding on the merits of their claims.

There is no question that plaintiffs were participants in the Separation Pay Plan of Texaco. The question has become whether plaintiffs were eligible to receive the enhanced benefits as set forth in the Pennacchio letter of June 2, 1999. (A.Ex. E at Texaco 0100.) That letter was drafted by Texaco, distributed to Texaco employees, and states: "The purpose of this letter is to provide you with information regarding change-of-control provisions of two of the executive compensation plans and an enhancement to the Plan for members of *our* management group (position grade 20 and above.)" (A.Ex. E at Texaco 0100 (emphasis added).) Although appropriate FAMM employees were eligible for the enhanced benefits, this letter was originally not distributed to FAMM employees and set forth no eligibility criteria for FAMM employees. (App. X. E at Texaco 0100; Meade Depo. P51 L13 -- P52 L14 (A.Ex. F).) Accordingly, plaintiffs reasonably interpreted the eligibility criteria to include the "management group" of FAMM, and because FAMM did not define its "management group" in terms of a FAMM position grade 20 or above (Swanson Depo. P61 L19-21 (A.Ex. H)), plaintiffs sought the enhanced benefits.

Without reiterating all of the facts set forth in the Statement of Facts, it is clear that plaintiffs, as FAMM position grade 19s, were considered key members of FAMM's management group and plaintiffs were afforded benefits reserved only for FAMM's key management. (App. Exs. U, V, O and P; Bandy Depo. P18 L4-15 (A.Ex. G); Swanson Depo. P40 L7-12 and PP52-53 (A.Ex. H); Meade Depo. PP43-44 (A.Ex. F).) Indeed, in response to Requests for Admission, defendants readily admit that both plaintiffs were both "officers" of FAMM. (See Requests for Admission Nos. 5 and 6 and Answers thereto (A.Ex. B).)

Moreover, a perfunctory analysis of the benefits afforded to plaintiffs reveals that they were treated equally or better in terms of benefits and total compensation than Texaco employees holding a Texaco position grade 20. (See discussion in Section 4 of the Statement of Facts.) Carolyn Sellers, a Texaco employee and member of the Change of Control Committee, testified that as a Texaco employee, one had to be a Texaco position grade 20 to be eligible for the Cash Bonus Plan. (Sellers

Depo. P13 L16 -- P14 L3 and P20 L8-16 (A.Ex. M); Swanson P39 L6-16 (A.Ex. H).) One also had

to be a Texaco position grade 20 to be eligible for the Supp. 3 and the Long Term Incentive plans if

a Texaco employee. (Sellers Depo. P15 L3-23 (A.Ex. M).) Plaintiffs both received benefits under all

three of these benefit plans, despite holding a FAMM position grade 19. Moreover, Mr. Raftery's

replacement in Houston was afforded the equivalent of a Texaco position grade 20, for a position

entailing less duties and responsibilities. (See discussion in Section 4 of the Statement of Facts.) In

addition, plaintiffs received two of the three benefits set forth in the Pennacchio letter (A.Ex. E at

Texaco 0100.)

Accordingly, while at this stage in the litigation it is not necessary for the Court to undertake

a complete de novo review of plaintiffs' claims and decide the issues, it is clear that plaintiffs'

claims are not frivolous. Plaintiffs, therefore, respectfully request that their motion for summary

judgment be granted on defendants' counterclaim.

### B.    *Plaintiffs' Claims Are Not Frivolous Even When Applying An Arbitrary and Capricious Standard of Review.*

In the present case, even if applying the arbitrary and capricious standard of review, it is clear

that plaintiffs' claims are not frivolous.

#### 1.    *Existence of a conflict of interest to be a factor considered under "arbitrary and capricious" standard of review.*

The existence of a conflicted administrator is a factor to be considered even when analyzing a

denial of benefits under the arbitrary and capricious standard of review. Adams v. Avondale

Industries, Inc., 905 F.2d 943, cert. denied, 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990).

