# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LARRY A. KATZ** | : | |
| **And KENNETH M. RAFTERY,** | : | **CIVIL ACTION NO.** |
| | : | **302 CV 02201 (AWT)** |
| **Plaintiffs,** | : | |
| | : | |
| **V.** | : | |
| | : | |
| **THE SEPARATION PAY PLAN** | : | |
| **OF TEXACO, INC.** | : | |
| **And TEXACO, INC.,** | : | |
| | : | **JUNE 29, 2004** |
| **Defendants.** | : | |

## PLAINTIFFS' LOCAL RULE 56(a)1 STATEMENT

1.  Plaintiffs Larry A. Katz and Kenneth M. Raftery are former employees of Fuel and Marine Marketing, LLC ("FAMM"), a subsidiary of defendant Texaco, Inc., and are both participants in and beneficiaries of the severance pay plan adopted by FAMM, namely defendant The Separation Pay Plan of Texaco, Inc., as defined by ERISA, 29 U.S.C. §§1002(7) and (8).  (See Complaint ¶¶1-2.)

2.  The Separation Pay Plan of Texaco, Inc. (hereinafter the "Plan") is an unfunded welfare benefit plan as defined by ERISA, 29 U.S.C. §1002(1), with benefits payable from the Plan sponsor's general assets. (See Requests for Admission Nos. 1-4 and Answers thereto (A.Ex. B).)

3.  Texaco, Inc., until November 1998, had a division of its company that was referred to at "T-FAMM," standing for Texaco Fuel and Marine Marketing. (Swanson Depo. P13 L3-8 (A.Ex. H); Bandy Depo. P9 L6-23 (A.Ex. G).)

4.  Texaco, Inc. and Chevron then created a joint venture that combined their respective Fuel and Marine Marketing divisions and called this company "FAMM," standing for Fuel and

Marine Marketing. (Swanson Depo. P13 L2-8 (A.Ex. H); FAMM description from SEC website (A.Ex. J).)

5.      In November 1998, FAMM was created as a stand-alone, independent company. (A.Ex. J.)

6.      Plaintiff Larry Katz had previously been employed at Texaco from 1991 until he started at FAMM in 1998. (Deposition of Larry Katz taken April 29, 2004 ("Katz Depo."), P8 L6-16 (A.Ex. K.) Indeed, from approximately 1993 through 1995, Mr. Katz was employed in the T-FAMM division of Texaco. (Katz Depo. P8 L25 -- P9 L2 (A.Ex. K).)

7.      Similarly, Mr. Raftery began his employment with Texaco in 1990 as an accountant in the alternate energy and eventually became assistant manager of Texaco International Manufacturing and Marketing. (Deposition of Kenneth Raftery taken April 30, 2004 ("Raftery Depo."), PP6-7 (A.Ex. L).) In approximately September 1998, Mr. Raftery also joined T-FAMM as manager of accounting. (Raftery Depo. P11 L16-19 (A.Ex. L).)

8.      Eventually, upon the creation of FAMM as the joint venture between Texaco and Chevron, Mr. Raftery was offered and accepted a position as Comptroller of FAMM (Raftery Depo. PP7-8 (A.Ex. L)), while Mr. Katz accepted the position of Treasurer for FAMM (Katz Depo. P10 L7 (Ex. K).

9.      Thus plaintiffs became employed by FAMM in November 1998; Larry Katz as Treasurer and Kenneth Raftery as Comptroller. (Meade Depo P24 L6-23 (A.Ex. F).)

10.     The duties and responsibilities for both plaintiffs increased significantly upon accepting offers to work at FAMM. (Raftery Depo. P11 L20 -- P12 L1 (A.Ex. L).)

11.     The difference in T-FAMM versus FAMM was immense, as FAMM was the combination of both Texaco's and Chevron's Fuel and Marine Marketing divisions and the business increased significantly. (Raftery Depo. P12 L24-25 (A.Ex. L).)

12.     FAMM was now a stand-alone entity with two parent companies. (Raftery Depo. P13 L4-8 (App Ex. L).)

13.   Indeed, FAMM's total revenues as a stand-alone company totaled about $4.3 billion, while T-FAMM's gross revenue had been less by at least a billion. (Meade Depo. P21 L6-21 (A.Ex. F); Bandy Depo. P9 L17 – P10 L1 (A.Ex. G).)

14.   It is undisputed that upon being hired by FAMM, both Mr. Katz and Mr. Raftery were made part of the management group of FAMM. (Swanson Depo. P20 L5-10 (A.Ex. H).)

15.   From the inception of FAMM, there was animosity and even hostility between Texaco and FAMM. (Bandy Depo. P18 L20 -- P19 L13 (A.Ex. G); Meade Depo. P56 L4-25 (A.Ex. F).)

16.   FAMM was being run as an entrepreneurial entity striving to remain independent and to create its own compensation and benefit schemes that would be separate and apart from those of Texaco. (Bandy Depo. P14 L14-25 (A.Ex. G).)

17.   As a result, the executive compensation board at Texaco no longer had control over FAMM or its employees. (Bandy Depo. P19 L4-13 (A.Ex. G); Meade Depo. P56 L4-25 (A.Ex. F).)

