

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
CIVIL ACTION NO. 302 CV 02201 (AWT)

LARRY A. KATZ and
KENNETH M. RAFTERY,

Plaintiffs,

-vs-

THE SEPARATION PAY PLAN OF
TEXACO, INC. and TEXACO, INC.,

Defendants.

COPY

DEPOSITION OF:

PETER M. MEADE

TRANSCRIPT of testimony as taken by and before CLAIRE CIANNAMEA-POLCARI, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, at the Courtyard Hotel, 600 Hope Road, Tinton Falls, New Jersey, on Thursday, February 5, 2004, commencing at 1:05 in the afternoon.

GAF LEGAL SERVICES, INC.
COURT REPORTING * VIDEOGRAPHY * INTERPRETING
188 Eagle Rock Avenue
Roseland, NJ 07068
(973) 618-0500

A P P E A R A N C E S:

MARTIN, LUCAS & CHIOFFI, LLP
BY: SCOTT R. LUCAS, ESQ.
-and-
MARY CANADAY, ESQ.
177 Broad Street
Stamford, Connecticut 06901
Attorneys Representing Plaintiffs

JACKSON LEWIS, LLP
BY: CONRAD S. KEE, ESQ.
177 Broad Street
P.O. Box 251
Stamford, Connecticut 06904
Attorneys Representing Defendants

I N D E X

| WITNESS | PAGE |
|---|---|
| PETER MICHAEL MEADE | |
| Direct Examination by Mr. Lucas | 4 |
| Cross Examination by Mr. Kee | 87 |
| Redirect Examination by Mr. Lucas | 97 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 9 | One page list of names | 22 |
| 10 | Supplemental Bonus Retirement Plan of Texaco Inc. | 32 |
| 11 | Bates No. 231 | 34 |
| 12 | Bates No. 47 | 35 |
| 13 | Bates Nos. 232 to 245 | 42 |
| 14 | Employee Deferral Plan | 44 |
| 15 | Director and Employee Deferral Plan | 45 |
| 16 | Incentive Agreement | 47 |
| 17 | Bates No. 73 | 65 |
| 18 | Bates Nos. 74 and 75 | 70 |
| 19 | Bates No. 20 | 75 |

P E T E R M I C H A E L M E A D E
300 Worthington Avenue
Spring Lake, New Jersey 07726
having been duly sworn according to law, testifies as follows:

MR. LUCAS: First, on the record, stipulations we're going to do are not the usual stipulations. Because this is out of state, Mr. Meade will not be available for trial. We're proceeding under federal rules and provisions, they're unmodified.

DIRECT EXAMINATION
BY MR. LUCAS:

Q. Mr. Meade, my name is Scott Lucas. I represent Ken Raftery and Larry Katz in a federal litigation they brought against Texaco and Texaco Separation Pay Plan for enhanced severance benefits.

Have you ever had your deposition taken before?

A. Yes.

Q. On how many occasion?

A. Three times.

Q. When was the most recent?

A. It was probably, I think it was '94, '95.

Q. So I won't spend too much time on the procedure then.

I'm going to ask you a series of questions. You've been sworn under oath as if you were in a court of law. If you don't understand what I've asked you, let me know. Otherwise, I'm going to presume you understood it. If you want to take a break at any time, let me know.

A. Okay.

Q. The general rules. You have to answer audibly instead of nodding your head. The court reporter can't get that down accurately.

If you'll wait until I finish the question before you start your answer, I'll wait until you finish your answer before I ask the next question, which is sometimes difficult to do. If you'll try, I'll try and we'll have an accurate record. Okay?

A. I understand.

Q. Very good.

Are you currently employed?

A. Yes.

Q. What do you do?

A. I'm a consultant.

Q. In what field?

A. I'm working with a foreign oil company to help them expand their services worldwide.

Q. Do you have any particular area of specialty or expertise?

A. I would say yes.

Q. What would that be?

A. I'd say two areas.

One would be finance; the other is the marine fuel and lube businesses.

Q. Can you briefly give me your educational background after high school?

A. After high school I attended Saint Leo University in Saint Leo, Florida. I graduated in 1971 with a B.A. in management.

I then went on to get my M.B.A. at Long Island University in Brooklyn.

Q. When did you achieve your M.B.A.?

A. Approximately 1975.

Q. Okay.

A. Let me change that. No, '75.

Q. Any other higher education?

A. No.

Q. Any courses you have taken in which you've not received a degree?

A. No.

Q. Did you go to work in 1971 after you received your Bachelor of Arts in management?

A. Yes.

Q. Where did you begin working?

A. Chase Manhattan Bank.

Q. How long were you with Chase Manhattan?

A. Five years.

Q. What positions did you hold at Chase Manhattan?

A. I was -- I went through their global credit training program. After that I went on to be a bank lending officer.

Q. Is that the position you held when you left?

A. Yes.

Q. What was your next full time position?

A. I'm trying to get my title. I was assistant manager of General Foods, domestic treasury area.

Q. When did you begin that?

A. Right after the five years at Chase Manhattan Bank.

Q. So 1976 or so?

A. '76, '77.

Q. For how long were you with General Foods?

A. I was there for approximately four to five years.

I'm doing the math. I know when I started Texaco it was October of 1980. So you get the idea.

Q. Did you get your M.B.A. at night?

A. Yes.

Q. Your next job was Texaco?

A. Texaco. Do you want to know when I left General Foods I was actually manager of their international finance.

Q. Okay. Thanks.

When you began at Texaco what position did you start at?

A. It was an analyst position.

Q. Can you be any more specific than that or what area, what field?

A. Well, it was an analyst specializing in corporate finance.

Q. Where did you work?

A. At the Harrison facility.

Q. In New York?

A. It's in Harrison, New York, which is right off of 287.

Q. That was their corporate headquarters, wasn't it?

A. Corporate headquarters, yes. That was October 1980. That I know for a fact.

Q. When you began did Texaco have its Texaco pay grade system in place?

A. Yes.

Q. What grade level did you start at?

A. I don't remember. Do you want me to guess?

Q. No, I don't.

A. I don't remember.

Q. How long were you an analyst?

A. One to two years.

Q. Did anybody report to you while you were an analyst?

A. No.

Q. What was your next position?

A. Probably assistant manager cash management.

Q. How long did you hold that position?

A. I'm going to say maybe a year or so.

Q. Do you recall your pay grade in that position?

A. No.

Q. Any subordinates in that position?

A. Two.

Q. What was your next position at Texaco?

A. Manager of cash management.

Q. How long did you hold that position?

A. I'm going to say approximately one year.

Q. Again, do you know your grade level at that job?

A. No.

Q. Next position?

A. I switched over to foreign

exchange. I was actually manager of the foreign exchange area.

Q. Backing up a second. When you were manager for cash management do you recall how many reports you had?

A. Well, at that point I was actually in the trading room. I probably had about, I'd say, four to six people reporting in to me.

Q. Okay.

A. If I said a year, I was manager for cash management for a number of years. It was probably two or three or four years.

Q. Then as foreign exchange manager, how many reports did you have?

A. Foreign exchange I didn't have any.

Q. How many years were you a foreign exchange manager?

A. I'd say probably one, maybe one and a half years.

Q. Do you recall your pay grade in that position?

A. No.

Q. Your next job at Texaco?

A. How many years have I added up on

that?

Q. Let's see. One to two in your first job.

A. Right.

Q. One in your second job. So that's three years or so. Another two to three would make us five to eight?

A. That's right.

Q. So six to nine?

A. Okay. If I remember correctly, it was 1987 I was sent to Texaco Canada as assistant treasurer. I was up in Toronto, Ontario for two years.

Q. Was Texaco Canada a subsidiary of Texaco?

A. Well, it was a subsidiary. There was outside ownership, so it wasn't wholly owned.

Q. Did they have their own compensations structure fully apart from Texaco?

A. Yes.

Q. And did they have a pay grade system?

A. Yes.

Q. Was it similar to Texaco

headquarters?

A. Probably. I don't know for sure.

Q. It wasn't identical though?

A. I don't know.

Q. Do you recall what pay grade you were at Texaco Canada?

A. No, I don't. But I was an assistant treasurer, I can tell you that. I go by titles.

Q. How long were you assistant treasurer?

A. Two years.

Q. Did you stay at Texaco Canada after that?

A. No. I came back to the corporate headquarters in Harrison, New York.

Q. About 1989?

A. '89, yes.

Q. To what position?

A. I was assistant to the treasurer.

Q. Do you know what your pay grade was then?

A. At that point I did. I was at 19.

Q. So Texaco pay grade 19?

A. Texaco pay grade 19.

Q. What were your duties as assistant to the treasurer?

A. Well, the duties were -- this was right after they had the problem with Penzoil. They had just come out of bankruptcy. Part of the deal was for them to repurchase 500 million of Texaco common stock. I led that effort, among other projects which the treasurer gave me. But the main project was the repurchase program.

