Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LARRY A. KATZ and | * | |
| KENNETH M. RAFTERY, | * | |
| Plaintiffs, | * | |
| | * | |
| VS. | * | CIVIL ACTION |
| | * | NO. 302 CV 02201 (AWT) |
| THE SEPARATION PAY PLAN OF | * | |
| TEXACO, INC., and TEXACO, INC., | * | |
| Defendants. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

C. MICHAEL BANDY

APRIL 1, 2004

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF C. MICHAEL BANDY, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 1st day of April, 2004, from 1:30 p.m. to 2:54 p.m., before LaRita J. Cormier, Certified Shorthand Reporter in and for the State of Texas, reported by stenographic means, at the Marriott Courtyard Downtown, 916 Dallas, Sterling Room, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

DEPOSITION OF C. MICHAEL BANDY

Page 2

```
                    APPEARANCES

 FOR THE PLAINTIFFS:
   Mr. Scott R. Lucas
   MARTIN, LUCAS & CHIOFFI, L.L.P.
   177 Broad Street
   Stamford, Connecticut 06901
   PHONE: 203-973-5200
   FAX:   203-973-5250



 FOR THE DEFENDANTS:
   Mr. Conrad S. Kee
   JACKSON LEWIS, L.L.P.
   177 Broad Street
   Stamford, Connecticut 06904
   PHONE: 203-961-0404
   FAX:   203-324-4704
```

Page 3

```
                    INDEX
                                              PAGE
APPEARANCES..................................  02
EXAMINATION
   By Mr. Lucas..............................  04
CHANGES......................................  52
SIGNATURE....................................  53
REPORTER'S CERTIFICATE.......................  54


              EXHIBIT INDEX
NO.  DESCRIPTION                              PAGE
50...........................................  06
   Subpoena issued by the USDC for the Southern
   District of New York for Michael Bandy

51...........................................  13
   Group of e-mail between M. Bandy, G. Tilton,
   and W. De Santis, re: TFAMM Incentive
   Compensation Plan Proposal
52...........................................  14
   E-mail attaching message from M. Bandy, 6-16-99,
   re: 1999 PAMM Global Compensation Study
53...........................................  25
   Handwritten note 2-19-01. "Katz 00021"
54...........................................  40
   Handwritten note 8-6-01. "Katz 00029"
55...........................................  43
   E-mail to L. Katz from K. Raftery, 4-10-02, re:
   Discussion with Mike Bandy. "Plaintiffs 000163"
56...........................................  46
   E-mail to M. Bandy from K. Raftery, 5-24-02,
   re: Enhanced Benefit Issue. "Katz 0001"
57...........................................  48
   E-Mail to R. Boilla and Distribution from J.
   Bethancourt, 5-30-02, re: Memo titled Faxed to
   Seoul. "Texaco 0034 - 0036"
58...........................................  50
   E-mail to M. Bandy from O. Phillips, 7-23-02,
   re: Change of Control Committee Appeal
```

Page 4

1              C. MICHAEL BANDY,
2  having been first duly sworn, testified as follows:
3               EXAMINATION
4  BY MR. LUCAS:
5     Q. Mr. Bandy, my name is Scott Lucas, and I represent
6  Ken Raftery and Larry Katz in a lawsuit they brought against
7  the Separation Pay Plan of Texaco, Inc., and Texaco. In
8  that lawsuit they're seeking additional change of control
9  severance benefits.
10    A. Right.
11    Q. You are currently employed as we sit here today;
12 is that correct?
13    A. Yes. I'm employed for the next two weeks. I
14 retire April 15th from ChevronTexaco.
15    Q. Congratulations.
16    A. Yeah.
17    Q. And what is your current title?
18    A. Well, until January 1 I was president of Global
19 Trading and FAMM. As of January 1, I think I'm just an
20 advisor/consultant.
21    Q. So as of January 1 it was Global Trading and FAMM
22 that you were president of?
23    A. Right. I have one of my old business cards stuck
24 in my pocket just in case.
25    Q. After the merger between Chevron and Texaco, those

Page 5

1  became divisions, did they, FAMM and --
2     A. Yeah. They're divisions of the downstream of
3  ChevronTexaco.
4     Q. While FAMM was a joint venture for the period, I
5  think 1998 until the merger, some point in 1998 until the
6  merger, after the merger it was no longer a stand-alone
7  entity? Is that correct?
8     A. That's not correct.
9     Q. Okay. Where was I mistaken?
10    A. FAMM was a separate legal entity incorporated in
11 the state of Delaware, which was a joint venture from 1998
12 to 2001 of Chevron and Texaco, with Texaco owning 69 percent
13 and Chevron owning 31 percent. As of October 2001 it became
14 a wholly-owned subsidiary or company of ChevronTexaco. It
15 still has -- it still has legal status as FAMM LLC.
16    Q. I see.
17    A. But from a management perspective, it's wholly
18 owned.
19    Q. Okay. Is Global Trading a wholly-owned subsidiary
20 as well?
21    A. No. Global Trading is a division of
22 ChevronTexaco.
23    Q. Okay. Let me show you what was previously marked
24 as Exhibit 26 and ask you if that's an accurate description
25 of FAMM as it existed from its creation in 1998 to the date

Case 3:02-cv-02201-AWT   Document 51-8   Filed 06/30/2004   Page 3 of 14

DEPOSITION OF C. MICHAEL BANDY

Page 6

1  of the merger.
2  A. My only comment on this would be I don't know that
3  it's fair to say FAMM initiated the Internet company
4  OceanConnect. FAMM is one of the founding shareholders of
5  OceanConnect, but it was initiated jointly with BP Shell and
6  ChevronTexaco with FAMM.
7  Q. Okay. Other than that comment on the third
8  paragraph, the rest is accurate?
9  A. Yes.
10 Q. Okay. Thank you. Now, as a ChevronTexaco
11 employee you're being represented by Mr. Kee here today;
12 correct?
13 A. Yes.
14     (Exhibit No. 50 was marked for
15     identification and is attached hereto.)
16 Q. (BY MR. LUCAS) Let me show you what I've marked
17 as Exhibit 50, which is a subpoena, and ask you if you've
18 ever seen that document before.
19 A. Yes, I've seen it.
20 Q. Okay. And were you asked to obtain any documents
21 that are listed in the document request attached as the
22 Schedule A to Exhibit 50?
23 A. I was asked to look through my files to see if I
24 had any documents, yes.
25 Q. Okay. And did you do that?

Page 7

1  A. Yes.
2  Q. Okay. And you presented some documents to
3  counsel, did you?
4  A. The ones I could find, yes.
5  Q. Okay. We'll mark those as we go forward today.
6  Can you take me briefly through your career at Texaco, what
7  positions you held?
8  A. Sure. I started with Texaco in 1970 as a
9  shipboard engineering officer.
10 Q. Ship?
11 A. I was an officer on board their tanker fleet.
12 Q. Oh, okay. Shipboard. And after that?
13 A. I was progressed through the engineering ranks in
14 ships until 1977, when I took a two-year leave of absence
15 for graduate school, to get my master's degree.
16 Q. And what did you get your master's in?
17 A. University of New Mexico, in business.
18 Q. MBA?
19 A. Yeah; uh-huh.
20 Q. And what was your undergraduate degree?
21 A. Engineering.
22 Q. From where?
23 A. Texas A&M.
24 Q. I interrupted you. I'm sorry. So you got your
25 master's for two years?

