Page 1

1

                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF CONNECTICUT

3    LARRY A. KATZ and                  *

     KENNETH M. RAFTERY,               *

4              Plaintiffs,             *

                                       *

5    VS.                               *   CIVIL ACTION

                                       *     NO. 302 CV 02201 (AWT)

6    THE SEPARATION PAY PLAN OF        *

     TEXACO, INC., and TEXACO, INC.,   *

7              Defendants.             *

8

     ***************************************************

9                    ORAL DEPOSITION OF

10                    MICHELE SWANSON

11                    MARCH 31, 2004

     ***************************************************

12

13   ORAL DEPOSITION OF MICHELE SWANSON, produced as a witness at

14   the instance of the Plaintiffs, and duly sworn, was taken in

15   the above-styled and numbered cause on the 31st day of

16   March, 2004, from 1:06 p.m. to 3:32 p.m., before LaRita J.

17   Cormier, Certified Shorthand Reporter in and for the State

18   of Texas, reported by stenographic means, at the Marriott

19   Courtyard Downtown, 916 Dallas, Sterling Room, Houston,

20   Texas  77002, pursuant to the Federal Rules of Civil

21   Procedure and the provisions stated on the record or

22   attached hereto.

23

24            (THIS DEPOSITION CONTAINS CONFIDENTIAL

25            DOCUMENTS SUBJECT TO PROTECTIVE ORDER.)

Page 2

A P P E A R A N C E S

1
2
3
4  FOR THE PLAINTIFFS:
5    Mr. Scott R. Lucas
6    MARTIN, LUCAS & CHIOFFI, L.L.P.
7    177 Broad Street
8    Stamford, Connecticut  06901
9    PHONE:  203-973-5200
10   FAX:  203-973-5250
11
12
13
14  FOR THE DEFENDANTS:
15    Mr. Conrad S. Kee
16    JACKSON LEWIS, L.L.P.
17    177 Broad Street
18    Stamford, Connecticut  06904
19    PHONE:  203-961-0404
20    FAX:  203-324-4704
21
22
23
24
25

Page 4

EXHIBIT INDEX cont'd
NO.   DESCRIPTION                                        PAGE
31...........................................   48
  Employee Deferral Plan. "Plaintiffs 00053-59"
32...........................................   49
  Memo to FAMM Annual Cash Bonus Plan Participants
  from M. Swanson, 5/4/01. "Plaintiffs 0005-6"
33...........................................   50
  Memo to Employee Deferral Plan Participants from
  S. Pensacchio, 9/20/01. "Plaintiffs 0003"
34...........................................   50
  Series of e-mails between K. Raftery, C. Toto, and
  M. Bandy. "Katz 00024-25"
35...........................................   53
  Letter to K. Raftery, Forecasted Compensation and
  Benefits Statement, 10/2/00. "Raftery 00025-38"
36...........................................   57
  Separation Pay Plan of Texaco.
  "Plaintiffs 000205-235"
37...........................................   62
  FAMM Position Descriptions for Treasurer and
  Comptroller
38...........................................   64
  Employee Salary Change Report 4/1/02.
  "Plaintiffs 00051"
39...........................................   65
  Strictly Confidential document. "Texaco 0698"
40...........................................   66
  Chevron Texaco Structure Conversion. "JL 0643"
41...........................................   66
  Series of e-mail May 14-15, 2001. "Plaintiffs
  0007E-79"
42...........................................   71
  Board of Director Meeting Minutes 7/31/01.
  "Texaco 0134"
43...........................................   76
  FAMM Comptroller Position Justification for
  PG 20. "Katz 00028"
44...........................................   77
  Position Summary GG-400. "JL 0642"
45...........................................   77
  Handwritten Note dated 10/10. "Katz 00030"
46...........................................   84
  E-mail between K. Raftery and P. Meade, re:
  Enhanced Benefits. "Plaintiffs 00077"

Page 3

INDEX
                                        PAGE
APPEARANCES..........................   02
EXAMINATION
  By Mr. Lucas........................   05
CHANGES..............................   91
SIGNATURE............................   92
REPORTER'S CERTIFICATE...............   93

EXHIBIT INDEX
NO.   DESCRIPTION                        PAGE
20...........................................   05
  Subpoena issued by the USDC, Southern
  District of New York, to Michele Swanson
21...........................................   18
  FAMM Total Reward Competitiveness Review
  6/30/99. "Texaco 699-777"
22...........................................   19
  Memo to Distribution from C. M. Bandy, 12-29-98,
  Re: February FAMM Board Meeting. "Raftery 000113"
23...........................................   21
  E-mail to Distribution from M. Cezo, 2/19/99,
  Re: LTM Action Items. "Raftery 000111-112"
24...........................................   23
  Series of e-mails 6/17/99, forwarding Weekly Staff
  Meeting Notes 6/16/99. "Raftery 000123-124"
25...........................................   23
  E-mail from W. Allen to FAMM Worldwide, re: FAMM
  Staff Meeting Notes, 8/4/99. "Raftery 000117"
26...........................................   27
  Document titled: "Fuel and Marine Marketing
  LLC (FAMM)"
27...........................................   40
  Letter to K. Raftery from M. Bandy, 4/3/02.
  "Plaintiffs 00033"
28...........................................   40
  Letter to K. Raftery from M. Bandy.
  "Plaintiffs 00032"
29...........................................   43
  Letter to K. Raftery from M. Bandy, 7/27/00.
  "Raftery 00016-17"
30...........................................   43
  Letter to K. Raftery from M. Swanson, 11/20/00.
  "Texaco 0118"

Page 5

1                MICHELE SWANSON,
2    having been first duly sworn, testified as follows:
3                  EXAMINATION
4    BY MR. LUCAS:
5        Q.  Good morning, Ms. Swanson, or afternoon.
6        A.  Good afternoon.
7        Q.  As you know, my name is Scott Lucas.  I represent
8    Larry Katz and Ken Raftery in a suit that they brought in
9    Federal court in Connecticut, seeking some severance
10   benefits under the Texaco severance plan.  You're appearing
11   here today pursuant to a subpoena; is that correct?
12       A.  I believe so.
13       Q.  Okay.  Let me just show you, I'm going to mark it
14   and show it to you.
15           (Exhibit No. 20 was marked for
16           identification and is attached hereto.)
17           MR. KEE:  Just for the record here, I think
18   as we've discussed, we dispute the validity of the subpoena,
19   but Ms. Swanson is obviously here.
20           MR. LUCAS:  Okay.  I thought we had agreed to
21   accept service on it.
22           MR. KEE:  I agreed to accept service, but I
23   don't think we agreed to the validity of a subpoena
24   served -- I think we had agreed to accept service, that you
25   didn't need to go serve it in White Plains versus

DEPOSITION OF MICHELE SWANSON

Page 6

1  Connecticut, but I don't think we agreed that a subpoena,
2  regardless of whether it was served in Connecticut or New
3  York, was valid for a witness who is employed in Houston,
4  and I thought that was the issue that we went before the
5  judge on and when the judge said come back down here. But
6  in any event, she's here and we have complied with the
7  subpoena. I don't know of anything we haven't complied
8  with.
9       MR. LUCAS: Okay.
10      Q. (BY MR. LUCAS) Have you seen a copy of this
11  before?
12      A. No.
13      Q. Okay. There's attached to it a Schedule A that
14  starts on the second page, and then it goes on and it
15  requests various documents.
16      A. Uh-huh.
17      Q. Have you ever seen the document request before?
18      A. Anything through Shawn that he's requested is what
19  I've given.
20      Q. Okay. My question is specific; have you seen this
21  actual document?
22      A. Absolutely not.
23      Q. Okay. So you were not asked to go through this
24  list and see what documents you have that might be
25  responsive in your possession?

Page 7

1      A. No.
2       MR. KEE: You've seen the documents requested
3  in the earlier discovery requests in this case, the list of
4  the various categories of documents you were to put
5  together?
6       THE WITNESS: The only thing I saw was
7  through your office on certain issues that were requested.
8       MR. KEE: Okay. You don't need to --
9       THE WITNESS: Okay.
10      MR. LUCAS: But I was asking the questions.
11      MR. KEE: Sorry.
12      MR. LUCAS: That's okay.
13      A. I had not seen this.
14      Q. (BY MR. LUCAS) Okay. I'll get back to it in one
15  second. Are you currently employed?
16      A. Yes.
17      Q. Okay. And where are you working?
18      A. 1111 Bagby Street, ChevronTexaco building.
19      Q. Okay. For what company?
20      A. ChevronTexaco, Unit FAMM, Fuel and Marine
21  Marketing.
22      Q. Is that an independent entity, this FAMM?
23      A. No, it's not.
24      Q. So it's a division of ChevronTexaco?
25      A. Yes, it is.

Page 8

1      Q. And when did you begin working with the unit FAMM,
2  as a ChevronTexaco entity?
3      A. When we merged, October 9th, 2001.
4      Q. 2001?
5      A. Right.
6      Q. Okay. And what's your current position?
7      A. My current position is regional manager, global
8  marketing for FAMM.
9      Q. And to who do you report?
10      A. Bill Rung, William Rung, R-u-n-g.
11      Q. Okay. Is Mr. Bandy still with FAMM?
12      A. He's still there. He retires effective
13  April 15th.
14      Q. Okay. Did you used to report to him?
15      A. Yes, I did.
16      Q. Until when?
17      A. Up until January 1st, 2004.
18      Q. Okay. Can you -- I'm going to back up now and
19  take you forward again -- just give me your educational
20  background.
21      A. I have a degree, not quite finished, from Lehman
22  College in the Bronx.
23      Q. Okay. Almost but not quite?
24      A. Right.
25      Q. Okay. Was that a bachelor's degree?

Page 9

1      A. Yes.
2      Q. Bachelor of Arts?
3      A. Bachelor of Business Administration.
4      Q. Okay. Any other courses that you've taken?
5      A. Oh, throughout the years at Texaco, yeah.
6      Q. Okay. Various management courses?
7      A. Yes. Supervisory, leadership, all sorts of
8  courses.
9      Q. When did you begin working with Texaco?
10      A. June 1974.
11      Q. In what position?
12      A. As a stenographer/secretary.
13      Q. And what was your next position?
14      A. Probably stayed that way until a supervisory
15  position, 1979.
16      Q. Okay. And what was your first supervisory
17  position?
18      A. What was it? For the administrative support
19  center. It was called supervisor of administrative support
20  centers.
21      Q. Okay. And you were supervising administrative
22  individuals?
23      A. Uh-huh.
24      Q. Okay. And what was your next position?
25      A. Next position was probably human resources.

3 (Pages 6 to 9)

DEPOSITION OF MICHELE SWANSON

Page 10

1    Q.  What did you initially do at human resources?
2    A.  Human resources was inside the operating unit
3    called international marine sales.
4    Q.  And when was that?  When did you first have that
5    position?
6    A.  I would say from 1980 forward, 'til about 1995,
7    '96, somewhere in there.
8    Q.  Okay.  And was it the same position?
9    A.  That was -- well, yeah, various levels, but yes.
10   Q.  Okay.  And what sort of things did you do for the
11   international marine sales?
12   A.  In human resources, I just handled administration
13   of policies, worked with the corporate HR group, all
14   encompassing, you know, pensions, salary upgrades.
15   Q.  You worked with --
16   A.  Corporate HR.
17   Q.  Did you work with the benefit plans?
18   A.  Sure.
19   Q.  In what capacity?
20   A.  Just administering them.
21   Q.  Looking at their terms and administering them?
22   A.  No looking at the terms.  Just administering them
23   within the group, in the U.S. only at that time.
24   Q.  In working with the plans, did you read the plans?
25   A.  To help determine what they said; but, yeah, I

Page 11

1    would read the plans.
2    Q.  And if you had questions, who would you go to to
3    interpret the plans?
4    A.  If I couldn't interpret them, it usually went to
5    the benefit plans administration group, which was stationed
6    down here in Houston.  We had a service group.
7    Q.  Okay.  And did your title change during that
8    period 1980 to 1996?
9    A.  Yeah.  It gradually changed with promotional --
10   Q.  What was the last title that you've held for the
11   international marine sales in the 1996 time period?
12   A.  Probably coordinator human resources.
13   Q.  What was your pay grade as a coordinator for human
14   resources in 1996?
15   A.  In those days it was probably a Texaco Pay Grade
16   15.
17   Q.  Now, is international marine sales different than
18   something I've heard of as TFAMM?
19   A.  It was all a progression of the same group, so
20   that was the original name, Texaco International Marine
21   Sales Department; then it became Texaco Fuel and Marine
22   Marketing.
23   Q.  When did it become TFAMM?
24   A.  When did it become TFAMM?  I couldn't give you --
25   Q.  Was it before 1996 or after?

