Page 1

1              UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF CONNECTICUT
3    *  *  *  *  *  *  *  *  *  *  *  *  *
                                         *
4    LARRY A. KATZ and                   *
     KENNETH M. RAFTERY,                 *
5                                        *
            Plaintiffs,                  *
6                                        *
     VS.                                 *    Civil Action No.
7                                        *    302 CV 02201 (AWT)
     THE SEPARATION PAY                  *
8    PLAN OF TEXACO, INC.,               *
     and TEXACO, INC.,                   *
9                                        *
            Defendants,                  *
10                                       *
     *  *  *  *  *  *  *  *  *  *  *  *  *
11                                    Stamford, CT
12                                    April 29th, 2004
13                                    9:12 a.m.
14                      _ _ _
15          DEPOSITION OF LARRY A. KATZ
                        _ _ _
16   APPEARANCES:
17     FOR THE PLAINTIFFS LARRY A. KATZ and KENNETH M.
       RAFTERY:
18          MARTIN, LUCAS & CHIOFFI, LLP
            BY:  SCOTT R. LUCAS, ESQUIRE
19             177 Broad Street
               Stamford, CT  06901
20
       FOR THE DEFENDANTS THE SEPARATION PAY PLAN OF
21     TEXACO, INC., and TEXACO, INC.:
            JACKSON, LEWIS, LLP
22          BY:  C. SHAWN KEE, ESQUIRE
               177 Broad Street
23             Stamford, CT 06904
24
25     ALSO PRESENT:  KENNETH M. RAFTERY

Page 2

1          Deposition of LARRY A. KATZ, taken on
2   behalf of the defendant herein, for the purpose of
3   discovery and for use as evidence in this cause,
4   pending in the United States District Court for the
5   District of Connecticut, pursuant to Notice, before
6   Dorothy J. M. McGrath, Licensed Shorthand Reporter,
7   No. 442, and a Notary Public within and for the
8   State of Connecticut, at the offices of Jackson,
9   Lewis, LLP, 177 Broad Street, Stamford, Connecticut,
10  on the 29th day of April, 2004, at 9:12 a.m., at
11  which time counsel appeared as hereinbefore set
12  forth. . .
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          Thereupon:
2          LARRY A. KATZ, residing at 48 Janes Lane,
3   Connecticut, being first duly sworn, as
4   hereinafter certified, was examined and testified
5   as follows:
6   DIRECT EXAMINATION BY MR. KEE:
7       Q.   Mr. Katz, as you know, we're here today
8   to take your deposition in the lawsuit that you
9   brought against Texaco and the Separation Pay Plan
10  of Texaco, and I think you should know, I represent
11  the defendant in this case. We're going to take
12  your deposition today. Have you ever had your
13  deposition taken before?
14      A.   Once, yes.
15      Q.   Can you tell me the context of that?
16      A.   It was a -- it was a case FAMM had
17  against a ship owner. I think the ship owner owed
18  us some money.
19      Q.   How long ago was that?
20      A.   That was, I think, in early 2002, best I
21  can recall.
22      Q.   Well, maybe a few ground rules, as you
23  recall from that case. One is, your deposition
24  here is under oath and can be used for many
25  purposes as we go through the case, including

Page 4

1   evidence at trial, for example. Okay. Were you
2   aware of that?
3       A.   Yeah.
4       Q.   Are you aware that you're under oath?
5       A.   Yes.
6       Q.   And it's also important as we go
7   through here that you answer yeah, sometimes while
8   you and I understand that, doesn't always look so
9   well because we have a court reporters who's typing
10  everything that's said, so it's important, yes, no,
11  for example, nods -- affirmative answers as opposed
12  to nods and so forth. And also, if you don't
13  understand the question, you can ask for
14  clarification. If you don't hear the question, ask
15  me to speak up, etcetera.
16          Are you under any medication that would
17  affect your ability to accurately testify today?
18      A.   No.
19      Q.   Is there any other reason that you're
20  able to accurately testify today?
21      A.   No.
22      Q.   Can you tell me what you've done to
23  prepare for your deposition?
24      A.   Yes. I reviewed the notes that we
25  submitted. I've read the depositions or skimmed

Page 5

1   through some of them and -- that were already taken
2   and had a discussion yesterday with Scott Lucas.
3       Q.   Have you reviewed any documents that
4   you've not provided to your attorney?
5       A.   No.
6       Q.   How long have you lived at the address
7   in Stamford?
8       A.   Since 1997.
9       Q.   Do you own the property there?
10      A.   Yes.
11      Q.   Are you married?
12      A.   Yes.
13      Q.   First marriage?
14      A.   Yes.
15      Q.   What's your wife's name?
16      A.   Joy.
17      Q.   Do you have any children?
18      A.   Yes.
19      Q.   How old are they?
20      A.   They are six, seven, and nine.
21      Q.   And have you ever been a party to a
22  lawsuit before this one?
23      A.   Yes.
24      Q.   How many times?
25      A.   I think twice.

2 (Pages 2 to 5)

Page 6

1    Q.    Can you tell me about the -- about
2    those cases generally?
3    A.    Sure.  One was -- one was a car accident
4    where we were trying to recover damages to our car,
5    and the other was a vacation package that didn't --
6    didn't meet expectations.
7    Q.    And how long ago were these cases?
8    A.    Approximately ten years ago.
9    Q.    So for the past ten years, at least
10   since those cases, you haven't been involved in a
11   lawsuit?
12   A.    Correct.
13   Q.    Have you ever filed for bankruptcy?
14   A.    No.
15   Q.    Have you ever been convicted of any
16   crime?
17   A.    No.
18   Q.    Where did you go to college at?
19   A.    Cornell University.
20   Q.    And what year did you graduate from
21   Cornell?
22   A.    1987.
23   Q.    What did you do after that?
24   A.    I went to work for Bristol Myers Squibb
25   in New York City.

Page 7

1    Q.    How long did you work for Bristol
2    Myers?
3    A.    Approximately two years.
4    Q.    And what did you do after that?
5    A.    I went to graduate school at Duke
6    University.
7    Q.    And what?  For your M. B. A.?
8    A.    Correct.
9    Q.    And what did you do after your
10   M. B. A.?
11   A.    I started work at Texaco in White
12   Plains.
13   Q.    You left Texaco when?
14   A.    I left Texaco in 1998.
15   Q.    And let me rephrase that.  After --
16   then you went to FAMM at some point?
17   A.    Yeah, in --
18   Q.    You left -- when did you leave FAMM --
19   A.    -- 1999 I started FAMM, and I left FAMM
20   in July of 2002.
21   Q.    And what have you been doing since
22   July 2002?
23   A.    I'm currently -- well, I -- I worked for
24   an insurance company in Stamford, XL Insurance, and
25   then now I'm currently working for Premcor Refinery

Page 8

1    in Old Greenwich.
2    Q.    And what's your job at Premcor?
3    A.    Assistant treasurer.
4    Q.    When did you start at Premcor?
5    A.    I started there in November of 2003.
6    Q.    So you went to Texaco, let's see, after
7    grade school.  What year was that?
8    A.    That was 1991.
9    Q.    And what was your first job when you
10   went to Texaco?
11   A.    I was -- I believe I was -- my title was
12   something like financial analyst in the treasury
13   department.
14   Q.    Can you take me through the -- you
15   know, your steps of progression between '91 and
16   '98?
17   A.    Okay.  I was in the treasury department
18   for approximately two years, and I went to work for
19   T-FAMM, which was Texaco's fuel, oil, and lubricant
20   division for ships, and I worked for that company
21   for -- or that division I should say -- for a couple
22   of years, and then I moved in to a group that does
23   the -- did the M&A, mergers and acquisition activity
24   for Texaco, and that's where I finished in 1998.
25   Q.    So when you -- I guess from what, '93

Page 9

1    to '95, you were at T-FAMM?
2    A.    Yeah, approximately.
3    Q.    And that Mike Bandy was in charge of
4    T-FAMM at that time?
5    A.    No, Mike was not.  I -- I can't remember
6    the -- the gentlemen's name who was in charge, but
7    Mike was not in charge at that point.
8    Q.    Now, in 1998, what was your position at
9    the Texaco?
10   A.    I was -- it was a corporate development
11   associate.
12   Q.    Is there a position grade attached to
13   that?
14   A.    Yes, I believe I was a 16, Texaco 16.
15   Q.    So in 1998, 1999, you go to work for
16   FAMM --
17   A.    Correct.
18   Q.    -- right?  Now, let me just make sure.
19   As I understand it, at the time, you know,
20   generally we know in this case that FAMM was a
21   joint venture between Chevron and Texaco; is that
22   accurate?
23   A.    Correct.
24   Q.    At the time you went to work for FAMM,
25   was that the case, in 1998 or 1999?

Page 10

1    A.    Correct.
2    Q.    And was November 1998 the date you
3  started there with FAMM?
4    A.    I think I actually started slightly
5  earlier but around there.
6    Q.    And what was your job at FAMM?
7    A.    At FAMM, I was the treasurer of FAMM.
8    Q.    Did you continue to be the treasurer of
9  FAMM through July of 2002?
10   A.    Yes, correct.
11         (Discussion off the record.)
12   Q.    (By Mr. Kee) Let me show you Exhibit 37
13  and ask -- there's four pages in Exhibit 37. I
14  would just like for the moment really take a look at
15  the first two pages and tell me if this is a
16  document you recognize.
17   A.    Yes.
18   Q.    What is this?
19   A.    This was a job description for the
20  treasurer function that I believe was -- was drafted
21  subsequent to the announcement of the merger.
22   Q.    Is this job description generally
23  accurate as to what your job was at about the time
24  of the merger?
25   A.    Yes.

Page 11

1    Q.    Now, let me also ask you to take a
2  look -- keep Exhibit 37 in front of you -- take a
3  look at Exhibit 38 and tell me if that's a document
4  you recognize.
5    A.    No, it's not.
6    Q.    It is a document, I'll tell you, that
7  you produced in this case so --
8    A.    Well, this is Ken Raftery's. I don't
9  know if you want to give me mine.
10   Q.    I should be looking at -- I should be
11  looking at -- I'm looking at the wrong one. It
12  will probably be appropriate if I show you yours,
13  which I don't think we have one of those for you.
14         Your position grade as the treasurer at
15  FAMM when you started in 1998 was a position grade
16  19; is that correct?
17   A.    It -- when I started, it was either an
18  18 or a 19. I can't recall, but very quickly, it
19  was a 19.
20   Q.    And was that position grade ever
21  changed?
22   A.    No, I was a FAMM 19 throughout FAMM.
23   Q.    As I understand it, your last position
24  grade at Texaco was a 16?
25   A.    Correct.