Indeed, a conflict of interest requires the court to closely scrutinize an employer's interpretation of a

benefit plan when the employer has avoided a large outlay as a result of its decision. Id. In the

present case, the enhanced benefits defendants refused to grant to plaintiffs are alleged by plaintiffs

to total over $850,000. (See A.Ex. C.) Accordingly, by denying such benefits, Texaco, as sponsor

and administrator of the Plan, avoided a large financial outlay, and the Court should apply its deference accordingly.

### 2. *Plaintiffs' claims were not properly investigated by either Committee.*

The evidence and deposition testimony elicited during discovery exposes the fact that plaintiffs' claims were simply not properly investigated by either the Benefits Center Change of Control Claims Committee or the Change of Control Committee. (Goldsby Depo. P14 L7 -- P16 L3, P20 L7-13 and P31 L3-11 (A.Ex. Y); Sellers Depo. P27 L24 -- P28 L9 and P32 L9-23 (A.Ex. M); Lynch Depo. P20 L10 -- P21 L23 (A.Ex. Z).) A review of the documents comprising the "administrative record" reveals that there was no meaningful analysis or investigation of plaintiffs' claims. (See A.Ex. E.) Although the "administrative record" as produced by defendants in discovery consists of 133 pages (see Request for Admission No. 18 and Answer thereto (A.Ex. B)), if the documents created *after* the final denial of plaintiffs' claims by the Change of Control Committee are excluded and if duplicates and triplicates are excluded, what is left is truly minimal. Indeed, the only documents comprising the "administrative record" which could have been reviewed by *either* Committee are the following (in the order defendants produced them):

(1) a Memo dated June 24, 2002 from Kwame K. Satchell, Texaco's in-house counsel, to Mr. Alan Preston, Mr. Richard Remley and Mr. William G. Duck[15] enclosing a copy of Ron Boilla file;

(2) a copy the June 18, 2002 letter from plaintiffs' attorney attaching exhibits A – F;

(3) e-mails dated May 29 and May 30, 2002;

(4) hand-written paragraph of Ron Boilla dated April 16, 2002;

(5) the April 22, 2002 letter of denial from the "Change of Control Claims Committee" (sic);

---

[15] As stated above, Richard Remley and William G. Duck are senior members of ChevronTexaco's legal department and Alan Preston is a member of Texaco's Human Resources Department. In fact, through an internet search conducted by counsel, Richard Remley was recently identified as Senior Counsel for ChevronTexaco and William G. Duck was identified as top litigation attorney for ChevronTexaco.

(6) plaintiffs' e-mail of March 27, 2002 enclosing their "Submittal to Claim Committee for Review" and the "FAMM Treasurer/Comptroller Positions Justification for Enhanced Benefits";

(7) an "employee home address inquiry" for Kenneth M. Raftery dated April 16, 2002;

(8) hand-written memo entitled "Executive Change of Control Committee" bates stamped Texaco 0097.

Moreover, in reviewing the eight items listed above, the only possible documents which could have been reviewed by the Benefits Center Change of Control Claims Committee are: (4) - the handwritten note of Ron Boilla dated April 16, 2002; (6) - the original submission by plaintiffs; and (7) - an "employee home address inquiry" presumably printed out in order to send Mr. Raftery his denial letter.

The case law requires that a denial of benefits to be supported by substantial evidence. See, e.g., Kinstler v. First Reliance Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999); Pagan v. NYNEX Pension Plan, 52 F.3d 438, 442 (2d Cir. 1995). Substantial evidence must be such evidence that a "reasonable mind might accept [it] as adequate to support the conclusion reached by the [decision maker and] requires more than a scintilla but less than a preponderance." Miller v. United Welfare Fund, 72 F.3d 1066 (2d Cir. 1995); Billinger v. Bell Atlantic, 240 F.Supp.2d 274 (S.D.N.Y. 2003). There simply is no substantial evidence to support the Committees' decisions denying benefits. The Benefits Center Change of Control Claims Committee simply drew a line in the sand at position grade 20 and the Change of Control Committee "rubber-stamped" the decision. There is absolutely no evidence in the administrative record or otherwise that either Committee ever considered or analyzed *any* of the evidence presented by plaintiffs or their attorney that a FAMM position grade 19 is not the same as a Texaco position grade 19. Indeed, in view of the testimony elicited during depositions and set forth in Sections 6 and 7 of the Statement of Facts, it is questionable that the Change of Control Committee ever actually conducted a full and fair review of this matter as required by law. 29 U.S.C.