18.   Ms. Swanson testified that she continually faced resistance from Mr. Pennacchio in connection with FAMM compensation issues.  (Swanson Depo. P26 L14-16 (A.Ex. H).)

19.   Michael Bandy, President of FAMM, also testified that he experienced resistance from Texaco in his pursuit to create a different pay structure and different benefits plans for FAMM employees. (Bandy Depo. P19 L4-13 (A.Ex. G); Swanson Depo. P22 L9 -- P23 L1 (A.Ex. H).)

20.   The executive compensation groups of both Texaco and Chevron were very reluctant to have FAMM create something in terms of its compensation programs that were significantly different than either the Chevron or Texaco plans. (Bandy Depo. P19 L4-13 (A.Ex. G).)

21.   Shortly after commencing work with FAMM, both plaintiffs received position grades of FAMM 19 and maintained those position grades until they left FAMM's employ in 2002. (Raftery Depo. P9 L4 (A.Ex. L); Katz Depo. P11 L12 (A.Ex. K).)

22.   Both plaintiffs reported to Mr. Peter Meade, who accepted the position of Vice President and CFO of FAMM and held a position grade of FAMM 20. (Meade Depo. P30 L13-14 (A.Ex. F).)

23.   Prior to becoming employed by FAMM, Mr. Meade held a position grade at Texaco of 20, and this grade was not changed upon commencing employment at FAMM despite the fact that his duties significantly increased. (Meade Depo. P30 L13-19 (A.Ex. F).)

24.   Mr. Meade testified that if he had the duties he assumed at FAMM while he was still employed at Texaco, he would have certainly held a position grade higher than a Texaco position grade 20. (Meade Depo. P30 L20-23 (A.Ex. F).)

25.   Mr. Meade held the same position grade for over a decade, despite the tremendous advances he made in terms of his duties and compensation. (Swanson Depo. P32 L11 -- P33 L6 (A.Ex. H).)

26.   FAMM, as a general matter, simply did not focus on position grades, but rather focused on an individual employee's function and responsibility within the organization. (Meade Depo. P89 L19-21 and P90 L5-14 (A.Ex. F).)

27.   While initially adopting the position grading system of Texaco, the system did not evolve with FAMM and it became distorted over time and simply did not maintain equivalence with that of Texaco over the years. Peter Meade, Vice President and CFO of FAMM, testified that as far as position grades were concerned, he "didn't really care what was happening at Texaco," he just analyzed his leadership team and made sure that everyone was fully and fairly compensated. (Meade Depo. P99 L3-10 (A.Ex. F).)

28.   The president of FAMM testified that upon becoming employed by FAMM, he no longer had a pay grade at Texaco because FAMM was a separate company. (Bandy Depo. P11 L1-8 (A.Ex. G).) Mr. Bandy further testified that the position grades initially adopted from Texaco

"were pretty much irrelevant because FAMM was creating its own compensation system, which was significantly different from Texaco's." (Bandy Depo. P12 L13-19 (A.Ex. G).)

29.  When asked whether the Texaco and FAMM position grades were similar, Ms. Swanson, head of FAMM's executive compensation, stated that FAMM was a totally different company, so it is difficult to compare the position grades of FAMM employees to those of Texaco employees, FAMM was an independent organization. (Swanson Depo. P80 L11-20 (A.Ex. H).)

30.  In Mr. Meade's case, his position grade was totally inconsistent with Texaco's position grade for the job that he performed. (Swanson Depo. P81 L9-14 (A.Ex. H).) And plaintiffs both worked directly for Mr. Meade. (Swanson Depo. P81 L15-17 (A.Ex. H).)

31.  Instead of using a position grade demarcation for its benefit plans, FAMM required that an individual employee be part of FAMM's "management team" to be eligible for certain plan benefits such as the cash bonus plan. (Swanson Depo. P40 L7-12 (A.Ex. H).)

32.  Plaintiffs were perceived as being part of FAMM's management group. (Bandy Depo. P17 L7-12 (A.Ex. G); Swanson Depo. P20 L5-10 (A.Ex. H) and P26 L9-21; see also A.Ex. I.)

33.  Plaintiffs were afforded the same type of benefits reserved only for Texaco employees holding a position grade 20 or above. (Deposition of Carolyn Sellers taken April 1, 2004 ("Sellers Depo."), PP13-15 (A.Ex. M).)

34.  Peter Meade testified that individuals holding a FAMM position grade 19 received benefits that someone holding a Texaco position grade 19 simply would not be entitled to. (Meade Depo. P99 L11-19 (A.Ex. F).)

35.  The undisputed testimony demonstrates that both plaintiffs were key members of FAMM's management group and key members of FAMM's leadership team. (Deposition of C. Michael Bandy taken April 1, 2004 (hereinafter "Bandy Depo."), P17 L7-12 (A.Ex. G); Deposition of Michele Swanson taken March 31, 2004 (hereinafter "Swanson Depo."), P20

L5-10, P26 L9-21 (A.Ex. H); FAMM management listing and letters to Raftery referring to him as a member of FAMM's management team (all part of A.Ex. I).)