Q. Was there a common core of duties that were similar to your position as assistant treasurer for Texaco Canada and as assistant to the treasurer for Texaco the parent company?

A. No. They were two --

Q. Very different positions?

A. Very different positions, yeah.

Q. How long were you assistant to the treasurer?

A. I'm going to say one year.

Q. So it changed in approximately 1990?

A. About 1990, right.

Q. What did it change to, your title?

A. Then I became director of cash

management.

Q. How long were you director of cash management?

A. Until 1994 when I left the finance department.

Q. So you maintained that title director of cash management?

A. Director of cash management.

Q. What was your pay grade, Texaco pay grade?

A. 20.

Q. Backing up for a second.

As assistant to the treasurer, did you have any people reporting to you?

A. I had one person.

Q. As director of cash management did you have any people reporting to you?

A. I probably had, I'd say 12. I'd say 12 to 15 people.

Q. What were your areas of responsibility as director of cash management?

A. I was responsible for the commercial paper program; all investments, that is investing the surplus funds of the corporation; and buying and executing foreign

exchange strategy.

Q. Anything else you can recall?

A. I also got involved with sinking funds for long-term debt and working with corporate finance in managing the long-term debt position.

Q. To whom did you report as director of cash management?

A. The treasurer.

Q. Do you know what pay grade level the treasurer held?

A. No.

Q. Then your title changed in 1994?

A. In 1994 I moved from the finance department into Texaco Fuel and Marine Marketing division which was an operating division located in Harrison.

Q. What was your title?

A. I went in as assistant general manager, finance.

Q. Was there a general manager of finance in that division?

A. No.

Q. So to who did you report as assistant general manager of finance for that

division?

A. I reported directly to the general manager of Texaco Fuel and Marine Marketing.

Q. Who was that at that point?

A. His name was Jim Bartel.

Q. Did your Texaco pay grade change when you obtained the position of assistant general manager for finance?

A. No.

Q. So were you still at 20?

A. Yes.

Q. Did you have any people reporting to you?

A. Yes.

Q. How many?

A. Maybe six.

Q. I'm going to test your memory here.

Do you recall what their titles were?

A. No, I don't. I could guess, but I can't remember.

Q. Was there a controller of that division?

A. No.

Q. Is that a role that you fulfilled?

A. At that point there was an accounting function that's part of FAMM, TFAMM Texaco Fuel and Marine Marketing.

Q. That's for the division, that's the abbreviation you're using?

A. Um-hum.

Q. As opposed to the wholly owned subsidiary we'll refer to as FAMM?

A. Yes. Excuse me.

Before FAMM it was TFAMM. Texaco Fuel Marine Marketing Division which was a division of Texaco. Being a division of Texaco there was an accountant that had a staff of accountants reporting in to this particular individual. He was responsible for the accounting for this particular division.

I worked with the accountant, but the accountant reported directly in to the Texaco side of the business.

Q. Do you recall what the pay grade was of that accountant?

A. No. I could guess, but I don't know for sure what that pay grade was.

Q. What would be your best estimate

of what that pay grade was?

A. I'd say somewhere between maybe 18 to 20 in Texaco's terms.

Q. Was there a treasurer at TFAMM?

A. A treasurer for TFAMM, no.

Q. Was that a role you fulfilled?

A. That role was fulfilled by the Texaco finance department. Really, my old job, as director of cash management. It was just cash, FAMM's cash coming into Texaco was like anybody else's. It was managed centrally.

Q. That was position 20 you held?

A. Yes.

Q. When you performed that function you were at Texaco grade 20?

A. I was Texaco grade 20, yes.

Q. Did you have a different position at TFAMM before it became FAMM?

A. Yes.

Q. What was your next position?

A. My next position was assistant general manager with responsibility for marine lubricants worldwide.

Q. In addition to finance or instead of?

A. Instead of. I actually moved into the operating part of the business.

Q. When did you do that?

A. That was '95.

Q. How long did you hold that position?

A. Three years.

Q. Same Texaco pay grade?

A. Same Texaco pay grade.

Q. 20?

A. 20.

Q. Did you have any reports?

A. I had -- I probably had 40 to 50 people worldwide.

Q. What was your next position after your assistant general manager for the marine lube worldwide in 1998?

A. That's when I became VP and CFO of the new joint venture between Chevron and Texaco where we combined the fuel and marine lubricant businesses of both companies and called the fuel company Fuel and Marine Marketing, LLC or FAMM for short.

Q. So you combined TFAMM with Chevron the name kind of lent, if you will, to come up

with FAMM?
A. Yes.
Q. So that was a larger operation by definition than just TFAMM?
A. Yes.
Q. How much larger by way of I guess I don't know how you would measure it, revenue, gross revenue?
A. Well, I know that FAMM's total revenues as a stand alone company totaled about 4.3 billion.
Q. How about when it was TFAMM? The last year it was TFAMM?
A. I don't remember.
Q. Was it significantly less than 4.3 billion?
A. Yes.
Q. Approximately 50 percent of it?
A. I'd be guessing. But less.
Q. Less by maybe at least a billion?
A. Easily. Yeah.
Q. And when you became VP and CFO of FAMM, did your base of operations change or were you still in Harrison?
A. Still in Harrison.
Q. To whom did you report as VP and CFO of FAMM?
A. The president of FAMM. The president of FAMM.
Q. Who was that?
A. C. Michael Bandy.
Q. C. Michael Bandy?
A. Yes.
MR. LUCAS: Let me show you Exhibit 9 that I've marked. It's a one-page list of names.

(Whereupon, the referred-to document was marked Exhibit 9 for Identification.)

Q. Do you recognize the names on Exhibit 9?
A. Yes. Yes, I do.
Q. Can you tell me what that list represents?
A. Well, the list is a combination of things. It shows the officers, the corporate officers of FAMM.
Q. Okay.
A. Yes. That's what this thing

shows.
Q. Are these the key management personnel of FAMM?
A. Define key.
Q. The senior management team, if you will?
A. No.
Q. Okay.
A. Well, it's more than the senior management team.
Q. Where would you draw the line on this list if you can, as to who was the key management team?
A. I would draw it under James Baker, James E. Baker, vice-president.
Q. After the vice-president level?
A. Right.
Q. What makes you draw it there?
A. The vice-presidents and the presidents made up the leadership team. And I'm defining the word key as the leadership team of FAMM.
Q. Okay. Below that are positions of general counsel and assistant secretary, secretary, treasurer, comptroller, several

assistant secretaries and an assistant treasurer. Correct?
A. Correct.
Q. The treasurer and comptroller -- withdraw that.
The treasurer position was held by Mr. Katz. Is that correct?
A. Yes.
Q. Did he start that position at the same time, on or about the same time you started your position at FAMM?
A. Yes.
Q. He reported to you. Is that correct?
A. Yes.
Q. How about Mr. Raftery, did he report to you?
A. Yes.
Q. He was the controller?
A. Yes.
Q. Did he start that position at or about the same time you started yours?
A. Yes.
Q. Did anyone else on this list report to you?

A. Mr. Farp.

Q. The assistant secretary?

A. Yes. And indirectly Mr. Gonya. Mr. Gonya reported to Larry Katz as treasurer who in turn reported to me.

Q. Do you know what Mr. Katz's position was at Texaco before he went to FAMM?

A. Yes.

Q. What was that?

A. Larry reported to an executive vice-president whose name escapes me right now and this particular -- did I say executive vice-president or senior?

Q. Executive.

A. I think his official title was senior vice-president. In fact, change that to senior vice-president.

I know he reported directly to Peter Bijur who was chairman and chief executive officer of Texaco at the time. This individual, the senior vice-president came from Wall Street. I think he actually came from First Boston. Part of his responsibility was to look at acquisitions on behalf of Texaco. He had a team of three individuals, one of which was Larry

Katz.

Q. Do you recall that senior vice-president's name?

A. No, I don't.

Q. Did you work with Mr. Katz while you were with Texaco?

A. Yes.

Q. Did you have some reporting relationship with him?

In other words, did he report to you directly or indirectly?

A. At one point it was an indirect reporting relationship.

Q. Do you recall what his pay grade was at Texaco before he went over to FAMM?

A. I think it was 16 when he started at Texaco, I think.

Q. How about when he started at FAMM, what was his last position at Texaco, do you know?

A. I'm sorry. I misunderstood your question.

When you asked me if there was a direct reporting relationship I was going back to when I was back in the finance department.