Page 8

1  A. Then I was for about a year in Port Arthur in the
2  marine department of Texaco, Inc., doing vessel repair,
3  shipyarding, new construction. Then in '79, '80, I moved to
4  Harrison, New York, which was the headquarters of Texaco,
5  Inc. I held a variety of jobs in the marine department,
6  including economics and planning. You're straining my
7  Alzheimers here. What else did I do in that period of time.
8  That was a long period of time. That was six years, about.
9  Q. So up to 1986?
10 A. '85.
11 Q. '85. And then what happened?
12 A. Then I was transferred to international marine
13 sales, which was the forerunning organization of Texaco Fuel
14 and Marine Marketing, which became FAMM, with responsibility
15 for the West Coast of the United States. Between 1985 and
16 1990 I progressed through a series of positions taking
17 responsibility for the Gulf Coast and the East Coast and all
18 of the United States and all of the Global Trading
19 operations of the enterprise. In 1990 I became assistant
20 general manager of the division. In 1993 or '4 I became the
21 deputy for the division and was made general manager of the
22 Fuel and Marine Marketing division. And then in 1998, when
23 we created FAMM, I was asked to be president of the
24 independent company. And upon the merger in October of
25 2001, I was asked to assume the responsibility for

Page 9

1  ChevronTexaco's worldwide trading operations as well as FAMM
2  in January of 2002, until January of 2004 in preparation of
3  my retirement in two weeks.
4  Q. And how old are you now?
5  A. I'm 55.
6  Q. In 1994, so I understood you correctly, you became
7  general manager of what I'm going to refer to as TFAMM, the
8  predecessor of FAMM?
9  A. In 1995.
10 Q. And that means you were basically in charge of
11 that operation, TFAMM?
12 A. Yes.
13 Q. And TFAMM was the predecessor, if you will, to
14 FAMM?
15 A. It was the piece of the business which Texaco
16 contributed to FAMM, you're correct.
17 Q. And prior to the combination with Chevron, what
18 were the -- I don't know how you measured income, but gross
19 revenue of TFAMM? In 1998, just prior to the formation of
20 FAMM.
21 A. Prior to the formation of FAMM. FAMM would be
22 easier. Gross revenue, several billion dollars, say two or
23 three billion.
24 Q. And FAMM, when it combined with Chevron, was
25 approximately 4.5 billion?

3 (Pages 6 to 9)

RIVERSIDE REPORTING, INC.                                  (713) 662-0062

DEPOSITION OF C. MICHAEL BANDY

Page 10

1  A. 4 to 5 billion, that's right.
2  Q. What was your pay grade when you were general
3  manager of TFAMM?
4  A. 23.
5  Q. And what was your pay grade when you became
6  president of FAMM?
7  A. I don't know.
8  Q. Didn't change as far as you knew?
9  A. I honestly don't know the answer to that question.
10 Q. Okay.
11 A. Once you -- in -- yeah. I can't tell you. It
12 would be 23 or 24, but I can't tell you which.
13 Q. But you don't recall receiving any notification
14 that your pay grade changed when you became president of
15 FAMM; is that correct?
16 A. I don't know. I can't remember.
17 Q. Okay. When Chevron merged with Texaco in October
18 of 2001, what was your pay grade?
19 A. Well, at that point we moved to a totally
20 different pay grade scheme. We moved to the Chevron pay
21 grade scheme, completely different. And it was -- I believe
22 it was 41 at that point.
23 Q. Okay. But prior to taking on Chevron pay grade,
24 did you receive any notification that your pay grade at
25 Texaco had changed?

Page 11

1  A. Well, I didn't -- I no longer had a pay grade at
2  Texaco once I became president of FAMM.
3  Q. Okay. Why is that?
4  A. Because FAMM was a separate company.
5  Q. Okay.
6  A. So there was no -- it was a separate company and I
7  was -- I was the president of it. It didn't matter what pay
8  grade I was, so I really didn't pay much attention to it.
9  Q. Okay. And would that be the same for Mr. Meade as
10 well?
11 A. I don't understand your question. Would what be
12 the same as Mr. Meade?
13 Q. That the Texaco pay grade was sort of irrelevant
14 for Mr. Meade as well.
15 A. Well, remember, FAMM -- what FAMM did, because 69
16 percent of our people were from Texaco, we adopted -- we as
17 FAMM adopted the protocol and pay grades of Texaco.
18 Q. When you created FAMM?
19 A. When we created FAMM.
20 Q. Okay.
21 A. Technically they were not Texaco pay grades. They
22 were FAMM pay grades, and virtually all of us that came over
23 into FAMM came over at our existing pay grades or
24 thereabout.
25 Q. Right. And from there on forward, FAMM pay grades

Page 12

1  may or may not have been adjusted, they may or may not have
2  been comparable to Texaco's; is that accurate?
3  A. Repeat that one more time. They may or may not
4  have been --
5  Q. Over the period of four years that FAMM was a
6  stand-alone joint venture, the FAMM pay grades, a, remain
7  FAMM pay grades; correct?
8  A. Well, we had, for simplicity purposes, adopted the
9  Texaco pay grade system. But for the three, four years that
10 FAMM was in place, the Texaco pay grades, I don't want to
11 say they were irrelevant because they did set the bands of
12 the base pay, okay, the minimum, maximum of the base pay.
13 But they were pretty much irrelevant because FAMM was
14 creating its own compensation system, which was
15 significantly different from Texaco's. So people were
16 actually -- we were creating a small company that was a
17 higher risk company, and people were actually getting
18 compensated, for the most part, as well or better than
19 Texaco. So pay grades weren't anywhere near the issue in
20 FAMM as they were in Texaco.
21 Q. Okay. And you mentioned your own compensation
22 scheme at FAMM. There was a study performed, was there not,
23 incident to the formation of FAMM or at about that time?
24 A. I believe it was -- I believe the final studies
25 were done after the formation of FAMM.

Page 13

1  Q. Okay.
2  A. There was an internal review between Chevron and
3  Texaco HR of what I'll call the Day One kind of starting
4  point, and then there was some study done in the first year,
5  first year and a half of FAMM's life, to try to benchmark
6  all of our people to market.
7  Q. Okay. You produced a few documents incident to
8  the subpoena that relate to the compensation study; right?
9  A. I don't recall.
10 Q. Oh, okay.
11     (Exhibit No. 51 was marked for
12     identification and is attached hereto.)
13 Q. (BY MR. LUCAS) Let me show you what I've marked
14 as Exhibit 51.
15 A. Yes.
16 Q. Okay. That's a --
17 A. This is an e-mail from me to the then -- I'm not
18 sure if Glenn was the senior VP or the vice chairman, but
19 this was to one of the senior executives in Texaco who
20 was -- Texaco Natural Gas was trying to develop a trader
21 bonus scheme for its traders. It was consistent with what
22 we were trying to do for our traders in FAMM. And so this
23 was a communication from -- Glenn had asked me that he was
24 going to be reviewing the Texaco Natural Gas proposal and
25 did I have any input or thoughts or suggestions relative to