Page 12

1    A.  Probably before.
2    Q.  Okay.
3          MR. KEE:  Don't talk over each other.  Wait
4    'til he finishes.
5    Q.  (BY MR. LUCAS)  What was your next position after
6    your HR position at -- I'm going to refer to it as TFAMM, if
7    that's okay.
8    A.  Uh-huh.  I became the supervisor for the marine
9    lubricants group.
10   Q.  And is that a part of TFAMM?
11   A.  Yes.
12   Q.  A section of it, if you will?
13   A.  Uh-huh.
14   Q.  What did you do as supervisor for the marine
15   lubricants group?
16   A.  I worked with the customer service marketing
17   personnel to service marine lubricant customers, supervise
18   the work in the group.
19   Q.  That's not an HR position; correct?
20   A.  No; huh-uh.
21   Q.  How long were you a supervisor for the marine
22   lubricants group?
23   A.  I was there for two years.
24   Q.  Until 1998?
25   A.  Correct.

Page 13

1    Q.  And is that when FAMM was formed?
2    A.  And FAMM begun to be formed at that moment, yes.
3    Q.  Okay.  Up until 1998 it was TFAMM, and it was a
4    division; correct?
5    A.  Correct.
6    Q.  And then in 1998 it became its own corporate
7    entity owned by Texaco and by Chevron; right?
8    A.  In a joint venture, correct.
9    Q.  And what position did you initially hold at FAMM?
10   A.  I was offered the position of director of human
11   resources.
12   Q.  Did you accept it?
13   A.  I did.
14   Q.  And that was 1998; correct?
15   A.  Correct.  November of 1998, to be exact.
16   Q.  Thank you.  And how long were you director of HR
17   for FAMM?
18   A.  Up until the merger, which was October 2001,
19   October 9th.
20   Q.  Right.  And then after the merger, what job did
21   you take?
22   A.  Advisor to the president.
23   Q.  Is that Mr. Bandy?
24   A.  Yes.
25   Q.  Okay.  And how long did you hold that position?

4 (Pages 10 to 13)

DEPOSITION OF MICHELE SWANSON

Page 14

1    A.  Up until January 1st, 2004.
2    Q.  What were your duties as advisor to the president?
3    A.  Project coordination, counsel to the president.
4    Q.  That took you out of the HR function?
5    A.  Mostly.
6    Q.  Okay.  I want to focus now on your job as director
7  of HR for FAMM.
8    A.  Okay.
9    Q.  To whom did you report?
10    A.  Directly to Mike Bandy.
11    Q.  And he was the president and CEO?
12    A.  Correct.
13    Q.  And can you tell me as best you can what your
14  duties were as director of HR?
15    A.  I was responsible for human resources on a global,
16  on a worldwide basis.  I had six people worldwide working
17  for me.  We instituted policies and procedures,
18  compensation, incentive programs, all personnel hiring.
19    Q.  Basically all human resources functions for FAMM?
20    A.  All inclusive, uh-huh.
21    Q.  Now going back to what's in front of you,
22  Exhibit 20, there is in the document request document
23  request No. 4 on page 2.  Would you take a look at that?
24  Just read that; not out loud, just to yourself.
25    A.  (The witness complies.)

Page 15

1    Q.  And if you look attached -- the document that's
2  being referenced is attached.  It's dated December 2nd.  And
3  just take a moment to look at that.
4    A.  Yes.
5    Q.  Okay.  Were you asked to pull together any
6  documents you had that were responsive to No. 4?
7    A.  A global compensation study, yes, I was.
8    Q.  You pulled together the actual study; correct?
9    A.  Yes, I did.
10    Q.  Did you look for other documents, like e-mails
11  that might concern the study or discuss the study, things of
12  that nature?
13    A.  Well, I -- no, I didn't look.
14    Q.  Okay.  So you were just asked to get the study and
15  you got the study and none of the back-up or other documents
16  surrounding the study; correct?
17    A.  It was pretty inclusive; but no, I did not.
18    Q.  Okay.  Can you tell me were you involved in
19  retaining the Hay Group to perform the study?
20    A.  Yes.
21    Q.  Okay.  And in your capacity as director of HR,
22  were you involved in sort of coordinating the work on the
23  study?
24    A.  Yes.
25    Q.  What was the purpose of the study?

Page 16

1    A.  The purpose of the study was to conclude one way
2  or the other if the employees at FAMM were underpaid in
3  conjunction with the marketplace and the work that we were
4  doing according to our competition.
5    Q.  And that was FAMM as a stand-alone entity;
6  correct?
7    A.  Correct.
8    Q.  Okay.  And part of the analysis, looking at the
9  second paragraph on the December 2nd memorandum, is looking
10  not only in the industry but also FAMM's compensation
11  structure vis-a-vis the parent company's compensation plans;
12  correct?
13    A.  Correct.
14    Q.  At this point, December of 1999, how long had FAMM
15  been in existence?
16    A.  From November of 1998.
17    Q.  Okay.  And incident to the formation of FAMM and
18  your coming on as director of human resources, did FAMM
19  adopt its own benefit plans?
20    A.  No.
21    Q.  Did it at some point develop its own benefit
22  plans?
23    A.  No.
24    Q.  Okay.
25    A.  It was to cumbersome.

Page 17

1    Q.  Did it develop its own compensation structures?
2    A.  No.
3    Q.  Okay.  I'm going to have to ask you to explain to
4  me what was done --
5    A.  Sure.
6    Q.  -- but let me go through the documents because
7  it's a little confusing.
8    A.  Okay.
9    Q.  All right.  So when the Hay Group performed this
10  study, it was looking at FAMM's compensation structure;
11  correct?
12    A.  (The witness nods.)
13    Q.  And looking at the industry as a whole; correct?
14    A.  (The witness nods.)
15    Q.  And also comparing it vis-a-vis Texaco's?
16    A.  Correct.
17    Q.  Okay.  So FAMM's was not identical to Texaco's if
18  it was being compared to Texaco; correct?
19    A.  It was the salaries that we were looking at.  We
20  weren't looking at the compensation programs.  We were
21  looking at the salaries of the employees as it pertained to
22  the marketplace and the parent companies, not just Texaco
23  but Chevron's as well.
24    Q.  Okay.  And were salaries adjusted as a result of
25  this study?

DEPOSITION OF MICHELE SWANSON

Page 18

1    A. Yes.
2        (Exhibit No. 21 was marked for
3        identification and is attached hereto.)
4    Q. (BY MR. LUCAS) Let me show you what's been marked
5  as Exhibit 21 for identification. It's Texaco Bates number
6  698 through 777. I'll show it to you. It purports to be
7  the Hay Group plan study.
8    A. Okay.
9    Q. Just let me know if you recognize that document.
10   A. Yes, uh-huh.
11   Q. Okay. And you've turned to Bates number --
12   A. This is the competitive analysis, yeah.
13   Q. Okay. What's the Bates number on that?
14   A. 749.
15   Q. You've looked at 749. Is that the organizations
16  that FAMM was compared against?
17   A. Yes.
18   Q. Okay. And that includes, as you see, Texaco;
19  correct?
20   A. Yes. And Chevron as well.
21   Q. And then there's a section in this plan
22  that deals with executive compensation and benefits, I
23  believe?
24   A. Correct.
25   Q. And another that deals with benefits that don't

Page 19

1  fall under the heading compensation but would be things like
2  medical benefits and that sort of thing; correct?
3    A. Uh-huh.
4    Q. And were all of those items being looked at by the
5  Hay Group?
6    A. Yes.
7    Q. Okay. So when you said before they were just
8  looking at salaries, what did you mean by that, because I'm
9  just confused.
10   A. The purpose of the compensation study was to look
11  at people's salaries; but in general when they look at a
12  compensation for a person, they include all things including
13  bonuses, medical benefits and things of that nature.
14   Q. Okay.
15   A. So what they did was they compared all of those
16  things against all of those companies you just saw, as well
17  as the parent companies.
18   Q. Okay.
19       (Exhibit No. 22 was marked for
20       identification and is attached hereto.)
21   Q. (BY MR. LUCAS) I'm going to show you what I've
22  marked as Exhibit 22, Raftery 000113, and ask you if you
23  recognize that document.
24   A. I can't say that I've seen this.
25   Q. Okay. You see at the top it indicates it was

Page 20

1  directed to you?
2    A. Uh-huh; yes.
3    Q. Were you part of the management group at FAMM?
4    A. I was part of the management group, yes.
5    Q. Okay. Was Mr. Raftery part of the management
6  group?
7    A. Yes, he was.
8    Q. And how about Mr. Katz, was he part of the
9  management group?
10   A. Yes, he was.
11   Q. And this indicates that, if you'll look at the box
12  on the bottom, that you are the owner -- I think those are
13  your initials, are they not -- of the FAMM compensation
14  program?
15   A. Correct.
16   Q. Is that because you were in charge of coordinating
17  it and presenting it to the board?
18   A. Because I was the director of HR, correct.
19   Q. Okay. Did the management group meet periodically,
20  the FAMM management group?
21   A. Yes.
22   Q. Was it on a specified time period, like monthly,
23  weekly?
24   A. We met weekly, and then we met monthly. We met a
25  lot.

Page 21

1    Q. Okay. And were minutes taken of those meetings?
2    A. Weekly staff meetings had minutes.
3    Q. Okay. Did those have action items sometimes?
4    A. They did.
5        (Exhibit No. 23 was marked for
6        identification and is attached hereto.)
7    Q. (BY MR. LUCAS) I'll show you what I've marked as
8  Exhibit 23. If you look at the first page it indicates you
9  are one of the recipients of this e-mail.
10   A. Yes.
11   Q. It's Bates No. 111, 112, Raftery. And on the
12  second page it has some action items; correct? Do you
13  recognize that?
14   A. Correct.
15   Q. Do you recognize the document?
16   A. We had many documents like this.
17   Q. Okay. And the fourth one down says, "Establish
18  global salary grades for FAMM with country specific salary
19  ranges." Do you see that?
20   A. Right.
21   Q. Was that something that you did as director of HR?
22   A. We tried to do.
23   Q. Okay. "Tried" meaning it was never accomplished?
24   A. Correct.
25   Q. And why was that?

RIVERSIDE REPORTING, INC.                                    (713) 662-0062

DEPOSITION OF MICHELE SWANSON

## Page 22

1    A.  Too many problems within each country to establish
2  pay grades that were commensurate with the U.S., trying to
3  get everyone on the same pay grade system.
4    Q.  Okay.  Is that because the foreign countries, did
5  they have any pay grade system at that time?
6    A.  Some did.  Some were working off of the Texaco's
7  pay grade systems commensurate in that country, and others
8  were never established.
9    Q.  Okay.  And FAMM at least initially was working off
10  the Texaco pay grade system; is that correct?
11    A.  Correct.
12        MR. KEE:  By that you mean FAMM U.S.?
13    Q.  (BY MR. LUCAS)  FAMM U.S., I mean.  But the other
14  areas of FAMM were not necessarily; is that correct?
15    A.  The other areas in FAMM were if there was an
16  established pay grade system in those countries, they were
17  on those.
18    Q.  Okay.
19    A.  And what we were trying to do is get everyone on
20  the same pay grade system so an 18 here is an 18 there, but
21  we never got that far.
22    Q.  Okay.  Did you meet any resistance from Texaco in
23  that exercise?
24    A.  And Chevron; yes, we did.
25    Q.  So yes to Texaco?

## Page 23

1    A.  Yes to Texaco and yes to the other parent.
2    Q.  Okay.  I'm going to show you a few more e-mails
3  dealing with the committee meeting and the study.
4    A.  Sure.
5        (Exhibit No. 24 was marked for
6        identification and is attached hereto.)
7    Q.  (BY MR. LUCAS)  Show you Exhibit 24, Bates
8  No. Raftery 123, 124.
9    A.  These are the weekly staff meetings, yeah.
10    Q.  These are minutes from the weekly staff meeting?
11    A.  (The witness nods.)
12    Q.  Okay.  And it indicates under Michele Swanson that
13  the letter on the compensation study has been issued.  Do
14  you have any idea what that's in reference to?
15    A.  No.
16    Q.  Okay.  The specific letter doesn't pop into your
17  mind?
18    A.  There were so many, I guess.
19    Q.  Okay.
20        (Exhibit No. 25 was marked for
21        identification and is attached hereto.)
22    Q.  (BY MR. LUCAS)  Exhibit 25, Raftery 117.  These go
23  chronologically, by the way.  This is August 1999.  Under
24  your name -- first of all, is this a staff meeting note or
25  minute?