Page 12

1    Q.    So did -- in your view -- did you ever
2  hold any position at Texaco that was higher than a
3  Texaco grade 16?
4    A.    No.
5    Q.    Did you ever request to be promoted to
6  a position grade 20 while working at FAMM?
7    A.    While working at FAMM?
8    Q.    Right.
9    A.    Yes, we had the discussion about
10  becoming a FAMM 20, yes.
11   Q.    And was that after the merger was
12  announced?
13   A.    Yes.
14   Q.    So before the merger was announced,
15  there were no discussions of promotion or at least
16  none that you were involved in about getting
17  promoted to be a position grade 20?
18   A.    Correct, FAMM -- I was -- I was
19  comfortable being a FAMM 19, enjoying all the
20  executive perks allowable to all the executives at
21  FAMM.
22   Q.    FAMM had various executive comp
23  programs, correct?
24   A.    Correct.
25   Q.    And can you tell me what some of these

Page 13

1  executive comp programs were that you participated
2  in FAMM?
3    A.    Okay. There was the annual cash bonus
4  plan. There was the long-term incentive plan, there
5  was the income deferral plan, and there was a
6  supplemental pension plan.
7    Q.    Is that supplemental pension plan
8  sometimes known as the sub-three?
9    A.    Correct.
10   Q.    To your knowledge, did Texaco have a
11  cash bonus plan?
12   A.    Yes.
13   Q.    Did you participate in the Texaco cash
14  bonus plan?
15   A.    No.
16   Q.    Did Texaco have a long-term incentive
17  plan?
18   A.    Yes.
19   Q.    Did you participate in the Texaco
20  long-term incentive plan?
21   A.    No.
22   Q.    Did Texaco have a deferral plan?
23   A.    Yes.
24   Q.    Did you participate in that?
25   A.    No.

Page 14

1    Q.    Did Texaco have something like a
2  sub-three?
3    A.    Yes.
4    Q.    And did you participate in that?
5    A.    Yes. I mean, no. Excuse me, excuse me.
6  No.
7    Q.    So were there any Texaco executive comp
8  plans that you participated in as an employee of
9  FAMM?
10    A.    As an employee of FAMM, no. To my
11  knowledge, no.
12    Q.    Were there any Texaco plans that you
13  participated in as an employee of FAMM?
14    A.    Were there any Texaco plans?
15    Q.    Let me rephrase that here. A -- were
16  there any Texaco benefit plans such as medical, for
17  example, that you participated in at FAMM?
18    A.    You know, I'm not clear. You'd have to
19  ask HR. I mean, I know our medical was similar, but
20  I don't know how that was arranged.
21    Q.    As treasurer, who did you report to?
22    A.    I reported to the C. F. O., Peter Meade.
23    Q.    And did you report to Peter Meade from
24  the time you started until the time he left?
25    A.    Yes.

Page 15

1    Q.    Do you know when he left?
2    A.    In the middle of 2002 also.
3    Q.    Did he leave before you did?
4    A.    No.
5    Q.    So about the same time?
6    A.    Yeah.
7    Q.    Well, just to, you know, be clear here
8  for the record, at '98, FAMM is a joint venture of
9  Texaco and Chevron, and at sometime between the
10  year 2000 or 2001, Chevron announces -- Texaco and
11  Chevron announce that there's going to be a merger;
12  is that accurate?
13    A.    Correct.
14    Q.    Do you recall when that announcement
15  was?
16    A.    I believe it was in October of 2000.
17    Q.    And at that point, you worked -- during
18  the time you worked for FAMM, you worked in White
19  Plains, New York?
20    A.    Correct.
21    Q.    And as part of the merger, the work
22  that was being done in White Plains, New York, was
23  going to be moved to Houston, Texas?
24    A.    Correct.
25    Q.    And is it also accurate that FAMM as a

Page 16

1  joint venture would be ceasing to exist following
2  the merger?
3    A.    As a joint venture -- I mean, FAMM the
4  company, was going to continue to exist, but as a
5  joint venture, I would say, yes, that's correct,
6  because the parents had merged, so it was going to
7  be a wholly owned subsidiary of Chevron, Texaco.
8    Q.    So at -- I mean, somewhat interesting
9  here that somebody formed this joint venture, and
10  eventually, the two companies later merged, but
11  there was no connection between the concept of
12  forming a joint venture in '98 and a merger in
13  2001, was there?
14    A.    No, no. In fact, Chevron and Texaco had
15  a large -- a much larger venture in Asia that had
16  existed for, I don't know, at least 50 years, so
17  there was a long history of cooperation or
18  co-investing between the companies.
19    Q.    While the business that FAMM was
20  involved in would continue after the merger, it was
21  going to be operated differently than it had been;
22  is that accurate?
23    A.    Well, that wasn't clear when we -- at
24  the time of the merger that FAMM had been quite
25  successful in its operations, and there were going

Page 17

1  to be some changes in the way it cooperated with
2  some of the other divisions or -- or companies,
3  depending on what they were, within Chevron, Texaco,
4  but it wasn't clear to me whether it was going to be
5  operated significantly different or not.
6    Q.    Now, were you offered the opportunity
7  to relocate to Houston?
8    A.    Yes.
9    Q.    And did you accept that opportunity?
10    A.    No.
11    Q.    So when did you learn that your job was
12  going to be moving to Houston?
13    A.    It must have been -- you know, I can't
14  recall exactly, but I would -- I would --
15          MR. LUCAS: I just don't want you
16  to guess.
17          THE DEPONENT: Okay. I can't
18  recall exactly.
19    Q.    (By Mr. Kee) Well, do you recall when
20  you heard that there was going to be a merger?
21    A.    That was October 2001.
22    Q.    So sometime between October 2001 --
23    A.    Excuse me, excuse me. October 2000 was
24  the announcement. October 2001 was the merger so --
25    Q.    Now, did you know before October 2001

5 (Pages 14 to 17)

Page 18

1  that your job was going to Houston?
2      A.   Yes, yeah, and -- and sometime after
3  October 2000, I knew my job was going to Houston.
4      Q.   And was it sometime before October 2001
5  that you decided you weren't going to Houston, you
6  weren't going to accept the offer?
7      A.   Yes.
8      Q.   When did you learn that there was going
9  to be some type of severance pay program that you
10 would be eligible to participate in?
11          MR. LUCAS:  Object to the -- you
12 mean the plan itself?
13          MR. KEE:  No.
14     Q.   (By Mr. Kee) When did you learn there
15 was going to be something, some type of severance
16 pay that you would be eligible to participate in?
17          MR. LUCAS:  I object.  It's vague.
18 Do you understand the question?
19          THE DEPONENT:  Well, I guess.
20          MR. LUCAS:  Well, I don't want you
21 to guess.  If you need him to rephrase it --
22          THE DEPONENT:  Okay.
23          MR. LUCAS:  Do you need him to
24 rephrase it so --
25          MR. KEE:  I'm happy to rephrase it.

Page 19

1  I mean --
2          MR. LUCAS:  I just don't want him
3  to guess --
4          MR. KEE:  Okay.
5          MR. LUCAS:  To me, it's ambiguous.
6      Q.   (By Mr. Kee) Sometimes, you know, when
7  people are offered or told, you know, your job is
8  moving to Houston and people say no, they say, well,
9  good luck, wish you the best.  Other times, people
10 may say if you -- your options are to either take
11 the job in Houston or to get some type of financial
12 package.
13     A.   Yeah.
14     Q.   When did you learn there might be some
15 type of financial package associated with not
16 relocating to Houston --
17     A.   Sure.  Okay.  Sure.  Shortly after the
18 announcement and we were -- it became understood
19 we'd move to Houston.  Okay.  I can't recall exactly
20 when that was, but there -- this plan, this
21 separation pay plan existed, and the employees of
22 FAMM came to understand they would be participants
23 under that plan.
24     Q.   So you've got some understanding, I
25 think, there's a plan out there and that you're

Page 20

1  going to -- that you'll be eligible for it if you
2  don't go to Houston?
3      A.   Correct.
4      Q.   Did you have any plan documents?  Did
5  you have any written information on that?
6      A.   Yes, we -- we had -- the way Texaco
7  managed this is, they had a three-ring binder, and
8  they would send out new pieces of the binder, and it
9  was expected that the employees would show that in
10 their benefits manual, so there was a plan that
11 people could review regarding separation pay.
12     Q.   Now, what was your understanding of
13 generally how that separation pay was going to
14 work?
15          MR. LUCAS:  At which point in time?
16          THE DEPONENT:  Yeah --
17     Q.   (By Mr. Kee) At -- at this point in --
18 before October 2001.
19     A.   Okay.  I know also that there were some
20 employee meetings that FAMM was having to try to
21 explain how this would work, but it -- in general,
22 it was understood that you would receive one month
23 of separation pay for each year of service up to a
24 maximum of 24 months.  Then there were other items
25 that were covered in there, including medical and

Page 21

1  other benefit extensions.
2      Q.   And you had, at that point, about ten
3  years in with the company?
4      A.   Yes.
5      Q.   Are you familiar with something that
6  I'll call the Pennacchio letter?
7      A.   Yes.
8          (Discussion off the record.)
9      Q.   (By Mr. Kee) Let me show you Exhibit 6
10 and ask if you recognize that.
11     A.   Yes.
12     Q.   Is this what's sometimes referred to as
13 the Pennacchio letter?
14     A.   Yes.
15     Q.   Can you give me your general
16 understanding of what this is?
17          MR. LUCAS:  This red writing
18 shouldn't be in there.
19          MR. KEE:  Yeah, just --
20          THE DEPONENT:  Sure.  This was an
21 enhancement to the separation pay plan for the
22 management group of Texaco.
23          MR. KEE:  Off the record.
24          (Discussion off the record.)
25     Q.   (By Mr. Kee) So let me make sure I have

Page 22

1  your -- get -- your understanding is sometime before
2  October 2001 that there's a basic severance plan
3  that's going to pay you one month of service -- one
4  month of pay for each year of service, and then
5  there is an enhancement for people at a certain
6  level in the company?
7      A.    Correct, enhancement for those in the
8  management group.
9      Q.    Do you recall when you first received a
10 copy of the Pennacchio letter, Exhibit 6?
11     A.    Not exactly, but it would have been late
12 2000.
13     Q.    How did you get a copy of this?
14     A.    I can't recall.
15     Q.    Did you have any meetings about this
16 letter? I mean, let me rephrase that. Did you
17 have any official type meetings about this letter?
18     A.    No.
19     Q.    Was this discussed in any type of staff
20 meetings that you might have with Mike Bandy or
21 other managers at FAMM?
22     A.    I don't believe so, don't believe it was
23 ever discussed in any of your general management
24 meetings.
25     Q.    Now, at some point, you attempt to get