§1133(2); <u>Firestone Tire Rubber Co. v. Bruch</u>, 489 U.S. 101, 113 , 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

Even if it could be found that some type of investigation took place (which plaintiffs firmly assert did not)[16], it is clear that both of the Committees failed to consider important evidence submitted by the plaintiffs and this alone should, at the very least, result in a judgment in plaintiffs' favor on defendants' counterclaim and could easily support a finding that defendants' decision to deny benefits was arbitrary and capricious as a matter of law.

> **3.    *Both Committees entirely failed to consider important evidence presented by plaintiffs.***

Despite plaintiffs' submissions, there is no evidence that either Committee considered the issues of (1) whether Texaco's position grading system and FAMM's position grading system were analogous, or (2) whether plaintiffs' responsibilities, duties, compensation and benefits were equivalent to a Texaco employee holding a position grade 20. Incredibly, in response to a Request for Admission, defendants admit: "***No committee, or member thereof, analyzed the duties, responsibilities or compensation of employees holding a FAMM position-grade 19 as compared to employees holding a Texaco position-grade 19 or 20 when making the determination to deny plaintiffs the enhanced benefits they sought under the Plan***." (See Request to Admit No. 20 and Answer thereto (A.Ex. B) (emphasis added).)

The case law is clear that if a committee is found to have failed to consider an important aspect of the problem or overlooked something important, its interpretation of an ERISA plan will not stand even if reviewed under the arbitration and capricious standard. <u>Lister v. Stark</u>, 942 F.2d 1183, 1189 (7th Cir. 1991); <u>Wahlin v. Sears, Roebuck & Co.</u>, 78 F.3d 1232, 1235 (7th Cir. 1996).

---

[16] As set forth above in Section 6 of the Statement of Facts, there is no evidence in the administrative record or otherwise that John Burgess conducted any type of investigation for either Committee on this matter. Indeed, other than testifying that Mr. Burgess is sometimes used by the Committees to

Accordingly, as defendants readily admit that there was no consideration or analysis of the arguments put forth by plaintiffs, not only is it clear that plaintiffs' claims are not frivolous, it is clear that defendants' denial of benefits was arbitrary and capricious as a matter of law.

### *CONCLUSION*

In view of the foregoing, plaintiffs respectfully request that their Motion for Summary Judgment on defendants' counterclaim be granted and defendants be ordered to reimburse plaintiffs for all reasonable legal expenses pursuant to the provisions of The Separation Pay Plan of Texaco.

By_____
    Scott R. Lucas (ct00517)
    Mary Alice S. Canaday (ct17608)
    *Attorneys for Plaintiffs*
    MARTIN, LUCAS & CHIOFFI, LLP
    177 Broad Street
    Stamford, CT 06901
    Phone: (203) 973-5200
    Fax: (203) 973-5250
    slucas@mlc-law.com
    mcanaday@mlc-law.com

---

investigate claims, no one could confirm that he had done any work on plaintiffs' claims. (Goldsby Depo. P20 L7-13 and P31 L3-11 (A.Ex. Y); Sellers Depo. P32 L9-23 (A.Ex. M).)

### _CERTIFICATE OF SERVICE_

This is to certify that on this 29th day of June, 2004, a copy of the foregoing was hand delivered to:

Conrad S. Kee, Esq.
Jackson Lewis LLP
177 Broad Street, P.O. Box 251
Stamford, CT 06904
Phone: (203) 961-0404
Fax: (203) 324-4704
KeeC@JacksonLewis.com

_____
Scott R. Lucas