36. Defendants admit that plaintiffs were both Officers of FAMM. (Requests for Admission Nos. 5-6 and Answers thereto (A.Ex. B).)

37. In approximately 1998, Texaco drafted the Separation Pay Plan of Texaco entitling employees who lost their positions as a result of a change in control to receive separation pay. (A.Ex. A.)

38. Mr. Pennacchio, Vice President of Executive Compensation for Texaco, attempted to have FAMM employees excluded from participating in the Separation Pay Plan of Texaco. (Bandy Depo. P21 L3-20 (A.Ex. G); Swanson Depo. P54 L7 -- P55 L11 (A.Ex. H).)

39. It took negotiations between Deval Patrick, in-house counsel for Texaco, and Peter Bijur, Texaco's CEO, to ultimately allow FAMM employees to participate in the Plan. (Bandy Depo. P21 L3-20 (A.Ex. G); Swanson Depo. P54 L7 -- P55 L11 (A.Ex. H).)

40. In approximately October of 2000, Texaco and Chevron announced that the two companies were going to merge and become ChevronTexaco. (Katz Depo. P15 L7-16 (A.Ex. K).)

41. The result of the merger would mean that FAMM would cease to exist as a joint venture, but would rather become a wholly owned subsidiary of ChevronTexaco. (Katz Depo. PP15-16 (A.Ex. K).) The merger took place in October 2001. (Katz Depo. P17 L13-14 (A.Ex. K).)

42. Shortly after the merger was announced, plaintiffs became aware that their positions were being moved from White Plains, New York to Houston, Texas. (Katz Depo. P18 L2-3 (A.Ex. K).)

43. Although offered positions in Houston, Texas, plaintiffs decided not to relocate. (Katz Depo. P18 L4-7 (A.Ex. K).)

44.    About this same time, plaintiffs became aware that the Separation Pay Plan of Texaco existed and that employees of FAMM were participants under that plan. (Katz Depo. P19 L18-23 (A.Ex. K); Raftery Depo. P19 L23 – P20 L2 (A.Ex. L).)

45.    It was understood that under this plan, employees would receive one month of separation pay for each year of service up to a maximum of 24 months. (Katz Depo. P20 L19-25 (A.Ex. K).)

46.    Plaintiffs also became aware that there was an enhancement made to the Separation Pay Plan. (Katz Depo. P21 L20-22 (A.Ex. K).)

47.    The Separation Pay Plan of Texaco itself does not include any provisions for the enhanced benefits or who is or is not eligible to receive such enhanced benefits. (See A.Ex. A.)

48.    The amendment to the Plan was announced to *Texaco* employees holding a position grade 20 or above via a Texaco memorandum dated June 2, 1999 from Stephen Pennacchio. (See A.Ex. E at Texaco 0100.) In that memorandum, it states that "the purpose of this letter is to provide you with information regarding … an enhancement to the Plan for members of *our* management group (position grade 20 and above)." (A.Ex. E at Texaco 0100 (emphasis added).)  No such limitation to the term "management group" was provided for FAMM employees. (A.Ex. E at Texaco 0100.)

49.    Despite the direct instruction in 1998 to include FAMM in the Separation Pay Plan of Texaco, upon drafting the memo regarding the enhancement to the Plan (A.Ex. E at Texaco 0100), Mr. Pennacchio again attempted to exclude FAMM employees from the enhancement.

50.    Mr. Pennacchio did not circulate this memo to *any* FAMM employees (regardless of position grade) and did not advise any FAMM employees of the informational meeting regarding the enhanced severance options. (Swanson Depo. P56 L18 -- P57 L11 (A.Ex. H); Meade Depo. P51 L13 -- P52 L14 (A.Ex. F).)

51.    Ms. Swanson testified that she "felt that Mr. Pennacchio was being vindictive and Texaco was having a great enhanced program and that he was trying to exclude FAMM from that enhanced package." (Swanson Depo. P55 L19-22 (A.Ex. H).)

52.    Moreover, Texaco also exclusively provided approximately twenty of its officers with an additional severance deal, above and beyond that contained in The Separation Pay Plan of Texaco or the Pennacchio letter (A.Ex. E at Texaco 0100). (Goldsby Depo. P16 L4-7; A.Ex. EE.) No such deals were provided for officers of FAMM.

53.    As part of FAMM's management group, plaintiffs were of the understanding that that they would receive all three of the benefits set forth in the Pennacchio memo (A.Ex. E at Texaco 0100). Mr. Katz testified that: "The enhancement under The Separation Pay Plan was for the Texaco management group. FAMM was a separate company participating in The Separation Pay Plan, and as a member of FAMM's management group that received every FAMM executive perk, I had no reason to believe that I wouldn't receive this executive perk for FAMM's management group." (Katz Depo. P30 L8-15 (A.Ex. K).)

54.    Accordingly, plaintiffs raised the issue of their entitlement to the enhanced severance with FAMM's CFO, Peter Meade, who then raised the issue with Michelle Swanson, the director of FAMM's Human Resources. The issue was then reviewed by Michelle Swanson with Texaco's executive compensation board who advised her that plaintiffs would not be afforded the enhanced severance. (Katz Depo. P32 L10-19 (A.Ex. K).)