Q. Oh. I'm sorry.

A. Larry when he was hired came into the finance department and he indirectly reported to me back then.

BY MR. LUCAS:

Q. He was a 16 at that point?

A. I think when he started Texaco, we started the MBA's at a 16. That seems to stick with me. I could be wrong on that.

Q. Do you know what his pay grade was when he left Texaco and went to FAMM, what his Texaco pay grade was?

A. He actually left the finance department to go to TFAMM before going up to work for the senior vice-president for some period of time.

When he was working for the senior vice-president and he came on board from that, I think he was an 18 or 19.

Q. How about Mr. Raftery, first: Did you ever work with Mr. Raftery?

A. Prior to FAMM, no.

Q. Do you know what Mr. Raftery's pay

grade was when he went over to FAMM, Texaco pay grade?

A. The Texaco pay grade, I think he was a 19.

Q. Now, FAMM was jointly owned by Chevron and Texaco. Correct?

A. Correct.

Q. Was it physically located separately from Texaco at Harrison?

A. We were in our own section. But if you were walking through the building you probably wouldn't know you were in a separate company.

At first -- let me rephrase that.

When we first did the joint venture we were just in the old area where TFAMM was. But at some point after the joint venture we did move to a different part of the building and they did actually enclose us with glass doors and we had the company's name, we had FAMM written on the door. So we were in the building, really we were just another tenant in the building. Because the building had taken on some third party tenants at the time.

Q. Did FAMM establish some of its own

compensation plans. Is that correct?

A. Yes.

Q. I want to back up a second. I'm going to explore those in a minute.

What were your duties as vice-president and chief financial officer of FAMM?

A. I had responsibility for the controller function; the treasury function; the planning function; EH&S which is safety, health, you know, and IT or the programming computer area. I had five areas of responsibility.

Q. Was that an increase in duties from what you were responsible for when you were at Texaco?

A. Oh, it was completely different, yes.

Q. Would you say it was a significant increase in responsibility?

A. Yes.

Q. Yet did your pay grade change when you went over?

A. My Texaco pay grade.

Q. Well, now you're at FAMM. Correct?

A. Right.

Q. Did FAMM originally at least operate under Texaco's pay grade. Correct or not?

A. We used that as a guide, I would say.

Q. Then at some point the comparability between the two was not one to one. Is that correct?

I'll withdraw that. You went over as a 20?

A. Yes.

Q. You stayed as a 20. Right?

A. Yes.

Q. Until the end, almost 2001?

A. Yes.

Q. Despite the fact your duties were significantly increased?

A. Yes.

Q. If you had those duties at Texaco do you believe it would have been appropriate to grade you as a 20?

A. No.

Q. While at FAMM, there were certain compensation plans put into place that were

different from Texaco's. Correct?

A. Yes.

Q. Did you have any responsibility for the financial side of those plans as chief financial officer?

A. Yes.

Q. I'm going to ask you this. I hope I have several plans here. I want to ask you about them because there's some confusion as to how they interact with the Texaco plans and so forth.

Confusion on my part at least. There's something called a Supp 3 plan. It's a supplemental retirement plan. Correct?

A. Yes.

Q. It's an unqualified plan. You're familiar with that term. Correct?

A. Yes.

Q. Texaco had its own Supp 3 plan, did it not?

A. Yes.

Q. Did FAMM have its own Supp 3 plan that you're aware of?

A. FAMM had a Supp 3 plan. I assumed it was separate.

Michelle Swanson who had responsibility for HR who reported directly into Mr. Bandy, had that responsibility.

To answer your question, I would help her from a financial standpoint if she had questions about calculating things and the like. But she and her team were the ones responsible for the FAMM set of plans.

MR. LUCAS: I'm going to mark as Exhibit 10 a document entitled Supplemental Bonus Retirement Plan of Texaco Inc. It's Bates numbers Texaco 212 through 230.

(Whereupon, the referred-to document is marked Exhibit 10 for Identification.)

BY MR. LUCAS:

Q. Do you recognize that document?

A. It is something that I have read in the past.

Q. I don't expect you to read every page as you sit here right now.

Did it look to you at least on its face to be the supplemental bonus retirement plan of Texaco at least as it existed at some

point?

A. Yes. This looks -- this is the Texaco Supplemental Bonus Retirement Plan that I read sometime ago.

Q. If you look on the first page, the first paragraph, the purpose of this plan was to provide benefits for certain management or highly compensated employees of Texaco, Inc. and its subsidiaries and affiliates. I'm reading.

Would you agree with that?

A. Yes.

Q. It indicates on the last page that the plan administrator designated certain subsidiaries to be participants in the plan.

Do you see that?

A. Yes.

Q. It lists FAMM as number 11. Is that correct?

A. That's correct.

Q. Then there was, at least I have the document here that I've marked as Exhibit 11, Texaco Bates number 231, as an outline for a FAMM supplemental 3 retirement plan.

Do you see that?

A. Yes.

(Whereupon, supplemental bonus retirement plan - Supplement No. 3 is marked Exhibit 11 for Identification.)

Q. Do you recognize that document at all?

A. Yes, I do recognize it.

Q. Now, Exhibit 11, the FAMM plan also indicates that supplemental bonus retirement plan is designed to provide benefits to certain management or highly compensated employees.

It goes on to say -- do you see that?

A. Yes.

Q. Would you agree with that as the purpose for the plan implemented by FAMM whether it was different or not than Texaco?

A. Yes. That was the intent.

Q. Texaco did not let pay grades below 20 participate in Supp 3. Isn't that correct?

A. I don't know.

(Whereupon, document Bates No. Raftery 00047 is marked Exhibit 12 for Identification.)

BY MR. LUCAS:

Q. Let me show you what I've marked Exhibit 12. I don't suspect you've seen it before. It's Bates number Raftery 47.

I direct your attention to the bottom paragraph where it says Hi Tom. It's an e-mail from Ken Raftery to Tom Lynch?

A. Yes.

Q. He indicates in there Don was under Texaco Supp 3 plan and I am supposedly under FAMM's Supp 3 plan. I wanted to know if you believed FAMM did indeed have their own Supp 3 plan. Also, were any Texaco PG 19's eligible for Supp 3 plan.

Do you see that?

A. Yes.

Q. Why don't you read his reply. I want to ask you questions about your understanding, not about Tom's but about your understanding.

A. Okay.

Q. Was it your understanding that there was a separate Supp 3 plan for FAMM different from Texaco's or do you have no opinion on that?

A. I really had no opinion on that.

Q. Were you aware that Texaco, at least do you agree with Mr. Lynch's statement that Texaco 19's were not allowed to, were not participants in the Supp 3 plan?

A. That was my understanding.

Q. FAMM had its own pay grade system, did it not?

It had a pay grade system?

A. It had a pay grade system in place.

Q. 19's in FAMM were allowed to participate in the Supp 3. Correct?

A. Yes.

MR. KEE: Just for clarity. Which Supp 3?

MR. LUCAS: Well, FAMM Supp 3.

THE WITNESS: FAMM Supp 3.

Q. If it was different which we don't know. Correct?

A. Right.

Q. There's some companies mentioned by Mr. Lynch. Caltex, was that a subsidiary of Texaco?
A. Caltex was a joint venture between Chevron and Texaco.
Q. Did it have its own pay grade system? Do you know?
A. I don't.
Q. How about Amoseas, was that a subsidiary?
A. Yes. It was a subsidiary. I don't know if they had their own pay system.
Q. How about Star Enterprise. The same question.
A. Star was also a joint venture with Shell. I think they actually had their own pay system, their own grade system.
Q. You never got involved, did you, in determining benefits for employees of those subsidiaries?
A. No.
Q. Now, there's also a cash bonus plan that FAMM had in place. Correct?
A. Correct.
Q. Before I mark any. Can you, to

the best of your ability, I don't know how easy or hard this will be, tell me what the compensation plans were at Texaco besides the cash bonus plan and the Supp 3.
When I say compensation plans, I mean Welfare pension benefits and compensation benefits, generally?
A. This is Texaco, not FAMM?
Q. I'm trying to ask for FAMM. Did I say Texaco? I want both. Let's start with FAMM. Then we'll compare it to Texaco.
A. Okay. At FAMM I know that every job had a grade assigned to it.
How Michelle and her team came up with those grades, I really don't know how they went about doing that.
Everyone got, obviously, a salary. And there were a number of incentive programs.
The very basic one for all employees of FAMM involved certain objectives which were set at the beginning of the year or met or exceeded those employees would get a percentage of their salary payable in cash. I think it was actually benefit driven in a sense that it would be considered for pension

calculations and the like. I think some years it was and some years it wasn't. I really can't remember how that worked its way through it. That was the basic one.
Q. What was that called?
A. I don't know the name of it. It was kind of, I'll call it the first tier. The bonus that they could get, I think was the largest they ever received was somewhere between maybe 6 to 8 percent of their gross salary.
Then I would say there was, within FAMM there was a trader bonus system. The trader's were treated as a special group. There were a number of individuals which could actually get this trader bonus. I think there was a number of 16 was the number which the board approved for people within this group. Besides their base salary they would get a bonus based upon how well their particular area and the entire organization did from a trading perspective. Getting the bonus one year didn't guarantee that you're going to get the bonus the following year.
So in that particular trader bonus area, you could have from a Texaco perspective,

grade perspective, people as low as a 16 to people as high as probably a 19, in that group, maybe even a 20. That was the trader bonus.
Then there was, I'm going to call the executive bonus plan, where it was combination of salary plus bonus. But the bonus really wasn't a percentage of your salary. It was more of a bonus that I think Texaco actually used or Chevron Texaco used a calculation based upon -- maybe it was your salary and your grade and everything else that somehow came up with a dollar value. Or since I wasn't actually involved with saying this person gets this much and this person gets that much, it might have been subjective for all I know, not an objective type.
Q. For what pay grades was that?
A. Again, there was really no pay grade. It was a group of people that would fall into that category.
Q. Were they senior management people?
A. Well, some were senior. It would depend how you define senior. There was a leadership team and others in that category.