DEPOSITION OF C. MICHAEL BANDY

Page 14

1  these kind of schemes. And so I sent him this note kind of
2  outlining where we stood on FAMM's compensation review.
3      Q. I see. The review of the Hay Group had not been
4  commenced at this point, is that correct, as of —
5      A. As of '97, no.
6      Q. Okay.
7      A. But certainly we didn't have the results of the
8  Hay study. Whether it had started or not, I can't say.
9      Q. And there's another document that was handed to me
10 just prior to this deposition by your counsel. I'll mark it
11 as Exhibit 52, and maybe you could tell me what that is.
12         (Exhibit No. 52 was marked for
13         identification and is attached hereto.)
14     A. Yeah, this was in June of '99, which would have
15 been about 18 months into the merger. And this was -- if
16 you go back to what I said, we were establishing totally
17 different compensation schemes in Texaco, under the premise
18 that this was a small entrepreneurial enterprise and it
19 needed to be benchmarked and needed to compete with
20 different competitors than a Chevron or a Texaco. It was
21 competing with the smaller trading houses, the Glencores and
22 the Vitols. And while we had set up the initial transition,
23 just kind of on the mirror of Texaco, we were really
24 striving to develop our own independent plans and pay scales
25 and all that kind of thing. So by June of '99 we had the

Page 15

1  framework of a study which we were going to do, which
2  affected and actually went to the senior management, the
3  traders, and the operations and customer support group. And
4  I sent this out to all the employees just to tell them what
5  we were doing and where we were at.
6      Q. (BY MR. LUCAS) And eventually the study was
7  completed, was it not, by the Hay Group?
8      A. The Hay Group completed their work. I'm not sure
9  that we ever fully executed the study because of the merger.
10 By October of 2000 the merger of ChevronTexaco was
11 announced.
12     Q. Okay.
13     A. And probably by June or July of 2000, inside the
14 executive ranks, we knew what was going on, and so a lot of
15 this kind of work stopped.
16     Q. Okay.
17     A. Okay. But the Hay Study was completed or -- this
18 was in December of '99?
19     Q. Yeah.
20     A. So I would say by mid year of 2000, this was kind
21 of moot.
22     Q. Okay. So you're reading from a memo by you to
23 FAMM worldwide employees dated December 2nd, 1999, that's
24 attached to Exhibit 50; correct?
25     A. Yeah. I have no idea what this is.

Page 16

1      Q. That's just a check you should have gotten.
2      A. You're going to pay me 50 bucks? Wow.
3      Q. I think your counsel is going to pass it on to
4  you. It's a subpoena fee.
5      A. Right. We have completed the Hay Study at this
6  point in time, and there were some action plans which we
7  were going to implement. We started the process. That's
8  right.
9      Q. And indeed, Michele Swanson, in conjunction with
10 yourself, implemented quite a few FAMM compensation plans
11 during the time FAMM was a stand-alone entity; correct?
12     A. Correct. He was our director of HR.
13     Q. Right. And one of those was FAMM's Annual Cash
14 Bonus Award?
15     A. Yes.
16     Q. And that had its own deferral plan, correct, FAMM
17 did?
18     A. Yes.
19     Q. And its own Supp 3 plan?
20     A. Yes.
21     Q. And its own Long Term Incentive Plan?
22     A. Yes.
23     Q. I want to show you briefly exhibits --
24     A. And I can't recall if those were all come in
25 simultaneously or staged in. We ultimately had them all in

Page 17

1  there.
2      Q. Okay. I'm showing you Exhibit 27. Is that your
3  signature on that document?
4      A. This is a computer-generated scan of my signature
5  that went out on all the -- this is his actual bonus for the
6  year. That would be my signature.
7      Q. Okay. And Mr. Raftery was, as you put it in the
8  second paragraph, a key member of FAMM's management team,
9  was he not?
10     A. Yes.
11     Q. And Mr. Katz as well; correct?
12     A. Yes.
13     Q. And as key members of management they were
14 accorded a special status under the deferral plan of FAMM,
15 were they not? And let me show you Exhibit 34.
16         MR. KEE: Objection to form as to what you
17 mean by "special status."
18     Q. (BY MR. LUCAS) If you need me to rephrase the
19 question, I'll be happy to.
20     A. Well, let me read this, then ask your question.
21     Q. Sure.
22     A. Okay. And your question is?
23     Q. They, along with 10 others, for a total of 12,
24 were allowed to defer their Cash Bonus Awards, according
25 them, I think I used the words "special status" under the

5 (Pages 14 to 17)

RIVERSIDE REPORTING, INC.                                                              (713) 662-0062

DEPOSITION OF C. MICHAEL BANDY

Page 18

1  deferral plan.
2      MR. KEE: The question is were they?
3      MR. LUCAS: Yes.
4   A. I would -- it's not so much special status.
5  Remembering what we were trying to do was establish a
6  different set of compensation from Texaco. Texaco's
7  compensation plans were only -- were pay grade key. What we
8  were doing is by saying we were allowed to have 30 people in
9  the Cash Bonus Program, we said the only people that had
10 entitlements to the Cash Bonus Program were the executive
11 counsel, senior leadership and officers. Everyone else
12 would be on merit only. So anyone on the team that fell
13 into one of those three statuses would have been able to be
14 guaranteed to participate, but it wouldn't guarantee what
15 they would get.
16  Q. (BY MR. LUCAS) Correct.
17  A. Okay. I mean, they automatically, by stature of
18 their relative position in one of those three groups, would
19 qualify.
20  Q. Okay. And in that effort of FAMM to do as you
21 just described, create a different pay structure and
22 different plans and so forth, did you encounter some
23 resistance from Texaco?
24  A. Oh, yeah. Oh, yeah.
25  Q. And from who in particular, if you can identify

Page 19

1  any specific individuals.
2  A. Well --
3  Q. Or was it companywide?
4  A. Well, the only people that were really involved in
5  this at Chevron and Texaco were the executive compensation
6  groups. Both the executive compensation groups -- this is
7  a -- this was a case where the senior management of
8  ChevronTexaco had a vision around FAMM, which in some ways
9  threatened the turf of the executive compensation group, and
10 therefore the executive compensation groups of both
11 companies were very reluctant to have FAMM create something
12 which was significantly different than either the Chevron or
13 Texaco plans.
14  Q. Okay. And you were able to do that but with some
15 degree of difficulty; correct?
16  A. I think that's a fair statement.
17  Q. And one of the areas where there was a bone of
18 contention, if you will, was with the Texaco Separation Pay
19 Plan; correct?
20  A. No, never.
21  Q. Okay. Well, let me ask you this: Do you
22 recall --
23  A. Can I answer that question?
24  Q. Sure.
25  A. FAMM adopted Texaco benefits while we were

Page 20

1  creating our own independent compensation plans. The
2  executive compensation groups were resistant to us creating
3  our own compensation plans. Benefits were generally never a
4  bone of contention.
5   Q. Okay.
6   A. Because we adopted the benefit plans under the
7  policies and practices of Texaco.
8   Q. Right. But when Texaco created its Separation Pay
9  Plan and Mr. Pennacchio listed the entities that would
10 participate, the companies which would participate, he did
11 not include FAMM initially. Do you recall that?
12  A. If you've got a document, I have to take a look at
13 it.
14  Q. There's been testimony to that effect. I don't
15 have a specific document.
16  A. Well, who participated in the plans or not
17 participated in the plans were not Mr. Pennacchio's call.
18 When FAMM was created, FAMM became a member of the Texaco
19 benefit plan. So it had basically a mirror of all the
20 Texaco benefit plans. We did not have a benefits oversight
21 committee or anything like that. We mirrored and adopted
22 the Texaco's plans, and that was not Mr. Pennacchio's call.
23  Q. Okay. But you don't recall Mr. Pennacchio not
24 including FAMM initially and then Mr. Deval Patrick having
25 to become involved and speaking with maybe Peter Bijour?