## Page 24

1    A.  FAMM staff meeting, yes.
2    Q.  Okay.  It indicates the compensation program study
3  is moving ahead on schedule?
4    A.  Correct.
5    Q.  Okay.  How long did it take to complete the study
6  from beginning to end?
7    A.  I'd only be guessing.  I don't really remember.
8    Q.  It was within a year, though; right?
9    A.  I would say yes.
10    Q.  Okay.  Then turning back to the first one I showed
11  you, the subpoena and the memo that was issued in December
12  of 1999, by that time was the study completed?
13    A.  I would have written this to -- yes, after it was
14  completed.
15    Q.  Okay.  And it indicates in the third paragraph
16  that recommendations would be solicited from each regional
17  manager in conjunction with the vice president and human
18  resources representatives?
19    A.  Uh-huh.
20    Q.  Is that correct?
21    A.  Correct.
22    Q.  And then it says "rolled back to Harrison."  Is
23  that back to FAMM's headquarters in Harrison?
24    A.  Correct.
25    Q.  Not to Texaco; correct?

## Page 25

1    A.  Right.
2    Q.  And it was subject to approval by the president,
3  it says.  Is that the president of FAMM?
4    A.  Correct.
5    Q.  Mr. Bandy?
6    A.  Correct.
7    Q.  Okay.  And the last paragraph speaks for itself,
8  but it indicates that FAMM had expended considerable amounts
9  of time and resources to ensure that its employees were
10  fairly and competitively compensated.  Would you agree with
11  that?
12    A.  Correct.
13    Q.  And it directs questions to you in Harrison if
14  anybody has any questions; correct?
15    A.  Correct.
16    Q.  Was there any resistance by Texaco to having the
17  study performed in the first place?
18    A.  Yes, there was.
19    Q.  Okay.  And did you encounter some hostility in
20  that regard from Texaco --
21    A.  I certainly did.
22    Q.  You have to let me finish the question before you
23  answer.  It's very difficult for the stenographer.  Who did
24  you experience resistance from?
25    A.  Steve Pennacchio and Dennis Crilly.

DEPOSITION OF MICHELE SWANSON

Page 26

1    Q. Did Mr. Pennacchio explain to you why he was
2  resistant?
3    A. Yes, he did.
4    Q. And what did he tell you?
5    A. He felt that as the Texaco vice president of
6  executive compensation, that he had fiduciary responsibility
7  for the actions of FAMM.
8    Q. So he wanted to be in charge of what FAMM
9  employees received by way of benefits?
10    A. Correct.
11    Q. And did he resent the fact that you were in charge
12  of that and not beholden to him?
13    A. Correct.
14    Q. And that was a theme throughout your tenure as
15  director of HR; correct?
16    A. Correct.
17    Q. Let me show you what was marked previously as
18  Exhibit 1 in front of you. There is a list on the bottom of
19  Exhibit 1 that carries over to the top of that exhibit, and
20  you're included in that list. Is that a list of the
21  management team at FAMM?
22        MR. KEE: Objection. Form.
23    Q. (BY MR. LUCAS) As you understood it?
24        MR. KEE: You can answer.
25    A. The reason I hesitate is there's two people on

Page 27

1  this list that weren't originally with FAMM, Girish Desai,
2  Andrew Tong. They were new players to the game.
3    Q. Mr. Hannen was added?
4    A. And Hannen, correct. That's why I hesitated. The
5  answer is yes.
6    Q. Okay.
7    A. Most of the other people were the original
8  members.
9    Q. Okay. Let me do it this way. If you look at
10  Exhibit 9, is that a list of the original management group,
11  as you understood it, of FAMM?
12        MR. KEE: And by "original" do you mean 1998?
13        MR. LUCAS: Right.
14    A. I agree.
15    Q. (BY MR. LUCAS) And did that change prior to the
16  change in control, the people added and deleted? Let me
17  rephrase that.
18        Did you, Mr. Katz, and Mr. Raftery remain within
19  the management team at least up until the change in control,
20  October 9th, 2001?
21    A. Yes, we did.
22    Q. Okay.
23        (Exhibit No. 26 was marked for
24        identification and is attached hereto.)
25    Q. (BY MR. LUCAS) Let me show you a description of

Page 28

1  FAMM. I'm not sure -- I'm sorry.
2    A. That's okay.
3    Q. If I'm rushing you, let me know.
4    A. Okay.
5    Q. Is that an accurate description of FAMM, in your
6  estimate?
7    A. Correct.
8    Q. So you would agree with that description?
9    A. I do.
10    Q. All right. Can you explain to me what
11  compensation plans were available to employees of FAMM?
12    A. Yes.
13    Q. Okay. And maybe -- I'll let you list them, and
14  then I have some documents that I want to show you just so I
15  can clarify what's what.
16    A. We had a salary administration program which
17  included merit increases, promotional increases. And we had
18  an Annual Cash Bonus Program for executives, which was an
19  Incentive Compensation Plan. We have a Long Term Incentive
20  Compensation Plan for executives, which included performance
21  units and stock appreciation rights.
22    Q. They're called SARs, right, S-A-R-s?
23    A. SARs, correct. And we had something called an
24  Incentive Compensation Program, ICP, for the majority of
25  employees.

Page 29

1    Q. And is that all of them that you can think of?
2    A. I believe so.
3    Q. Now let me ask you about -- let's start with
4  those. The cash bonus plan that you referred to --
5    A. Annual cash bonus plan.
6    Q. -- right -- were there different levels of
7  participation in that?
8    A. Correct.
9    Q. And what were the levels, as best you can recall?
10    A. The levels were based on pay grade, and
11  commensurate with that pay grade was a percentage of your
12  salary that you would receive in accordance with various
13  other matrix.
14    Q. And were there some people who were guaranteed a
15  cash bonus?
16    A. The leadership team of FAMM was guaranteed.
17    Q. And was that a subcategory within that plan or a
18  different plan?
19    A. I don't understand the question.
20    Q. I'm doing the best I can. The leadership team who
21  were guaranteed a bonus, was that a term of the Annual Cash
22  Bonus Plan or was it a separate plan?
23    A. It was a term of the Annual Cash Bonus Program.
24    Q. Okay. And so there's a level of leadership that
25  was guaranteed every year a cash bonus; correct? That's the

DEPOSITION OF MICHELE SWANSON

Page 30

1  leadership team?
2     A.  Right.
3     Q.  And then there's a level that you talked about
4  that based on a certain matrix and pay grade got a certain
5  amount, depending upon those factors, those matrix; correct?
6     A.  Correct.
7     Q.  And could that be zero?
8     A.  That could be zero.
9     Q.  All right.  And is there anything between those
10  two categories?
11     A.  No.
12     Q.  Okay.  There was a Trader Bonus Plan; correct?
13     A.  Correct.
14     Q.  Okay.  And that's just for traders?
15     A.  Only for the traders.  That was another one.  That
16  came in later.
17     Q.  Okay.
18     A.  I forgot that one.
19     Q.  Okay.  This Cash Bonus Plan, was that a FAMM plan?
20     A.  Correct.
21     Q.  It was not a Texaco plan; correct?
22     A.  No, it was not.
23     Q.  When I asked you earlier whether FAMM adopted its
24  own compensation plans and you said no, how was I --
25     A.  This is an incentive program as, in my mind,

Page 31

1  different than a compensation program, which I look at as
2  the salary administration.  We used Texaco pay grades and
3  salary ranges, and this was above and beyond that.
4     Q.  Okay.
5     A.  So yes, this was above and beyond what Texaco had,
6  and Chevron.
7     Q.  Right.  And was that because Texaco mandated you
8  use certain pay grades?
9     A.  Did they mandate we use certain pay grades?  I
10  don't know.  I don't know if they did or not.
11     Q.  Were there pay grade reviews for the leadership
12  team?
13        MR. KEE:  When?
14     Q.  (BY MR. LUCAS)  At any time at FAMM when you were
15  director of HR.
16     A.  For leadership team, yes, there was.
17     Q.  At the very end; correct?
18     A.  I think we reviewed them early on, and then we
19  reviewed them at the end.
20     Q.  Are you aware Mr. Meade was a Texaco Pay Grade 20
21  in late 1980s?
22     A.  Correct.
23     Q.  And he stayed at Texaco Pay Grade 20 despite the
24  fact he testified that his duties and responsibilities when
25  he became CFO of FAMM increased dramatically from the

Page 32

1  position he held as a Pay Grade 20 in Texaco.  Are you aware
2  of that?
3        MR. KEE:  Objection to the extent that -- I
4  mean, there were about four or five questions.  One is he
5  stayed at 20.  Are you asking her is she aware that he stayed
6  at 20, are you asking her is she aware what Mr. Meade's job
7  was, or are you asking is she aware of what Mr. Meade's
8  testimony was in his deposition?
9        MR. LUCAS:  Let me break it down.  I'm trying
10  to keep things moving along.
11     Q.  (BY MR. LUCAS)  Mr. Meade was at one time a Texaco
12  Pay Grade 20; correct?
13     A.  Correct.
14     Q.  And when he came over to FAMM, would you agree
15  that his job responsibilities increased from what he had
16  when he was at Texaco?
17     A.  There's a missing piece.
18     Q.  Okay.
19     A.  He came from Texaco as a 20 into a job of
20  lubricants, vice president of lubricants, where he stayed a
21  20.  And then he went from the lubricants job to the
22  CFO job, he stayed a 20, which is where his duties
23  significantly increased.
24     Q.  Okay.  But his pay grade did not change from the
25  late '80s until just before the merger with Chevron;

Page 33

1  correct?
2     A.  Correct.
3     Q.  Despite the fact his salary and other benefits
4  were pretty much out of whack with a Texaco Pay Grade 20;
5  correct?
6     A.  Correct.
7     Q.  And how do you square that with periodic reviews
8  for the management team as to pay grade?  In other words,
9  why wasn't his pay grade adjusted while he was at FAMM?  If
10  you know.
11     A.  I don't know why.
12     Q.  Okay.  Did you receive any resistance from
13  Pennacchio incident to the implementation of the FAMM Cash
14  Bonus Plan?
15     A.  Yes, I did.
16     Q.  Okay.  Under the same rationale?  Did he explain
17  to you why he was upset about that?
18     A.  Yes.
19     Q.  Was it the same rationale?
20     A.  Yes.
21     Q.  Okay.  And as a result of the Cash Bonus Plan and
22  other compensation plans, you've mentioned the individuals
23  with pay grades at FAMM very often were on an overall
24  compensation basis compensated at a higher level than their
25  peers at Texaco; correct?

9 (Pages 30 to 33)

DEPOSITION OF MICHELE SWANSON

**Page 34**

1   MR. KEE: Objection. What individuals?
2   MR. LUCAS: Let me try it again.
3   Q. (BY MR. LUCAS) If you looked at, say, a Texaco
4   Pay Grade 19, typical 19, and you look at a FAMM -- someone
5   at FAMM who had that pay grade, given the compensation plans
6   that were implemented by FAMM, the 19 at FAMM very often
7   would be compensated at a far greater level than the Texaco
8   19; is that not correct?
9   A. Due to the incentive programs that we instituted.
10  Q. Correct.
11  A. Correct, I agree.
12  Q. All right. And why did you institute these
13  programs rather than just raise the salary?
14  A. We were restricted by Texaco to raise those
15  salaries.
16  Q. Okay. And who at Texaco was restricting them in
17  particular? Anyone?
18  A. The executive compensation group.
19  Q. Including Mr. Pennacchio?
20  A. Correct.
21  Q. And so the way around that was, in order to
22  compensate your employees fairly and commensurate with what
23  you think was appropriate, FAMM implemented these plans; is
24  that correct?
25  A. Correct. I would like to add one thing, though.