Page 23

1  the benefits under this letter; is that right?
2      A.    Correct.
3      Q.    And I mean, that's the -- that's
4  part -- really the essence of what your lawsuit is,
5  is that you claim you're entitled to the benefits
6  as set forth in this letter, correct?
7      A.    Correct, and -- and additional benefits,
8  yes.
9      Q.    Well, what additional benefits?
10     A.    Well, the -- the -- what's not covered
11 in this letter is the enhancement afforded to the
12 officers of Texaco.
13     Q.    Why do you believe that you're entitled
14 to the benefits that might be provided to officers
15 of Texaco?
16     A.    Okay. FAMM as a separate company was
17 participating in the Texaco Separation Pay Plan, and
18 it was understood that the Texaco officers were
19 afforded enhancements in their severance pay. Since
20 FAMM was participating in that plan and I was an
21 officer of FAMM, I believe I deserved the same
22 enhancements.
23     Q.    And do you know whether or not those
24 benefits were provided for under the separation pay
25 plan or whether they were provided for in

Page 24

1  individual agreements?
2      A.    I -- I'm not aware.
3      Q.    Any other reason you believe you're
4  entitled to those benefits?
5      A.    "Those" meaning the officers --
6      Q.    The officers, right.
7      A.    No.
8      Q.    At some point, you attempt to get the
9  benefits under Exhibit 6, correct?
10           MR. LUCAS: Can we just clarify
11 which benefits you're referring to? There's three
12 categories of benefits here. I don't know if you
13 mean to be inclusive of that --
14           MR. KEE: I actually mean to be
15 inclusive of the whole thing --
16           MR. LUCAS: You did. Okay.
17           THE DEPONENT: Okay. Well, for
18 clarification, the only -- of the three benefits
19 delineated in this letter, the only one that had
20 been communicated to us that we may not be afforded
21 was the separation pay category.
22     Q.    (By Mr. Kee) Now, how did you learn that
23 you -- let me rephrase that.
24           Under the Pennacchio letter, there were
25 three categories of benefits, correct?

Page 25

1      A.    Correct.
2      Q.    There was -- if we look down at maybe
3  starting from the bottom, we see a statement that
4  deferred compensation, and it says, "All benefits
5  under this program would be immediately vested in
6  the event of a change of control," correct?
7      A.    Yeah, "immediately vested," correct.
8      Q.    And, indeed, that did happen for you --
9      A.    Correct.
10     Q.    -- correct? And as far as you know, is
11 there anything in this letter or elsewhere in
12 Texaco policy that say deferred compensation is
13 contingent on a person's position grade? The
14 vesting of preferred compensation for people
15 affected by the change in control?
16           MR. LUCAS: I'm sorry. Can I have
17 that question back?
18           THE DEPONENT: Yeah.
19           MR. KEE: Probably -- why don't I
20 reword it there.
21           MR. LUCAS: Can I have it back?
22           MR. KEE: I'll revise it.
23     Q.    (By Mr. Kee) Do you know of any policy
24 or written document at Texaco that made the vesting
25 of deferred compensation following the change of

7 (Pages 22 to 25)

Page 26

1  control contingent on a person's position grade?
2      A.    No.
3      Q.    Now, but you personally were given this
4  benefit of deferred compensation vesting?
5      A.    Yes, and -- and I -- I should point out,
6  deferred compensation was only afforded to those in
7  the management group of Texaco and -- and similarly
8  the management group of -- in FAMM.
9      Q.    Now, you're aware from materials
10 produced in this case, though, that, in fact, there
11 were -- well, let me go back and revise it.
12         All right.  Let's look at -- the next one
13 up is the stock incentive plan.  As it states in the
14 stock incentive plan provision here, it seems to
15 provide, "In the event of control, all stock awards
16 shall become fully vested."
17     A.    Correct.
18     Q.    And you were provided this benefit?
19     A.    Correct.
20     Q.    And the same question as I asked
21 earlier of the deferred compensation, are you aware
22 of any policy or written document at Texaco that
23 made the vesting of stock incentive plan after a
24 change of control contingent on a person's position
25 grade?

Page 27

1      A.    No.
2      Q.    Now, if we go up the -- the third
3  benefit is the one that is at issue in this case,
4  right?  That being the separation pay?
5      A.    That's one of the issues, correct.
6      Q.    In addition to your officer's issue we
7  just discussed.  All right.  Now, the separation
8  pay section here seems to say, if I read this
9  correctly, "In determining severance under the
10 separation pay plan, employees in position grade 20
11 and above will have their severance determined as
12 set forth below with an enhancement," correct?
13         MR. LUCAS:  I'll object to that.
14     Q.    (By Mr. Kee) Do you see the language
15 there of -- in the separation pay section?
16     A.    Yes, that this applies to Texaco grade
17 20s.
18     Q.    And it would appear that a grade 20
19 gets a certain type of enhancement, a grade 21 gets
20 a larger enhancement, and a grade 22 gets a still
21 larger enhancement, correct?
22     A.    Correct.
23     Q.    You know, is it fair to say that of the
24 three benefits covered under the Pennacchio letter
25 only the one on separation pay appears to have some

Page 28

1  relationship to a person's position grade?
2          MR. LUCAS:  Objection.
3      Q.    (By Mr. Kee) You can answer.
4      A.    Well, can you re--- can you restate the
5  question?
6      Q.    Sure.  In the section regarding
7  separation pay, is it fair to say that the amount
8  of enhancement is expressly related to a person's
9  position grade?
10     A.    Yes, it's fair to say.
11     Q.    Is there any language in this which
12 suggests that someone should consider whether an
13 employee is in a position equivalent to a grade 20?
14     A.    Well, is there any language in this
15 letter --
16     Q.    In this letter which suggests that the
17 separation pay enhancement -- in determining
18 whether or not a person is eligible for the
19 separation pay enhancement, one needs to consider
20 whether they're in the position equivalent to a
21 grade 20.
22     A.    To a Texaco 20, no, does not.
23     Q.    And when we talk about grade 20, what
24 did you understand that to mean?  A Texaco grade
25 20, a grade 20 of some other company or what?

Page 29

1      A.    Yeah, I understood it to mean a Texaco
2  grade 20, which was a level that qualified you to be
3  part of the management group of Texaco, which was
4  not the case at FAMM.
5      Q.    But we can all agree that you were
6  never a Texaco grade 20, correct?
7      A.    Correct.
8      Q.    Now, as I understand -- maybe I can
9  paraphrase what I think your argument is.  Tell me
10 if I'm accurately stating it -- that in the first
11 paragraph of this letter it discusses benefits that
12 are available to members of our management group,
13 and then there's a parenthetical position grade 20
14 and above?
15     A.    Yes, I see that.
16     Q.    And is that the basis for why you
17 believe you're entitled to this benefit?
18         MR. LUCAS:  Objection to the extent
19 you're seeking a legal argument from this witness,
20 give his own opinion.  He can answer --
21         MR. KEE:  Right.
22     Q.    (By Mr. Kee) I'm asking your opinion.
23     A.    I'd say that's one of the reasons, yes.
24     Q.    Well, tell me what your reasons are,
25 why you believe you're entitled to the benefits

8 (Pages 26 to 29)

Page 30

1  under the Pennacchio letter.
2      A.    Okay.
3      Q.    But I'm -- let me rephrase it.  Since
4  the only benefit at issue is the separation pay
5  plan, explain to me why you believe you're entitled
6  to the separation pay benefits under the Pennacchio
7  letter.
8      A.    Okay.  The -- the enhancement under the
9  separation pay was for the Texaco management group.
10 FAMM was a separate company participating in the
11 separation pay plan, and as a member of FAMM's
12 management group that received every FAMM executive
13 perk, I had no reason to believe that I wouldn't
14 receive this executive perk for FAMM's management
15 group.
16     Q.    Did you have any understanding
17 regarding whether FAMM had any limitations on who
18 it could have participate in its executive comp
19 plans?
20     A.    Can you restate the question?
21     Q.    Sure.  As far as you know, if FAMM had
22 wanted to establish a sub-three for -- and allowed
23 receptionists, secretarial staff to participate in
24 a sub-three type plan, do you know of any reason
25 why FAMM could not have done that?

Page 31

1      A.    Well, to -- I mean --
2            MR. LUCAS:  Just don't want you to
3  guess.
4            THE DEPONENT:  -- I'm not fully
5  aware, but to the best of my knowledge, the FAMM
6  board would have had to approve such a plan.
7      Q.    (By Mr. Kee)  So is that your
8  understanding that the FAMM board had the discretion
9  to provide benefits to certain levels of employees
10 at FAMM and not provide benefits to people at other
11 levels at FAMM?
12     A.    Yes.
13     Q.    Do you know whether or not the FAMM
14 board ever considered that they should only provide
15 benefits that people would have received if they
16 were at Texaco?
17     A.    Can you restate the question?
18     Q.    Do you know whether or not the FAMM
19 board ever considered that they would only provide
20 benefits to FAMM employees if those FAMM employees
21 would have received the same benefits in comparable
22 positions at Texaco?
23     A.    I'm not aware of what the FAMM board
24 reviewed.
25     Q.    But in any event, at some point, you

Page 32

1  begin to seek the separation pay benefits under the
2  Pennacchio letter, right?
3      A.    Correct.
4      Q.    And we know at some point you submit
5  application or a claim to -- through the formal
6  process under the separation pay plan, correct?
7      A.    Correct.
8      Q.    Now, what did you do before you
9  submitted that claim to try to get these benefits?
10     A.    Okay.  We -- after becoming aware of the
11 letter, we had discussions with the FAMM C. F. O.,
12 Peter Meade, our boss, about the issue.  He took it
13 up with the FAMM HR director who, I believe,
14 reviewed it with the Texaco executive comp people.
15     Q.    And what feedback did you get from
16 that?
17     A.    And ultimately, we got feedback from
18 Michelle Swanson, who was the director of HR, that
19 we likely would not be afforded that enhancement.
20     Q.    Is that sort of the first step that you
21 took?
22     A.    Yes, I believe so.
23     Q.    Can you give me a time frame of when
24 that happened?
25     A.    Yeah, I would say that was late 2001 or