55.    It was soon revealed that Texaco's reason for denying the enhanced severance was solely because plaintiffs did not hold a Texaco position grade 20. (Katz Depo. P34 L7-13 (A.Ex. K).)

56.    Michelle Swanson testified that Texaco's position was that plaintiffs had to have a position grade of 20 or above to be eligible for enhanced benefits, and Texaco let FAMM know in no uncertain terms that this was their position. (Swanson Depo. P78 L13-23 (A.Ex. H).)

57.     One initial step plaintiffs took in an attempt to receive the enhanced severance was simply to seek being promoted to FAMM position grade 20s, believing that this would simply do away with the problem. Mr. Michael Bandy, the President and CEO of FAMM, was in favor of ensuring that plaintiffs received the enhanced severance, and he brought the issue of promoting plaintiffs to the FAMM Board of Directors. (Katz Depo. P37 L16-24 (A.Ex. K).)

58.     Mr. Scott Jeffrey, a Texaco employee on the FAMM Board of Directors, testified that the Board (which was comprised of two Texaco employees, two Chevron employees and one non-voting FAMM employee (Meade Depo. P62 L21 -- P63 L9 (A.Ex. F)) recognized that should plaintiffs be successful in their attempt to be promoted to FAMM position grades 20, there would be financial ramifications to Texaco in the form of enhanced severance payments from its general assets. (Jeffrey Depo. P28 L12-23 (A.Ex. S).)

59.     Mr. Peter Meade and Mr. Eric Reider, two other FAMM employees, were being considered for promotions at the same time as plaintiffs. Unlike plaintiffs, these promotions were formally put before the Board, voted on and affirmed.  As Mr. Meade and Mr. Reider had already maxed-out in terms of their severance payouts, their promotions would not affect Texaco's bottom line in terms of severance payments. (Meade Depo. P63 L21-25 (A.Ex. F); Swanson Depo. P73 L1-10 (A.Ex. H).)

60.     This was not so for Mr. Katz and Mr. Raftery. Indeed, Mr. Meade, VP and CFO of FAMM, testified that he believed it was a "strong possibility" that the cost that ChevronTexaco might pay in additional benefits to plaintiffs would be a factor in the Board's consideration of their promotions. (Meade Depo. P94 L24 -- P96 L1 (A.Ex. F).)

61.     Ultimately there was no formal proposal  presented to the Board of Directors with respect to promoting Mr. Katz or Mr. Raftery, and the FAMM Board of Directors never voted on whether to promote plaintiffs to a position grade 20. (Swanson Depo. P75 L25 -- P76 L5; A.Ex. X.)

62.    FAMM's benefit plans, however, were based not on position grade, but rather on an individual's function within the management group. (Katz Depo. P83 L6-22 (A.Ex. K); Meade Depo. P.99 L11-19 (A.Ex. F).)

63.    Plaintiffs, as FAMM position grade 19s, were, however, considered key members of FAMM's management group and plaintiffs were afforded benefits reserved only for FAMM's key management. (App. Exs. U, V, O and P; Bandy Depo. P18 L4-15 (A.Ex. G); Swanson Depo. P40 L7-12 and PP52-53 (A.Ex. H); Meade Depo. PP43-44 (A.Ex. F).)

64.    Individuals holding a FAMM position grade 19 were eligible to participate in FAMM's Annual Cash Bonus Plan. ("FAMM 2001 Annual Cash Bonus Program" (A.Ex. O).)

65.    As a Texaco employee, one had to be a position grade 20 to be eligible for the Cash Bonus Plan. (Swanson Depo. P39 L6-16 and P40 L25 (A.Ex. H); Sellers Depo. P13 L16 – P14 L3 (A.Ex. M).)

66.    FAMM's Annual Cash Bonus plan was targeted toward "key" individuals within the FAMM organization whose performance was critical to the success of the business. (Meade Depo. P43 L1-13 (A.Ex. F).)

67.    The President and CEO of FAMM testified that "the only people that had entitlements to the Cash Bonus Program were the executive counsel, senior leadership and officers." (Bandy Depo. P18 L4-15 (A.Ex. G).)

68.    Ms. Swanson testified that in determining eligibility for cash bonus benefits, FAMM used the term "management team." (Swanson Depo. P40 L7-12 (A.Ex. H).)

69.    Mr. Katz and Mr. Raftery were both participants of this Cash Bonus Plan. (Meade Depo. P43 L11-13 (A.Ex. F).)

70.    FAMM's Deferral Plan (A.Ex. P) provided that certain "key" employees were guaranteed to be eligible for a deferred payment of any or all of their cash bonus award. (A.Ex. Q.)

71.    This option was only available to twelve FAMM employees, identified as part of FAMM's "key management." (Swanson Depo. P52 L3—P53 L2 (A.Ex. H); Meade Depo. P44 L22-25 (A.Ex. F); A.Ex. R.)