Again, this particular tier that I'm talking about right now, you could get a bonus one year in this particular tier but you don't necessarily mean you're going to get one the following year.

If you were exceptional in a particular year you could find yourself getting an exceptional "management bonus."

Next year if you were mediocre you could find yourself in the lower tier getting that percentage of salary.

Then there was another tier that actually was I'm not going to use the words guarantee, but it was expected being in this pool, that the corporation was successful, you would get your again, obviously, your salary and a bonus which would be substantial as compared to the 6 to 8 percent that you would see in the lowest tier.

There were certain individuals that were told they were permanently in that group or certain individuals that were told it was a hit or miss type thing.

Then finally the upper tier would be your salary, plus the bonus, plus some type

of option arrangements which you would qualify for. That's the way I saw the tiers within the FAMM organization.

Q. I'm going to show you a group of documents relating to something called FAMM 2001 annual cash bonus program.

A. Okay.

MR. LUCAS: That's Exhibit 13. It's Bates numbers Texaco 0232 through 245.

(Whereupon, the referred-to documents are marked Exhibit 13 for Identification.)

Q. I want to direct your attention, if I might --

MR. KEE: This is Exhibit 13?

MR. LUCAS: Right.

Q. -- to the number on the bottom, 0241.

A. 0241. Okay.

Q. The top paragraph says introduction.

A. Yes.

Q. This is an annual cash bonus

program. It says in the second sentence: This program is targeted towards key positions within the organization whose performance is critical to the success of the business.

A. Yes.

Q. Which plan that you just described would this be, would it be the one when you used the word guaranteed bonus pool?

A. Yes. That would be the guaranteed bonus pool.

Q. Do you know whether Misters Raftery and Katz were in this plan?

A. Yes. They were both in that plan.

Q. Now, did Texaco have a similar plan?

A. Yes.

Q. Do you know for what grade levels it was available, Texaco pay grade levels it was available?

A. 20 and above.

Q. Are you familiar with an employee deferral plan that FAMM had in place?

A. Yes.

Q. Who was that available to?

A. The key group.

Q. The people --

A. The people that were getting base salary, bonus and options.

Q. How about the people who were getting that guaranteed bonus that we just saw?

A. That's what I meant. Base salary, obviously guaranteed bonus and options or similar. I think they called them SARS.

Q. I'm showing you what I've marked as Exhibit 14. It's a document entitled FAMM employee deferral plan. Texaco Bates numbers 267 and 268.

Is that a description of the FAMM plan?

A. Yes. This was the FAMM deferral plan.

(Whereupon, the referred-to document is marked Exhibit 14 for Identification.)

Q. It indicates under eligibility that you're eligible if you were an active or retired key employee of FAMM?

A. Yes.

Q. Misters Raftery and Katz participated in the plan as well. Correct?

A. Yes.

Q. Did Texaco have a similar deferral plan?

A. Yes.

Q. Do you know what Texaco pay grade that was made available to?

A. I only became aware of it when I became a level 20.

Q. That's when it was offered to you?

A. That's when it was offered to me, yes.

Q. I'm showing you Exhibit 15. It's a document entitled Director and Employee Deferral Plan. It's Texaco Bates numbers 269 through 278.

(Whereupon, the referred-to document was marked Exhibit 15 for Identification.)

Q. Is that the Texaco deferral plan that was offered to you when you became a Texaco level 20?

A. Yes. This was the plan that I entered into at Texaco.

Q. If you look at the first page where it says coverage. It indicates this plan is intended to apply to (A) and it uses FAMM language, similar to those active and key employees or affiliate aid group which is defined as Texaco and its subsidiaries.

Do you see that?

A. Yes.

Q. Texaco generally defined its key employees as Texaco pay grade 20 and above. Right?

A. To the best of my knowledge, yes.

Q. And a long term incentive program?

A. Yes.

Q. Was that one of the plans you were referring to earlier or was that different?

A. Long term incentive plan I think was the option plan I was referring to.

Q. That was made available by FAMM to key members of its management team?

A. Yes.

MR. KEE: What was the question again.

(Whereupon, the reporter reads back the last question and answer.)

MR. KEE: Thanks.

MR. LUCAS: Exhibit 16 is a document entitled Fuel and Marine Marketing, LLC The Long Term Incentive Plan. It's numbers 260 through 265. It's Texaco Bates numbers 260 to 265.

(Whereupon, the referred-to document is marked Exhibit 16 for Identification.)

BY MR. LUCAS:

Q. Is that the plan you're referring to?

A. Yes.

Q. Misters Raftery and Katz were participants in that plan?

A. Yes.

Q. Did Texaco have a similar plan?

A. Yes.

Q. Do you know what that was called?

A. I think it was called long term incentive plan.

Q. Do you know what pay grades that was made available to by Texaco?

A. To the best of my knowledge, level 20 and above. But being a 20 didn't guarantee that you get the long term incentive.

Q. If you were at Texaco at a Texaco pay grade 20 it didn't guarantee you?

A. It didn't guarantee it.

Q. It just made you eligible for it?

A. It made you eligible. You had to be approved on a yearly basis. When you became a 21, then it was more of a guaranteed one.

Q. I see.

Now, FAMM participated in Texaco's severance pay plan. Right?

A. Yes.

Q. And do you recall whether initially when FAMM was created, Stephen Pennacchio included FAMM as a participant under Texaco operation pay plan?

A. I think the first time he went through it he left out FAMM. And we brought it to their attention I think at that point.

I remember there was a problem -- not a problem. I don't know if it was an

oversight or what, but if I remember correctly, the first cut FAMM was not included.

Q. Right.

A. I think we had to go back through Michelle Swanson to make the change, so we did become part of the severance package.

Q. Do you recall that being a matter of some concern at the time?

A. Yes.

Q. The fact that Mr. Pennacchio left it out?

A. Yes.

Q. Did he ever indicate whether it was an oversight or intentional on his part?

A. To the best of my knowledge, no.

Q. Do you remember Patrick Deval -- do you know who Mr. Deval Patrick is?

A. Yes.

Q. Was he in-house counsel for FAMM?

A. He was in-house counsel for FAMM.

Q. Did he have to get involved in order to straighten this out?

A. Now that you mention his name, that's absolutely correct.

Q. As a matter of fact, the president

of Texaco had to be brought in, did he not, or contacted I would say?

A. I don't know.

Q. But it took some doing to get it undone and get FAMM added to the plan?

A. To the best of my knowledge that statement is correct.

Q. Were you involved in any discussions as to how this omission occurred?

A. No.

Q. Is there anything about that event that you can recall now that I haven't asked you about?

A. No.

Q. At some point did you become aware there was going to be a change of control event at Texaco?

A. Yes.

Q. When did you become aware of that?

A. You're asking the exact date?

Q. I'm sorry. I have to do two things at once. I'm not trying to be rude.

A. I understand. You're asking the exact date.

Q. Approximate. That you became

aware.

A. Well, it's when Chevron agreed to take over or excuse me, merge with Texaco.

Q. When did you learn about that?

A. When it was announced on the news and I read about it in the Wall Street Journal the next day.

Q. Do you recall what year that was?

A. I'm trying to think now.

Q. Change of control was October of 2001. If that helps you at all.

A. So I can't remember.

Q. Let me show you what's been marked in a previous deposition as Exhibit 6.

Have you seen that letter before or memo I guess I should call it?

A. Yes.

Q. When is the first time you saw that?

A. I saw it at a meeting that I attended sponsored by Stephen Pennacchio.

Q. Who was the meeting for?

A. It was for position grades 20 and above, employees.

Q. At FAMM or at Texaco?

A. At Texaco. But if I remember correctly, FAMM wasn't invited to this meeting at first. We found out about it and I remember going on my own volition.