Page 21

1  A. That was much later.
2  Q. Okay. And what do you recall about that incident?
3  A. Just prior to the merger of ChevronTexaco in 2001,
4  Mr. Pennacchio drafted some language for our chairman to
5  sign which would exclude some number of companies. They
6  were mostly paper companies. There were some 30 or 50 of
7  them, and FAMM was mistakenly put on that. After consulting
8  with Deval Patrick, who was the general counsel, he
9  discussed it with the chairman, and all of that was
10 reversed.
11  Q. Okay. Was it ever -- is it your testimony that
12 was an error by Mr. Pennacchio or an intentional act?
13  A. I couldn't say. I mean, I think certainly the
14 chairman recognized that whatever the intentions were, it
15 wasn't the right thing to do, and he didn't support it.
16  Q. And Mr. Pennacchio was one of the individuals in
17 the benefits department of Texas who was giving FAMM
18 resistance in creating its own compensation scheme and
19 structure; correct?
20  A. That's a fair statement.
21  Q. Let me show you Exhibit 6. I know it's a messy
22 copy, but ignore the handwriting on it.
23  A. No problem.
24  Q. Do you recognize that document?
25  A. It's very similar to many things that were sent

DEPOSITION OF C. MICHAEL BANDY

Page 22

1  out by the executive comp group. Let me read through it and
2  see what it is.
3      Q. Sure.
4      A. Yeah. This is -- the announcement is to -- this
5  was sent to all the Position Grade 20 and above Texaco
6  employees outlining the new changes in what effectively was
7  a poison pill separation package in case of change of
8  control.
9      Q. It was not sent to FAMM employees, was it?
10     A. This probably would not have been sent to FAMM
11 employees.
12     Q. And Texaco looked at its management team as
13 Position Grade 20 and above; correct? See here in Exhibit 6
14 where it refers to "our management group, Grade 20 and
15 above"?
16     A. Yeah. I mean, I think that's -- the only thing
17 I'd say on that is that was the general reference. It was
18 not hard and fast.
19     Q. Okay.
20     A. In other words, there were some -- there were some
21 19s that would be included in that. There were some 20s
22 that may get bumped out for some reason. But generally
23 speaking, once you cracked over 20, you participated in
24 these plans, yes.
25     Q. And just have you take a look at Exhibit 36. That

Page 23

1  is the Separation Pay Plan -- ignore the front page.
2  Starting at the second page is the Separation Pay Plan of
3  Texaco, at least as it existed at some point in 2001. And I
4  want to specifically ask you a question. Number one,
5  without reading the whole document, does it look familiar to
6  you?
7      A. Yeah. This is basically one of our plan
8  summaries.
9      Q. Now, if you look at page number toward the end,
10 26. It's Bates numbered Plaintiff's 000233. Do you see
11 that list of participating companies?
12     A. Yes.
13     Q. Which ones of these companies are what you would
14 call paper companies; in other words, they may not have any
15 employees or, if they do, very limited employees. If you
16 know.
17     A. Well, I would say that Four Star Oil & Gas had a
18 few employees.
19     Q. Okay.
20     A. Two or three. We had employees in Fuel and Marine
21 Marketing. And most of the rest of these were paper
22 companies.
23     Q. Was there a president of Four Star Oil & Gas
24 Company, that you know?
25     A. I can't say if there was actually a president.

Page 24

1      Q. It was significantly different than FAMM in
2  composition, was it not? In other words, it didn't have its
3  own workforce, et cetera?
4      A. That's right. Most of these companies were
5  holding companies in one form or another that had very
6  limited or no operations per se.
7      Q. Okay. So of this list, FAMM is the only company
8  that had its own compensation structure, compensation plans,
9  those items that we discussed earlier; is that correct?
10     A. I can't say because I'm not that familiar with a
11 lot of these companies.
12     Q. But as best you know?
13     A. Best I know, yes.
14     Q. Did you have an employment agreement with Texaco
15 prior to the merger with Chevron?
16     A. No.
17     Q. Are you aware that certain officers of Texaco did?
18     A. Yes.
19     Q. Do you know whether those agreements were entered
20 into as a poison pill provision?
21     A. I really don't have any knowledge other than some
22 people had different arrangements.
23     Q. Okay. Are you aware that there were some 20
24 executives who had severance agreements with Texaco which
25 had Change of Control provisions in them?

Page 25

1      A. Wasn't aware of that. Are you telling me I should
2  have negotiated better for my own --
3      Q. I don't know what the story is behind those. At
4  some point you became aware, did you not, that Ken and Larry
5  were seeking enhanced Change of Control benefits similar to
6  the management team at Texaco?
7          MR. KEE: Objection to the term. You can
8  answer if you can.
9      A. I think the best characterization is that it was
10 kind of a progressive thing that started with certain issues
11 and then kind of revolved around a bunch of different
12 issues.
13     Q. (BY MR. LUCAS) Okay. But at some point Ken and
14 Larry made it known to you that they wanted the enhanced
15 severance that's outlined in Mr. Pennacchio's Exhibit 6;
16 right?
17     A. Yes.
18     Q. And I don't know that you've seen these documents,
19 but I want to ask you a few questions.
20         (Exhibit No. 53 was marked for
21         identification and is attached hereto.)
22     Q. (BY MR. LUCAS) Let me show you what I've marked
23 Exhibit 53. Have you ever seen that note before?
24     A. I'm not sure I can read this. Let me see.
25 "Meeting with Mike and Ken. One-hour meeting on what to do

7 (Pages 22 to 25)

DEPOSITION OF C. MICHAEL BANDY

Page 26

1  next. Mike: I couldn't exactly tell Glenn, as we
2  discussed" --
3      Q. You may not want to read all of that.
4      A. -- "as we discussed me transferring to Global
5  Trading president with HR" -- no, I have never seen this
6  before, and I certainly -- I wouldn't have phrased it like
7  that.
8      Q. That may be a paraphrase by Ken or Larry, whoever
9  wrote this note. Looks like it's Larry's. But do you
10 remember having a discussion -- this is the first, earliest
11 note I have of a conversation with them in which you
12 indicated to them that you were supportive of their
13 position, but you weren't necessarily willing to go to Glenn
14 Tilton and stick your neck out on this issue?
15     A. No. I think -- I think the best characterization
16 of it is Ken and Larry approached me about their pay grades,
17 and I was very supportive of them pursuing whatever routes
18 of appeal they could pursue to determine if their pay grades
19 were appropriate, because I didn't have enough transparency
20 across the entire enterprise to tell. They were in a
21 finance role rather than an operations -- you know, my
22 primary -- while -- as we created FAMM, everyone reported to
23 me. Each of the divisions, if you would, with inside Texaco
24 and Chevron had different criterias and job descriptions and
25 stuff around their people. And I was not the right person