**Page 35**

1   Q. Sure.
2   A. It wasn't a way around the program; it actually
3   was to incent our employees to stay with us. And so we
4   wanted to compensate them and give them bonuses commensurate
5   with working hard inside the JV, I mean, that was the
6   reason for it, was to incent our employees to stay.
7   Q. What's a JV?
8   A. Joint venture.
9   Q. Okay. In front of you is Exhibit 13. I'll try to
10  keep these from getting mixed up here. I'm going to ask you
11  to flip to 13. Okay. So several documents together
12  relating to the Cash Bonus Program?
13  A. Correct.
14  Q. And I want to -- these are FAMM documents, are
15  they?
16  A. Correct.
17  Q. Did you create these?
18  A. I did.
19  Q. If you would look at the document that has Bates
20  number 0241, Texaco 0241. It's in the middle of the packet.
21  A. Sorry. I have to get used to this legal stuff.
22  Got it.
23  Q. Okay. The introduction says the program is
24  targeted towards -- this is the top paragraph. It says,
25  "This program is targeted towards key positions within the

**Page 36**

1   organization whose performance is critical to the success of
2   the business."
3   A. I'm sorry. Where are you?
4   Q. First paragraph, second sentence.
5   A. Yes.
6   Q. Okay. Was this plan available to everyone at
7   FAMM?
8   A. No.
9   Q. Okay. Where was the line drawn for the Cash Bonus
10  Program?
11  A. Pay Grade 18.
12  Q. Okay. And at the bottom of Eligibility, next
13  section, it indicates, "If you're selected to participate in
14  the Annual Cash Bonus Program" -- which is this; correct?
15  A. Correct.
16  Q. -- "you will not be eligible for the FAMM
17  Incentive Compensation Program" --
18  A. Correct.
19  Q. -- "the Trader Cash Bonus Program" --
20  A. Correct.
21  Q. -- "or the Outstanding Contributors Rewards
22  Program."
23  A. Correct.
24  Q. That last one is something we haven't mentioned
25  yet. What is that?

**Page 37**

1   A. That is like a reward and recognition program
2   where someone will designate you having done a good job and
3   you get a spot reward, which is cash.
4   Q. Purely subjective, based on recommendation?
5   A. Recommendation.
6   Q. Okay. And what's the FAMM Incentive Compensation
7   Program?
8   A. That's the Incentive Compensation Program that all
9   employees are eligible for.
10  Q. I see.
11  A. Basically, you couldn't double-dip.
12  Q. Okay. Does it say somewhere in here that if
13  you're in the leadership management team, that you're
14  guaranteed a bonus?
15  MR. KEE: And you're talking somewhere in the
16  entire exhibit or just on that page?
17  Q. (BY MR. LUCAS) On this exhibit, if you know.
18  MR. KEE: So throughout the entire --
19  Q. (BY MR. LUCAS) Since you wrote that, I don't know
20  if you'd know where it is or not. It's not attached to it.
21  A. It might be. You want me to look?
22  Q. You can look. If you don't know off the top of
23  your head, I don't really want to spend the kind of time --
24  A. It might be in here somewhere.
25  Q. Okay. But your best recollection is that

DEPOSITION OF MICHELE SWANSON

Page 38

1  somewhere in the plan terms it's there; correct?
2  　A.  Yes.
3  　Q.  All right.  And then if you were to leave FAMM
4  and, for example, go to Texaco, the time spent in this plan
5  would be prorated; correct?
6  　A.  Correct.
7  　Q.  Okay.  Because Texaco didn't have this plan?
8  　A.  For Pay Grade 19s and below, no.
9  　Q.  It had a Cash Bonus Plan only available to pay
10  grades 20 and above?
11  　A.  Correct.
12  　Q.  And you know that in your performing your duties
13  as director of HR for FAMM?
14  　A.  At that time, yes.
15  　Q.  Okay.  And were people in the Cash Bonus Program
16  allowed to defer their cash bonus?
17  　A.  Correct.
18  　Q.  And that was something that was not available if
19  you were a Texaco employee unless you were a grade 20 or
20  above; correct?
21  　A.  Correct.
22  　Q.  Is it fair --
23  　　MR. KEE:  You're pointing to something?
24  What's that?
25  　　THE WITNESS:  This was back to the question

Page 39

1  of were officers included -- 10 percent of the employees,
2  including officers of FAMM.
3  　Q.  (BY MR. LUCAS)  The first page is where that
4  guaranteed payment is found?
5  　A.  Correct.
6  　Q.  Okay.  Thank you for pointing that out.
7  　I don't know if you answered that question.  Were
8  people who got cash bonuses at FAMM allowed to defer the
9  cash bonus?
10  　A.  Correct.
11  　Q.  And that was something that was only available at
12  Texaco if you were a Pay Grade 20 or above?
13  　A.  Correct.
14  　Q.  And that's because Texaco basically viewed 20 and
15  above as its management team; correct?
16  　A.  Correct.
17  　Q.  And that's not --
18  　　MR. KEE:  Objection to form as to the term
19  "management team."
20  　　MR. LUCAS:  Okay.
21  　　MR. KEE:  Objection to foundation as well.
22  　Q.  (BY MR. LUCAS)  Well, in your job as director of
23  HR for FAMM, you had to be familiar with the benefit plans
24  for Texaco as well; correct?
25  　A.  I was loosely familiar with the plans for Texaco

Page 40

1  on the incentive compensation side, because it was held very
2  much in confidence in the compensation group.  Became
3  familiar with it when writing these (indicating).
4  　Q.  So when creating the FAMM plans, you had to become
5  familiar with the Texaco plans?
6  　A.  Correct.
7  　Q.  The term "management team" is something that FAMM
8  used in practice in making cash bonus awards, did it not?
9  Show you Exhibit 27.
10  　　(Exhibit No. 27 was marked for
11  　　identification and is attached hereto.)
12  　A.  Correct.
13  　Q.  (BY MR. LUCAS)  Is Exhibit 27 an illustration of
14  that?
15  　A.  Yes.
16  　　(Exhibit No. 28 was marked for
17  　　identification and is attached hereto.)
18  　Q.  (BY MR. LUCAS)  And 28 as well?
19  　A.  Yes.
20  　Q.  Do you know or did you know in your capacity as
21  director of HR for FAMM and in working with Texaco whether
22  the cash bonuses that are reflected in exhibits 27 and 28
23  for Mr. Raftery of 40,000 and 30,000, respectively, are high
24  for a Texaco grade 19?
25  　A.  Texaco grade 19s didn't receive cash bonus awards.

Page 41

1  　Q.  They got stipends?
2  　A.  There was no comparison.
3  　Q.  Correct?  Did they get stipends?
4  　A.  I don't know.
5  　Q.  Okay.  But they didn't get cash bonuses; correct?
6  　A.  Correct.
7  　Q.  You mentioned the Long Term Incentive Plan.  If
8  you would look at Exhibit 16 in your pile.  Can you tell me
9  what Exhibit 16 is?
10  　A.  It's a long term Incentive Agreement.
11  　Q.  Okay.  Were those offered to certain FAMM
12  employees on an annualized basis?
13  　A.  Yes.
14  　Q.  Okay.  Or actually looks like it covers a two-year
15  period.  Is that typical?
16  　A.  It's three years running.
17  　Q.  I see.  Okay.  And underneath this plan you get, I
18  think you said SARs, stock appreciation rights?
19  　A.  Right.
20  　Q.  And you also get performance units; correct?
21  　A.  Right.
22  　Q.  And the stock appreciation rights are a fraction
23  of the value of Texaco and Chevron stock; is that correct?
24  　A.  At that time, yes.
25  　Q.  At the time they're awarded?

Jun.28. 2004 1:14PM MARTINLUCASCHIOFFI No.2573 P. 12

Case 3:02-cv-02201-AWT Document 51-9 Filed 06/30/2004 Page 12 of 24

DEPOSITION OF MICHELE SWANSON

Page 42

1 A. Yes.
2 Q. And the performance units are a different formula;
3 correct?
4 A. Hundred dollars a unit, when they're awarded.
5 Q. Okay. And then there's a formula for determining
6 their value, what's divested?
7 A. The ROCE scale, yes.
8 Q. And the last page of Exhibit 16 says Long Term
9 Incentive Plan Highlights. Is that sort of a summary plan
10 description of sorts?
11 A. Yes.
12 Q. Did you create this?
13 A. Yes.
14 Q. Okay. This is not something that was available to
15 Texaco Pay Grade 19s; correct?
16 A. Correct.
17 Q. And this plan is specific to FAMM?
18 A. Correct.
19 MR. KEE: By the way, I assume you meant --
20 you weren't meaning to -- your question Texaco Pay
21 Grade 19s, you weren't meaning to include people at FAMM who
22 may be classified as Texaco Pay Grade 19?
23 MR. LUCAS: You mean FAMM grade 19? Yes.
24 MR. KEE: I assume Mr. Katz and Raftery
25 weren't writing us any checks for money they were

Page 43

1 erroneously paid. But just to be clear, you're talking --
2 MR. LUCAS: I meant people employed at
3 Texaco.
4 A. They were not eligible for that plan.
5 Q. (BY MR. LUCAS) And again by way of illustration
6 I'm marking Exhibit 29 what appears to be two awards, one
7 for 2000, one for 2001, to Mr. Raftery under this plan.
8 (Exhibit No. 29 was marked for
9 identification and is attached hereto.)
10 Q. (BY MR. LUCAS) Are these award sheets under that
11 plan? Are these awards sheets under that plan?
12 A. Yes, they are.
13 Q. Okay. And very often you issued those, did you
14 not?
15 A. Yes, I did.
16 (Exhibit No. 30 was marked for
17 identification and is attached hereto.)
18 Q. (BY MR. LUCAS) Look at Exhibit 30. Here's one to
19 Mr. Raftery, November 27, 2000, issued directly from you;
20 correct?
21 A. Correct.
22 Q. Okay. Now, in addition to the compensation plans
23 you've mentioned, FAMM offered to its employees something
24 that was referred to as the Supp 3; correct?
25 A. Correct.

Page 44

1 Q. And was that available to all FAMM employees?
2 A. No.
3 Q. Who was it made available to?
4 A. It was only available to those employees receiving
5 the Annual Cash Bonus Program, the Annual Cash Bonus
6 Program.
7 Q. Okay. Whether or not it was guaranteed? It
8 wasn't just the key people that had the guaranteed bonus?
9 A. Correct.
10 Q. So it was everybody who received it?
11 A. Who received an annual cash bonus.
12 Q. Okay. And that was available to grade 18 and
13 above, was it?
14 A. Correct.
15 Q. Okay. Texaco had its own Supp 3 plan; correct?
16 A. Correct.
17 Q. And that was only available to grade 20 and above?
18 A. I don't know.
19 Q. You don't know. Okay. Turn if you would to
20 Exhibit 12 that's in front of you. And if you wouldn't
21 mind, it starts at the bottom because it's two e-mails.
22 It's one from Ken Raftery to Mr. Tom Lynch, dated
23 December 19th, 2002, inquiring about whether FAMM's Supp 3
24 plan was different from Texaco's. Do you see that?
25 A. Uh-huh.

Page 45

1 Q. And then there's a response from Mr. Lynch. Okay.
2 You've never seen this document before; correct?
3 A. Correct.
4 Q. Were you aware there was some confusion as to
5 whether there was an independent Supp 3 or not for FAMM?
6 A. I think as of the merger when we were trying to
7 put Supp 3 in its place, suddenly it became clear that
8 Mr. Lynch was confused.
9 Q. Okay. What was Mr. Lynch's position?
10 A. He was -- he worked for Steve Pennacchio. He was
11 an executive comp, and I don't know his title.
12 Q. Did you have any talks with Mr. Lynch about his
13 confusion?
14 A. Yes, we did.
15 Q. And who is "we"?
16 A. Christina Toto and myself.
17 Q. And who is Christina Toto?
18 A. She was my manager of compensation.
19 Q. And what did you tell Mr. Lynch?
20 A. He was very well aware that FAMM had a Supp 3
21 summary plan benefits and that he had a copy of it and that
22 he in fact took part in writing it and that it was approved
23 by the legal department as well as Chevron compensation.
24 Q. Okay. Did he give you an explanation as to the
25 source of his confusion?

12 (Pages 42 to 45)

RIVERSIDE REPORTING, INC.                    (713) 662-0062

DEPOSITION OF MICHELE SWANSON

Page 46

1  A. He claimed he never saw it.
2  Q. And other than what Mr. Lynch says here, you're
3  not aware whether Supp 3 was offered to 19s at Texaco or
4  not?
5  A. I'm not aware of that.
6  Q. All right. And then there's three enterprises
7  mentioned, three companies I guess I should call them --
8  Caltex, Amoseas, and Star Enterprise?
9  A. Correct.
10  Q. Did you have any dealings with HR directors at
11  those companies?
12  A. Caltex.
13  Q. Did they have their own HR director at Caltex?
14  A. They had many HR directors at Caltex.
15  Q. Did Caltex have its own pay grade system?
16  A. Yes, it did, and its own compensation plans as
17  well.
18  Q. Okay. And did Caltex ever express to you they
19  were encountering difficulties of the nature you were
20  encountering with Texaco regarding the implementation and
21  administration of their claims and compensation?
22  A. No.
23  Q. Okay. How about Amoseas?
24  A. Never dealt with them.
25  Q. Okay. And how about Star Enterprise?