Page 33

1  maybe just into early 2002.
2      Q.    Did Michelle give you an explanation on
3  why you would likely not receive that benefit?
4      A.    No.  You know, she said she had had a
5  discussion, but there wasn't a lot of explanation.
6      Q.    Did you understand that the reason why
7  you -- the company was taking the position you
8  wouldn't get this benefit is because you were a
9  grade 19?
10           MR. LUCAS:  "Company" being Texaco?
11     Q.    (By Mr. Kee) "Company" being Texaco.
12     A.    You know, I think that didn't become
13 crystal clear until -- until we filed our claim.
14     Q.    So we got sort of the -- the first
15 stage of this is, you told Peter, Peter talked to
16 Michelle, and Michelle came back to you?
17     A.    Yeah, I think -- yes, correct.
18     Q.    What did you do after that to try to
19 get these benefits?
20     A.    Okay.  We were referred by Michelle and
21 Peter and some discussions with Mike Bandy to engage
22 ombuds process, which was a person that was supposed
23 to intermediate between employees and management
24 over issues such as this.  So we had some
25 discussions with Carole Young, who was the

Page 34

1  ombudsperson at the time, and she ended up having
2  some discussions with us and the executive comp
3  people at Texaco who had told Michelle that we would
4  not be afforded the benefits.
5      Q.    And can you explain to me what
6  information came back to you from that process?
7      A.    We had a -- I -- I remember us having a
8  meeting with Dennis Krilly who said the issue had
9  come up that were our jobs accurately graded as FAMM
10  19s, and his response was, they were.  We asked him
11  what had been done in that evaluation, and he said
12  he wasn't sure and that he hadn't done an evaluation
13  himself in -- I think he said 15 years.
14      Q.    And who was Dennis Krilly?
15      A.    He was a manager in executive
16  compensation for Texaco.
17      Q.    Can you tell me what else information
18  you received during that -- during the time you
19  were going through the ombuds process?
20      A.    Sure.  Sightly there -- soon thereafter,
21  we actually switched ombuds.  Carole Young, I think,
22  recused herself from the duties because she was
23  moving on to some other activities, and we switched
24  to an ombudsman, Al Swenson, who was very supportive
25  and encouraging of -- of -- of us and had some

Page 35

1  discussions with Mike Bandy and with other
2  executives in Texaco regarding the issue.
3      Q.    And what was the ultimate outcome of
4  the ombuds process?
5      A.    There was not a conclusive letter or
6  anything.  He was just encouraging us to, you know,
7  seek the -- you know, seek clarification of the
8  issue.
9      Q.    So we get sort of -- I guess maybe I
10  understand.  Stage one is you going through HR
11  channels?
12      A.    Correct.
13      Q.    Stage two is, you start going through
14  the ombuds who say, get some clarification.  What
15  happens next?
16      A.    Well, the ombuds and -- and our
17  management encouraged us to seek support from other
18  executives at Texaco that might clarify the issue.
19      Q.    Now, I've seen through the file.
20  There's a lot of E-mails that went out to other
21  Texaco executives.  Is that what the -- sort of
22  what you're talking about?
23      A.    Correct, yeah, there were some -- I had
24  conversations with some of my former bosses and some
25  of the executives at Texaco, and we were essentially

Page 36

1  seeking their assistance to try and clarify the
2  issue either at the FAMM board level or within
3  Texaco executive comp or what have you.
4      Q.    And what was the outcome of that?
5      A.    Well, ultimately, no definitive action
6  was taken before we received or I received my notice
7  informing me what my separation or severance pay
8  would be, which I think was right around the time of
9  October 2001.
10      Q.    So sort of these three things we're
11  talking about were all happening before the fall of
12  2001?
13      A.    Correct.
14      Q.    And earlier you testified about at some
15  point you tried to get promoted to a position grade
16  20.
17      A.    That -- that was recommended as one of
18  the solutions or clarifying steps.
19      Q.    And who recommended that?
20      A.    I can't recall.
21      Q.    So one of the things you understood was
22  that if you could just get promoted to a position
23  grade 20 that would mean -- you know, that would
24  eliminate the issue about whether or not you were
25  eligible for these, the separation pay benefit?

Page 37

1      A.    Yes, that -- that becoming a FAMM 20
2  would make it easier for people to read this letter
3  with respect to FAMM's pay grades.
4      Q.    And as far as you know, people who were
5  graded as FAMM 20s received the separation pay
6  enhancement?
7      A.    Yeah, I'm not aware.
8      Q.    Do you know other people who were FAMM
9  20s that left at the same time you did?
10      A.    I -- let's see.  Well, that were at
11  least FAMM 20s, yes.
12      Q.    Can you give me some example?
13      A.    Peter Meade, I think he was a FAMM 21
14  when he left.  I can't think of any others at the
15  moment.
16      Q.    So at some point, you're told that if
17  you could get promoted to be a position grade 20
18  that would help the situation, right?
19      A.    Correct.
20      Q.    What did you do to try to get promoted
21  to be a position grade 20?
22      A.    Well, we had some discussions with
23  Mike Bandy, and Mike brought the issue of promoting
24  us to a FAMM grade 20 to the board of FAMM.
25      Q.    Do you know what the outcome was at the

10 (Pages 34 to 37)

Page 38

1  board?
2      A.    I think there was -- there was no
3  decision made.
4      Q.    Well, the fact that there was no
5  decision made meant that you were not promoted to a
6  position grade 20, right?
7              MR. LUCAS:  I'm going to object to
8  the --
9              THE DEPONENT:  Yeah, I'm not -- I
10  mean, I -- you could ask my attorney better what the
11  minutes say at the board meeting.
12      Q.    (By Mr. Kee) Well, were you ever
13  promoted to position grade 20?
14      A.    No, I was not promoted to a FAMM grade
15  20, no.
16      Q.    And let me look at -- let me ask you to
17  take a look at Exhibit 3 and Exhibit 2 and ask if
18  you've ever seen those.
19      A.    Yes, I -- I've seen these associated
20  with the -- this lawsuit.
21      Q.    You didn't see these at the time you
22  were employed at FAMM?
23      A.    Correct.
24      Q.    Now, let me ask you to take a look at
25  position grade two -- or I'm sorry -- Exhibit 2,

Page 39

1  and then we can take a look here, and is this -- if
2  we look under paragraph two in Exhibit 2, it would
3  appear that there was a meeting of the board, and
4  it talks about the rationale about that -- that Ken
5  was given to discuss this request for a pay grade
6  increase from 19 to 20.  Do you see that?
7      A.    I do see that, but this -- this isn't
8  signed or anything, so I don't know if this really
9  represents what the board talked about or not.
10      Q.    Well, I understand.  All right.  Now,
11  you see the rationale that is listed here under
12  Ken's name, the A through D as to why he should be
13  promoted to a 20?
14      A.    I see that.
15      Q.    And then it -- in paragraph three, it
16  suggests your request for promotion or pay grade
17  increase from pay grade 19 to 20 for the same
18  rationale?
19      A.    I see that.
20      Q.    Was the rationale listed up above under
21  Ken -- was that accurate for the reason you were
22  looking to get promoted from a 19 to 20?
23      A.    I think it's a -- it's a broad summary
24  but somewhat aggregate, yeah.
25      Q.    And do you know whether or not this was

Page 40

1  the first or the second time whether the board ever
2  discussed this issue?
3              MR. LUCAS:  Objection.
4              THE DEPONENT:  Yeah, I don't know
5  what the board discussed, and it doesn't even appear
6  to me that -- without being signed, I don't even
7  know if they discussed this.
8      Q.    (By Mr. Kee) So do you know whether or
9  not the board discussed your promotions in August of
10  2001?
11      A.    No.
12      Q.    Were you ever told that the board
13  discussed it?
14      A.    I can't recall.
15      Q.    Did Mike Bandy ever come back to you
16  and tell you what had happened with the attempt to
17  get you promoted to a pay grade 20 through the
18  board?
19      A.    Yeah, I -- I can't recall.
20      Q.    Did you have any understanding whether
21  that had ever gone to the board?
22      A.    Yeah, I -- I can't recall.  You know,
23  Mike -- what Mike did with the board I was not --
24  never privy to.
25      Q.    Did you have any discussions with any

Page 41

1  members of the board other than Mike either before
2  or -- change that.
3              Did you have any discussions with any
4  members of the board other than, perhaps, Mike
5  regarding getting promoted to a position grade 20?
6      A.    Yes, I had -- well, I had discussions
7  with Scott Jeffery about -- about the issue, not
8  about -- I don't think about the -- the direct
9  promotion but about the issue.
10      Q.    And what discussions did you have with
11  Scott Jeffery?
12      A.    We discussed the -- the FAMM
13  compensation plans, the executive benefits that I
14  was afforded at FAMM and how I was at least
15  equivalent to the benefit compensation level to
16  Texaco grade 20, and he was sympathetic to -- to
17  clarifying and solving the issue.
18      Q.    Let me show you Exhibit 7 and ask if
19  you recognize this.
20      A.    Yes, I remember this.
21      Q.    Is this an E-mail you sent to
22  Scott Jeffery?
23      A.    Yes, appears so.
24      Q.    Let me ask you Exhibit 8 -- take a look
25  at that and tell me, are those notes that you

11 (Pages 38 to 41)

Page 42

1   prepared of your conversation with Scott Jeffery?
2       A.   Yes.
3       Q.   And from looking here at this E-mail,
4   it would appear that these notes were prepared on
5   August 10th, 2001?
6       A.   Correct.
7       Q.   Now, why you were calling Scott Jeffery
8   on August 10th -- or let me strike that here.
9            Is this by telephone?  In person?  How did
10  you have this discussion?
11      A.   Yeah, I -- well, it -- I've written here
12  that I called him at his house.
13      Q.   How was it that you came to call
14  Scott Jeffery at his house in August of 2001?
15      A.   Well, I knew the board -- I mean, the --
16  there had been some discussion with the Texaco
17  executive comp group that was part of the change of
18  control claims committee that suggested that this
19  was an issue that FAMM's board could clarify, and I
20  think subsequent to that I called Scott to see if he
21  could help.
22      Q.   If you look at Exhibit 3, which is in
23  front of you, that's the signed minutes of the
24  board.  See that?
25      A.   Okay.