72.    Mr. Katz and Mr. Raftery were identified as "key management" and both eligible to defer the payment of their cash bonus awards. (Meade Depo. P45 L1-3 (A.Ex. F).)

73.    Although Texaco had a similar plan, utilizing similar eligibility criteria (*to wit:* "key employees"), the benefits of that plan were limited to those individuals holding Texaco position grades 20 or above. (Swanson Depo. P42 L8-16 and P52 L22 -- P53 L2 (A.Ex. H); Meade Depo. P45 L7-13; Deposition of Scott D.H. Jeffery taken December 16, 2003 (hereinafter "Jeffery Depo.") P9 L5-10 (A.Ex. S).)

74.    Both plaintiffs participated in the Supplemental Bonus Retirement Plan, despite the fact that *Texaco* "has never recognized PG 19 for this plan even if they received a bonus (sometimes as high as 40k plus)… ." (A.Ex. T.)

75.    As a Texaco employee, one had to hold a Texaco position grade of at least a 20 to be eligible for the Supplemental Retirement Plan. (Sellers Depo. P15 L3-23 (A.Ex. M).)

76.    The Plan language specifically reserves this benefit for "certain management or highly compensated employees." (App. Exs. U and V.)

77.    The Long-Term Incentive Plans are no different. As a Texaco employee, one had to hold a Texaco position grade of at least a 20 to be eligible to participate in the Long-Term Incentive Plan. (Sellers Depo. P15 L3-23 (A.Ex. M); Jeffrey Depo. P33 L23-25 (A.Ex. S).)

78.    Again, FAMM did not use a position grade identifier as a demarcation for benefits. FAMM concentrated on an employee's status or position within the management group. (Katz Depo. P83 L6-22 (A.Ex. K).)

79.    Accordingly, despite the fact that plaintiffs held position grades of FAMM 19, they both participated in the Long-Term Incentive Plan. (Meade Depo. P47 L18-10 (A.Ex. F).)

80.    Plaintiffs were also compensated at a much higher rate than Texaco employees holding a Texaco position grade 19. (Swanson Depo. P34 L3-11 (A.Ex. H).)

81.    Mr. Katz testified that he was paid at least $100,000 more than Texaco employees holding a position grade 19. (Katz Depo. P82 L15-22 (A.Ex. K).)

82.    Mr. Jeffrey, a Texaco employee on the FAMM Board of Directors, testified that when he held a Texaco position grade 19, his total compensation, including bonuses and benefits, was approximately $130,000 annually. (Jeffrey Depo. P7 L14-21 (A.Ex. S).)

83.    Moreover, in 2001, Mr. Jeffrey had a manager working under him that held a Texaco position grade 19 whose total compensation was approximately $145,000 annually. (Jeffrey Depo. P8 L19 -- P9 L1 (A.Ex. S).)

84.    Plaintiffs who both received annual compensation of approximately $200,000 - $250,000 as FAMM position grade 19s. (A.Ex. W.)

85.    Mr. Jeffery, a Texaco employee, testified that annual compensation of approximately $250,000 would be high for a Texaco employee holding a position grade 19. (Jeffrey Depo. P40 L1-12 (A.Ex. S).)

86.    A Texaco employee by the name of Scott Hannen was chosen to take over Mr. Raftery's position of Comptroller for FAMM when Mr. Raftery decided not to relocate to Houston, Texas. (Raftery Depo. P18 L15-20 (A.Ex. L); Swanson Depo. P63 L4-7 (A.Ex. H).)

87.    The duties and responsibilities of the Houston position were less in scope than Mr. Raftery's position. ("FAMM Treasurer/Comptroller Positions, Justification for Enhanced Benefits" (A.Ex. E at Texaco 0031).) For example, the Houston position was only a divisional position rather than being Comptroller of stand-alone LLC; external audits and other stand-alone filings were no longer required; many of the complex accounting matters were to be handled by ChevronTexaco's corporate division; and a majority of the treasury functions would be the responsibility of other ChevronTexaco divisions, such as ChevronTexaco Credit,

ChevronTexaco Risk Management and ChevronTexaco Treasury. (<u>Id.</u> (A.Ex. E at Texaco 0031).)

88.    Despite the substantial decrease in duties and responsibility, the Houston position was accorded a ChevronTexaco position grade 27, which is the equivalent to a Texaco position grade 20. (<u>See</u> "Chevron Texaco Structure Conversion," memo from Katz to Tilton dated 12/6/01 re: "HR Appeal – FAMM," and "Position Summary, GO-400" (all A.Ex. N); Swanson Depo. P63 L4-17 (A.Ex. H).)

89.    Moreover, despite giving Scott Hannen a higher position grade than that of Mr. Raftery, Mr. Hannen, unlike Mr. Raftery, was not a CPA, and therefore had less credentials than Mr. Raftery. (A.Ex. E at Texaco 0031.)

90.    Ultimately, plaintiffs submitted a claim to the Benefits Center Change of Control Claims Committee.  Plaintiffs' submittal comprised of a letter outlining their position, together with "point sheet." (A.Ex. E at Texaco 0030-31.)