Q. So this memorandum was never circulated to FAMM employees directly, correct, by Texaco?

A. To the best of my knowledge, no. I received this when I went to the meeting.

Q. To the best of your knowledge FAMM wasn't even invited to the meeting until you found out about it and decided to go on your own?

A. That I remember. That's true.

Q. Do you recall there being some concern among your subordinates at FAMM as to how the enhanced severance outlined in Mr. Pennacchio's letter was going to be applied to FAMM employees?

A. You mean as of the date of the meeting I went to?

Q. After the meeting.

A. Well, it was after this meeting where people started talking about it. How long after the meeting and how concerned they were, I

really don't know.

Q. At the time you went to this meeting, were you aware that there would be a change of control event or a change of control event was anticipated by Texaco?

A. Yes.

Q. Was that in the summer of '99 or June-ish of 1999?

A. Yes.

Q. So to the best of your knowledge, you can recall it was in June of 1999 at about the time dated in that memo?

A. Yes. He had a number of meetings. I think we actually missed the first meeting. We went to the second meeting after we heard there was the meeting.

Q. Had you ever seen a version of the severance pay plan that incorporated those changes outlined in Mr. Pennacchio's letter?

A. I don't understand the question.

Q. There's a summary plan description and an official plan text, is there not, for the severance pay plan of Texaco?

A. Yes.

Q. My question is only do you recall ever seeing in a summary plan description or the actual plan document those changes outlined in Mr. Pennacchio's letter Exhibit 6 that you have in your hand?

A. Yes. If I remember correctly at the meeting he had another handout which got into more detail. This is kind of the summary that he went into depth.

Q. At that meeting was anyone from Caltex there that you can recall?

A. That I recall no.

Q. How about the other subsidiaries that we mentioned earlier?

A. It was Star and -- to the best of my memory, no.

Q. Do you, as you sit here today, know whether any of the executives of those other subsidiaries received the benefits, any of the benefits -- let me rephrase that.

Withdrawn.

Do you know as you sit here today whether any executives of those other subsidiaries received the enhanced separation pay outlined in Mr. Pennacchio's letter, Exhibit 6?

A. No, I don't.

Q. Do you know if are there any repercussions to Mr. Pennacchio career-wise for the omission of FAMM from the severance pay plan?

A. I think the answer is yes to that.

Q. In what way was his career impacted, to the best of your knowledge?

A. I know that because of this, there was friction between Mr. Pennacchio and FAMM.

Q. Okay.

A. This did not help the situation.

Q. Mr. Pennacchio's position was what at Texaco?

What department was he in?

A. He was in executive compensation.

I think he was the director. He was one of the top executive compensation people. I think he reported directly to Mr. Bijur, Peter Bijur.

Q. What was Mr. Bijur's title?

A. He was chairman and chief executive officer.

Q. Now, you said there was friction between FAMM and Mr. Pennacchio?

A. Yes.

Q. What was the cause of that friction?

A. To the best of my understanding, FAMM being somewhat unique within the Texaco organization, again this is before the big merger with Chevron, Texaco, we were more of the entrepreneur free spirit type.

Mr. Pennacchio, it appeared to me, that I don't know if he resented it. But somehow he could draw a box around the entire Texaco organization and he had control of the executives because he had a lot, he input to Mr. Bijur on how they were compensated.

So I saw it as we didn't give him the respect that he perceived he should get. Because we really didn't care what he thought.

Q. The compensation of FAMM executives did not always fall in line with Texaco. Correct?

A. Correct.

Q. There was some friction between FAMM and its administration of its plans and Texaco's. Correct?

A. Yes.

Q. When you first joined FAMM, do you recall there being a compensation study undertaken by the Hay Group?

A. Yes.

Q. What do you recall was the purpose of that study?

A. The purpose was to make sure that the people within the FAMM organization were fully compensated as a stand alone unit as opposed to depending upon Chevron or Texaco for feedback as to what a particular position was from a compensation perspective.

Q. All elements of compensation including benefits?

A. Yes.

Q. Was there a report prepared by the Hay Group that you recall?

A. Yes, there was.

Q. Was that circulated to the management team?

A. No.

Q. Did you ever see a copy of it?

A. I might have seen parts of it.

Q. There used to be weekly meetings by FAMM's management team. Isn't that correct?

A. Correct.

Q. How was it determined who would attend those meetings?

Who was invited, put it that way?

A. Are you talking about weekly meetings now?

Q. Well, I think they're weekly. Let me start with weekly.

Were there weekly meetings?

A. There were weekly meetings. The weekly meeting was nothing more than an operational type meeting where the leadership team would be there with some of their direct reports. The purpose of that meeting was mostly operational, how everything was doing from an earnings perspective.

However, we did take the time to bring up other issues at those meetings only because everyone was there and it could be easily disseminated among the team.

We actually had conference calls, people were in from all over the world.

Q. Were there minutes prepared of those meetings or notes?

A. Yes.

Q. Was there a different management meeting system that you're aware of?

A. Yes. At least on I'd say a monthly basis, the leadership team, leadership as I defined, was the vice-presidents, with Mr. Bandy as executive vice president Maureen Caso. When it came to personnel matters, Michelle Swanson would be there.

We would have those management meetings monthly. They would be all day meetings and we'd cover everything.

Q. Were there minutes prepared of those meetings or notes?

A. I don't think so.

Q. Do you recall over what period of time the Hay study was undertaken?

A. If I remember correctly, it was soon after the formation of FAMM which would make it probably 1999.

Because FAMM began in, if I remember correctly, November of 1998.

Q. Do you know where changes were adopted as a result of that study, if any?

A. No, I don't.

Q. Do you know whether FAMM's pay grade system was one of the topics of that study?

A. I do not.

Q. How specific titles were compensated was a topic of the study, is that correct, specific positions?

A. Let me go back.

I would say that yes, if I remember correctly, they were looking at my particular position, just doing a typical -- there is such a thing as typical review, of the position, the responsibility. I think what they were doing was comparing that to the industry.

I was, from a personal standpoint, I was more concerned about the total compensation versus what number you're going to assign to it.

From the start of my career, I never really focused in on that.

Q. The head, the CEO Mr. Bandy, he was a grade, referred to as a FAMM grade 23. Correct?

MR. KEE: Objection to what you're calling a FAMM grade 23. To the extent that that implies anything, but go ahead.

A. I don't know what grade Mr. Bandy was.

Q. You remained a 20 throughout?

A. Yes.

Q. Your compensation and your package was significantly greater than a Texaco 20. Was it not?

A. Well, when I left I was actually promoted to at least a 21.

I don't know how that actually affected my final payout.

Q. Not talking about the severance payout. I'm talking about your basic compensation on an annualized basis?

A. When I finally was made a 21, I don't think anything really drastic happened salary-wise to my pay. I think my bonus increased, but my salary I don't think changed that much at all.

Q. You felt as a 20 you felt if you were at Texaco you would have been significantly higher than a 20. Correct?

A. I mean --

Q. What I'm trying to say. You said you were pay grade 20 at Texaco when you went

over to FAMM. Your duties went up?

A. They went up substantially within the FAMM organization.

Q. So those same duties if I heard it right would have merited a higher Texaco pay grade. Correct?

A. Logic, correct.

Q. The compensation you received at FAMM was not in line with what a Texaco 20 would receive. Correct?

A. Correct.

Q. It was significantly higher?

A. To the best of my knowledge, yes.

Q. Then at the some point there was an adjustment made to your pay grade at FAMM. Correct?

A. Correct.

Q. That was presented to the board of directors?

A. Correct.

Q. Who were the board of directors at the time that it was presented?

A. On the Texaco side it was Scott Jeffrey and George Batavick.

Q. Do you want to spell it for her?

MR. KEE: B-A-T-A-V-I-C-K.

A. I think that's right.

On the Chevron side it was a gentleman by the name of Matt Foehr, and I think it was Joe Geagea.

MR. KEE: G-E-A-G-E-A.

A. Mr. Bandy was also on the board, but he was a non-voting board member if you want to get exact.

Q. Were you present at the board of directors meeting where your pay grade was discussed?

A. No.

Q. Your pay grade was presented as a change in addition to Mr. Katz and Mr. Raftery's and one other individual. Correct?

Or at least Mr. Katz and Raftery?

A. I know the three. It may have been four. I don't know. HR matters were handled between Michelle and Mr. Bandy.

Q. Changing your pay grade from a 20 to 21 did not result in any greater payout under the severance pay plan because you had already maxed out based on your years of service?

A. Correct.

Q. But changing Mr. Raftery or Mr. Katz would have changed the Texaco payout. Correct?

A. Yes.

Q. So yours went through; Mr. Raftery and Mr. Katz's did not. Correct?

A. Yes.

MR. LUCAS: Let me take a five minute break.