Page 27

1  to make the decision whether the treasurer of our company
2  and the comptroller of the company were appropriately
3  graded. That decision would be done in conjunction with the
4  treasury and comptroller's division of Chevron and Texaco.
5  So I was very supportive of them pursuing whatever routes of
6  appeal, process and stuff to determine if they were properly
7  graded.
8      Q. When you say "properly graded," you indicated that
9  once they became FAMM employees, these were essentially FAMM
10 pay grades.
11     A. Right.
12     Q. And what you're saying is whether or not a FAMM
13 Pay Grade 19 should be looked at the same as a Texaco Grade
14 19? Is that what you mean?
15     A. Well, yeah; yes. And my delegations of authority
16 were I could only -- I could only make decisions on pay
17 grades up to Pay Grade 19. Anything over 19 had to be
18 approved by the board.
19     Q. I see. And the board had two Texaco individuals
20 on it and two Chevron individuals; right?
21     A. Right.
22     Q. And the Chevron individual -- you used to attend
23 board meetings; right?
24     A. Yes. I was a director also.
25     Q. You were a nonvoting member?

Page 28

1      A. I was a nonvoting director.
2      Q. Okay. And the Chevron people basically didn't
3  take a position on this issue, did they? In other words,
4  they deferred to Texaco?
5      A. I don't know that that's fair. I mean, I think
6  how any discussions around these type of things would
7  happen, if there was issues, I would bring the issue to the
8  board. Generally, they would go back to their respective
9  Chevron and Texaco HR groups. They would confer with them.
10 The voting directors would discuss it and give me the
11 answer.
12     Q. So you wouldn't be present for the discussion
13 necessarily?
14     A. I would not necessarily be present for any of the
15 discussions which involved benchmarking back and forth with
16 inside Chevron or Texaco. I would be present for the
17 discussions where we tabled the issue, and I would be
18 present for the discussions where the decisions around the
19 issues were discussed.
20     Q. Okay.
21     A. Because those other discussions normally happened
22 outside of the board meeting.
23     Q. Okay. Were you ever excused from a board meeting
24 while the voting directors would discuss issues, or were you
25 allowed to sit through all the meetings all the time?

Page 29

1      A. There may have been one or two occasions where I
2  was -- well, let me back up. I can't recall any occasion
3  where I was asked to leave a face-to-face board meeting.
4      Q. Okay.
5      A. There were occasions where we, on teleconference
6  board meetings, we interrupted the board meeting, they
7  conferred among themselves, and we reconvened.
8      Q. When the board discussed Larry and Ken's issues
9  with regard to entitlement with regard to pay grade, were
10 you present during those discussions?
11     A. No.
12     Q. Were you excused by them?
13     A. That was -- my most vivid recollection of that was
14 the -- it was a telephone -- it was a teleconference board
15 meeting. I presented the -- I presented to the board those
16 issues which I felt were either bubbling and contentious and
17 needed their input or recommendations to them. They
18 listened to that kind of dialog. We stopped the board
19 meeting. They went away. And I can't recall if it was
20 several hours or the next day we reconvened the board
21 meeting and then they had a decision.
22     Q. Okay. So it's safe to say, then, you weren't
23 privy to what this discussion of the merits was amongst
24 them?
25     A. No. That's correct.

8 (Pages 26 to 29)

RIVERSIDE REPORTING, INC.                                                  (713) 662-0062

DEPOSITION OF C. MICHAEL BANDY

Page 30

1  Q. And let me show you Exhibit 41. Mr. Batavick was
2  one of the Texaco board members; correct?
3  A. Yes.
4  Q. And he was the comptroller of Texaco?
5  A. He was the comptroller for Texaco.
6  Q. And did you -- this is a different issue, but
7  since I've got it in front of you, I'll discuss this with
8  you. Did you understand that Scott Hannen was taking over
9  Ken Raftery's position once the merger was completed?
10 A. No. That was not my understanding.
11 Q. Okay. Take your time. I'm not going to rush you
12 on this. I'm jumping a little on you.
13 A. It was my intention and purpose — we were pleased
14 with all of the members of our team and we were -- it was my
15 intention to keep as many of the members, incumbent members
16 of our team in place that we could.
17 Q. Okay. And did Ken express to you his opinion that
18 the comptroller job here in Houston, once the merger was
19 completed, was a lesser position than he currently occupied
20 in Harrison?
21 A. Well, certainly there were a lot of things
22 changing simultaneously. As an independent company, FAMM
23 had direct responsibility and control for a lot of things.
24 And as we came back into the wholly-owned company of
25 ChevronTexaco, some of those functions were removed and put

Page 31

1  up at the corporate levels and different things kind of came
2  back in, so it was a lot of moving pieces at one time.
3  Q. Okay.
4  A. Certainly changing.
5  Q. But Ken expressed to you his opinion at least that
6  he thought it was not a -- not a -- not quite the same
7  position as -- a lateral at best but perhaps less?
8  A. I think that's a fair assessment of what Ken felt,
9  yeah.
10 Q. Right. And the person taking over that position
11 was, at least according to Exhibit 41 and in actuality what
12 happened, a gentleman by the name of Scott Hannen; correct?
13 A. Yeah. There was a whole process behind that
14 selection; but that's correct, Scott ultimately ended up the
15 comptroller of FAMM after the merger.
16 Q. And he had a Chevron grade 27; correct? If you
17 know.
18 A. That's -- that's my understanding, yes.
19 Q. And he had a Texaco grade prior to the merger of
20 20?
21 A. That was ultimately, after full disclosure of
22 that, that, I believe, proved to be the case. He was in the
23 auditing group.
24 Q. Was there some reluctance on Texaco's part to
25 disclose that to you?

Page 32

1  A. Well, there was a lot of confusion around the
2  merger because, first off, you were translating pay grades
3  between an old system and a new system; and these positions
4  which previously had been part of FAMM and under kind of my
5  kind of full disclosure to me as the president of the
6  enterprise weren't handled that same way. In other words,
7  the treasurer and comptroller's positions within
8  ChevronTexaco reported to the CFO and treasurer of Chevron,
9  not to me. They were PDCs, what they call personnel human
10 resource committees, in those functions which determined job
11 descriptions, pay grades, and all that type of stuff. So it
12 was not transparent to me.
13 Q. Had you made inquiries and not gotten
14 satisfactory answers initially?
15 A. I'm sure I made inquiries and I'm sure I probably
16 wasn't satisfied with the answers, yes. But, you know, a
17 lot of that was attributed to the confusion of the merger.
18 Q. Exhibit 42 are minutes of a board meeting of FAMM,
19 July 31st, 2001. If you would look through the whole
20 document, I'm going to ask you a question about the last
21 paragraph.
22 A. Okay.
23 Q. The two individuals referred to in the first
24 sentence --
25 A. Right.