Page 47

1  A. Never dealt with them.
2  Q. Okay. Do you know who owned Caltex?
3  A. It was a joint venture between Texaco and Chevron,
4  50/50 split.
5  Q. I see. We spoke briefly earlier about a deferral
6  plan. If you would look at Exhibit 14.
7  A. Okay.
8  Q. Is Exhibit 14 a summary plan description of the
9  FAMM deferral plan?
10  A. Right.
11  Q. Did you draft that?
12  A. I think Christina did this.
13  Q. Christina who worked for you?
14  A. Correct.
15  Q. So you would have reviewed it; correct?
16  A. Yes.
17  Q. And this is, again, a FAMM plan, not a Texaco
18  plan; correct?
19  A. Correct.
20  Q. And we talked earlier about who was eligible to
21  participate. You had to get a cash bonus, I think you
22  indicated?
23  A. Correct. And long term incentive.
24  Q. Okay. And was there any confusion that you're
25  aware of between the independence of FAMM's deferral plan

Page 48

1  and Texaco's deferral plan over at Texaco?
2  A. FAMM had their own non-qualified deferral plan.
3  It was very difficult to implement, but we did have our own,
4  and it should not have been confusing because we had our own
5  plan number.
6  Q. Was there confusion, though?
7  A. Not that I'm aware of.
8  Q. Okay. You said it was difficult to implement. In
9  what way was it difficult to implement?
10  A. To split the program out away from Texaco's
11  deferral plan.
12  Q. Difficult logistically or difficult because Texaco
13  resisted?
14  A. Both.
15  Q. Okay. Exhibit 15, have you ever seen that
16  document?
17  A. No.
18  Q. Okay. I'm going to mark Exhibit 31, a document
19  entitled Employee Deferral Plan --
20  (Exhibit No. 31 was marked for
21  identification and is attached hereto.)
22  Q. (BY MR. LUCAS) -- and ask you if you recognize
23  that document.
24  A. Yes. This was our plan, FAMM's plan.
25  Q. And did you have a hand in drafting Exhibit 31?

Page 49

1  A. Yes.
2  Q. Did Texaco participate in the drafting of
3  Exhibit 31?
4  A. Yes.
5  Q. Okay. Who at Texaco?
6  A. Michael Lalli, senior tax attorney for Texaco.
7  Q. Okay.
8  (Exhibit No. 32 was marked for
9  identification and is attached hereto.)
10  Q. (BY MR. LUCAS) Show you Exhibit 32. Is that a
11  memorandum you issued to the FAMM Annual Cash Bonus Plan
12  participants regarding the deferral plan? I'm not claiming
13  the writing on the first page. Is that something you
14  authored and issued?
15  A. You know, I don't remember this at all.
16  Q. It doesn't look familiar to you?
17  A. No.
18  Q. You do see your name on it on the front?
19  A. Oh, absolutely. I'm sure I issued it.
20  Q. So you just have no recollection?
21  A. No.
22  Q. Okay. Any reason to doubt that it came from your
23  office?
24  A. No.
25  (Exhibit No. 33 was marked for

13 (Pages 46 to 49)

DEPOSITION OF MICHELE SWANSON

Page 50

1      identification and is attached hereto.)
2      Q.   (BY MR. LUCAS)  Now, Exhibit 33, a Texaco
3  document, that, I gather from your testimony, would not be
4  applicable to FAMM employees; is that correct?  I guess my
5  question is, this is a memo --
6      A.   Some FAMM employees would have received this
7  because they were still in some Texaco plans prior to their
8  term with FAMM.
9      Q.   Okay.
10     A.   So there were some --
11     Q.   I guess what I'm saying is, this memo doesn't
12  apply to the FAMM deferral plan?
13     A.   Correct.
14     Q.   Okay.  That's a better way of putting it.  Okay.
15           (Exhibit No. 34 was marked for
16           identification and is attached hereto.)
17     Q.   (BY MR. LUCAS)  And then I want to show you
18  Exhibit 34.  It's an e-mail.  You can read the whole thing,
19  but I'm focusing on the top paragraph which is an e-mail
20  from Mr. Raftery to Mr. Bandy.
21     A.   (The witness complies.)
22     Q.   Is that accurate?
23     A.   It's accurate that we had been allowed to
24  participate in the deferral plan because we were receiving a
25  cash bonus award, that is correct.

Page 52

1  you weren't able to do that.  And so there were 12 of us who
2  were always in the program.
3      Q.   And the 12 people are the key management people at
4  FAMM?
5      A.   Correct.
6      Q.   And that included Mr. Raftery?
7      A.   Correct.  And Larry.
8      Q.   And Mr. Katz?
9      A.   Correct.
10     Q.   All right.
11     A.   Yeah.  Just a point.  Anyone could be eligible for
12  deferral, but only for the LTIP awards, because you had a
13  longer period of time for constructive receipt on those
14  investment payouts.  Okay.  That's what I was remembering.
15  So on the cash bonus it was limited to 12.  On the LTIP it
16  was anybody that was in it.
17     Q.   So only the 12 key people we've discussed,
18  including Mr. Katz and Mr. Raftery, were able to defer their
19  cash bonus payments?
20     A.   Cash bonus, correct.  Just wanted to make that
21  point.
22     Q.   Okay.  And at Texaco you couldn't do that unless
23  you were a Pay Grade 20 or above; correct?
24     A.   I don't know that.
25     Q.   Well, you didn't get a cash bonus if you weren't a

Page 51

1      Q.   Okay.  He seemed to call, Mr. Raftery does, that
2  only the leadership team, which is the people we talked
3  about; correct?
4      A.   Uh-huh.
5      Q.   Michele, which would be you, Peter Tong, Larry and
6  myself?
7           MR. KEE:  By the way, I'm not sure I
8  understand -- you said leadership team is the term that you
9  talked about, but I'm not sure that it came from her.
10          MR. LUCAS:  All right.  Let me rephrase the
11  question.  I withdraw that.
12     Q.   (BY MR. LUCAS)  You indicated earlier that the
13  deferral was available to anyone who got a cash bonus; is
14  that correct?
15     A.   I did.
16     Q.   And yet here Christina is indicating that 12
17  people are somehow treated differently on the deferral plan
18  with regard to the cash bonus?
19     A.   Correct.
20     Q.   In what way were they treated differently, is my
21  question.
22     A.   Other than the 12, those people could be in or out
23  of that program at any time and, because of constructive
24  receipt, needed to make an election six months prior to
25  receiving the bonus.  And if you didn't know you were in,

Page 53

1  Pay Grade 20 -- right -- at Texaco?
2      A.   Correct.
3           (Exhibit No. 35 was marked for
4           identification and is attached hereto.)
5      Q.   (BY MR. LUCAS)  Exhibit 35, is that your signature
6  on the bottom of 35?
7      A.   Correct.
8      Q.   And did you periodically give Forecasted
9  Compensation and Benefit Statements to FAMM personnel?
10     A.   I believe we did it once.
11     Q.   Okay.  In October 2000?
12     A.   Correct.
13     Q.   And does this look like what you sent to
14  Mr. Raftery?
15     A.   Yes.
16     Q.   And what was the purpose of sending this
17  information to Mr. Raftery?  In other words, what is
18  Exhibit 35?
19     A.   It's a benefit statement about how his incentive
20  programs were valued at, what his Supp 3, Supplemental 3
21  would look like based on age.  It was very similar to a
22  Texaco format that they sent to all of their employees as
23  well.
24     Q.   And this packet seems to deal only with FAMM
25  plans; correct?

14 (Pages 50 to 53)

DEPOSITION OF MICHELE SWANSON

Page 54

1    A.  Correct.

2    Q.  Now, there's one plan we haven't discussed, and it

3  doesn't look like FAMM ever adopted its own plan independent

4  of Texaco, and that is the Separation Pay Plan. Are you

5  familiar with that plan?

6    A.  Correct, I am.

7    Q.  Okay. And my understanding is that at some point

8  certain subsidiaries of Texaco were indicated to Mr. Bijour

9  to be included within that plan, but it didn't include FAMM

10  at one point. Do you recall that?

11    A.  I recall an incident where that happened, yes.

12    Q.  And Mr. Pennacchio excluded FAMM from the

13  severance pay plan when he listed the companies who would be

14  participating in the plan; is that correct?

15    A.  Correct.

16    Q.  Did you have any talks with Mr. Pennacchio about

17  that?

18    A.  No, I did not.

19    Q.  Okay. How did you become aware of it?

20    A.  I believe -- well, I know that I received a phone

21  call from Michael Lalli, the senior tax attorney, who

22  advised me that FAMM's name was not listed on the list that

23  you just referred to, due to the fact that we were not 80

24  percent or more owned by Texaco.

25    Q.  Okay. And what did you do with that information

Page 55

1  when you received it from Mr. Lalli?

2    A.  I went to Mike Bandy and our general counsel, Jim

3  Baker.

4    Q.  And did you also speak with Mr. Deval Patrick?

5    A.  Mr. Baker had directly spoke with Deval Patrick,

6  general counsel for Texaco.

7    Q.  And were you involved in any of those

8  conversations?

9    A.  No, I wasn't.

10    Q.  At some point was FAMM included after that?

11    A.  Yes, they were.

12    Q.  And how long after they were excluded were they

13  then included?

14    A.  My recollection is pretty quickly, a week.

15    Q.  Okay. And was that a topic of discussion around

16  FAMM that it had been in fact excluded?

17    A.  Within a small circle, yes.

18    Q.  Okay. And what was your take on the situation?

19    A.  Well, I felt that Mr. Pennacchio was being

20  vindictive and Texaco was having a great enhanced program

21  and that he was trying to exclude FAMM from that enhanced

22  package.

23    Q.  And Exhibit 6 in front of you, do you recognize

24  that document? You should have the original. Ignore the

25  handwriting.

Page 56

1    A.  It might be in here somewhere.

2        MR. KEE: I don't think so. I put them in

3  order.

4    A.  Yes, I do recognize that.

5    Q.  (BY MR. LUCAS)  Okay. And when did you first see

6  this document?

7    A.  I believe the Pay Grade 20s and above of FAMM were

8  invited to attend a meeting that Mr. Pennacchio held, and I

9  received a copy from Peter Meade.

10    Q.  Have you ever read Mr. Meade's deposition

11  testimony?

12    A.  No, I did not.

13    Q.  Do you know for a fact that FAMM Pay Grade 20s

14  were invited?

15        MR. KEE: Objection to the extent that it

16  suggests that she's agreeing or not agreeing with whatever

17  the definition of FAMM Pay Grade 20s is.

18    Q.  (BY MR. LUCAS)  Let me rephrase it. Mr. Meade

19  testified that he wasn't invited, that he found out and

20  showed up. Do you know whether he was in fact invited?

21    A.  I was aware of the statement you just made. He

22  was not invited. He just showed up and invited others.

23    Q.  Right. So it wasn't Mr. Pennacchio who invited

24  anyone from FAMM, as far as you know?

25    A.  Correct.

Page 57

1    Q.  And the incident that you're talking about where

2  Mr. Pennacchio tried to exclude FAMM, was it for these

3  enhanced benefits or for the separation plan generally?

4    A.  Generally.

5    Q.  So Mr. Pennacchio had excluded FAMM from

6  participating in the severance plan at all; correct?

7    A.  Correct.

8    Q.  And then if we're to believe Mr. Meade, he at

9  least was not invited or made aware of this enhancement

10  independently?

11    A.  Correct.

12    Q.  Okay. Have you seen a copy of the severance plan?

13    A.  Of the Texaco enhanced severance plan?

14    Q.  Right.

15    A.  Probably many times.

16    Q.  I don't think we've marked one yet in this

17  litigation. I'm going to mark one.

18        (Exhibit No. 36 was marked for

19        identification and is attached hereto.)

20    Q.  (BY MR. LUCAS)  Show you Exhibit 36. I'm not

21  claiming the cover as part of the plan. Do you recognize

22  the rest of 36?