Page 43

1       Q.   It would seem to indicate that there
2   was a board meeting on August 22nd of 2001, right?
3       A.   Okay.
4       Q.   I mean, you don't have any independent
5   knowledge of that, but the document would seem to
6   indicate that, right?
7       A.   Okay.  I agree.
8       Q.   And it would seem to indicate that
9   Mike Bandy presented issues that two employees had
10  concerning their pay grades.  Fair -- fair enough?
11      A.   I see that sentence.
12      Q.   So when you're talking to Scott Jeffery
13  on August 10th, did you have any understanding
14  whether or not there was going to be a board
15  meeting in the near future to consider your request
16  to have your pay grade changed from 19 to 20?
17      A.   I -- I can't recall.
18      Q.   So it's possible that that may just
19  have been coincidence?
20      A.   Yeah, I mean, again, as I stated the --
21  I may have known, but I can't recall, but we had
22  been informed directly by the change of control
23  claims representatives that FAMM's board could
24  clarify this, you know.
25      Q.   And by clarifying this, you meant could

Page 44

1   promote you to a grade 20?
2       A.   Well -- or just describe how FAMM's
3   participation in the separation pay plan was going
4   to work with respect to its management program.
5       Q.   And who was the representative that
6   told you this?
7       A.   That was John Goldsby.
8       Q.   And did John tell you this in the
9   fall -- fall or summer of 2001, or was that at some
10  later point?
11      A.   No, somewhere -- somewhere in the
12  summer, fall, 2001.
13      Q.   And I note somewhere in the file
14  here -- and we'll see these later -- there are
15  notes of conversation you had with John Goldsby.
16      A.   Correct.
17      Q.   Would you have -- whatever
18  conversations you had with John Goldsby, would you
19  have prepared notes and dated those?
20      A.   I can't recall.
21           (Discussion off the record.)
22      Q.   (By Mr. Kee) Did you follow back up with
23  Scott Jeffery after August 10th?
24      A.   I can't recall.  I mean, I definitely
25  had discussions with Scott after August 10.  What do

Page 45

1   you mean by follow up, I guess?
2       Q.   Well, the August 10th -- in the
3   August 10th E-mail you wrote to Scott, you would
4   be calling him back during the week of August 22nd,
5   right?
6       A.   Okay.  I did write that.
7       Q.   Do you know if you did that?
8       A.   I don't -- I can't recall.
9       Q.   And you had some guidance from
10  John Goldsby and perhaps others that the FAMM board
11  could clarify this issue regarding your eligibility
12  for the benefit or your position grade?
13      A.   Yes.
14      Q.   Did the FAMM board ever do that?
15      A.   No.
16      Q.   Do you have an opinion as to why not?
17      A.   You know, I think -- no, I really can't
18  answer why the FAMM board -- what they, you know,
19  discussed or -- or -- or what have you.
20      Q.   Fair enough.  All right.  So if -- and
21  have you read Scott Jeffery's deposition
22  transcript?
23      A.   Yes.
24      Q.   And are you aware from that transcript
25  that the board did -- at least if he's testified

12 (Pages 42 to 45)

Page 46

1  truthfully and accurately -- that the board did
2  consider whether or not to promote you guys?
3     A.    Okay.
4     Q.    You and -- I mean, you're aware of that
5  from Scott's deposition transcript?
6     A.    Okay. I can't recall the deposition
7  exactly but --
8     Q.    So we get in to -- so at some point,
9  you're dealing with the promotion. You've got the
10  HR, the ombuds process, getting support, you're
11  working with the promotion, try to do something --
12  perhaps working with the board to try to get
13  promoted. What's the next thing that you do or if
14  anything before you file your claim?
15             MR. LUCAS:  Just going to object to
16  the summary.
17     Q.    (By Mr. Kee) To try to get promoted.
18             MR. LUCAS:  Same objection.
19             THE DEPONENT:  Yeah, I'm -- I'm not
20  sure I agree with that summary but --
21     Q.    (By Mr. Kee) Well, if it's not accurate,
22  tell me -- I mean --
23     A.    Okay.  State it again.
24     Q.    Well, I'm trying to understand things
25  that took place to try to get your position grade

Page 47

1  or I mean -- I'm trying to understand the general
2  steps that you took to obtain the severance pay
3  benefits before you got to the step of submitting a
4  formal claim. And as I understand it so far,
5  you've told me there was a time period that you
6  were working with Peter and Michelle Swanson to get
7  the benefits. There was a time when you were
8  working with the ombuds -- through the ombuds
9  process. There was a time when you were trying to
10  get support from various people in the Texaco
11  organization, and there was also a time when you
12  were trying to get clarification from the board.
13     A.    I think that's fair.
14     Q.    Okay.  And are those sort of the
15  general categories before you get to the claims
16  process?
17     A.    Yes.
18     Q.    Now, before you got to the claims
19  process, having done these other things, did you
20  have an understanding as to why Texaco was taking
21  the position you weren't eligible for these
22  benefits?
23     A.    Yes.
24     Q.    And what was that understanding?
25     A.    It was my understanding that since I was

Page 48

1  not a Texaco pay grade 20 I would not be afforded
2  the benefits.
3     Q.    Now, do you know how the position
4  grading was done when your position at FAMM was
5  graded as a grade 19?
6     A.    No.
7     Q.    Do you know who did that?
8     A.    No, I can't recall.
9     Q.    Now, earlier, we looked at the job
10  description for your position.
11     A.    Yes.
12     Q.    Do you recall when that job description
13  came up in the context of all this or if it did?
14     A.    Yeah. That description was only done
15  just slightly before the merger with Chevron. It
16  was done way after the grading.
17     Q.    Do you know who prepared that?
18     A.    I believe it was someone in
19  Michelle Swanson's group.
20     Q.    Do you know whether they considered
21  whether the grade was accurate and appropriate for
22  that position?
23     A.    No, I don't know.
24     Q.    One way or the other?
25     A.    Right, I don't know what they

Page 49

1  considered.
2             (Discussion off the record.)
3             (Whereupon, the April 29 memo was
4  marked as Defendant's Exhibit 63 for
5  identification.)
6     Q.    (By Mr. Kee) Let me show you Exhibit 63
7  and ask if you recognize that. Actually, let me
8  pull the back page off there, please.
9     A.    (The deponent complies.)
10             MR. LUCAS:  I didn't mark it like
11  that, did I?
12             MR. KEE:  What's that?
13             MR. LUCAS:  No, you just marked it.
14             MR. KEE:  I just marked it.
15             THE DEPONENT:  Yes.
16     Q.    (By Mr. Kee) What is this?
17     A.    This was a letter that we had discussed
18  with Peter Meade that FAMM might send to clarify the
19  enhanced severance issue.
20     Q.    Somewhere in the file, it looked to me
21  like this was attached in an E-mail that you sent
22  to Peter or that Peter may have sent up to Mike or
23  Michelle saying, do you think Mike would sign
24  something like this. Is that --
25     A.    I -- I think that's fair.

Page 50

1    Q.    And this has a -- what appears to have
2  Mike's signature on it, and is it fair to say that
3  Mike had it on electronic -- Mike Bandy had an
4  electronic signature?
5    A.    Yes.
6    Q.    And as far as you know, this letter was
7  never actually approved by Mike?
8    A.    Yes, I agree with that.
9    Q.    This was really -- the signature was
10 really presented to Mike as a draft?
11   A.    Correct.
12         MR. KEE:  Why don't we take that
13 break?
14         (Whereupon, a recess was taken.)
15   Q.    (By Mr. Kee) Back up to -- back to your
16 deposition here, Mr. Katz, before you filed the
17 claim, did anybody at Texaco tell you, you were
18 going to receive these benefits?
19   A.    That we were going to receive the
20 benefits?
21   Q.    Right.
22   A.    No.
23   Q.    Some people, I understand, along the
24 way told you that they supported you and, perhaps,
25 even thought you should receive the benefits?

Page 51

1    A.    Yes, a number of people did.
2    Q.    Did you have an understanding before
3  you submitted the claim on who was making the
4  decision that whether or not you were or were not
5  entitled to those benefits?
6    A.    Well, the -- the -- I don't recall.  I
7  mean, I -- I -- the way I understood it was that the
8  claims committee was going to review it, and
9  thereafter, if we didn't like the response, we could
10 appeal to the more senior change of control
11 committee.
12   Q.    Now, how was it you -- how did you come
13 to learn the process that you were supposed to
14 follow?
15   A.    I think that came out of discussion
16 with -- with John Goldsby, I believe.
17         (Discussion off the record.)
18         (Whereupon, the Administrative Record
19 was marked as Defendant's Exhibit 64 for
20 identification.)
21   Q.    (By Mr. Kee) Mr. Katz, I've handed you
22 what's been marked as Exhibit 64, which I believe to
23 be what one might call the administrative record in
24 this case, and I want to point -- have you look at a
25 few different documents, at this.  You'll see down

Page 52

1  at the bottom the pages have little numbers down
2  there saying Texaco 4, 5, 6, etcetera.
3    A.    Okay.
4    Q.    Can look at the pages numbered
5  Texaco -- beginning at Texaco 43?
6    A.    (The deponent complies.)
7    Q.    And this would appear to be an E-mail
8  from Ken to Ron Boila with you being cc'd?
9    A.    Yeah.
10   Q.    Right.  Do you recognize this E-mail?
11   A.    Only from the documents, but I don't
12 recall it.
13         MR. LUCAS:  43?
14         THE DEPONENT:  Yeah.
15   Q.    (By Mr. Kee) And it appears to be
16 enclosing your submittal to the initial claims
17 committee?
18   A.    Yes.
19   Q.    If you'll look at page 44 and 45, do
20 you see that?
21   A.    Yeah.
22   Q.    Are these the documents that you
23 submitted to the claims committee?
24   A.    Yes, to the best of my knowledge, yes.
25   Q.    Do you recall anything else you

Page 53

1  submitted to the claims committee?
2    A.    I can't recall.
3    Q.    Did you -- well, I'll do this:  If I
4  look at the E-mail where this is going forward, it
5  would appear that this was submitted on or about
6  March 27th, 2002.
7    A.    Okay.  Yeah.
8    Q.    Do you believe that to be about the
9  right time?
10   A.    Yeah, that sounds right.
11         (Discussion off the record.)
12   Q.    (By Mr. Kee) And can I ask you to take a
13 look at the document labeled Texaco 128, 129, and
14 130 and ask if you recognize these documents?
15   A.    Yeah.
16   Q.    And this would appear to be a letter
17 that was sent to you sometime around April 22nd,
18 23rd, informing you that the claims committee had
19 determined you were not eligible for these
20 benefits?
21   A.    Correct.
22   Q.    Now, did -- between April 27th -- I'm
23 sorry -- between March 27th when this was submitted
24 and April 23rd of 2002, did you have any
25 communications with members of their claims

14 (Pages 50 to 53)

Page 54

1  committee regarding this matter?
2      A.    Well, I know I had a conversation with
3  Carolyn Sellers, but I'm not sure of the exact date
4  that took place.
5      Q.    Who did you understand were members of
6  the claims committee?
7      A.    I don't know them off the top of my
8  head, but I think we knew who they were.
9      Q.    Well, John Goldsby would be one,
10  correct?
11     A.    Correct.
12     Q.    Ron Boila?
13     A.    Correct.
14     Q.    Carolyn Sellers?
15     A.    Correct.
16     Q.    Now, have you worked with
17  Carolyn Sellers' husband before?
18     A.    Yes.
19     Q.    So you knew Carolyn through her
20  husband?
21     A.    Yes.
22     Q.    And you mentioned earlier that you had
23  talked to John Goldsby?
24     A.    Yes.
25     Q.    At some point, you talked to

Page 55

1  Carolyn Sellers about this, right?
2      A.    Yes.
3      Q.    Do you recall it was before or after
4  learning the decision and they --
5      A.    I don't recall, but there are notes
6  in -- in the submittal somewhere.
7      Q.    Hold that for a minute. I'm showing
8  you Exhibit 47 which would appear to be notes dated
9  April 24th regarding a call that you had with
10  Carolyn Sellers.
11     A.    Correct.
12     Q.    And so if that's accurate, that appears
13  to me you would have called Carolyn after finding
14  out the decision.
15     A.    Correct.
16     Q.    Do you recall if you spoke with her
17  before that?
18     A.    I -- I can't recall.
19            (Discussion off the record.)
20     Q.    (By Mr. Kee) I'm showing you Exhibit 59
21  and also Exhibit 60. Is one of these in your
22  handwriting?
23     A.    Yes.
24     Q.    Which one?
25     A.    60.