91.    The Benefits Center Change of Control Claims Committee consisted solely of the following Texaco and former Texaco employees:  John Goldsby as chairman, Carolyn Sellers, Glenn Phillips, Kwame Satchell, Rebecca Roberts, Richard Loving, Ron Boilla, Linda Ryan (who resigned from committee).  (Goldsby Depo. P9 L4-23 (A.Ex. Y).)

92.    In response to their submittal, plaintiffs each received a one page letter from the Benefits Change of Control Claims Committee dated April 22, 2002, stating in one sentence the reason for denying the enhanced benefits, *to wit:* "The Claims Committee has determined that your status as a position grade 19 makes you ineligible for the enhanced benefits available for position grade 20 individuals."

93.    No further reasoning was provided, despite the information provided to the Committee in the original submittal regarding an inequality in the position grading schemes of Texaco and FAMM. (A.Ex. E at Texaco 0033.)

94.    John Goldsby, the Chairman of the Benefits Center Change of Control Claims Committee, testified that plaintiffs' claims were rejected because "The committee's position was that they were in Position Grade 19 and felt that the plan was clear that you had to be in Position Grade 20. (Deposition of John W. Goldsby taken April 2, 2004 (hereinafter "Goldsby Depo.") P27 L14-16 and P36 L4-10 (A.Ex. Y).)

95.    The plan documents make no such distinction (<u>see</u> A.Ex. A) and, at best, the eligibility criteria set forth in the Pennacchio letter is ambiguous, as it does not refer to FAMM employees, nor, as stated above, was it originally distributed to them. (A.Ex. E at Texaco 0100; Meade Depo. P51 L13 -- P52 L14 (A.Ex. F).)

96.    Ms. Carolyn Sellers, another member of the Benefits Center Change of Control Claims Committee, recalls that plaintiffs were not eligible for additional change of control benefits because they were pay grade 19s and that was the main determining factor for her and the consensus of the committee. (Sellers Depo. PP31-33 (A.Ex. M).)

97.    Ms. Sellers only recalls reviewing the submittal letter presented by plaintiffs. She has no recollection of even reviewing the "point sheet" attached thereto or any other documents in connection with analyzing plaintiffs' claims. (Sellers Depo. P27 L24 -- P28 L9).)

98.    Mr. Goldsby only recalls reviewing plaintiffs' letter requesting benefits, a copy of the Separation Pay Plan (A.Ex. A) and possibly a copy of the Pennacchio letter (A.Ex. E at Texaco 0100). (Goldsby Depo. P14 L7 -- P16 L3 (A.Ex. Y).)

99.    Mr. Goldsby admits that he never personally investigated plaintiffs' claims (Goldsby Depo. P19 L23-25 (A.Ex. Y)) nor did he have any discussions with any FAMM employees with regard to plaintiffs' claims. (Goldsby Depo. P40 L5-7 (A.Ex. Y).)

100.  As Chairman of the Committee, Mr. Goldsby does not recall looking at any documents in making a determination that a FAMM position grade 19 was the same as a Texaco position grade 19.

101.  Neither Mr. Goldsby nor Ms. Sellers can recall if John Burgess, an investigator allegedly employed by the committee on occasion, conducted an investigation in connection with plaintiffs and, if he did, what he did or said on the issue. (Goldsby Depo. P20 L7-13 and P31 L3-11 (A.Ex. Y); Sellers Depo. P32 L9-23 (A.Ex. M).)

102.  There is no mention of Mr. Burgess anywhere in the administrative file, there are no notes or minutes from any investigation he conducted, and he never contacted plaintiffs to discuss their claims, nor are plaintiffs aware of Mr. Burgess contacting any other FAMM employee as part of any "investigation." (A.Ex. E.)

103.  At the time Mr. Goldsby voted in favor of denying the enhanced benefits, he was of the understanding that the issue of plaintiffs' promotion had formally been considered and denied by the FAMM Board of Directors. (Goldsby Depo. P35 L10-12 (A.Ex. Y).) That was not the case. (A.Ex. X); Swanson Depo. P76 L3-5 (A.Ex. H); Jeffrey Depo. P20 L24 -- P21 L2 and P24 L20-23 (A.Ex. S).)

104.  In May 2002, after the decision by the Benefits Center Change of Control Claims Committee denied plaintiffs' claims, but *before* plaintiffs filed their appeal to the Change of Control Committee, there is an e-mail exchange (which is sent to multiple members of *both* Committees) that advises everyone to be "***careful how you handle this one as you could set a precedent for others....***" referring to Texaco pay grade 19 employees. (A.Ex. E at Texaco 0034-0036 (emphasis added).)

105.  Upon receiving notice of the denial of benefits by the Benefits Center Change of Control Claims Committee, plaintiffs retained the undersigned firm to aid them in the process of

appealing the initial decision to the Change of Control Committee. (Katz Depo. P58 L22 -- P59 L19 (A.Ex. K).)