(Whereupon, a short break was taken.)

BY MR. LUCAS:

Q. Now, Mr. Katz and Mr. Raftery we've established worked directly for you?

A. Correct.

Q. Did they complain to you that they felt they were being wrongfully excluded by the enhanced severance referred to by Mr. Pennacchio in his letter, Exhibit 6?

A. Yes.

Q. Let me show you what I've marked as plaintiff's Exhibit 17.

It's Bates number 73. It's an

e-mail from Larry Katz to Glenn Tilton.

MR. KEE: What number is this?

MS. CANADAY: 17.

(Whereupon, the referred-to document is marked Exhibit 17 for Identification.)

Q. I ask you, have you ever seen that before?

A. Yes. I've seen this.

Q. When was the first time you saw this?

A. About the time it was dated.

Q. Did Mr. Katz share it with you before it went out?

A. I don't remember. He might have.

Q. Were you sympathetic to his position?

A. Yes.

Q. Do you believe they should have gotten the enhanced severance referred to in Mr. Pennacchio's letter?

THE WITNESS: Do you want me to answer that?

MR. KEE: Can you read me the question.

(Whereupon, the reporter reads back the last question.)

MR. KEE: Yes. You can answer that if you have an opinion.

A. Yes.

Q. And did you share that opinion with Mr. Katz and Mr. Raftery?

A. Yes.

Q. Who else did you share that opinion with in 2001/2002 time frame?

A. You want all the people?

Q. Sure.

A. Michelle Swanson, Mike Bandy. I think I spoke to Scott Jeffrey about it too.

Q. Anyone else you can recall?

A. Well, obviously Ken and Larry.

Q. What was Miss Swanson's -- did she express an opinion to you on that topic?

A. To the best of my knowledge, I can't remember.

Q. How about Mr. Bandy, did he

express an opinion to you on that topic, namely whether Misters Katz or Raftery should get the enhanced benefits referred to by Mr. Pennacchio in his letter, Exhibit 6?

A. Again, I think you're going to have to ask Mr. Bandy that question.

Q. In this Exhibit 17 in the second to last paragraph Mr. Katz says he has reviewed the issue, namely his entitlement with several of my former bosses including Bill Mather, Steve Carlson, Bill Wicker, Peter Meade, George Wall, and Mike Bandy, he says who understood my current activities and all believed I was doing grade 20 work.

Did you believe he was doing grade 20 work?

A. Yes.

Q. And did you have any discussions other than Mr. Bandy who you've already referred to with any of these other individuals listed to Bill Mather, Steve Carlson, Bill Wicker or George Wall?

A. I didn't talk to Bill Mather, Steve Carlson or Bill Wicker who by the way is the senior vice-president's name I couldn't

remember. I might have discussed it with George Wall.

Q. I gather since you said you might have, you don't have any specific recollection of that discussion?

A. I am pretty sure I discussed it with George Wall.

Q. Did he share your opinion that should be received by Misters Raftery and Katz?

A. I think he was sympathetic to what they were saying, yes.

Q. Were you advocating their position on their behalf or just having discussions?

A. I was advocating.

Q. Did you have any discussions with anyone at Texaco directly about this?

For example, Mr. Pennacchio?

A. No. Not Mr. Pennacchio.

Q. Anyone else over at Texaco?

A. Again, I think I might have mentioned Scott Jeffrey.

Q. Do you know what his opinion was, did he share it with you?

A. He didn't share it with me, no.

Q. By the way, in Exhibit 17 there's

a reference to the position in Houston being filled by Mr. Raftery's replacement or successor and it being a CP 27 equivalent to a Texaco 20 and indicating the job was lesser in scope than Mr. Raftery's job.

Do you see that?

A. Yes.

Q. Did you undertake any analysis of that issue yourself?

A. No.

Q. But did Mr. Raftery or Katz explain to you the reasoning for making those statements in that paragraph?

A. Yes. I think the person who took Ken's spot in Houston -- the argument is whose spot did he take, did he take my spot as CFO or did he take Ken's spot as comptroller. I think Scott has a CPA. I don't know if Scott Hannen has a CPA. It's Scott H-A-N-N-A-N or E-N.

MS. CANADAY: E-N.

Q. The job was reduced in scope, was it not, from yours or Ken's job?

A. From my job I was definitely reduced in scope. In fact, I never accepted that discussion at all. I don't know what

Scott's actually doing at this minute, so it would be difficult for me to answer that.

Q. At the time it was Ken's opinion was it not as expressed to you, that the job was less than what he was doing at FAMM?

A. That's a matter of opinion. I'd say it was comparable. Because it was the comptroller function.

Q. And it was being equated to a pay grade, Texaco pay grade 20. Correct?

A. Correct.

Q. Let me show you Exhibit 18. It's another e-mail. It's Bates number 74 and 75. It's actually a series of e-mails.

(Whereupon, the referred-to document is marked Exhibit 18 for Identification.)

Q. I direct your attention it's the e-mail we just saw, Exhibit 17 with two additional e-mails. The top being Bill Mather's.

My question is really have you seen this before?

A. Yes, I did see this prior to looking at it right now.

Q. Did you see it at or about the time of December 10, 2001?

A. Yes.

Q. Does it refresh your recollection as to whether you had any discussions with Mr. Mather of his position?

A. I did not have any discussion with Bill.

Q. But you're aware that he shared your opinion that he was in support of Mr. Katz getting the enhanced benefits referred to in Exhibit 6?

A. I would have been surprised if he disagreed.

Q. Why is that?

A. Well, as I mentioned, Larry did work with Bill Mather, not only on the Chevron Texaco FAMM joint venture, he worked on other very complicated trades.

Larry is probably one of the smartest people I've ever met. He's really sharp. And he did very well when he was up with the senior vice-president and Bill and Steve and

those guys.

Q. You indicated earlier I believe that you did have some conversations with Mr. Bandy on this. Is that correct?

A. Yes.

Q. And do you know was he reluctant to advocate Mr. Katz or Mr. Raftery's position, do you know?

A. No. I don't think that he was. I mean, just the fact that he brought it to the board, shows, that you know if Mike didn't -- I can't talk for Mike. But it wouldn't have been a board item if Mike didn't support it.

Q. Did he indicate to you whether Texaco board representatives were resisting?

Either Mr. Batavick or Mr. Jeffrey?

A. I spoke to Mike prior to the board meeting on this.

After the board meeting and I got the feedback, again obviously I was happy because I got mine.

Q. Right.

A. My increase.

However, I was disappointed that

Ken and Larry didn't get the 20. You'd have to ask Mike how he felt.

Q. Why did you seek to have it changed to 21? If it didn't benefit you at all, why were you doing it?

A. It was something that was nagging me over the last few years that I was at the time I guess it was still Texaco. I was made a 20, when I came into FAMM. I knew that the other vice-presidents or at least most of the vice-presidents that I dealt with on a regular basis probably had less responsibility than I had, with 21. So it was something that I thought that was long overdue and that again the way that the bonus was actually calculated, was a function of the so-called grade you were. That's my understanding.

Q. The Texaco bonus?

A. Even the FAMM bonus, if I'm not mistaken.

You had, I think, more flexibility.

I guess the other thing. Again, when I was in FAMM, I felt secure that I was always going to get the senior management bonus

and long term incentive.

But under the Texaco plan, being a 20, you didn't automatically qualify, as I said earlier, for the long term incentive. You had to be a 21 to qualify for that.

So I was leaving I thought it was time for them to make a change.

Q. So as long as you were under FAMM's umbrella it didn't bother you too much, but the fact that wasn't the case any longer was of concern to you?

A. And when you think about it, within the thinking I would say within Texaco in order for Larry and Ken to be twenties I would have to be a 21. Because they don't have twenties reporting to twenties. So by default they had to bump me up too.

Q. Who is Pat Wertz, W-E-R-T-Z?

A. Pat is either a senior or executive vice-president of Chevron. She reports directly in to the chairman. She's responsible for the complete downstream of Chevron Texaco. And Mike Bandy reported in to her.

Q. Do you know whether Mr. Bandy had

any discussions with Pat Wertz abouts Larry's concerns?

A. No.

Q. You didn't speak with Pat Wertz?

A. No.

Q. Who is Mr. Al Swensen, S-W-E-N-S-E-N?

A. I think he had something to do with the grievance committee or HR Texaco, if I I'm not mistaken.

Q. You didn't have any discussions with him about Larry's or Ken's concern?

A. No. I didn't really even know Al Swensen.

Q. Let me show you Exhibit 19. It's another e-Mail. Bates number Katz 20.

(Whereupon, the referred-to document is marked Exhibit 19 for Identification.)