Page 33

1  Q. -- which reads, "The Board convened, without
2  others in attendance, to consider a proposal made by
3  Mr. Bandy to promote two employees."
4  A. Correct.
5  Q. His employees were Peter Meade and Eric Rieder;
6  correct?
7  A. Correct.
8  Q. Okay. And Mr. Meade had had a pay grade which
9  hadn't changed in, at this point, 11 years; right?
10 A. Correct.
11 Q. And you would agree, would you not, that his
12 duties of his position had evolved to the point where the
13 pay grade that he had, i.e. 20, was completely
14 inappropriate?
15 A. I think a fairer description is Peter Meade was
16 part of our executive counsel and leadership team with
17 responsibilities that were, in my opinion, equivalent to the
18 other members of the executive council and leadership team,
19 and he was graded lower than some of his peers in the
20 executive council leadership team.
21 Q. Well, he had had a Pay Grade 20 two jobs ago at
22 Texaco; right?
23 A. Correct.
24 Q. And he had become, I don't know if I have the
25 title exactly right, but the head financial person for

DEPOSITION OF C. MICHAEL BANDY

Page 34

1 TFAMM; right?
2   A. No. When he joined TFAMM, he took over the marine
3 lubricant business.
4   Q. Okay. And then when he went to --
5   A. And at that job, 20 was very appropriate.
6   Q. And then didn't he receive a promotion at TFAMM?
7   A. Not to my knowledge. I don't recall. I don't
8 believe so.
9   Q. And then he went over to FAMM, correct, and
10 became --
11   A. Chief financial officer.
12   Q. CFO. Was he senior vice president as well?
13   A. He was a vice president and chief financial
14 officer.
15   Q. And as with yourself, the amount of revenue and
16 other things that he was dealing with increased
17 significantly? In other words, from a 2 billion-dollar
18 company to a 4 and a half billion-dollar company, 2 to 3
19 billion to --
20   A. I think it's more appropriate to say that when we
21 created FAMM, for simplicity sake, virtually everybody on
22 the leadership team came over just laterally, whatever their
23 pay grades were, they stayed with the understanding that we
24 were going to basically kind of review everything once the
25 dust all settled. And as the dust all settled and I looked

Page 35

1 at the responsibilities of the various members of the
2 leadership team, I felt it was appropriate that Peter get a
3 bump.
4   Q. But with Peter getting a bump, did you also
5 consider the fact that he would have to get a bump in order
6 to appropriate -- in order to grade Mr. Katz and Mr. Raftery
7 at a 20, consistent with being part of the management team?
8   A. I don't know that that was a particular piece of
9 the equation. It was really more what was an appropriate
10 grade for Mr. Meade relative to his peer group on the
11 leadership team.
12   Q. But Mr. Meade had raised it to you as sort of a
13 package, I want to be bumped, and I have to be bumped in
14 order for these other two to be graded appropriately; right?
15   A. Well, by this time -- what's the date on this --
16 July 2000. By this time, Ken and Larry were pretty vocally
17 expressing their views that they should be 20s; so I'm sure
18 this may have been part of Mr. Meade's thought process. It
19 certainly wasn't part of my thought process. I had been
20 trying to get Mr. Meade promoted to a 21 for about two
21 years.
22   Q. But FAMM, as you put it, was a FAMM grade 20 that
23 he was at. FAMM could just as easily have had an A, B, C,
24 or D as opposed to 1 through 30; right?
25   A. Could have. But, I mean, we adopted the Texaco

Page 36

1 pay grade system so that we didn't have to do all of the pay
2 ranges and stuff on the base pays.
3   Q. But then FAMM implemented a compensation structure
4 for which, for example take Mr. Meade, for a Pay Grade 20,
5 he was compensated at a rate that far exceeded the average
6 Texaco 20; correct?
7   A. Not in base pay.
8   Q. Well, not in base pay, but with all the
9 compensation together.
10   A. I think in aggregate, because of the higher risk
11 of the company, all of our people probably got as attractive
12 or better bonuses and long-term incentives. Now, that being
13 said, they got those because the company performed. Had the
14 company not performed, they would have gotten substantially
15 less compensation than their Texaco counterparts. This was
16 an attempt to mirror the risk profile of this company to the
17 rewards of the employees of this company, which meant that
18 the employees had more up side and much more down side.
19 Now, we were very fortunate in the first two or three years
20 of the enterprise, we were very successful. We met our
21 business plan objectives, which quite honestly most people
22 in the parent company didn't think we could do; and
23 consequently, people did very well.
24   Q. The base pay bands, as you put it, for pay grades
25 was flexible; in other words, there's a scale, right, for

Page 37

1 first quartile and fourth quartile?
2   A. Yes. There's a range, a minimum and max with
3 quartiles.
4   Q. Okay. So any given salary, you were saying as a
5 FAMM 19, 20, could fall within several bands at Texaco? In
6 other words, if you had a salary of $140,000, that could be
7 a high 18 or a very low 21?
8   A. Correct. And it was not uncommon to see higher
9 pay graded people being paid less than lower pay graded
10 people at times.
11   Q. Show you Exhibit 3.
12   A. Okay.
13   Q. Do you recognize those minutes?
14   A. Yes.
15   Q. Okay. Did you sign those minutes or initial them?
16   A. Yes; I initialed them, yes.
17   Q. Do you agree that that's what happened in the
18 telephone conference?
19   A. To the best of my recollection, yes.
20   Q. Do you recall there being a draft of minutes at
21 this meeting that were rejected or not signed?
22   A. That, I don't recall. It's pretty common for
23 minutes of board meetings to be drafted, sent around to all
24 the directors, all the directors put in their edits, send
25 them back. So I would be, quite honestly, surprised that

DEPOSITION OF C. MICHAEL BANDY

Page 38

1  this wasn't a second or third edit of a draft, yeah.
2      Q.  Okay. Can you tell me what you recall happening
3  in that board meeting with regard to the Ken and Larry
4  issue?
5      A.  I believe, if I got the dates right in my mind,
6  this was after the board meeting where Peter and Eric had
7  been promoted and I had first raised the issue of the two
8  other employees, which were Ken and Larry.
9      Q.  That's correct.
10     A.  At that time the board said that they were going
11 to go back and check with their respective HR groups and
12 they were going to get back to me. And this special meeting
13 was basically them getting back to me.
14     Q.  Was there any discussion that promoting Eric
15 Rieder and Peter Meade would have no impact on their
16 separation pay because they had already maxed out?
17     A.  No. That was nothing. That was never a
18 consideration.
19     Q.  Okay. Do you know if that was a consideration --
20 you wouldn't know if that was a consideration when the
21 directors went back to their respective HR departments then?
22     A.  No. I wasn't part of those conversations.
23     Q.  Okay. Do you know who the Texaco HR person would
24 be that Texaco reps had to go back and consult with?
25     A.  We had two Texaco directors on the board. One was

Page 39

1  George Batavick and one was --
2      Q.  Scott Jeffery?
3      A.  Yeah. It was Scott Jeffery at this time. They
4  were both in the Texaco downstream, so it could have been
5  Dennis Crilly or -- my guess is it would have been back to
6  Dennis Crilly. He would have been their primary HR contact.
7      Q.  Have you ever seen Exhibit 43 before?
8      A.  I can't say that I've ever seen this one before,
9  but --
10     Q.  Do you recognize the content of it as -- do you
11 recognize the content of it?
12     A.  Well, yeah. This would have been very consistent
13 with -- Ken and Larry had been lobbying for some time around
14 their pay grades and generating a lot of justifications, if
15 you will, and passing this stuff up through Michele Swanson.
16 I would assume that this is something that they passed up in
17 support of what they were discussing with Michele Swanson
18 with hopes that it would be shared with the board or
19 something like that.
20     Q.  Did you share it with the board, that information?
21     A.  Not that I recall, but I can't say that it wasn't.
22 Michele may have -- may have passed that as part of some
23 pre-readings to the board. I don't know.
24     Q.  Did Ken and Larry express to you the reason they
25 wanted that pay grade change was to make it easy for Texaco