23    A.  Yes.

24    Q.  The document you were just looking at, Exhibit 6,

25  that is not -- that is different, is it not, from the

15 (Pages 54 to 57)

DEPOSITION OF MICHELE SWANSON

Page 58

1  newsletter Focus on Benefits?  You know what Focus on
2  Benefits is?
3       A.  Yes, I do know what that is.
4       Q.  Exhibit 6 is not a part of that, is it?
5       A.  No, it is not.
6       Q.  Okay.  Have you ever seen a Focus on Benefits that
7  discusses the enhancement that's explained by Mr. Pennacchio
8  in Exhibit 6?
9       A.  Absolutely not.
10      Q.  Okay.  Are you aware that in the plan itself the
11  enhancement in Exhibit 6 does not contain any of its terms?
12      A.  Yes, I am aware of it.
13      Q.  Do you know why that is?
14      A.  This is a special program for executives in
15  Texaco.
16      Q.  Okay.  Texaco has a duty, does it not, to
17  administer the plan equally for all those companies who are
18  participants; right?
19           MR. KEE:  Objection.  Calls for a legal
20  conclusion.
21      Q.  (BY MR. LUCAS)  Well, in your capacity of director
22  in HR, is that your understanding?
23           MR. KEE:  What does "participants" mean?
24      Q.  (BY MR. LUCAS)  Okay.  Looking at page 26 of
25  Exhibit 36, for those companies listed on page 26.

Page 59

1       A.  Ask me the question again, please.
2       Q.  Okay, Texaco has a fiduciary obligation, does it
3  not, to administer the plan consistently, not just for
4  itself but for these participating companies?
5       A.  I really don't know the answer to that.
6       Q.  Okay.  But your understanding is the reason why
7  it's not in the plan and why FAMM's not made aware of it is
8  that it was directed toward Texaco?
9           MR. KEE:  No.  Objection.  That misstates the
10  testimony.
11           MR. LUCAS:  Okay.  Well, she can tell me if I
12  misstated it.
13      Q.  (BY MR. LUCAS)  I'm not trying to misstate it; I'm
14  just trying to understand your testimony when you said
15  that's because it was a Texaco enhancement directed at
16  Texaco.
17      A.  You're talking about this?  Is that what you're
18  speaking about?
19      Q.  Yeah, why the enhancement in Exhibit 6 doesn't
20  appear in the plan terms anywhere in Exhibit 36.
21      A.  Because that was separate for a different group of
22  pay grade management team people.  This was for the rest of
23  the people.
24      Q.  Exhibit 36?  But you don't believe Exhibit 6
25  represents an amendment to the Separation Pay Plan?

Page 60

1       A.  No.
2       Q.  It does or it doesn't?
3       A.  I don't believe it's an amendment, no.
4       Q.  It's an enhancement?
5       A.  I think it's an enhancement.
6       Q.  I see.  And you don't have an opinion whether that
7  enhancement needs to be offered across the board to the
8  participating companies on Exhibit 26?  You don't know one
9  way or the other?
10      A.  I imagine they treated everybody in this group
11  that were pay grades 20 and above in the same manner.
12           MR. KEE:  And you're pointing to page --
13      A.  -- 26 of Exhibit 36, Participating Companies.
14      Q.  (BY MR. LUCAS)  Do you know whether the people in
15  all these companies, whether these companies all had the
16  same pay grades as Texaco?
17      A.  I don't know that.
18      Q.  Okay.
19      A.  To make it just a little easier, something like a
20  Texaco International Limited, it's just a payroll function.
21  It wasn't even a company.  It was a place to incorporate
22  expatriates in the payroll system; so it didn't even have
23  people.  You know what I mean?
24      Q.  Right.  Look at Exhibit 6, when it indicates that
25  the enhancement pertains to -- it used the words "our

Page 61

1  management group."  Do you see that?
2       A.  Uh-huh.
3       Q.  Nobody in FAMM is in the Texaco management group;
4  right?
5       A.  Right.
6       Q.  Okay.  But if you're going to be in the FAMM
7  management group, it would be those 12 people we talked
8  about; correct?
9           MR. KEE:  Objection to -- objection.  Try to
10  answer with --
11      A.  Ask me again, please
12           MR. LUCAS:  Can I have that read back?
13       (The reporter read the requested material.)
14      A.  This stipulates Position Grade 20 and above, and
15  ours would say 18 or 19 and above.
16      Q.  (BY MR. LUCAS)  I understand that.  When Texaco
17  talks about its management group it refers to 20 and above.
18      A.  Right.
19      Q.  I understand that.  I'm talking about FAMM's
20  management group wasn't delineated as 20 and above, was it?
21      A.  No.
22      Q.  Were you aware that certain officers of Texaco had
23  employment agreements that gave them enhanced severance in
24  the benefit change of control?
25      A.  No.

16 (Pages 58 to 61)

DEPOSITION OF MICHELE SWANSON

Page 62

1  Q. You had no knowledge about that?
2  A. (The witness shakes head.)
3  Q. You have to answer out loud.
4  A. I'm sorry. No.
5      MR. LUCAS: Off the record for a minute.
6      (Discussion off the record.)
7  Q. (BY MR. LUCAS) You produced to Mr. Kee prior to
8  this deposition two FAMM position descriptions?
9  A. Yes, I did.
10     MR. LUCAS: I'm just going to mark them as
11 one exhibit. Is that all right?
12     (Exhibit No. 37 was marked for
13     identification and is attached hereto.)
14 Q. (BY MR. LUCAS) Are those the position
15 descriptions you gave us?
16 A. Yes, they are.
17 Q. Okay. Do you know when those were created?
18 A. I could not give you an exact date.
19 Q. Do you know whether they were ever reviewed by
20 Mr. Raftery or Mr. Katz?
21 A. I know they saw them.
22 Q. Do you know when they saw them?
23 A. No.
24 Q. Do you know if they agreed with them?
25 A. I didn't know that they disagreed with them.

Page 63

1  Q. You don't know one way or the other if they agreed
2  or disagreed?
3  A. Right.
4  Q. Mr. Raftery's position as comptroller was, after
5  the merger, given to a gentleman by the name of Scott
6  Hannen; correct?
7  A. Correct.
8  Q. Mr. Hannen was a Chevron 27, was he not, pay
9  grade?
10 A. He was a Texaco employee.
11 Q. Okay. Well, when he took the position he became a
12 Chevron employee; correct?
13 A. Correct, ChevronTexaco employee.
14 Q. As a 27?
15 A. Correct.
16 Q. And that equates to a 20 at Texaco?
17 A. Correct.
18 Q. And he was a 20 when he was at Texaco?
19 A. Yes, he was.
20     MR. KEE: Just to be clear, he didn't have
21 the position, and I forget which one it was, as a Texaco
22 Grade 20? Is that right? I don't know.
23     MR. LUCAS: He was a 20 when he was assigned
24 the position, and he became a 27 when he actually -- after
25 the merger.

Page 64

1  A. When the pay grades changed over to the Chevron.
2      MR. LUCAS: I'll clarify.
3      MR. KEE: All right.
4  Q. (BY MR. LUCAS) First I want to show you
5  Exhibit 38.
6      (Exhibit 38 was marked for
7      identification and is attached hereto.)
8  Q. (BY MR. LUCAS) Do you recognize Exhibit 38?
9  A. I'm confused.
10 Q. Okay.
11 A. I understand this is a salary change sheet that
12 was generated. I'm confused from old Pay Scale Group 26 to
13 the new Pay Scale Group 19.
14 Q. I can't help you because I don't know. Is this an
15 HR form?
16 A. This is a salary administration sheet that was
17 generated when someone gets a salary change, and looks like
18 we promoted him to come into FAMM, but that's way late,
19 4-1-2002. I know what this sheet is. I'm confused at the
20 information on the sheet.
21 Q. Do you know whether the salary information is
22 correct?
23 A. I wouldn't know that offhand.
24 Q. Okay. Assuming it's correct, either at the 133
25 level or the 151 level, that would be suitable for a range

Page 65

1  of pay grades at Texaco ranging from 18 up to 21, would it
2  not?
3  A. Say that question again.
4  Q. Okay. The salary, look at the old one of 133.
5  A. Yes.
6  Q. That would fall within one of the quartiles of
7  salary for Texaco employees who would have had the pay grade
8  in 2001. Do you agree with that?
9  A. Well, if I see it I could agree, but --
10 Q. Okay.
11     (Exhibit No. 39 was marked for
12     identification and is attached hereto.)
13 A. These were salary ranges that were in effect on
14 April 2001.
15 Q. (BY MR. LUCAS) This is a Texaco document, so if
16 you don't recognize it, you don't --
17 A. I do.
18 Q. Okay.
19 A. Yes. And so now I agree that those salaries fit
20 within the --
21 Q. 18 up to 21; correct?
22 A. Correct.
23     MR. KEE: By the way, just for the record, I
24 don't see a marking on this document, but I think when this
25 was produced the parties agreed that this document was

RIVERSIDE REPORTING, INC.                          (713) 662-0062

DEPOSITION OF MICHELE SWANSON

Page 66

1 confidential under the terms of the protective order in this
2 case.
3        MR. LUCAS: Exhibit 39?
4        MR. KEE: Yes.
5        MR. LUCAS: Okay. I have no issue with that.
6 You want me to do anything special with it at this time?
7        MR. KEE: Not at this time.
8        MR. LUCAS: Off the record.
9        (Discussion off the record.)
10       (Exhibit No. 40 was marked for
11       identification and is attached hereto.)
12 Q. (BY MR. LUCAS) Let me show you a conversion that
13 was provided to me marked Exhibit 40. Do you recognize that
14 document?
15 A. Yes, I do.
16 Q. And is that a conversion of new ChevronTexaco pay
17 scales to the old Texaco pay grades?
18 A. Yes, it is.
19 Q. And a 27 is in fact a 20? Do you see that?
20 A. Correct.
21 Q. And Mr. Hannen, when he assumed Mr. Raftery's
22 duties as a comptroller, became a 27; right?
23 A. Correct.
24       (Exhibit No. 41 was marked for
25       identification and is attached hereto.)

Page 67

1 Q. (BY MR. LUCAS) Okay. I marked as Exhibit 41 a
2 series of e-mails, and you're mentioned in the last one,
3 which is the first one, because they go in reverse order,
4 and are copied on either two or copied on all of the
5 subsequent ones, and I'm going to ask you if you remember
6 these.
7 A. Just give me a moment. I remember this.
8 Q. You do remember this?
9 A. Yes, I do.
10 Q. Okay. There's e-mail from you to Mr. Batavick in
11 the middle of the first page of the exhibit?
12 A. Right.
13 Q. And while the e-mail speaks for itself, could you
14 tell me what point you were trying to make with
15 Mr. Batavick?
16 A. Give me one moment.
17 Okay. The point I was trying to make at that time
18 was that Mr. Bandy was not pleased with the fact that Scott
19 Hannen was picked to be the comptroller for the organization
20 going forward, because he had nothing to say about it. And
21 so I was pushing back at this moment here trying to give it
22 a different angle.
23 Q. Right. Politely as you could, you were pushing
24 back to make that point?
25 A. Very politely.

Page 68

1 Q. And Mr. Batavick, his title was what? He was
2 comptroller, was he not, of Texaco?
3 A. I can agree.
4 Q. And was he one of the people giving some pushback
5 to you on FAMM benefit plans and compensation?
6 A. He was a board member for FAMM.
7 Q. Right.
8 A. And so we needed to go before him for all
9 purposes. He was not the one who would push back, however.
10 Q. He was one of the Texaco representatives on the
11 board; right?
12 A. Correct.
13 Q. Okay. And Mr. Raftery expressed to you that the
14 position he was being offered in Houston was in fact less of
15 a job than he was doing currently for FAMM, did he not?
16 A. I believe he expressed that to me, yes.
17 Q. Okay. And did you have an opportunity to do any
18 independent analysis on your own whether that was the case
19 or not, whether the job being offered Mr. Hannen was in fact
20 less than what Mr. Raftery was doing?
21 A. We felt that the job was — we did, yes. The
22 answer is yes. And after reviewing the duties of Mr. Hannen
23 versus the duties of Ken's job, we felt that Hannen had more
24 responsibility for the fact that the CFO was leaving, so was
25 the treasurer. So the job seemed larger in scope.