Page 56

1      Q.    So if I put -- looking at Exhibit 59
2  and 60, it would seem to me that there was a
3  meeting with you and Ken and John on or about
4  April 23rd.
5      A.    Correct.
6      Q.    And that would, again, be after you
7  received the information telling you, you had been
8  turned down?
9      A.    Correct.
10     Q.    Do you recall any discussions with John
11  in advance of this April 23rd meeting, perhaps
12  substantive discussions with John?
13     A.    Well, I mean, as I stated earlier, I
14  believe we had a meeting with John to talk about the
15  process and how -- how we should proceed.
16     Q.    Now, earlier, you mentioned that John
17  had told you that the board could clarify the
18  matter.
19     A.    Yes.
20     Q.    And if I read -- that appears to be
21  mentioned in your notes in Exhibit 60, right?
22     A.    Yes.
23     Q.    So do you think that that information
24  you got from John about having the FAMM board
25  clarify the matter came up in April of 2002?

Page 57

1      A.    Well, I think it did come up in April
2  2002, but it may have come up earlier as well,
3  and -- and it also may have been, you know, a
4  suggestion by other FAMM parties.
5      Q.    So you recall meeting with John to
6  explain the process, and you recall meeting with
7  John afterwards. Any other, you know, substantive
8  discussions that you recall having with John
9  regarding this issue or "this issue" being getting
10  severance pay?
11     A.    No, not that I recall.
12     Q.    Take these back here. Now, and to your
13  recollection, did you speak with any other members
14  of the claims committee about your submission?
15     A.    I can't remember the full list so --
16     Q.    Did you speak with Ron Boila?
17     A.    Yes, but I believe that was -- yes, we
18  did have a discussion with Ron Boila.
19     Q.    What do you recall discussing with Ron?
20     A.    I think most -- mostly procedural, but
21  I -- I can't recall.
22     Q.    Any discussions with Kwame Sachel?
23     A.    No, I did not have any -- well, I don't
24  recall any.
25     Q.    So by April 23rd or so you knew that

15 (Pages 54 to 57)

Page 58

1  your claim -- submission to the claims committee
2  had been turned down, right?
3      A.    Correct.
4      Q.    And you understood the reasons set
5  forth in the documents at Exhibit -- or excuse
6  me -- in Exhibit 64 at page 129, 130, right?
7      A.    You know -- well, there's -- there's one
8  sentence about reasoning that seemed to be very
9  little analysis. They did not ask to speak with
10  anyone from FAMM about the executive comp plans.
11  They did not ask to speak with Ken or I, so
12  actually, I -- I felt very deficient in an
13  explanation of what had been reviewed and why it
14  would not -- why the answer was no.
15      Q.    So what's the -- so looking at page 46
16  in that packet is the beginning of a letter from
17  Mr. Lucas to the committee.
18      A.    Okay.
19      Q.    Is that something you recognize and are
20  familiar with?
21      A.    Yes.
22      Q.    Now, as you understood the process, you
23  would go to the claims committee, to Mr. Goldsby's
24  committee, and submit requests for benefit to -- to
25  him, right, first? And if they turned you down,

Page 59

1  then you would go to this second committee for the
2  appeal?
3      A.    Yes. However, you know, along the way
4  with the ombudspersons, we had been assured that we
5  could take our issue to arbitration under several --
6  well, under procedures that were called steps or
7  solutions that allowed for redress of -- of issues,
8  and I think at this point we were trying to find
9  out, you know, was that the right option or not to
10  take, and it was explained us to that we needed to
11  exhaust the appeal process first.
12      Q.    So at some point, you retained
13  Mr. Lucas to assist you in this presumably, right?
14      A.    Correct.
15      Q.    And he submits a packet of material to
16  the change of control committee beginning at
17  page -- at least at page 46, right?
18      A.    Yeah, right, I'm not sure what else was
19  submitted.
20      Q.    Now, do you have any independent
21  knowledge of what the board -- or I'm sorry -- what
22  the change of control committee did after Mr. Lucas
23  submitted the materials beginning at page 46?
24      A.    No, I don't, and, you know, from reading
25  the more recent testimony, it doesn't seem like they

Page 60

1  did much.
2      Q.    And if I look at page 95 --
3      A.    Yes.
4      Q.    -- that appears to be a letter that was
5  sent to you on or about August 26 telling you that
6  your appeal was denied.
7      A.    Correct, again, with very little
8  explanation or advice about what was reviewed or
9  seemingly no phone calls to anybody that was
10  involved in the issue.
11      Q.    Did you ever speak with any members of
12  the change of control committee regarding your
13  eligibility for benefits?
14      A.    Can you remind me who's on the change of
15  control committee?
16      Q.    Sure. Well, there is Janet Stoner,
17  Glenn Tilton, John Bethencort, Pat Lynch --
18      (Discussion off the record.)
19          THE DEPONENT: Can we go one at a
20  time?
21          MR. KEE: Yeah --
22          THE DEPONENT: I'm not going to
23  remember all of these.
24          MR. KEE: Yeah, that's all right.
25      (Discussion off the record.)

Page 61

1      Q.    (By Mr. Kee) Janet Stoner?
2      A.    Janet Stoner I -- I did have a
3  conversation with.
4      Q.    What did you discuss with Janet Stoner?
5      A.    I -- I can't recall the full discussion
6  but basically explained how I viewed the issue.
7      Q.    And was this before you got the
8  decision or afterwards?
9      A.    I can't recall.
10      Q.    And so you explained generally why you
11  thought you were eligible for the benefits?
12      A.    Yes.
13      Q.    And do you recall her response?
14      A.    No, I -- I think it was quite vague.
15      Q.    But there's nothing from that call that
16  makes you remember whether it was before or after
17  your appeal? You got the letter in August.
18      A.    Yeah, right, I guess it would suggest to
19  me before because she was vague about -- about where
20  she stood or what -- you know, what she thought
21  about it.
22      Q.    And so it sounds to me like she heard
23  what your explanation of why you were eligible for
24  the benefits and it was sort of one of these calls,
25  well, thank you for calling?

16 (Pages 58 to 61)

Page 62

1    A.    Yeah.
2    Q.    But without I agree or I disagree?
3    A.    Yes.
4    Q.    Did you speak with Glenn Tilton
5    regarding this?
6    A.    No, but we -- we did -- I believe we
7    sent him an E-mail appealing to him at one point.
8    Q.    It would appear to me that there -- at
9    least from looking at the file -- that there seemed
10   to be a number of E-mails that -- in this file of
11   materials -- that you produced that either are cc'd
12   to Glenn Tilton or addressed to Glenn Tilton
13   discussing why you guys should get the benefits.
14   Is that fairly accurate?
15   A.    I think that's fair.  That's accurate.
16          MR. LUCAS:  Are you suggesting in
17   the question that he's a member of the change of
18   control committee?
19   Q.    (By Mr. Kee) Is Glenn -- you know, I
20   don't -- do you know at the time whether
21   Glenn Tilton was a member of the change of control
22   committee?
23   A.    I don't know.
24   Q.    Do you know whether or not he was a
25   member of the change of control committee at the --

Page 63

1    in 2002?
2    A.    I -- I don't -- I mean, I think from
3    reading the depositions he was at one point and then
4    left, and I don't know at what point we're talking
5    about really.
6    Q.    And I don't -- I --
7    A.    But Glenn -- I mean, just for -- Glenn
8    also was -- I guess he was still on the board but --
9    okay.  Well, I'll drop that.
10   Q.    And I don't recall as we sit here in
11   the deposition when Glenn Tilton went to United
12   Airlines and when he left the committee but --
13          MR. LUCAS:  You represented in the
14   interrogatory answers that the relevant people on
15   the change of control committee at the time did not
16   include Mr. Tilton.
17          MR. KEE:  And I'm sure that's
18   accurate.
19          MR. LUCAS:  Okay.
20   Q.    (By Mr. Kee) Did you speak with
21   Pat Lynch about this issue?
22   A.    I -- I don't believe -- I can't recall.
23   I don't believe so.
24   Q.    Did you speak with John Bethencort?
25   A.    I don't believe so.  I think we sent

Page 64

1    John an E-mail or tried to reach him at one point.
2    I do remember that he was unresponsive.
3          MR. KEE:  Can we go off the record?
4          (Discussion off the record.)
5          MR. KEE:  Back on the record.
6    Q.    (By Mr. Kee) Did you ever speak with
7    Mike Rudy or Rosemary Moore regarding this?
8    A.    No.
9    Q.    So far as -- it sounds to me like the
10   only person you directly recall discussing this
11   matter with from the committee itself was
12   Janet Stoner.
13   A.    Yes, correct.
14   Q.    And just to be clear, you don't have
15   any understanding apart from what you may have seen
16   in the documents from -- in discovery or from
17   reading deposition transcript what the committee
18   did or didn't do in regards to your claim?
19   A.    Correct.
20   Q.    Now, when you get back the response in
21   August of 2002, by that point you're no longer
22   employed at FAMM?
23   A.    Correct.  I left in July.
24   Q.    Do you know of any -- was there
25   anything else you did before commencing the lawsuit

Page 65

1    to try to get the benefits -- the severance pay
2    benefits under the Pennacchio letter?
3    A.    I -- I can't recall anything else.
4    Q.    And if -- do you know -- do you have
5    any independent knowledge whether or not Exhibit 64
6    is the administrative record that was maintained by
7    the board in this case?
8    A.    Well, what part of 64?
9    Q.    All of 64.
10   A.    Well, all of 64 comes as a whole lot of
11   stuff.  I don't --
12   Q.    Right.  I mean, do you know whether --
13   do you have any independent knowledge whether or
14   not that is the record maintained in their files?
15   A.    In which boards?
16   Q.    In the change of control committee's
17   files.
18   A.    Oh, I would doubt it.  I don't think
19   they had access to half of that stuff before they
20   did any of their review, if they did a review at
21   all.
22   Q.    Well, what is it you don't think they
23   had access to?  I mean, for example --
24   A.    I'm not clear what this first
25   sentence -- this first thing is but --