106. The second tier or appellate committee was identified as the "Change of Control Committee" and the members comprised, Janet Stoner as Chairman, Patrick Lynch, Michael Rudy, John Bethancourt and Rosemary Moore. (Lynch Depo. P9 L6-18 (A.Ex. Z.) The Plan requires that this committee be composed of individuals who held the offices of Senior Vice President of Texaco, Inc., Vice President and Secretary of Texaco, Inc., and the Vice President of the Human Resources Department of Texaco, Inc. at any time during the 12-month period immediately before the change of control. (A.Ex. A at p. 16.) The Change of Control Committee does not comply with this requirement. Indeed, the only individual who ever held one of these positions was Janet Stoner. (Lynch Depo. P24 L12 – P26 L10 (A.Ex. Z).)

107. As part of the appeal, plaintiffs submitted a packet of information through their attorney, together with a cover letter dated June 18, 2002. (See A.Ex. E at Texaco 0009-0033.)

108. In response, plaintiffs received a letter dated August 26, 2002 from the Change of Control Committee advising them that "The Committee concurs with the earlier decision by the Claims Committee that as a Position Grade 19 employee, you are not eligible for the enhanced benefits made available to Position Grade 20 employees." (A.Ex. E at Texaco 0095.)

109. This letter is signed "Ron G. Boilla On Behalf of Janet L. Stoner." Mr. Boilla was not a member of the Change of Control Committee, but rather a member of the Benefits Center Change of Control Claims Committee, the Committee that made the initial denial of benefits. (Goldsby Depo. P25 L1-25 (A.Ex. Y).)

110. Mr. Patrick Lynch, a member of the Change of Control Committee, testified that after rejecting a claim, the Benefits Center Change of Control Claims Committee would "brief"

his committee as to the rationale employed in rejecting the claim. (Deposition of Patrick J. Lynch taken April 28, 2004 (hereinafter "Lynch Depo.") P14 L17-21 (A.Ex. Z); Goldsby Depo. P25 L1-16 (A.Ex. Y).)

111.    In April 2002 Tom Lynch, head of executive compensation for Texaco (but who was not on either the Benefits Center Change of Control Claims Committee or the Change of Control Committee), informed Michael Bandy that plaintiffs' claims were a "slam dunk" for Texaco. In fact, Pat Lynch, who is Tom Lynch's brother, was on the Change of Control Committee (the appellate committee), and that Committee had not yet reviewed plaintiffs' claims. (Bandy Depo. P44 L5 -- P45 L10 (A.Ex. G); A.Ex. AA.)

112.    Patrick Lynch has virtually no memory whatsoever of reviewing any documents in connection with plaintiffs' claims, or what if any discussions he had with the Committee or anyone else regarding plaintiffs' claims. (Lynch Depo. P20 L10 -- P21 L23 (A.Ex. Z).)

113.    Mr. Lynch confirmed that the Committee kept no recordings, minutes or notes of its meetings. (Lynch Depo. P15 L6-13 (A.Ex. Z).)

114.    Incident to the appeal to the Change of Control Committee, Ron Boilla, Chairman of the initial committee that denied plaintiffs' claims, simply forwarded his complete file to Kwame Satchell, Esq., Texaco's General Counsel. Although Mr. Satchell was a member of that initial committee, Mr. Boilla's note indicates that this is for Mr. Satchell's "further handling." (A.Ex. E at Texaco 0007-0033.)

115.    Mr. Satchell then forwarded the file on to Alan Preston in Texaco Human Resources Department and to Richard Remley and William G. Duck, two senior members of ChevronTexaco's legal department. (A.Ex. E at Texaco 0007-0033.) This was nearly two months prior to any decision by the Change of Control Committee.

116.     No one from the Committee ever *initiated* contact with the plaintiffs, nor with any other employee of FAMM to discuss plaintiffs' eligibility for the enhanced severance. (Katz Depo. PP61-64 (A.Ex. K); Goldsby Depo. P40 L5-7 (A.Ex. :Y).)

117.     No committee members ever contacted Michelle Swanson concerning her view or opinions as to whether plaintiffs were entitled to enhanced severance. (Swanson Depo. P87 L1 -- P89 L21 (A.Ex. H).)

118.     Nor did any committee members ever contact Michael Bandy concerning his view or opinions as to whether plaintiffs were entitled to enhanced severance. (Bandy Depo. P49 L12-14 (A.Ex. G).)

119.     Similarly, no one identifying themselves as from a claims committee ever spoke to Mr. Meade about Mr. Katz or Mr. Raftery, despite the fact that he was their direct supervisor. (Meade Depo. P78 L10-6 (A.Ex. F).)

120.     Had any of the committee members made contact with Mr. Bandy, who was the CEO and President of FAMM, Mr. Meade, who was the VP and CFO of FAMM, or Michelle Swanson, who was the head of Human Resources and Executive Compensation at FAMM, they would have been told that each of these individuals believed that plaintiffs were key members of FAMM's management team, were performing work equivalent to that of a Texaco position grade 20 or above, and should have been afforded the enhanced benefits at issue here. (Meade Depo. P67 L15-17 and P68 L12-14 (A.Ex. F); Swanson Depo. P75 L9-11 (A.Ex. H).)

121.     After exhausting all of their administrative remedies, plaintiffs initiated the present federal litigation. (See Complaint.)