Q. I ask if you've seen that e-mail before?

A. I'm sorry. Your question was?

Q. Have you ever seen that e-mail

before, either one, there's two of them on there?

A. Oh. Ken wrote this to himself.

Q. Then forwarded it to Larry. I don't know if he shared it with you.

A. I don't think I saw this one.

Q. He indicates, Mr. Raftery does in the original e-mail this morning, both Peter Meade and Michelle Swanson's separately and confidentially confirmed that my replacement is graded as a ChevronTexaco, all one word, pay grade 27 which is a Texaco equivalent 20.

Do you recall confirming that?

A. Yes, I did.

Q. So when I asked you before whether you had done your own analysis you didn't analyze it but you did confirm it?

A. I did confirm it.

MR. KEE: Objection to the form on that. I'm not sure those are comparable questions, but go ahead.

Q. You satisfied yourself that the replacement was the equivalent of a Texaco 20. Is that correct?

MR. KEE: Objection to form.

THE WITNESS: Do you object?

MR. KEE: I object, but you can answer the question.

A. I didn't. I was stating more of a fact that the job is a 27 which equates to a 20. I didn't say to myself, well in this particular case, this particular job is equivalent to a 20.

Q. I see. Just confirm the fact that this is what Texaco's thoughts were on the topic?

A. Right.

Q. When did you leave FAMM?

A. My last official day was the end of November 2002.

Q. Up to that point, your last day of work at FAMM, did anyone from Texaco who was on the claims committee, the separation plan, speak to you about Larry or Ken's entitlement to enhanced severance?

A. Who's on the claims committee?

Before I answer that question can you let me mow know who's on the claims committee.

Q. Okay. Give me a minute.

Let me rephrase it.

Did anyone come to you identifying themselves as a member of the claims committee and wanting to inquire of you your opinion?

A. No.

Q. Or any events around the claim?

A. No.

Q. I don't think we have the list here. It wasn't meant to be a trick question.

A. No. I think I'm comfortable in saying no.

Q. Have you had any contact since you left FAMM with anyone at Texaco about Mr. Raftery or Mr. Katz's claims in this litigation?

A. Yes.

Q. Who?

A. I spoke to Michelle Swanson on that.

Q. That was going to be my next question.

Was it Chevron or FAMM? You're lumping that all together?

A. Well, at that point it's really all one.

Q. So Michelle Swanson?

A. Michelle Swanson. And I might

have mentioned to or just asked for an update from Mike Bandy.

Q. How many times have you spoken with Miss Swanson?

A. On this matter?

Q. Right. Since you left?

A. I'd say maybe twice.

Q. What do you recall saying to her and her to you in the first conversation?

A. Well, there were actually e-mails that we were sending back and forth.

Q. Do you have copies of those e-mails?

A. I do somewhere. Okay.

I had them, they came in through AOL. I'm very concerned about documentation. Because I knew there was a discovery request and anyone who's ever worked at Texaco is sensitive about discovery. So I did printout one or two e-mails. I put them in a safe spot, and I have had them for quite a period of time.

We were really scheduled to have this meeting earlier and I had taken them from my safe spot and placed them somewhere. I was looking for them for at least an hour today and

I could not find them.

But the gist of it was it was one of two or three topics that we were talking about. I might have mentioned to Michelle. I saw Ken and Larry and we really didn't even talk about the lawsuit, how is that coming along. And her reaction was, well, I just wish that whole thing would go away.

You know it's a lot of work with discovery. It was something where she was just wishing that we never got into this particular situation.

As a follow-up I'm going to have to go home and search for them again and I'll definitely get them to you.

But the gist was she was kind of frustrated with it. She might have said I wish they'd just pay them and make the whole thing go away.

Q. Had you had conversations with her prior to you leaving FAMM?

A. Chances are when I spoke to Michelle, whether prior or post, I would ask her about how things were going with the lawsuit.

Q. She supported the same position

that you supported, that they should be paid. Correct?

A. Well, not based on those memos. But based on previous conversations, my impression was that she was supportive. But again, how she really felt when you asked that question to her, I was led to believe that she supported their request.

Q. And you said you might have had a conversation with or maybe e-mails with Mr. Bandy?

A. Well, Mr. Bandy was just conversation. Again, I was asking him from his perspective, have you been deposed yet, that type questions. But nothing -- he didn't show his cards either way.

Q. He didn't?

A. No. If I find those documents I'll get them to Kevin and --

MR. KEE: Sean.

THE WITNESS: I'm sorry.

Q. You say you'll get them to Sean. Does Sean represent you?

A. I don't really think anyone does. I mean, Sean was the one who coordinated this

for me, I thought.

MR. KEE: Mr. Meade is testifying regarding his knowledge he had as an employee of Texaco. So for this deposition I represent him.

BY MR. LUCAS:

Q. But you haven't retained him specifically for that purpose?

A. I'm sorry?

Q. Other than the fact you're a former employee and he's here to protect the company's position, you haven't retained him to represent you?

A. No.

Q. Have you met with Mr. Kee to prepare for this deposition?

A. Yes. I met with him this morning.

Q. For how long?

A. Oh, about an hour.

Q. Did he show you any documents?

A. My mind is going to mush. No.

Q. Did you discuss with him what the case was about?

MR. KEE: Objection. Privileged

information. I instruct you not to answer.

MR. LUCAS: I just want to state for the record, I don't want to get contentious on it, this issue came up; I've done some research on it. I'll be happy to share it with you. I don't think the privilege extends under the circumstances to conversation you had prior to the deposition which might influence, what I don't mean by coaching, but anything you said that might influence his answer in anyway or how he views this litigation.

MR. KEE: I think I have the case that talks about a former employee who discusses with counsel for the employer his scope of employment, et cetera. I think Judge Arterton held that.

MR. LUCAS: I'm talking about conversations after he left employment.

MR. KEE: That's exactly what I'm talking about. Judge Arterton, as I understand, had a ruling on a case where one of the attorneys in our office spoke to a former employee in the middle of a deposition during a lunch break. Judge

Arterton held those conversations with the former employee were privileged communications.

MR. LUCAS: I have those here. At a break why don't you take a look at it and see whether you want to reconsider or not reconsider.

I think I might just about be done. Let's take a five minute break.

THE WITNESS: Sure.

(Whereupon, there is a short break taken.)

MR. LUCAS: I think, Sean, the case you're referring to Peralta versus Cendent, Rob Fischer's case. We're basically both right.

MR. KEE: Okay. To the extent let me make sure we're all in agreement and what I will and won't allow you to answer.

I think we agree this case says you can't ask for information regarding our conversations about your knowledge of the circumstances of their employment at FAMM.

I think that's one reading of this. I can't ask about that.

MR. LUCAS: Anything that was privileged before when he was employed remains privileged.

Anything after about the facts of the litigation I can ask him about. But I can't ask him about your opinions because that's work product.

MR. KEE: No. The way I read this is if I informed him of the testimony of witnesses such that you would not have had prior or independent knowledge of while you were there, you can ask him that.

MR. LUCAS: Right.

MR. KEE: Okay. Why don't you start with that.

BY MR. LUCAS:

Q. In your conversations with Mr. Kee, did he discuss with you the testimony of Mr. Jeffrey?

A. No.

Q. Was there any discussion of the facts as developed in this litigation?

MR. KEE: Beyond what you knew.

Q. Beyond what you already knew.

A. No.

Q. Mr. Batavick was a Texaco employee but on the board of FAMM. Correct?

A. Yes.

Q. Were you aware of any friction between Mr. Batavick and Michelle Swanson regarding issues of compensation at FAMM?

A. The easy answer is no. But I think when these matters came up Mr. Batavick had to get involved with it.

I know it was my impression that he didn't really like to deal with these type issues. So yes, I can see some friction between the two.

Q. Did you witness any -- I don't know if bias is the right word -- any expression of desire by Mr. Batavick to limit FAMM's compensation to keep it in line with Texaco's ?

A. No.

Q. Is it fair to say you probably were not party to all conversations between Mr. Batavick and Michelle Swanson on the topic of compensation?

A. Correct.

MR. LUCAS: That's all I have at this time subject to redirect.

MR. KEE: I have a few questions here, Mr. Meade.

CROSS-EXAMINATION

BY MR. KEE:

Q. Did you ever have any responsibility for compensation plans either at Texaco or FAMM?

A. No.

Q. Have you ever had to review the eligibility factors under either Texaco or FAMM plans for any employee to determine whether or not they're eligible for benefits?

A. No.

Q. You stated your opinion on whether you thought Mr. Raftery and Mr. Katz should receive benefits under this plan?

A. Yes.

Q. Did you base that on your interpretation of any terms of the plan at issue?

A. The terms, no.

Q. Was this in your mind sort of really an issue of you wanting to take care of employees who had done a good job for you?