Page 40

1  to justify giving them that excess Change of Control pay?
2      A.  Well, I think in their minds once the Change of
3  Control package came out and the rumors of the merger with
4  Chevron and Texaco became imminent, the pay grade became a
5  much more heated issue. I'm very satisfied and I think they
6  were satisfied that their overall compensation within FAMM
7  was very appropriate. Pay grade only became an issue I
8  think once the new policies came out.
9      Q.  In other words, Texaco was drawing the line on
10 things such as the severance; correct?
11     A.  Right.
12         (Exhibit No. 54 was marked for
13         identification and is attached hereto.)
14     Q.  (BY MR. LUCAS) Show you Exhibit 54. These are
15 some more notes of -- these are conversations, directing
16 your attention --
17     A.  This must be Larry's handwriting. I could never
18 read his notes when he'd send them to me anyway.
19     Q.  Looking at the bottom half where it says Mike
20 Bandy to Ken Raftery, I know these aren't your notes. I
21 just want to ask whether you recall having discussions with
22 either Mr. Raftery or Mr. Katz that are consistent with the
23 substance of this, and the first one being that you brought
24 the package of four issues to the board as a, quote,
25 "fairness," close quote, issue. Ken, Larry, Eric Rieder,

Page 41

1  who's the acting VP, and Peter, I guess that's Peter Meade.
2      A.  Right.
3      Q.  Do you recall telling them that you had done that?
4      A.  Yeah, I believe I did. And, you know, they would
5  be camped in my office about once a week wanting to know
6  what had happened.
7      Q.  Okay.
8      A.  And I believe I shared with them that this was not
9  an issue that I could handle unilaterally, that it had to go
10 to the board, that I had taken it to the board.
11     Q.  If you could have handled it unilaterally, would
12 you have made them a Pay Grade 20?
13     A.  I don't know. And the reason I say I don't know
14 is because aside from the Change of Control for FAMM, pay
15 grades were irrelevant. I was more concerned that everyone
16 was fairly compensated.
17     Q.  Okay.
18     A.  And that was kind of my driving force.
19     Q.  In the next paragraph it says argued, and I guess
20 that's a reference to you, argued strongly for all four.
21 Would you agree with that statement?
22     A.  I think -- I think a fair characterization is that
23 I presented to the board all the issues for all four as
24 objectively as I could. And I think -- yeah.
25     Q.  Next is "Texaco board member G. Batavick against

11 (Pages 38 to 41)

RIVERSIDE REPORTING, INC.                                    (713) 662-0062

DEPOSITION OF C. MICHAEL BANDY

Page 42

1  saying new comptroller job is more than old one. Chevron to
2  review." Do you remember saying that to Mr. Raftery or
3  Mr. Katz?
4      A. I don't know the date here, but this was probably
5  between the time that I presented to the board and they were
6  going to get back, and George Batavick was the one that was
7  taking a lead on the discussions with Chevron and was going
8  to get back to me. So in that context, that's probably
9  correct.
10     Q. Okay. "Mike said to Ken that he thinks jobs were
11 graded correctly in the beginning but his business grew and
12 became more complex, the job should have been upgraded to
13 20."
14     A. I agree with the first half of that one. I think
15 the second half of that one would be that I would have felt
16 that the jobs be -- given the growth in the business and the
17 complexity of the business should be compared with
18 comparable counterparts across the enterprise to see if they
19 were appropriately graded.
20     Q. Okay. Let me show you Exhibit 17. It's an e-mail
21 that you apparently were copied on. Just ask you whether
22 you recognize it and whether you were in fact copied on it.
23     A. I -- yes; I recall this. This was -- quite
24 honestly this was a message which Ken had asked that I send
25 to Glenn. I declined to do that because I didn't

Page 43

1  necessarily agree with everything that was in it, but I told
2  him I had no problem with him sending it if he chose, and so
3  he did.
4      Q. And did you have a conversation with Mr. Tilton
5  after this e-mail about this e-mail?
6      A. Not that I recall.
7      Q. Okay. And you didn't do your own e-mail saying
8  that you didn't agree with it to anybody?
9      A. No, I didn't -- I didn't make any -- take any
10 bones with this as far as writing him an e-mail in response.
11     Q. Okay. And let me show you 18. Do you recall
12 getting a response e-mail to Exhibit 17 from Mr. Mather?
13     A. Yes, I recall this.
14     Q. And Mr. Mather was clearly supportive of
15 Mr. Katz's appeal; right?
16     A. That's what he says here.
17     Q. Okay. Did you have any discussions with
18 Mr. Mather about this topic?
19     A. I may have. I don't recall the specifics of it.
20 Ken and Larry were lobbying pretty much everyone they could
21 lobby around this issue through this process.
22     Q. Okay.
23         (Exhibit No. 55 was marked for
24         identification and is attached hereto.)
25     Q. (BY MR. LUCAS) Show you what I've marked

Page 44

1  Exhibit 55. Appears to be an e-mail from Ken to Larry about
2  a discussion with you dated April 10th, 2002. Just take a
3  look at that.
4      A. Okay.
5      Q. I just really want to focus in on the first
6  paragraph. Do you remember having that conversation with
7  Mr. Tom Lynch?
8      A. Yeah. We were at a dinner on stage at the Met, he
9  and his wife and my spouse were together.
10     Q. Okay.
11     A. I'm not sure if he brought this up. I believe he
12 probably brought this up, and I believe I expressed my -- my
13 opinion that nothing is a slam dunk, but I don't know
14 that -- I don't know that I characterized it as a very
15 strong case, but anytime you go to forms of litigation, and
16 particularly Texaco should be aware of that.
17     Q. Now, Tom Lynch's position at this point, April
18 10th, 2002, is what? Do you recall?
19     A. He was head of executive compensation at that
20 time.
21     Q. Okay. And is his brother Pat Lynch?
22     A. His brother is Pat Lynch.
23     Q. Pat Lynch was on the appeal committee?
24     A. Correct.
25     Q. Was Tom Lynch on any committee, that you're aware?