Page 69

1 Q. But Mr. Raftery had given you a detailed list of
2 duties he had that were actually being taken away from the
3 comptroller down in Houston, that position that Mr. Hannen
4 was being offered, did he not?
5 A. He gave me a list. I don't recall the list.
6 Q. Do you recall him giving you or you don't recall
7 him giving you a list?
8 A. I don't recall him giving me a list. I recall
9 discussing it.
10 Q. Okay. Do you know whether he gave Mr. Bandy a
11 list?
12 A. I don't know.
13 Q. Okay. So you're saying you did your own
14 investigation and you thought it was an increased
15 responsibility to Mr. Hannen?
16 A. We were asked to take a look at it by Mr. Bandy.
17 Christina Toto and myself were asked to take a look at the
18 duties of the two jobs.
19 Q. Okay. Did you share that with Mr. Raftery, the
20 results of your investigation?
21 A. Not officially.
22 Q. He remained of the opinion after he looked into
23 it, did he not, that the job was less than what he was
24 currently doing?
25 A. Correct.

DEPOSITION OF MICHELE SWANSON

Page 70

1    Q. I'll find that list. I have it here somewhere.
2        Now, did you attend from time to time the board of
3    directors meetings at FAMM?
4    A. Yes, I did.
5    Q. Did you attend all of them?
6    A. Most of them.
7    Q. Okay. And when you were at those meetings did you
8    sit through all of the meeting, or were you sometimes asked
9    to step out?
10   A. I was asked to be excused.
11   Q. Mr. Bandy was on the board, but he was a nonvoting
12   member; is that correct?
13   A. Correct.
14   Q. And there were two Texaco representatives and two
15   Chevron representatives?
16   A. Correct.
17   Q. And would you be the drafter of the minutes of the
18   board of directors meetings?
19   A. No, I would not be.
20   Q. Do you know who did that?
21   A. Secretary.
22   Q. Liz Tulloch?
23   A. Yes. And prior to her, Bob Phillips.
24   Q. Would you review the minutes?
25   A. From my portion, yes.

Page 71

1    Q. Okay.
2        (Exhibit No. 42 was marked for
3    identification and is attached hereto.)
4    Q. (BY MR. LUCAS) Show you Exhibit 42, minutes of
5    July 31, 2001, ask if you recognize that document.
6    A. Yes, I do.
7    Q. Okay. Were you present at this meeting?
8    A. Yes, I was.
9    Q. And did you review these minutes after the
10   meeting?
11   A. Yes, I did.
12   Q. Is that your signature on the last page?
13   A. It is.
14   Q. Under Compensation it indicates that the board
15   convened without others in attendance. Were you not there
16   for that portion?
17   A. I was not.
18   Q. Okay. Who wrote that portion there? Do you know?
19   A. Mr. Bandy.
20   Q. I see. Do you know who the two employees he's
21   referring to there in the first sentence were? Is that
22   Mr. Meade and Mr. Rieder?
23   A. It was definitely Mr. Meade.
24   Q. Okay. Do you know who Mr. Rieder is, or Riter?
25   A. Mr. Eric Rieder. But I don't know that he was

Page 72

1    discussed there. I —
2    Q. Do you know why Mr. Meade was being promoted?
3    A. I don't.
4    Q. You don't?
5    A. I don't.
6    Q. Mr. Bandy was in favor, was he not, of ensuring
7    Mr. Katz and Mr. Raftery got the enhanced severance, if
8    possible?
9    A. Yes, he was in favor.
10   Q. And one way to ensure that they received it, to
11   cut through it all, if you will, would be to just make them
12   pay grades 20; correct?
13   A. Correct.
14   Q. And in order to do that, you would have to move
15   Mr. Meade, because they reported to Mr. Meade, correct, and
16   he was a 20?
17   A. Correct.
18   Q. Albeit he'd been a 20 for over a decade; correct?
19   A. Correct.
20   Q. Did Mr. Bandy ever share with you the rationale
21   that to raise Mr. Katz and Mr. Raftery, Mr. Meade had to be
22   bumped up as well?
23   A. That was a known of fact. In order to promote
24   people, you had to be two pay grades spread between yourself
25   and your boss, at least one if not two.

Page 73

1    Q. And do you know as you sit here whether bumping up
2    Mr. Meade had any impact on his severance pay?
3    A. No, it didn't have any impact on his severance
4    pay.
5    Q. Because he had already maxed out; correct?
6    A. That's correct.
7    Q. And do you know whether it had any impact on
8    Mr. Rieder?
9    A. No, because he had maxed out as well on the years
10   of service. It had impact on their benefit plans, though.
11   Q. The benefit plans, were those paid out of Texaco's
12   general assets or FAMM's?
13   A. Texaco's.
14   Q. When benefit plans are you referring to?
15   A. Pension.
16   Q. I see. And then in that pile in front of you,
17   exhibits 2 and 3, starting with Exhibit 2, there are draft
18   minutes that are unsigned for a teleconference of August
19   22nd, 2001. Do you see that?
20   A. Yes.
21   Q. It says in attendance was you. Do you remember
22   attending that teleconference?
23   A. I'm trying to imagine. I remember the issue, but
24   I don't remember the exact conference call.
25   Q. Okay. Did you draft these minutes?

19 (Pages 70 to 73)

DEPOSITION OF MICHELE SWANSON

Page 74

1  A.  No.
2  Q.  Okay.  It has your name as assistant secretary on
3  the second page.  Someone drafted them for you?
4  A.  Yes.
5  Q.  And who is that?
6  A.  I believe Marie Molloy.
7  Q.  And do you know where Marie got the content?
8  A.  She probably received it from me.
9  Q.  Okay.  Do you recall -- you're saying probably.
10  Are you speculating?
11  A.  I'll say that it was from me.
12  Q.  But you don't recall doing that; is that right?
13  A.  Right.
14  Q.  Okay.  I really just want your recollection.  I
15  don't want you to guess or speculate.  So your best estimate
16  is that it came from you, but you don't recall that; right?
17  A.  Right.
18  Q.  Looking at Exhibit 3, do you see that?
19  A.  Yes.
20  Q.  Okay.  Those are minutes from the same meeting.
21  Do you see that?  And they're signed by you?
22  A.  Yes.
23  Q.  Okay.
24  A.  The minutes of the same meeting?
25  Q.  But they're not signed by Mr. Matt Foehr?

Page 75

1  A.  Matt Foehr.
2  Q.  Matt Foehr.  Do you know why?
3  A.  No, I don't.
4  Q.  Okay.  And if you look at, going back to Exhibit 2
5  under Mr. Raftery, there's an a, b, c, and d.  I gather you
6  were aware of those issues Mr. Raftery was raising regarding
7  his entitlement to enhanced severance?
8  A.  Yes.
9  Q.  Okay.  And you advocated, did you not, his
10  receiving the enhanced severance as well as Mr. Bandy?
11  A.  Yes.
12  Q.  And these minutes, No. 2 were not signed but 3
13  were?
14  A.  Correct.
15  Q.  And do you know why?
16  A.  This was too much detail.
17  Q.  2 was?
18  A.  Yes.
19  Q.  And Mr. Bandy never put it to a vote, did he, the
20  actual --
21  A.  I don't recall.
22  Q.  In Exhibit 3, the minutes are accurate, it
23  indicates in there -- let me just find it.
24  A.  Yeah, I was just reading too.
25  Q.  It says no proposal was before the board.  No

Page 76

1  further action by the board was required.  Do you see that?
2  A.  Yes.
3  Q.  And so the board at least was taking the position
4  it never voted on the issue; right?
5  A.  Correct.
6        (Exhibit No. 43 was marked for
7        identification and is attached hereto.)
8  Q.  (BY MR. LUCAS)  I want to show you Exhibit 43.
9  It's that list I was referring to earlier, as well as other
10  things, but just want to know if you've ever seen
11  Exhibit 43.
12  A.  I did not see this.
13  Q.  Okay.  If you'll look under the fourth bullet
14  point, it raises the issue of Mr. Hannen being a Texaco
15  Grade 20, and Mr. Raftery asserts that the new position is
16  only divisional comptroller versus comptroller of a
17  stand-alone LLC, that the role reduced to a non-CPA role,
18  that there were no external audits or other stand-alone
19  filings, that the materiality scope greatly relaxed, as FAMM
20  being part of ChevronTexaco and other issues there.  Did he
21  share those with you, those items with you?
22  A.  Verbally.  Not like this.
23  Q.  Verbally?
24  A.  Yes.
25  Q.  Okay.

Page 77

1        (Exhibit No. 44 was marked for
2        identification and is attached hereto.)
3  Q.  (BY MR. LUCAS)  Let me show you something that was
4  given to me I'm marking as Exhibit 44.  Do you know what
5  that is?
6  A.  Chevron job description.
7  Q.  Right.  This isn't Mr. Hannen's job description,
8  is it?
9  A.  No.  It says comptroller of Global Trading.
10  Q.  Right.  Okay.
11        MR. LUCAS:  Off the record for a minute.
12        (Discussion off the record.)
13  Q.  (BY MR. LUCAS)  Ms. Swanson, you don't believe
14  this is Mr. Hannen's job description, do you?  Or you don't
15  know?
16  A.  I know he's not a Global Trading comptroller.
17  Q.  Okay.  We'll put it aside.
18        (Exhibit No. 45 was marked for
19        identification and is attached hereto.)
20  Q.  (BY MR. LUCAS)  I'll show you Exhibit 45.  It's a
21  handwritten note by Mr. Raftery of a conversation with you.
22  I don't know if you can read it any better than I can, but
23  it seems to say MS, referring to you, "Discussion with D" --
24  A.  Yes, Dennis Crilly.
25  Q.  I see -- "that history of FAMM issues has been

DEPOSITION OF MICHELE SWANSON

**Page 78**

1 very aggravating and that these guys deserve this and others
2 and they are not taking it." Do you know what that -- any
3 idea -- I don't expect you to know what was in Ken's mind.
4 Do you remember having a conversation with Mr. Crilly?
5    A. I had many discussions with Mr. Crilly. He was my
6 contact at Texaco.
7    Q. Did you have any discussion with Mr. Crilly about
8 Ken and Larry deserving the enhanced severance?
9    A. With Dennis Crilly? I don't recall.
10    Q. Okay. Do you recall sharing with Ken at any time
11 your position that you think he deserved the enhanced
12 severance?
13    A. I remember discussing it with him. I remember
14 understanding where he was coming from, but I also remember
15 telling him that you had to be a 20.
16    Q. That that was Texaco's position?
17    A. That that was Texaco's position, and we were
18 getting a very heavy that was the position on it.
19    Q. Right.
20    A. So I do remember discussing it with him and having
21 empathy for him and understanding where he was coming from,
22 yet the fact remained that you had to be a 20, and we
23 weren't.
24    Q. But he was treated, was he not, by FAMM as a 20?
25    A. How were you treated as a 20 versus a 19?

**Page 79**

1    Q. Compensationwise, that type of thing, total
2 package.
3    A. He was treated as a 19. That's how we -- you
4 know, it's --
5    Q. Treated as a FAMM 19, but I thought we established
6 earlier that if you took his package and you put him under
7 the Texaco umbrella, it would not be appropriate for a
8 Texaco 19.
9       MR. KEE: Objection to form. By "package,"
10 what do you mean?
11       MR. LUCAS: His compensation package.
12    Q. (BY MR. LUCAS) You're nodding.
13    A. So if you were a Texaco 19, you would not have had
14 the same compensation package as Ken did. As a 19 with
15 inside FAMM, you would more look like a 20 in Texaco.
16    Q. (BY MR. LUCAS) Right.
17       MR. KEE: You're asking if that's his
18 question, not that you're --
19    A. I'm asking you if that's your question, yes.
20    Q. (BY MR. LUCAS) Okay. I thought you had said that
21 earlier.
22       MR. KEE: Objection. Form.
23    A. Ask me the question over again.
24    Q. (BY MR. LUCAS) Okay. Mr. Raftery and Mr. Katz
25 received as part of their compensation, if you'll include

**Page 80**

1 non-salary items, benefits under plans that were only
2 available to 20 and above under Texaco but were made
3 available to him as a 19 at FAMM? To them I should say.
4       MR. KEE: Objection. Form. I mean, she's
5 testified about certain types of plans at Texaco to which
6 some she knew the answers to and others she didn't. She's
7 testified about the plans, what was available at FAMM to
8 FAMM employees. And I don't think she's testified -- I
9 think you're misstating her testimony.
10    Q. (BY MR. LUCAS) Am I misstating your testimony?
11    A. Well, it's hard to compare the two. It was a
12 different company. That's what I'm saying. It was a
13 totally different company.
14    Q. Exactly.
15    A. So you'll get somebody from BP who might have a
16 program that is equivalent to somebody who's a 21 at Texaco,
17 but that doesn't mean that that person is a 21 in Texaco.
18    Q. No. They're whatever they are in the independent
19 organization.
20    A. Exactly.
21    Q. So our position is that Texaco needed to do an
22 analysis to determine whether Mr. Raftery and Mr. Katz,
23 under the Texaco system, would be more properly graded as a
24 20. And they didn't do that, did they?
25    A. For their positions.