CAMPANO & ASSOCIATES
COURT REPORTING SERVICES

Page 66

1    Q.    For example, I would tell you from my
2    casual review that probably three-fourths of this
3    file, if not more, is the June 18th submission by
4    Mr. Lucas.
5    A.    Okay. Well, it's not -- I guess I don't
6    really know what they had or reviewed. I can only
7    go by the testimony of Mr. Lynch who recalled
8    reviewing nothing or didn't recall reviewing
9    anything.
10    Q.    But apart from what you may understand
11    that, you know, Mr. Lynch may have testified to,
12    you don't have any independent knowledge?
13    A.    Correct.
14    Q.    Is there anything else that you did
15    before commencing the lawsuit to try to get the
16    severance pay benefits other than what you've
17    previously testified to today?
18    A.    I don't believe so.
19          MR. LUCAS:  Just you're not talking
20    about attorney's fees, that you're talking about --
21          MR. KEE:  Right.
22          MR. LUCAS:  Okay.
23    Q.    (By Mr. Kee) Now, is it fair to say that
24    your understanding is the reason that the
25    committee -- the change of control committee decided

Page 67

1    you were not eligible for benefits is because they
2    simply looked at whether or not you were an
3    exhibit -- a position grade 20, said you weren't a
4    20, and didn't analyze your arguments about why you
5    ought to be treated as a position grade 20?
6    A.    Yeah, I -- I think that the recognition
7    that FAMM had its -- its own compensation plans and
8    executive benefits for its management group did
9    not -- did not seem to be considered. The -- I -- I
10    also know there was a lot of animosity between the
11    executive comp groups at Texaco and the HR
12    implementation of the management group compensation
13    plans at FAMM, and those people that -- at Texaco
14    that were disappointed with what FAMM was changing
15    and doing and establishing were part of the claims
16    committee and change of control committee group, for
17    lack of a better term.
18    Q.    So is it fair to say that you think
19    this -- these individuals who had some animosity
20    were involved in the decision to turn this down, to
21    reject your claim for benefits?
22    A.    Yes, that's my opinion, and, yeah, I
23    think that was corroborated by Tom Lynch's comments
24    to Mike Bandy when Tom was not on any of the
25    committees but informed Mike before the committee

Page 68

1    decided of what this committee's decision was going
2    to be.
3    Q.    Okay.
4    A.    And Tom worked directly for
5    Steve Pennacchio, and they were both part of the
6    most controversial or acrimonious group that FAMM
7    had to deal with regarding establishment of its
8    compensation plans.
9    Q.    Well, when you said there's animosity
10    between members of the exec comp group, do you mean
11    animosity between Mr. Pennacchio and people at
12    FAMM?
13    A.    It was -- Mr. Pennacchio was the head of
14    the Texaco executive comp group, but that included
15    Tom Lynch and Dennis Krilly, all of which dealt with
16    Michelle Swanson as we established our own executive
17    benefits plans.
18    Q.    Well, do you know if Mr. Lynch had any
19    animosity over this?
20          MR. LUCAS:  Which Mr. Lynch?
21          MR. KEE:  Tom lynch.
22          THE DEPONENT:  Tom Lynch, yeah, I
23    believe he did.
24    Q.    (By Mr. Kee) What's the basis for that?
25    A.    Just hearsay through Michelle Swanson.

Page 69

1    Q.    And what hearsay did you have that
2    would lead you to believe that Tom Lynch had some
3    animosity toward FAMM?
4    A.    Well, discussions with Michelle over the
5    years regarding establishment of the plans, how to
6    calculate the bonuses each year, how to send out
7    supplemental pension forms. I don't know, seemed
8    like just about anything.
9    Q.    And you -- this, to your knowledge,
10    had -- you knew of this over the years?
11    A.    Yes.
12    Q.    And I think you mentioned
13    Mr. Pennacchio. What did you understand about his
14    animosity?
15    A.    Well, I know he was -- well, I
16    understood he was against setting up some of the
17    plans, and I know ultimately he attempted to write
18    FAMM and maybe other participating companies out of
19    the separation pay -- pay plan altogether which had
20    to be corrected by the general counsel at -- at
21    Texaco, overruling him and --
22    Q.    Is that information you know from other
23    people telling you?
24    A.    Yes.
25    Q.    Who told you that?

18 (Pages 66 to 69)

Page 70

1    A.    Well, Michelle and Peter Meade and then,
2  I think, ultimately Jim Baker who was the attorney
3  for FAMM.
4    Q.    And when did you learn that
5  information?
6    A.    That was, I think, around the time of
7  the announcement of the merger when people in FAMM
8  were trying to understand would we have a separation
9  pay -- pay plan of our own or how would we get such
10  benefits.
11    Q.    Do you know when Steven Pennacchio left
12  Texaco?
13    A.    No, I don't.
14    Q.    Do you know if he'd left Texaco before
15  you submitted your claim to the claims committee?
16    A.    No, I have no idea.
17    Q.    And the other person you mentioned was
18  Dennis Krilly?
19    A.    Yes.
20    Q.    And do you believe that Dennis Krilly
21  had any animosity toward FAMM?
22    A.    Yeah, I think that whole group
23  essentially caucused with each and -- and was upset
24  that FAMM was establishing certain executive comp
25  plans and that they were not going to be in control

Page 71

1  of those plans, that the FAMM board and FAMM
2  management was going to be running those plans.
3    Q.    And do you know when those plans that
4  you're talking about were set up over at FAMM?
5    A.    Yeah, they were established in '99.
6    Q.    So you think they had this animosity
7  from the plans back in the time frame from '99 that
8  they opposed FAMM setting up its own plans?
9    A.    Yeah, definitely, that's -- that's my
10  understanding.
11    Q.    Anybody else involved in this process
12  that you felt had any animosity toward FAMM,
13  anybody else involved in the claims committee, the
14  change of control committee?
15    A.    You know, not that I was aware of, but I
16  would -- I would suggest that, you know, Texaco was
17  a place where it was quite political and people took
18  their cues from their senior managers, and if they
19  knew that Pennacchio didn't like FAMM people, they
20  were going to act accordingly. People did--- they
21  were not independent in their -- in their thinking.
22    Q.    Well, did you know whether or not -- at
23  the time that you submitted your claim whether or
24  not Carolyn Sellers was -- continued to be employed
25  by Texaco?

Page 72

1    A.    No, I didn't know.
2    Q.    Any reason to believe she had any
3  animosity toward you or FAMM?
4    A.    No.
5    Q.    Do you know whether or not John Goldsby
6  was employed by Texaco at the time you submitted
7  your claim?
8    A.    Yeah, I believe he was.
9    Q.    Do you know whether he was on his way
10  out?
11    A.    Yeah, I mean, I think he knew he was
12  going to be retiring, but he did work closely with
13  the executive comp group.
14    Q.    Do you know whether or not John Goldsby
15  had any animosity towards you, Ken, or anyone at
16  FAMM?
17    A.    You know, I think initially John was --
18  was -- was fair and open and suggested ways that
19  this could be concluded amicably, and then I
20  remember a discussion with him -- or maybe it wasn't
21  a discussion I had, but maybe it was a discussion
22  Ken had with him on the phone, but he informed us
23  that Tom Lynch had large problems with some of the
24  suggestions he had made to us and that he did see it
25  as a bigger problem subsequent to his discussions

Page 73

1  with Tom Lynch, so I mean, I think he was easily
2  influenced by the -- Texaco, for lack of a better
3  word, old-boy network.
4    Q.    And do you know if Tom Lynch is -- what
5  happened with Tom Lynch?
6    A.    No, I don't.
7    Q.    Did he retire?
8    A.    I think so.
9    Q.    Is it fair to say that most of the
10  people involved in -- from your understanding --
11  most of the people involved in the claims committee
12  and the change of control committee were
13  individuals that were -- had either left Texaco or
14  were going to be leaving Texaco as part of the
15  merger?
16    A.    You know, I'm not -- I'm not -- I'm not
17  sure I can say one way or the other.
18    Q.    Anybody else in the claims committee,
19  change of control committee process that in
20  particular you know of or that you believe to have
21  had any animosity toward FAMM generally or toward
22  you in particular?
23    A.    Well, I would suggest that
24  George Batavick, who was one of the FAMM board
25  members -- and I don't know to what extent he was

19 (Pages 70 to 73)

Page 74

1  consulted, was -- was not supportive of certain of
2  these things along the way, and -- and that may have
3  stemmed from his relationship with the executive
4  comp group but that there was an instance where he
5  unilaterally cut our bonus back one year, all of
6  FAMM's bonus, and George was very -- paid attention
7  to the political winds within Texaco and, I think,
8  tried to manage to those winds in a lot of ways,
9  and -- and I think George -- another reason I think
10 George was not exactly maybe unbiased is that he --
11 he at first recommended a different candidate than
12 Ken for the comptroller's job, and Mike did not
13 select the candidate George was pressing for, and I
14 think, you know, maybe George harbored some bad
15 feelings because of that.
16         There were many instances where
17 Peter Meade would describe George's approach at
18 board meetings where Peter was involved that -- that
19 led Peter -- well, and -- and myself subsequently --
20 to believe that, you know, George didn't agree with
21 a lot of things that we were trying to get done at
22 FAMM.
23     Q.    Do you know whether he had any role in
24 the change of control process?
25     A.    Yeah, I don't.