122.     On October 21, 2002, plaintiffs sent a letter to the Change of Control Committee requesting reimbursement of legal fees at that time totaling $1,846.67 pursuant to Texaco's Change of Control provision of The Separation Pay Plan. (A.Ex. BB.)

123.    In a letter dated November 6, 2002, the "Change of Control Claims Committee" (sic) refused to reimburse plaintiffs for their expenses, despite the clear requirement of The Separation Pay Plan. (A.Ex. E at Texaco 0085.)

124.    This letter is signed by Mr. Boilla who was not a member of the Change of Control Committee.

125.    Mr. Patrick Lynch, who was a member of the Change of Control Committee, testified that he had "no recollection of dealing with legal fees at *any* of the committee meetings." (Lynch Depo. P34 L23 -- P35 L3 (A.Ex. Z) (emphasis added).)

126.    There are no notes or minutes of any Committee meeting regarding plaintiffs' claims (Goldsby Depo. P22 L3-6 (A.Ex. Y); Sellers Depo. P24 L2-9 (A.Ex. M)).

127.    The deposition testimony of Committee members reveals that no one can quite remember what, if anything, the Committees did to review plaintiffs' claims. (Goldsby Depo. P14 L7 -- P16 L3, P20 L7-13, and P31 L3-11 (A.Ex. Y); Sellers Depo. P27 L24 -- P28 L9 and P32 L9-23 (A.Ex. M).)

128.    A review of the documents comprising the "administrative record" reveals that there was no meaningful analysis or investigation of plaintiffs' claims. (See A.Ex. E.)

129.    Although the "administrative record" as produced by defendants in discovery consists of 133 pages (see Request for Admission No. 18 and Answer thereto (A.Ex. B)), if the documents created *after* the final denial of plaintiffs' claims by the Change of Control Committee are excluded and if duplicates and triplicates are excluded, what is left is truly minimal. Indeed, the only documents comprising the "administrative record" which could have been reviewed by *either* Committee are the following (in the order defendants produced them):

   a.    Memo dated June 24, 2002 from Kwame K. Satchell, Texaco's in-house counsel, to Mr. Alan Preston, Mr. Richard Remley and Mr. William G. Duck enclosing a copy of Ron Boilla file;

b.    a copy the June 18, 2002 letter from plaintiffs' attorney attaching exhibits A – F;

c.    e-mails dated May 29 and May 30, 2002;

d.    hand-written paragraph of Ron Boilla dated April 16, 2002;

e.    the April 22, 2002 letter of denial from the "Change of Control Claims Committee" (sic);

f.    plaintiffs' e-mail of March 27, 2002 enclosing their "Submittal to Claim Committee for Review" and the "FAMM Treasurer/Comptroller Positions Justification for Enhanced Benefits";

g.    an "employee home address inquiry" for Kenneth M. Raftery dated April 16, 2002;

h.    hand-written memo entitled "Executive Change of Control Committee" bates stamped Texaco 0097.

130.    In reviewing the eight items listed above, the only possible documents which could have been reviewed by the Benefits Center Change of Control Claims Committee are: (4) - the handwritten note of Ron Boilla dated April 16, 2002; (6) - the original submission by plaintiffs; and (7) - an "employee home address inquiry" presumably printed out in order to send Mr. Raftery his denial letter.

131.    There is no evidence in the administrative record or otherwise that John Burgess conducted any type of investigation for either Committee on this matter.  Indeed, other than testifying that Mr. Burgess is sometimes used by the Committees to investigate claims, no one could confirm that he had done any work on plaintiffs' claims.  (Goldsby Depo. P20 L7-13 and P31 L3-11 (A.Ex. Y); Sellers Depo. P32 L9-23 (A.Ex. M).)

132.    Ms. Swanson testified that Texaco performed no analysis to determine plaintiffs' entitlement to enhanced severance; they just drew the line at position grade 20 and that was it. (Swanson Depo. P81 L4-8 (A.Ex.H).)

133.   In response to a Request for Admission, defendants admit: "***No committee, or member thereof, analyzed the duties, responsibilities or compensation of employees holding a FAMM position-grade 19 as compared to employees holding a Texaco position-grade 19 or 20 when making the determination to deny plaintiffs the enhanced benefits they sought under the Plan***." (See Request to Admit No. 20 and Answer thereto (A.Ex. B) (emphasis added).)

By_____
    Scott R. Lucas (ct00517)
    Mary Alice S. Canaday (ct17608)
    *Attorneys for Plaintiffs*
    MARTIN, LUCAS & CHIOFFI, LLP
    177 Broad Street
    Stamford, CT 06901
    Phone: (203) 973-5200
    Fax: (203) 973-5250
    slucas@mlc-law.com
    mcanaday@mlc-law.com

### ***CERTIFICATE OF SERVICE***

This is to certify that on this 29th day of June, 2004, a copy of the foregoing was hand delivered to:

Conrad S. Kee, Esq.
Jackson Lewis LLP
177 Broad Street, P.O. Box 251
Stamford, CT 06904
Phone: (203) 961-0404
Fax: (203) 324-4704
KeeC@JacksonLewis.com

_____
Scott R. Lucas