A. Partially.

Q. Okay. What else?

A. They both did a good job, as I said.

Again, this is only speculation on my part. But I firmly believe that both Ken and Larry, if they remained within the Texaco organization, they would have been at least twenties by the time this particular program came up.

Q. You say that because you believe because knowing the type of people they are and the contacts they had, that they would have been promoted into positions of higher responsibility?

A. I would say that the track Larry Katz was on I am 100 percent sure that he would have been at least a 20 within the time period he spent at FAMM. Just again because of the nature, the people he was working with and the exposure he was getting.

Ken, because of the nature of the controllers department, it would have been more difficult for him if he stayed within the controllers department. But the fact that, you know, I'm sure if FAMM didn't come along something else would have come along and he would have been recommended for that position also.

I'm sure in that same time period he would have been at least a 20 going forward.

Q. So if they had elected to stay in the Texaco organization rather than go into the FAMM organization, there would have been more promotional opportunities?

A. Yes.

Q. And because of the smaller size of the FAMM organization, there was limited promotional opportunities?

A. Well, again within the FAMM organization we really never talked about grades. At least I didn't talk about grades.

If Ken was coming in to talk about an individual and they were going to be changing a position and it involved more work, this is like a lower level accountant, in some cases it

would involve a higher grade. But I had no idea what the ranges were. I just knew there were higher, additional responsibilities, higher grade more pay.

But within the FAMM organization we really didn't talk or at least I never really talked about grade and what you were. It was more, you know, you were controller, I was the VP and CFO. We had our responsibilities and you know we knew what our salary was, we thought it was fair. The bonus plan was excellent. We knew what we had to do to get our bonuses and we knew we were all in the long term incentive program.

Q. When you say long term incentive program, was the long term incentive program that you were enrolled in at FAMM the same as the long term incentive program you had been in at Texaco?

A. I think they mirrored. But we were getting the SARS within the FAMM organization as opposed to -- I think at the end of the day it was basically the same thing. We were still getting Texaco Chevron stock as part of it. I should be up on this more, but I'm

not.

Q. Well, maybe that's the issue. Were you up on that?

A. No.

Q. To be clear: When you were at Texaco did you receive Chevron stock, when you were at Texaco?

A. Well, when I was at Texaco it was Texaco by itself. It had nothing to do with Chevron Texaco.

Q. When you were at FAMM, it just happened to be that FAMM was a joint venture of Chevron and Texaco?

A. Correct.

Q. Subsequently Chevron and Texaco merged?

A. Correct.

Q. But while you were at FAMM the stock appreciation rights or SARS, I think you called it, were combination of Chevron and Texaco?

A. Correct.

Q. That's because it was a joint venture?

A. Yes.

Q. Not because later on they happened to merge?

A. Correct.

Q. You made a comment here earlier that you had spoken with Michelle Swanson who had said that she wished these guys had just gotten paid out. Is that correct?

A. Correct.

Q. Did you take it that's because Michelle thought these guys were grade twenties and eligible to the benefits of the plan or more that she was unhappy with the burden of complying with discovery requests?

MR. LUCAS: Objection.

MR. KEE: You can answer.

A. I can answer it?

Again, you have to ask Michelle on that. It might be combination of the two.

Q. At the time that there was consideration of the promotion of these individuals going on from 19 to 20?

A. Right.

Q. Do you know whether Scott Jeffrey or George Batavick knew that they were not going to be employees of Texaco?

MR. LUCAS: Objection.

MR. KEE: Let me strike that.

Q. At the time all that was going on that the discussion or the promotion was going on people were aware of the Chevron Texaco merger?

A. Correct.

Q. And a number of -- am I correct in assuming that a number of people knew that after the merger they would no longer have jobs?

A. Yes.

Q. Are Scott Jeffrey and George Batavick employed by Texaco today?

A. No.

Q. Do you have any knowledge whether or not they knew in August of 2001, whether they were going to continue as employees of Texaco?

MR. LUCAS: Objection.

A. I can answer it?

Q. Yes.

A. I don't know what they knew themselves. But the nature of the jobs that they had, for example, George Batavick being controller of Texaco and knowing that the acquiring company has their own controller, I

made the assumption that George was going to be no longer employed at Texaco -- excuse me of the joint venture.

I think Scott Jeffrey knowing the fact that he liked this particular part of the country and his particular job would end up in San Ramon, California, I had a strong feeling that Scott would not be leaving the northeast to go to the west coast.

Q. Do you have any reason to believe that Mr. Batavick or Mr. Jeffrey or anyone else on the board considered the cost of what this might mean financially by promoting Mr. Katz or Mr. Raftery and making their decision not to promote them?

MR. LUCAS: Objection. Is there any evidence in the record that that decision was, in fact, made?

MR. KEE: Okay. Strike that.

Q. You knew that it was somehow up for consideration whether or not they would be promoted?

A. Yes.

Q. Do you know whether or not the cost that Chevron Texaco might eventually pay

for these additional benefits was a factor in that discussion?

A. That discussion at the board meeting?

Q. Right.

A. I don't know.

Q. Do you have any reason to believe that that was a consideration?

A. Yes.

Q. Why do you say that?

A. On Scott's side I don't think it was a consideration.

George Batavick on the other hand was definitely a Texaco company man. I don't mean that in a derogatory sense. He was a true Texaco person.

I'm just guessing that George was giving Larry and Ken some additional -- again, this is actually I think maybe again I don't know what George was thinking, I'd say it was a strong possibility he didn't want to do anything that if it got out that other people heard what was happening in FAMM, other Texaco people that were 19s might want to do the same thing and say the same arguments that Ken and Larry were

saying. But I guess it's less of a gray area from a Texaco perspective.

If I answered that question.

Q. So you think George might have been concerned that other people would come forward and say we're 19s but we really ought to be twenties?

A. Exactly.

Q. And presumably there would have been other people in the Texaco organization who you knew who wished they were grade twenties as well?

A. Oh, everybody in the organization wished they were a grade 20, at least a grade 20.

Q. But to your knowledge Mr. Katz and Mr. Raftery were not grade twenties?

MR. LUCAS: Objection.

A. Am I supposed to answer?

Q. Yes. You can answer.

A. I know within the Texaco system they were not registered as twenties.

Q. Do you know how, whether FAMM just used the precise grading that Texaco had done or whether it had its own independent grading

system?

A. Well, they had a system, I wouldn't call it a grading system. I'm living proof of it. I'm a 20. I just legalized that, going back in, what did I say '89, I was made a 20. It didn't really seem to kind of bother me. Just as long as I felt my compensation, my bonus and long term incentives were there. That's the way I always addressed it with them. If it ever came up I would say don't worry about it you're being fully compensated.

Q. Who would be the best authority within FAMM regarding how the FAMM structured its pay grades?

A. Michelle Swanson.

MR. KEE: That's all I have.

REDIRECT EXAMINATION

BY MR. LUCAS:

Q. FAMM and Texaco are aside from one being a partially owned subsidiary, are separate companies. Right?

A. Yes.

Q. Or were separate companies?

A. Yes.

Q. You're aware that Texaco for its employees were giving these enhanced benefits to grade twenties and above. Correct?

A. Correct.

MR. KEE: Objection to the term enhanced. Enhanced severance benefits.

MR. LUCAS: Yes.

Q. Enhanced severance benefits?

A. Yes.

MR. LUCAS: Objection withdrawn.

MR. KEE: Yes.

BY MR. LUCAS:

Q. The reason you feel you have to project where Ken and Larry would be in Texaco is because they weren't in Texaco, they were in FAMM. Correct?

A. Correct.

Q. And FAMM and its pay grade system does not mesh with Texaco?

In other words its system over time became distorted and not the equivalent of Texaco's. Correct?

A. Well, I assume Texaco's was

changing over the three-year period that FAMM was in existence. I can only talk from a personal standpoint. I didn't really care what was happening at Texaco. I was looking at Michelle and her team and the leadership team as I defined as the vice-president to make sure that everyone within the FAMM organization was fully compensated. And that we would go to the board with recommendations where we thought it was the right thing to do.

Q. So while Texaco chose a pay grade 20 and above as the marking line for certain benefits for its key management people, FAMM didn't use that demarcation. It used titles and responsibilities instead. Correct?

In other words, level 19 got benefits that you wouldn't get if you were a Texaco employee?

A. I would agree with that, yes.

MR. LUCAS: That's all I have.

MR. KEE: I don't have anything else.

(Whereupon, the deposition of Peter Michael Meade is concluded at 3:40 p.m.)

C E R T I F I C A T E

I, CLAIRE CIANNAMEA-POLCARI a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination, PETER MICHAEL MEADE was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Claire Ciannamea-Polcari
CLAIRE CIANNAMEA-POLCARI
CERTIFIED SHORTHAND REPORTER
LICENSE NUMBER XI01840