Page 45

1      A. I -- I couldn't say yes or no. Tom was -- Tom
2  succeeded Pennacchio as head of executive compensation for
3  the wind-down period there.
4      Q. Did Tom indicate to you where he had gotten his
5  information from with regard to what the answer was going to
6  be?
7      A. Not that I recall. I assumed it was through
8  petitions to the committee. I couldn't --
9      Q. He didn't tell you who he had discussed this with?
10     A. No.
11     Q. Do you remember Ken informing you that he would
12 like to get Pat Woertz involved in their efforts to get this
13 severance package?
14     A. Sure.
15     Q. And who is Pat Woertz?
16     A. Pat Woertz is the head of the ChevronTexaco
17 downstream organization, the executive vice president,
18 reports to Dave O'Reilly, the chairman of ChevronTexaco.
19     Q. Pat Woertz is someone you report to?
20     A. Pat is my boss.
21     Q. And were you upset that they wanted to get Pat
22 Woertz involved?
23     A. No. Once again, my position with Ken and Larry
24 has always been there are routes of appeal through the
25 company, and pursue whatever routes of appeal you feel are

DEPOSITION OF C. MICHAEL BANDY

Page 46

1  appropriate there.
2      Q. Okay. And had you had some discussions with Al
3  Swenson?
4      A. Yes. As a matter of fact, Al Swenson was the
5  ombuds.
6      Q. And you had expressed support for Larry and Ken's
7  position to Al Swenson?
8      A. Well, I think Al Swenson came to me and said Larry
9  and Ken had approached him with their displeasure. You
10 know, the purpose of an ombudsman is to handle internal
11 disputes in the company before they get kind of blown out of
12 proportion. As they were increasingly dissatisfied with the
13 answers they were getting, they approached Al Swenson as the
14 ombudsman. Al's normal protocol if someone in my
15 organization would approach him, well, then he approached
16 me. He talked to me. I told him I was well aware of the
17 issues involved. And I think probably the best
18 characterization of that conversation would be he would ask
19 me a series of questions because if you think about it, in
20 his role he's not taking sides, he's just kind of
21 interviewing everyone involved. And my reply to him would
22 have been, you know, I'm supportive of whatever fair outcome
23 here is as determined by the corporation.
24         (Exhibit No. 56 was marked for
25         identification and is attached hereto.)

Page 47

1      Q. (BY MR. LUCAS) Okay. Did Ken send you Exhibit
2  56?
3      A. It's addressed to me, so I have to say without
4  reading that probably Ken sent it.
5      Q. I don't want to assume anything, so I was just
6  wondering, do you recognize it? Actually Ken and Larry sent
7  it to you.
8      A. Right. I'm not sure what two out of three is
9  talking about, but I'm sure he probably sent that to me
10 relative to the meeting with Al Swenson.
11     Q. Do you recall whether you responded to it?
12     A. I probably did not.
13     Q. Did you take issue with anything they were saying
14 in here?
15     A. Well, I don't take issue with anything they're
16 saying here, but just as a point of clarification, FAMM's
17 management group is not FAMM's executive council or
18 leadership team. That's a separate entity.
19     Q. Right.
20     A. Okay. My direct reports were basically the
21 executive council and the leadership team, which Ken and
22 Larry were not my direct reports; they reported to Peter
23 Meade.
24     Q. Right. Who we'd seen earlier that the enhanced
25 benefits are directed toward a management group.

Page 48

1      A. Once again, it's directed towards – this is
2  Texaco's definition of a management group, which may or may
3  not have been the same as FAMM's definition. Texaco did not
4  have an executive council or a leadership team.
5      Q. Exactly.
6      A. Okay.
7          (Exhibit No. 57 was marked for
8          identification and is attached hereto.)
9      Q. (BY MR. LUCAS) Show you what's been marked as
10 Exhibit 57. They're e-mails that you were not copied on. I
11 just want to ask you a question about really just the first
12 page. I'm going to take that back. If you look at the
13 second page, there's a letter to Pat that you were copied
14 on.
15     A. Okay.
16     Q. First of all, the letter e-mailed to Pat that you
17 were copied on, do you remember being copied on that?
18     A. Yes.
19     Q. Did you have a follow-up discussion with Pat about
20 this e-mail?
21     A. I do not believe so. I believe this was handled
22 by Glenn Phillips. Glenn was Pat's HR person.
23     Q. And on the first page Tom Lynch expresses to
24 Mr. Phillips and others a concern about how doing what Ken
25 and Larry were asking might impact Texaco employees. Do you

Page 49

1  see that?
2      A. Uh-huh.
3      Q. Was that view ever expressed to you by the Texaco
4  members of the FAMM board?
5      A. No.
6      Q. Was it ever expressed to you by anyone at Texaco?
7      A. Not that I recall.
8      Q. You were not involved at all in the processing of
9  Ken and Larry's claims to the initial committee or to the
10 Change of Control Committee?
11     A. No.
12     Q. No one on the committee came and asked for your
13 opinion or spoke to you; is that correct?
14     A. That's correct.
15     Q. Do you know when Janet Stoner left ChevronTexaco?
16     A. It would have probably been in the first quarter
17 of 2002.
18     Q. Okay.
19     A. I think she -- but she remains on the Texaco
20 Change of Control Committee.
21     Q. To this day?
22     A. I think the Texaco Change of Control Committee
23 wrapped up two years after the merger, which would have been
24 October of 2003.
25     Q. Do you know any reason why Ron Boilla might be

13 (Pages 46 to 49)

RIVERSIDE REPORTING, INC.                                        (713) 662-0062

DEPOSITION OF C. MICHAEL BANDY

Page 50

1  acting on behalf of Ms. Stoner?
2    A.  No other reason other than he was a direct report
3  of hers as part of her staff.
4    Q.  What was Mr. Boilla's title?
5    A.  We had an army of HR people. I don't know.
6       (Exhibit No. 58 was marked for
7       identification and is attached hereto.)
8    Q.  (BY MR. LUCAS) I'm also going to mark as Exhibit
9  58 an e-mail your counsel tendered to me just prior to this
10 deposition.
11   A.  Right. This is the one from Glenn Phillips. When
12 you asked if I had any conversations with Pat, this was
13 basically the response I got back from Pat's HR person.
14   Q.  Basically telling you not to -- to stay out,
15 basically?
16   A.  Right.
17   Q.  Right?
18   A.  Right.
19   Q.  And you heeded their advice and didn't get
20 involved; correct?
21   A.  Correct.
22   Q.  Do you know whether Pat Woertz had any involvement
23 in the resolution of the claim at the Change of Control
24 Committee level?
25   A.  No. She would not be on the Change of Control

Page 51

1  Committee. That was a Texaco committee; she was a Chevron
2  employee.
3    Q.  And it says, "I'll keep both of you informed as
4  necessary." Were you kept in the loop at all?
5    A.  I don't recall being advised or counseled or
6  anything past -- that was kind of the last note I think I
7  had on this.
8    Q.  So after this you had no more involvement in it;
9  correct?
10   A.  Correct.
11      MR. LUCAS:  That's all I have.
12
13      (Deposition concluded at 2:54 p.m.)

Page 52

CHANGES AND SIGNATURE
WITNESS NAME: C. MICHAEL BANDY
DATE OF DEPOSITION: 04-01-04

PAGE    LINE    CHANGE    REASON

Page 53

1  I, C. MICHAEL BANDY, have read the foregoing deposition and
2  hereby affix my signature that same is true and correct,
3  except as noted above.
4
5  _____
6       C. MICHAEL BANDY
7
8  THE STATE OF TEXAS:
9  COUNTY OF HARRIS:
10
11      Before me, _____, on this day
12 personally appeared C. MICHAEL BANDY, known to me (or proved
13 to me under oath or through _____) (description
14 of identity or other document) to be the person whose name
15 is subscribed to the foregoing instrument and acknowledged
16 to me that they executed the same for the purposes and
17 consideration therein expressed.
18
19      Given under my hand and seal of office this
20 _____ day of _____, 2004.
21
22
23
24      _____
         NOTARY PUBLIC IN AND FOR
25      THE STATE OF _____

14 (Pages 50 to 53)

RIVERSIDE REPORTING, INC.                         (713) 662-0062