**Page 81**

1    Q. Right.
2       MR. KEE: They didn't do an analysis per
3 terms of the plan, or they didn't do an analysis?
4    Q. (BY MR. LUCAS) They didn't do an analysis
5 determining their entitlement to severance, as far as
6 you know; they drew the line at 20 and said you don't get
7 it?
8    A. I agree.
9    Q. Okay. And we saw, at least in Mr. Meade's case
10 for sure, his pay grade was totally inconsistent with
11 Texaco's; right?
12    A. For the job that he did.
13    Q. Right.
14    A. I agree.
15    Q. And Mr. Raftery and Mr. Katz worked directly for
16 Mr. Meade; right?
17    A. Yes, they did.
18       MR. LUCAS: Could we take a break?
19       MR. KEE: Sure.
20       (Short recess.)
21    Q. (BY MR. LUCAS) You indicated you'd spoke with Ken
22 about his position that he was entitled to enhanced
23 severance. Did you have conversations with Larry Katz as
24 well in that regard?
25    A. I don't believe I spoke to Larry about it, no. I

DEPOSITION OF MICHELE SWANSON

Page 82

1  talked more with Ken.
2      Q.  And you spoke with Mike Bandy about it; correct?
3      A.  Correct.
4      Q.  And anyone else you can think of?
5      A.  Peter Meade.
6      Q.  And Peter was supportive; right?
7      A.  Peter was supportive.
8      Q.  He wanted to see them get the enhanced severance;
9  right?
10     A.  Right.
11     Q.  And what do you recall -- how many conversations
12  with Mike did you have about the topic of Ken or Larry
13  getting enhanced severance?
14     A.  Over the course of the years, several.
15     Q.  Did he ever tell you that the benefits center
16  change of control committee -- that's the initial committee,
17  not the review committee -- was taking the position that it
18  was FAMM's decision to make?
19     A.  I don't recall that.
20     Q.  Okay.
21     A.  I recall when he was told it wasn't FAMM's
22  decision to make.  To be honest, that's what I recall.
23     Q.  And who told him that?
24     A.  Glenn Phillips, general manager of human resources
25  for the new ChevronTexaco.

Page 83

1      Q.  And what do you recall Mr. Bandy sharing with you
2  with regard to that conversation you had with Mr. Phillips?
3      A.  That he supported the position that Larry and Ken
4  get the package.
5      Q.  Mr. Bandy did?
6      A.  (The witness nods.)
7      Q.  And Mr. Phillips says it was not FAMM's decision
8  to make?  Is that correct?
9      A.  Correct.
10     Q.  And after that Ken and Larry continued to push,
11  did they not?
12     A.  Correct.
13     Q.  And they went to Pat Woertz.  Do you recall that?
14     A.  I do.
15     Q.  And that didn't make Mr. Bandy too happy, did it?
16  Or did he not care?  Do you know?
17     A.  I don't think he cared.
18     Q.  It became a little bit of a hot potato, did it?
19  Is that fair to say?
20     A.  In what way?
21     Q.  Well, Texaco was resistant, to say the least, were
22  they not?
23     A.  They were.
24     Q.  Okay.  And that resistance manifested itself
25  through basically a mandate, as you said, that if they're

Page 84

1  not 20s, forget it; right?
2      A.  Correct.
3      Q.  And do you know when that position was first
4  communicated to you or to Mr. Bandy as sort of an absolute?
5      A.  No.
6      Q.  Was it before June of 2002?
7      A.  I really can't recall.  June of 2002.
8      Q.  Are you still thinking about
9      A.  You can go -- yeah, I was still thinking about
10  that time frame.
11     Q.  Do you recall Mr. Meade asking you to see if
12  Mr. Bandy would write a letter supporting the effort of Ken
13  or Larry to get enhanced severance benefits?
14     A.  No.
15     Q.  Okay.
16          (Exhibit No. 46 was marked for
17          identification and is attached hereto.)
18     Q.  (BY MR. LUCAS)  Show you Exhibit 46.  If you would
19  just take a moment to read those two e-mails, three e-mails,
20  I guess it is.  Is that not ringing any bells?
21     A.  It's there in writing, so I guess we had this
22  discussion.
23     Q.  But you don't recall?
24     A.  No.
25     Q.  In any event, subsequent to this your

Page 85

1  understanding is that Texaco took the position it wasn't any
2  of FAMM's business, it was Texaco's decision; correct?
3      A.  Correct.  May I ask a question?  I don't recall
4  the dates of Larry and Ken's departure.  When was that?  Can
5  you refresh my memory when they actually left?
6      A.  It was midsummer 2002.
7      A.  2002?  Okay.
8      Q.  With regard to Pat Woertz getting involved, did
9  you have any discussion with Ms. Woertz?
10     A.  I did not.
11     Q.  Did Mr. Bandy tell you he had had discussions with
12  Ms. Woertz?
13     A.  I don't recall.
14     Q.  Did you have any discussions with Mr. Bethancourt
15  about Larry and Ken getting enhanced severance?
16     A.  John Bethancourt; correct?
17     Q.  Right.
18     A.  No, I did not.
19     Q.  How about Janet Stoner, any contact with her about
20  that?
21     A.  No, I did not.
22     Q.  How about Ron Boilla?
23     A.  No, I did not.
24     Q.  How about Mr. Batavick?
25     A.  Not on that particular subject, I don't believe I

22 (Pages 82 to 85)

DEPOSITION OF MICHELE SWANSON

Page 86

1  spoke to Batavick.
2  Q. How about Mr. Jeffery?
3  A. No, I didn't speak to Scott.
4  Q. Do you recall at those board meetings whether
5  Chevron was taking a position on the issue, the two Chevron
6  representatives?
7  A. I wasn't in the room, so I don't recall their view
8  ever.
9  Q. When you were involved in overseeing the minutes
10  being drafted, you were never instructed to put in a Chevron
11  position one way or the other; right?
12  A. No.
13  Q. And at one point shortly before their departure in
14  June of 2002 do you recall Mr. Raftery seeking your
15  assistance to invoke the arbitration process, the internal
16  arbitration process?
17  A. Yes, I remember. Is that the Steps process?
18  Q. Correct.
19  A. Okay.
20  Q. And Texaco took the position that it was not
21  applicable to ERISA claims, did it not?
22  A. I don't recall that, but I know that it didn't
23  refer them.
24  Q. Did not refer them?
25  A. Correct.

Page 87

1  Q. I just want to run through these names for a
2  moment. Some of them are going to be repetitive. I just
3  want to cover the committee members as I know them. Did you
4  have any discussions with Carolyn Sellers about the enhanced
5  severance of Ken and Larry?
6  A. No, I did not.
7  Q. How about Glenn Phillips?
8  A. Yes, I did.
9  Q. Okay. What conversation did you have with
10  Mr. Phillips?
11  A. I had gotten something in the mail, I guess it was
12  from your legal office, that they filed suit. And I had to
13  turn it over to him, and I discussed the issue at hand.
14  Q. And what did he say about that?
15  A. He went to see Mr. Bandy.
16  Q. And were you involved in that discussion?
17  A. No, I was not.
18  Q. Did he say anything to you about the merits of the
19  claims?
20  A. No, he did not.
21  Q. And did you share your view with Mr. Phillips?
22  A. No, I did not.
23  Q. And I think I've asked you about Mr. Goldsby. You
24  said you didn't have any conversations with him?
25  A. No.

Page 88

1  Q. How about Kwame Satchell?
2  A. Only as it pertains to the deposition.
3  Q. Is he still with Chevron?
4  A. Kwame?
5  Q. Yes.
6  A. Yes.
7  Q. How about Rebecca Roberts?
8  A. No, I did not.
9  Q. Richard Loving?
10  A. No, I did not.
11  Q. And I asked you about Ron Boilla, and you said no?
12  A. Correct.
13  Q. And I asked with Mr. Bethancourt. How about Mike
14  Rudy?
15  A. Michael Rudy, no, I didn't have a discussion with
16  him.
17  Q. Pat Lynch?
18  A. I did not speak to Pat Lynch.
19  Q. Rosemary Moore?
20  A. I did not.
21  Q. I asked about Ms. Stone. Did Mr. Bandy share with
22  you any other of his conversations with anyone about
23  Mr. Raftery and Mr. Katz, that you can recall, and their
24  entitlement to enhanced severance?
25  A. No, nothing that we haven't discussed.

Page 89

1  Q. Did Mr. Bandy ever express to you any frustration
2  in being unable to resolve this issue favorably for Ken and
3  Larry?
4  A. He was frustrated that the issue was still
5  outstanding.
6  Q. Is that because Ken and Larry wouldn't let it drop
7  or because Texaco wouldn't get rid of it or both?
8  A. Both.
9  Q. Do you know if he's still frustrated today that
10  it's outstanding?
11  A. I don't think he's frustrated any longer, no.
12  Q. He's retiring?
13  A. That's right.
14  Q. And you were not involved in reviewing the formal
15  claims submissions at any point, either to the initial
16  subcommittee or to the change in control committee; right?
17  A. I was not.
18  Q. And you were never interviewed or questioned about
19  your views by anyone from those committees as far as you
20  know?
21  A. No.
22  Q. Did Janet Stoner leave Chevron?
23  A. She did.
24  Q. When did she leave? Do you know?
25  A. Pretty quickly. Let's see. We merged in October.

DEPOSITION OF MICHELE SWANSON

Page 90

1   I believe she was -- I'm guessing.
2       Q.  You merged in October 2001.
3       A.  She left within the year.
4       Q.  Okay.  Do you know if she was gone by August 2002?
5   That would be almost a year.
6       A.  I'd be guessing.  It was fairly quickly, though.
7       Q.  Do you know who took over for her?
8       A.  His name escapes me.
9       Q.  It wasn't Ron Boilla.
10      A.  No.  It was the ex-Chevron HR vice president got
11  the job back again.  I can't think of his name.  And then it
12  went to John Bethancourt.
13      Q.  Okay.  All done.
14
15          (Deposition concluded at 3:32 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 92

1   I, MICHELE SWANSON, have read the foregoing deposition and
2   hereby affix my signature that same is true and correct,
3   except as noted above.
4
5   _____
6         MICHELE SWANSON
7
8   THE STATE OF TEXAS:
9   COUNTY OF HARRIS:
10
11      Before me, _____, on this day
12  personally appeared MICHELE SWANSON, known to me (or proved
13  to me under oath or through _____) (description
14  of identity or other document) to be the person whose name
15  is subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18
19      Given under my hand and seal of office this
20  _____ day of _____, 2004.
21
22
23
24      _____
25      NOTARY PUBLIC IN AND FOR
        THE STATE OF _____

Page 91

1          CHANGES AND SIGNATURE
2   WITNESS NAME: MICHELE SWANSON - DATE OF DEPOSITION: 3-31-04
3
4   PAGE    LINE    CHANGE        REASON____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 93

1   STATE OF TEXAS  )
2                   )
    COUNTY OF HARRIS )
3
         DEPOSITION OFFICER'S CERTIFICATE
4
5   ORAL DEPOSITION OF MICHELE SWANSON
    Taken on March 31, 2004
6
7   I, LaRita J. Cormier, Certified Shorthand Reporter in and
    for the State of Texas, hereby certify that this deposition
8   transcript is a true record of the testimony given by the
    witness named herein, after said witness was duly sworn or
9   affirmed by me.
10  I further certify that I am neither attorney nor counsel
    for, related to, nor employed by any of the parties to the
11  action in which this testimony was taken.  Further, I am not
    a relative nor employee of any attorney of record in this
12  cause, nor do I have a financial interest in this action.
13  Further certification requirements pursuant to the Rules
    will be certified to after they have occurred, if
14  applicable.
15  Subscribed and sworn to on this the 19th day of April, 2004.
16
17  _____
    LaRita J. Cormier, CSR
18  Texas State Certification No. 3412
    Certification Expiration:  12-31-05
19  Firm Registration No: 368
    Riverside Reporting, Inc.
20  6101 Southwest Freeway, Suite 200
    Houston, Texas  77057
21  (713) 662-0062
    Job No.:  41061R
22
23
24
25

24 (Pages 90 to 93)

RIVERSIDE REPORTING, INC.                              (713) 662-0062