Page 75

1      Q.    And change of control severance pay
2  process?
3      A.    Yeah, I don't. I don't know if he was
4  consulted or -- or what have you.
5      Q.    And what was it that John Goldsby told
6  you -- he had advised you that Tom Lynch had
7  problems with?
8      A.    John had first advised us that he saw it
9  as a FAMM issue, that FAMM should clarify how they
10 were going to include their management group in the
11 enhanced separation pay, and -- and we said to John,
12 okay, so if FAMM clarifies it to its own management
13 group and then we communicate that to Tom Lynch and
14 staff who were actually going to be issuing the
15 files to payroll to say pay this guy, would they
16 accept and understand that FAMM had clarified its
17 own way that it was going to implement the enhanced
18 severance, and in -- in our first meeting, he said,
19 I don't see why not, that he saw it as a FAMM issue.
20 And in our subsequent phone call, he was -- he said
21 Tom Lynch would -- would not, you know, heed to
22 that -- to FAMM's clarifying itself.
23     Q.    Any reason to believe that Tom Lynch
24 would have had any problem with your receipt of
25 benefits if the FAMM board had said that they

Page 76

1  wanted to promote you to be a position grade 20?
2      A.    You know, I -- I think Tom and
3  Steve Pennacchio and that group would have -- would
4  have fought that as well somehow.
5      Q.    Other than what you testified to today
6  and what's contained in your appeal to the -- or in
7  the information submitted up to the change of
8  control committee, are there any other reasons that
9  you believe you're entitled to the enhanced
10 severance pay benefits?
11     A.    No, I think the documents speak for
12 themselves.
13     Q.    All right.
14         (Discussion off the record.)
15         (Whereupon, the Change of Control
16 Benefits was marked as Defendant's Exhibit 65 for
17 identification.)
18     Q.    (By Mr. Kee) Do you recognize that
19 document?
20     A.    No.
21     Q.    Okay.
22         (Whereupon, the Cash Severance Benefit
23 Estimator was marked as Defendant's Exhibit 66 for
24 identification.)
25     Q.    (By Mr. Kee) Do you recognize

Page 77

1  Exhibit 66?
2      A.    No, but I understand what's written on
3  it.
4      Q.    Did you get something like Exhibit 66
5  when you were at Texaco or --
6      A.    Yes.
7      Q.    -- or at FAMM?
8      A.    Yes, something like this, maybe even
9  this but --
10     Q.    What do you understand that Exhibit 66
11 is?
12     A.    Okay. This is a calculation of your
13 total -- of my total severance benefit, what's under
14 certain assumptions when I was to leave or what have
15 you.
16     Q.    So as I read Exhibit 66, upon
17 separation from Texaco without the enhancement, you
18 would receive something like $107,000, and then
19 were you going to receive a pay out in 2003 and
20 2004 of about $53,000?
21     A.    Yeah, correct.
22     Q.    And did you, in fact, receive payments
23 in about that amount?
24     A.    Yes.
25     Q.    Now, this would appear to be calculated

20 (Pages 74 to 77)

Page 78

1 on the basis of you getting 12 months credit.
2   A.   Yes.
3   Q.   And do you believe this to have been
4 accurately calculated under the plan for a person
5 with 12 months' credit?
6   A.   Yes, I think it's pretty accurate.
7   Q.   So if you had the enhancement under the
8 Pennacchio letter, you would have received an
9 additional 12 months' credit?
10   A.   Correct. Well, yes, under the
11 Pennacchio letter only, correct.
12   Q.   So if I were to try to figure out what
13 it was that you were -- or trying to, you know,
14 make the calculation of what you were asking the
15 claims committee or the change of control committee
16 to give you, it would really be doubling this?
17   A.   Yeah, I think that's a fair estimation.
18   Q.   And then you -- I think you've
19 previously testified that you believe you're
20 entitled to some compensation beyond the Pennacchio
21 letter related to the officers' issue that we --
22 you testified about earlier this morning?
23   A.   Correct, and then there's the attorney's
24 fee issue as well.
25   Q.   Right. Now, on the attorney's fee

Page 79

1 issue, can you tell me what your financial
2 arrangement is with your attorney?
3   A.   No.
4   Q.   Do you have a written fee agreement?
5   A.   Yes.
6   Q.   So whatever that arrangement is would
7 be reflected in a written fee agreement?
8   A.   Correct.
9       (Discussion off the record.)
10      (Whereupon, the report submitted by
11 Mr. Katz and Mr. Raftery was marked as Defendant's
12 Exhibit 67 for identification.)
13   Q.   (By Mr. Kee) Can you take a look at
14 Exhibit 67 and tell me if you recognize this?
15   A.   Yeah, I recognize this type of report.
16   Q.   This would -- I'll represent to you that
17 this was a document that was produced by you and
18 Mr. Raftery in this case. And can you tell me how
19 this document came in to your position?
20   A.   I don't recall.
21   Q.   And would this be a document that you
22 would typically get in your responsibilities at
23 FAMM?
24   A.   There were times as manager of employees
25 that you would be -- that you would have access to

Page 80

1 this, but I wouldn't say it was distributed to me
2 every year.
3   Q.   So you think this may have been
4 distributed to you somehow in your -- because you
5 were a manager, or do you think you got this some
6 other way?
7   A.   I don't recall.
8       MR. LUCAS: When you say "this,"
9 are you referring to both pages of the exhibit?
10      MR. KEE: Both pages of Exhibit 67.
11      THE DEPONENT: Yeah, well, my
12 answer applies to both pages so --
13   Q.   (By Mr. Kee) One comment you made
14 earlier about a -- you discussed a comment that
15 Tom Lynch had made to Mike Bandy that was reported
16 to you.
17   A.   Yes.
18   Q.   And about the committee making a
19 decision.
20   A.   Yes.
21   Q.   What did you -- can you tell me what
22 you know about that?
23   A.   Well, Mike informed Ken actually -- I
24 don't think I was at the direct meeting -- that he
25 had seen Tom Lynch at the opera, and Tom had

Page 81

1 informed -- or they mentioned that -- or somehow it
2 came up that our claim was at the claims committee
3 and that Tom told Mike that it was a slam dunk it
4 wasn't going to be approved.
5   Q.   Ever have any conversations with
6 Glenn Phillips regarding this?
7   A.   No, not that I recall.
8   Q.   Did you believe the change of control
9 committee had any type of conflict of interest in
10 this matter?
11      MR. LUCAS: With which committee?
12   Q.   (By Mr. Kee) In connection with
13 determining your entitlement of severance pay
14 benefits, in change of control committee, that being
15 the Janet Stoner group.
16   A.   Yeah. Well, I mean, to some extent, if
17 they were going to pay us more money, it was going
18 to hurt the -- the profitability of the company that
19 they were vested in with plenty of shares.
20 Additionally, I think there probably was some
21 concern about, you know, well, would this somehow
22 set some precedent for other people within Texaco or
23 within other participating companies besides FAMM.
24   Q.   Any other reasons?
25   A.   I -- I can't think of any at the moment.

Page 82

1      Q.     Why at 20?  Why not at 21?  I mean, if
2  you look at the Pennacchio letter, if you're 21,
3  you get better -- a better enhancement than you
4  would as a 20.  Why not 21?
5      A.     Well, they're both capped at 24 months
6  and -- either way with one more month or year of
7  service, we were both going to be capped at 24
8  months, so it really didn't matter and -- in
9  equating our compensation packages.  It was probably
10  easiest for people to understand that we were at
11  least as equivalent as a Texaco 20.
12      Q.     Well, how do you -- how do you
13  determine whether people are equivalent to a Texaco
14  grade 20?
15      A.     Well, I think the way we were looking at
16  it primarily was total compensation package in
17  which, you know, I was getting at least $100,000
18  more than a -- the Texaco 19 that I knew, and the
19  fact that I was in every executive plan under FAMM
20  and part of FAMM's management group which is the
21  same benefits and monicker you would -- you would
22  attribute attaining a grade 20 at Texaco.
23      Q.     Have you seen the documents that have
24  been produced in discovery regarding some of the
25  bonuses that people below Texaco grade 20s

Page 83

1  received?
2      A.     I -- I've seen those, yes.
3      Q.     I mean, you are aware now that at least
4  there are some other pretty highly paid Texaco 19s
5  who get large bonuses similar to what you guys got?
6      A.     Yeah, I -- I'm not sure I really -- I
7  think I would need to see the details on whether
8  those included severance payments or other items
9  that really wouldn't be classified as annual bonus.
10  I think it's been -- it's been shown in the
11  testimony by a number of people -- Michelle Swanson,
12  Peter Meade, Mike Bandy -- that if you were a Texaco
13  19 you were not entitled to a annual cash bonus or
14  long-term stock incentive plan or deferral or
15  supplemental pension.  You were sometimes given a
16  stipend and maybe sometimes given some other one
17  type awards, but you were not a consistent member of
18  the management group.  That was obtained at level
19  Texaco pay grade 20, which under FAMM was attained
20  regardless of your FAMM pay grade.  It -- it had
21  more to do with your function within the management
22  group of FAMM.
23      Q.     Well, could Mike Bandy determine his
24  definition of the management group differently than
25  Texaco did?

Page 84

1      A.     Yes, certainly, and I think that became
2  evident in the whole discussions of how FAMM was
3  going to establish its own executive comp plans.
4          MR. KEE:  That's all I have.
5          (Whereupon, the deposition was
6          adjourned at 11:32 a.m.)
7   (Exhibits were retained by Attorney Shawn Kee.)

Page 85

1  STATE OF CONNECTICUT
2  JUDICIAL DISTRICT OF CONNECTICUT
3
4
5  _____
        LARRY A. KATZ
6
7
8
9          LARRY A. KATZ personally appeared
10  before me at _____, Connecticut,
11  this _____ day of _____, 2004, made oath
12  and acknowledged this deposition to be a true and
13  accurate transcription of his testimony.
14
15
16
17  My Commission Expires:
18
19
20
21  _____
           NOTARY PUBLIC
22
23
24
25

Page 86

1
2           C E R T I F I C A T E
3
4       I, DOROTHY J. M. MCGRATH, certify that I am a
    Notary Public within and for the State of
5   Connecticut, duly commissioned and qualified to
    administer oaths.
6
        I further certify that the deponent named in
7   the foregoing deposition was by me duly sworn and
    thereupon testified as appears in the foregoing
8   deposition; that said deposition was taken by me
    stenographically and reduced to writing by me; and
9   that the foregoing is a true and accurate transcript
    of the testimony.
10
        I further certify that I am neither attorney or
11  counsel for, nor related to or employed by any of
    the parties to the action in which this deposition
12  is taken, and further, that I am not a relative or
    employee of any attorney or counsel employed by the
13  parties thereto or financially interested in the
    action.
14
        IN WITNESS WHEREOF, I have hereunto set my hand
15  and affixed my notarial seal this _____ day
    of _____, 2004.
16
17
18
        _____
19          Dorothy J. M. McGrath, LSR
    My commission expires   Notary Public
20  March 31, 2009          State of Connecticut
    Lic. No. 442
21
22
23
24
25

Page 87

1
2                   I N D E X
3                                   PAGE
4   LARRY A. KATZ
5       Direct Examination by Mr. Kee            3
6
7           DEFENDANT'S EXHIBITS
8   No.         Description           ID
9   63  April 29 Memo                 49
10  64  Administrative Record         51
11  65  Change of Control Benefits        76
12  66  Cash Severance Benefit Estimator   76
13  67  Report Submitted by Mr. Katz and Mr.    79
14      Raftery
15
16
17
18
19
20
21
22
23
24
25