1                 UNITED STATES DISTRICT COURT
2                   DISTRICT OF CONNECTICUT
3  * * * * * * * * * * * * * * * * * *
4  LARRY A. KATZ and                    *
   KENNETH M. RAFTERY,                  *
6           Plaintiffs,                 *
                                        *
7        vs.                            *    Civil Action No.
                                        *    302 CV 02201(AWT)
8  THE SEPARATION PAY PLAN OF           *
   TEXACO, INC., and TEXACO, INC.,      *
9           Defendants.                 *
10 * * * * * * * * * * * * * * * * * *
11                        Stamford, CT
12                      April 30, 2004
13                        9:14 a.m.
14
15            DEPOSITION OF KENNETH M. RAFTERY
16
17 APPEARANCES:
18      FOR THE PLAINTIFFS:
19          MARTIN, LUCAS & CHIOPPI, LLP
            BY:  MARY ALICE S. CANADAY, ESQ.
20               177 Broad Street
                 Stamford, CT 06901
21
22      FOR THE DEFENDANTS:
23          JACKSON LEWIS, LLP
            BY:  CONRAD S. KEE, ESQ.
24               177 Broad Street
                 Post Office Box 251
25               Stamford, CT 06904
26

                                                    2
1  Also Present:    LARRY A. KATZ
2
3
4
5
6
7
8           Deposition of KENNETH M. RAFTERY, a Plaintiff,
9  taken on behalf of the Defendants herein, for the purpose
10 of discovery and for use as evidence in this cause,
11 pending in the United States District Court, District of
12 Connecticut, pursuant to Notice, before Lynne Stein,
13 Licensed Shorthand Reporter, No. 00110, a Notary Public
14 within and for the State of Connecticut, at the law
15 offices of Jackson Lewis, LLP, at 177 Broad Street,
16 Stamford, Connecticut, on the 30th day of April, 2004, at
17 9:14 a.m., at which time counsel appeared as hereinbefore
18 set forth . . .
19
20
21
22
23
24
25

                                                    3
1 Thereupon:
2 KENNETH M. RAFTERY, residing at 171 Meadows End Road,
3 Monroe, Connecticut 06468, being first duly sworn, as
4 hereinafter certified, was examined and testified as
5 follows:
6       MR. KEE:  Reading and signing, waive
7   notice, and waive challenges to the reporter.
8 DIRECT EXAMINATION BY MR. KEE:
9    Q    Good morning, Mr. Raftery.  Can you state your
10 name and address for the record, please.
11   A    It's Kenneth Raftery; 171 Meadows End Road,
12 Monroe, Connecticut 06468.
13   Q    We're here for your deposition in the lawsuit
14 that you have brought against Texaco and the Separation
15 Pay Plan Of Texaco.
16   A    Yes.
17   Q    You attended Mr. Katz's deposition yesterday,
18 right?
19   A    Yes.
20   Q    From that, I suspect you may be aware of some
21 of the process and procedures in place.  Of course, we'll
22 go over some of them.
23        First, it's important here, because the court
24 reporter is taking down a record, that you answer
25 affirmatively rather than with nods of the head or um-hum

                                                    4
1 or uhn-uhn.
2    A    Yes.
3    Q    It's important that you understand the
4 question because the deposition can be used for all sorts
5 of purposes in the case and you're here today under oath.
6    A    Yes.
7    Q    If you can't hear me or you need
8 clarification, speak up and say that.
9    A    Okay.
10   Q    Fair enough?
11   A    Yes.
12   Q    Any reason you're unable to accurately testify
13 today?
14   A    No.
15   Q    Under any medication that would affect your
16 ability to accurately recall?
17   A    No.
18   Q    Can you tell me what you've done to prepare
19 for your deposition today?
20   A    I have spoken to my attorneys and I have gone
21 over some of the documents, reviewed some of the
22 documents.
23   Q    Have you reviewed any documents that you have
24 not previously provided to your attorneys?
25   A    No.

5

1  Q  How long have you lived at your current
2 address in Monroe?
3  A  Ten years.
4  Q  You own your home?
5  A  Yes.
6  Q  Are you married?
7  A  Yes.
8  Q  What's your wife's name?
9  A  Laura.
10  Q  Is that your first wife?
11  A  Yes, it is.
12  Q  Do you have any children?
13  A  Yes.
14  Q  What are your children's names?
15  A  Kathleen and Alexander.
16  Q  How old are they?
17  A  Ten and eight.
18  Q  Have you ever filed for bankruptcy?
19  A  No.
20  Q  Ever been convicted of any crimes?
21  A  No.
22  Q  Ever been a party to a lawsuit before this
23 one?
24  A  No.
25  Q  Ever filed a claim against another employer?

6

1  A  No.
2  Q  Where did you go to college at?
3  A  Boston College, undergraduate.
4  Q  When did you graduate?
5  A  '83, 1983.
6  Q  What did you do after that?
7  A  I got a job at a company called Polycast in
8 Stamford as an accountant. Did that for two years.
9  Q  Take me up through the time you got to Texaco.
10  A  Did that through 1986. 1986 I joined Coopers
11 and Lybrand until 1990. In May of 1990 I joined Texaco.
12  Q  So what were you doing -- what was your job
13 with Texaco in 1990?
14  A  I was an accountant in the alternate energy
15 department.
16  Q  Do you recall what your position grade was at
17 the time?
18  A  I think it -- I'm not positive, but I believe
19 it was a 14.
20  Q  What was your next job at Texaco?
21  A  Next job was working in Texaco Europe as a
22 senior financial analyst, I believe the title was.
23  Q  Do you recall your position grade for that?
24  A  I don't really recall.
25  Q  What was your next job?

7

1  A  Two years later I moved to Texaco
2 Mideast/Far East. Once again, I was like a senior
3 financial analyst. There may have been a one grade
4 increase between those two.
5  Q  Same --
6  A  Same general work, just a different division
7 of Texaco.
8  Q  What was your next job?
9  A  Then after that I became assistant manager of
10 Texaco International Manufacturing And Marketing, TIMM.
11 And I was assistant manager of accounting.
12  Q  Do you recall your position grade there?
13  A  16 or 17. I think 17.
14  Q  What was your next job?
15  A  Then I was offered the controllership of FAMM.
16  Q  It sounds like three, four different jobs
17 between 1990 and 1998 with Texaco?
18  A  With Texaco, correct.
19  Q  And your last job was the assistant manager
20 job?
21  A  Yes.
22  Q  Then you joined FAMM in about, what, November
23 '98?
24  A  Yeah. I think I came on board about a month
25 before the merger was closed. The merger was closed --

8

1 the Texaco -- the FAMM joint venture was closed, I
2 believe it was November 1, 1998. I came on like a month
3 beforehand.
4  Q  What was the job you took at FAMM?
5  A  The controller.
6  Q  I know some of this may be a little rehash
7 from yesterday, but just so it's clear, FAMM was a joint
8 venture between Texaco and Chevron?
9  A  Correct.
10  Q  And so you ceased to be an employee of Texaco
11 and became an employee of FAMM --
12  A  Correct.
13  Q  -- sometime in late '98?
14  A  Correct.
15  Q  Do you know what your last position grade was
16 at Texaco before you went to FAMM?
17  A  That 16 or 17 that I became assistant manager
18 at. I think it was a 17, I believe.
19  Q  Do you know what the position grade was for
20 the controller position at FAMM?
21  A  It was FAMM -- either a FAMM 18 or a FAMM 19.
22  Q  Did the position grade -- always be an 18 or
23 19?
24  A  Can you rephrase the question?
25  Q  You said you believe it started as an 18 or

Campano & Associates Court Reporting Services  (203) 846-3402

9

1 19.
2  A  Correct.
3  Q  At some point, though, it was a 19?
4  A  Absolutely. A FAMM 19.
5  (Whereupon, a document was marked as
6 Defendant's Exhibit 68 for identification.)
7  Q  Let me show you Exhibit 68 and ask if that's
8 something you recognize.
9  A  I've seen forms like this, G 155. So, yeah.
10  Q  Now, this would appear to be referring to you,
11 right?
12  A  Yes.
13  Q  And it seems to me the date is as of August of
14 '98?
15  A  It says effective date 9/1/98.
16  Q  Right, effective date 9/1/98.
17  A  Okay, yes.
18  Q  And it would appear, if I look down toward the
19 bottom, this shows the last three pay changes? Or the
20 middle of the document.
21  A  Yes. Last three pay changes.
22  Q  It seems to show that as of 1/1/98 you were an
23 assistant manager at pay grade 17.
24  A  Yes. As I testified to.
25  Q  And then down at the Remarks, it seems to

10

1 state "transfer and promotion, 9/1/98"?
2  A  Yes.
3  Q  Were you dropped from the controllers
4 department and a pickup for TFAMM as manager?
5  A  Apparently 9/1/98 was the date. I knew I went
6 over before the venture started, so it must have been
7 September 1. At that time Texaco Fuel and Marine
8 Marketing was a division of Texaco, Inc.
9  Q  We have this TFAMM was the Texaco wholly owned
10 division that was involved in the marketing of marine
11 fuel products, right?
12  A  Yes.
13  Q  And when you went over there in September of
14 '98 or so, they were in the process of turning the TFAMM
15 business into being part of a joint venture company?
16  A  They were going to be combining that division
17 with a similar division at Chevron to form a joint
18 venture called FAMM.
19  Q  FAMM came about a couple of months later after
20 you joined?
21  A  November 1, I believe the date was.
22  Q  When you went over there in September, you
23 knew it was going to be part of FAMM?
24  A  I knew that TFAMM would be merged with a
25 division of Chevron to become FAMM, yes.

11

1  Q  It would appear from this form that your
2 initial job title at TFAMM was manager, accounting?
3  A  Sounds about -- it says on here manager,
4 credit. I was not the manager of credit. Somebody
5 crossed it out and wrote accounting. I believe my title
6 was manager of accounting under TFAMM, when I was working
7 for Texaco.
8  Q  Then it would appear that initially your grade
9 was an 18? I look down, it says annual salary --
10  A  New, 18. It appears that I joined TFAMM as an
11 18.
12  Q  When you joined --
13  A  Texaco 18.
14  Q  As a Texaco 18?
15  A  Yes.
16  Q  When you joined TFAMM, your job was as the
17 controller?
18  A  No. TFAMM, my job was apparently manager of
19 accounting.
20  Q  Were your duties at TFAMM the same as they
21 were at FAMM?
22  A  No.
23  Q  So between September and November, your duties
24 changed?
25  A  Yes. Upon the formation of FAMM my duties

12

1 changed, increased significantly.
2  Q  What were your duties before and after,
3 generally?
4  A  Well, generally --
5  MS. CANADAY: I just want to object, just
6 to the Exhibit 68, to the extent that at least on
7 my copy it looks like the left-hand margin is cut
8 off slightly. So some of the dates that you were
9 referring to under the heading Last Three Pay
10 Changes, I'm just not sure. I think you said
11 January 1 for those dates. I'm just not sure that
12 is a correct date.
13  MR. KEE: Unfortunately my copy is cut
14 off as well.
15  MS. CANADAY: Okay.
16  Q  You do believe that before you went over to
17 TFAMM you were an assistant manager at grade 17?
18  A  I do believe that to be the case.
19  Q  Generally, how did your duties change between
20 September-October of 1998 time frame and the time that
21 TFAMM became part of FAMM and you became an employee of
22 FAMM?
23  A  When I became an employee of FAMM, November 1,
24 1998, as the controller of FAMM, our business increased
25 significantly. Prior to becoming the controller of FAMM,

13

1 our business was only the Texaco side. When we brought
2 in Chevron to form the joint venture, my duties increased
3 significantly; basis, the number of transactions, the
4 number of people supervised. The fact that FAMM was a
5 stand-alone entity, had separate external and internal
6 audits on a stand-alone basis, which I was now
7 responsible for, that was never the case before. I was
8 responsible for reporting to two parent companies, which
9 I was never responsible for prior. The scope of
10 responsibility included the fact that under Texaco TFAMM
11 was relatively small, but as FAMM, as a stand-alone
12 entity, materiality was lowered a lot, meaning that from
13 an audit point of view, transactions became much more
14 important, watching every transaction.
15     Q    When did you leave FAMM?
16     A    I left July of 2002.
17     Q    Between November 1998 and July 2002, was your
18 job title always controller?
19     A    Yes, it was. Controller of FAMM.
20     Q    I'd like to ask you to take a look at Exhibit
21 37, really the last two pages of Exhibit 37.
22         Do you see the document that's entitled FAMM
23 Position Description?
24     A    Yes.
25     Q    This document, the last two pages appear to be

14

1 a position description for a controller at FAMM.
2     A    Yes.
3     Q    The question I have is: Do you recognize this
4 document?
5     A    I think I've seen it in the documents. Yes, I
6 believe I've seen this in the documents.
7     Q    Do you recall whether it's a document that you
8 saw during your time at FAMM?
9     A    I don't recall.
10     Q    Now, this document, again, would appear to
11 state that the position grade for the controller's
12 position was 19.
13     A    It was a FAMM position grade 19, correct.
14 That's what this document shows.
15     Q    Do you know when this document was created?
16     A    No, I do not.
17     Q    Do you know who created it?
18     A    No, I do not.
19     Q    Does it accurately reflect what your
20 responsibilities were?
21     A    It lists some of my responsibilities. It
22 doesn't include them all.
23     Q    What responsibilities are not included in
24 here?
25     A    Information systems, I don't believe I saw

15

1 information systems in here, implementation of
2 information systems. I implemented the Hyperion system.
3         Hiring of staff, hiring of external audit
4 firms, government reporting. There's more probably.
5 Those, off the top of my head, those are some. This is
6 an abbreviated listing, I would say.
7     Q    You said that you were a FAMM grade 19. Do
8 you know where FAMM received its -- whether FAMM adopted
9 the Texaco position grading system?
10     A    At the time -- my understanding is at the time
11 FAMM was formed, really thereafter, they had to adopt
12 some type of a compensation grading system. They had to
13 choose, I believe, between the Texaco format and
14 Chevron's format. They were very different. Or, I
15 guess, come up with their own. They chose to adopt the
16 format that Texaco had employed.
17     Q    Do you know, in terms of medical benefits and
18 HR systems generally, whether FAMM adopted the Chevron
19 system, the Texaco system, or some system of its own?
20     A    You know, I don't recall. I know I had the
21 benefits. I don't recall which system. I don't recall.
22     Q    In terms of the FAMM business, is it fair to
23 say that it was two-thirds or so owned by Texaco?
24     A    Well, the joint venture was owned 69 percent
25 by Texaco, 31 percent by Chevron.

16

1     Q    And in terms of the employees that came to
2 FAMM, was that about the same ratio of Texaco to Chevron
3 employees?
4     A    I don't know. You'd have to ask HR.
5     Q    If there was testimony in the case that said
6 FAMM generally adopted the Texaco HR systems and policies
7 and procedures, would you agree with that, disagree with
8 that, or not have a position?
9     A    I would disagree. What I'll say is when I
10 mentioned the fact we adopted a format, Texaco used
11 numbers for pay grades, Chevron used numbers and letters.
12 The only similarity is that we chose to use numbers,
13 rather than numbers and letters.
14     Q    Were you involved in any of the decision
15 making or discussion regarding the adoption of a position
16 grading system?
17     A    No.
18     Q    Who would be the best person to know about
19 that?
20     A    Probably the director of HR, Michelle Swanson.
21 Perhaps Michael Bandy, the president.
22     Q    Do you have any direct knowledge of how the
23 position grading system at FAMM worked?
24     A    Only to the extent that the higher the number,
25 the more responsibilities you had. And we used numbers.

**17**

1 Q  Your job didn't require any day-to-day
2 involvement with position grading, correct?
3 A  To the extent that I had employees who worked
4 for me, which I did, I had quite a few, I would be
5 familiar with their position grades, you know, promotions
6 came along.
7 Q  What was the highest position grade for any
8 employee that worked for you?
9 A  For me? I think 17 or 18. I don't recall
10 exactly.
11 Q  What would that person's job have been?
12 A  Assistant controller.
13 Q  Do you know the person's name?
14 A  There were two of them, Al Miller and Jim
15 Abbatello, at the end. There were others before them,
16 but those were the end ones we ended with.
17 Q  Who was your supervisor at FAMM?
18 A  The chief financial officer, Peter Meade.
19 Q  Was he your supervisor during your entire time
20 at FAMM?
21 A  Yes, he was.
22 Q  Let me show you what's been marked as Exhibit
23 38 --
24 A  Yes.
25 Q  -- and ask if that's a document you recognize.

**18**

1 A  I've seen this in the documents that were
2 produced.
3 Q  Is that a document that you recall seeing at
4 the time you were at FAMM?
5 A  No, I do not. I don't recall.
6 Q  Okay. Any idea why this document seems to say
7 you were a 26 and became a 19?
8 A  I do -- have no idea.
9 Q  But to your knowledge, there was no changing
10 of pay grade systems in April of 2002?
11 A  No.
12 Q  And you did not go from a 26 to a 19?
13 A  Not as far as I was told. More pay grade
14 confusion.
15 Q  What happened to the controller position
16 following the acquisition of Texaco by Chevron?
17 A  To the best of my knowledge, it continued. A
18 replacement was named.
19 Q  Who was that?
20 A  Scott Hannen.
21 Q  What about the treasurer function?
22 A  I don't know exactly what happened to the
23 treasurer function.
24 Q  To your knowledge, did the treasurer function
25 continue to exist after the acquisition?

**19**

1 A  I don't think so, but I don't -- I can't
2 recall for sure.
3 Q  Now, until there became an issue regarding the
4 eligibility for severance benefits, were you ever
5 involved in any discussions regarding your position
6 grade?
7 A  Not that I can recall.
8 Q  So in the fall of '98, you joined FAMM -- you
9 joined TFAMM, which becomes part of FAMM. When do you
10 learn that there's going to be a merger or acquisition of
11 Texaco by Chevron?
12 A  I believe that was announced in the fall of
13 2000.
14 Q  And the merger itself actually took place in
15 the fall of 2001?
16 A  Correct, one year later.
17 Q  When did you learn that Texaco had some type
18 of severance pay plan that might provide a severance
19 payment to you?
20 A  There was -- probably around the time of the
21 merger -- probably soon after the merger people started
22 talking about it.
23 Q  And when did you learn that there would be or
24 there might be an additional enhanced severance if you
25 were a position grade 20 or above?

**20**

1 A  Probably around the same time. Maybe a little
2 bit later.
3 Q  How did you learn that?
4 A  I got a copy of the Pennacchio letter.
5 Q  Do you know who gave it to you?
6 A  Offhand, I don't, no. There are lots of
7 people were discussing the whole separation issue.
8 Q  Let me show you Exhibit 6. You mentioned you
9 got a copy of the Pennacchio letter. That's Exhibit 6,
10 right?
11 A  Yes.
12 Q  When we discuss severance, you understood
13 there was some type of severance benefit for people whose
14 positions were eliminated or who were required to
15 relocate?
16 A  Yes.
17 Q  Is it fair to say you received that basic
18 benefit?
19 A  Yes.
20 Q  And so what's at issue here, in your case here
21 today, at least part of what's at issue is what's covered
22 in the Pennacchio letter?
23 A  That's true.
24 Q  And is there anything else beyond what's
25 covered in the Pennacchio letter?

21

1   A   Yes.
2   Q   What's that?
3   A   The extra enhancements afforded to officers of
4 the participating companies.
5   Q   Do you know how it came to be that -- what's
6 your basis or your factual basis for your belief that
7 you're entitled to that?
8   A   Several people have told me that that is the
9 case. I've never seen anything -- while I was working
10 there I had never seen anything written about it, but a
11 lot of stuff at Texaco was not written. It was done
12 behind closed doors.
13  Q   If those individuals had individually
14 negotiated agreements that were not part of the
15 separation pay plan, do you believe you'd be entitled to
16 those?
17      MS. CANADAY:  Just object to the form of
18   the question.
19  A   Can you rephrase it?
20  Q   Let's assume that Peter Bijur had negotiated
21 an agreement that would provide him severance pay. Do
22 you believe you would be entitled to that?
23  A   I'm not sure.
24  Q   Do you know whether the separation pay was
25 covered under the separation pay plan or under

22

1 individually negotiated agreements?
2   A   Which separation pay plan?
3   Q   For the officer group you mentioned.
4   A   We were never told. I never saw anything in
5 writing.
6   Q   If we focus on the Pennacchio letter, the
7 Pennacchio letter appears to provide for three separate
8 benefits. Is that fair to say?
9   A   Yes.
10  Q   Two of them are vesting of the stock incentive
11 plan and vesting of the deferred compensation plan.
12 Correct?
13  A   Yes.
14  Q   And you received those two benefits?
15  A   Yes, I did.
16  Q   So really the only benefit here under the
17 Pennacchio letter is the separation pay benefit.
18  A   That's correct. Just under -- for this
19 letter, for this issue.
20  Q   Any other basis -- when we talk about the
21 other issue, that being the severance that the officers
22 received -- any other reason other than what you've
23 testified to you believe you might be entitled to that?
24  A   Well, other than the fact that I was an
25 officer of Fuel And Marine Marketing, LLC, so similarly

23

1 to the officers of Texaco I should be entitled to the
2 same benefits.
3   Q   Anything else about that issue?
4   A   About that issue? No.
5   Q   Now, as I read the Pennacchio letter here,
6 under the separation pay section it appears to say that
7 employees in position grade 20 and above will have their
8 severance in the event of termination following a change
9 of control determining under the following schedule.
10 Okay? Then it provides an additional benefit accrual
11 which depends on the person's grade.
12  A   That's what it says.
13  Q   Why is it you believe that you're entitled to
14 this benefit which appears to say employees in position
15 grade 20 and above?
16  A   Because the letter says, and I'll quote from
17 the letter, that "The purpose of this letter is to
18 provide you with information regarding change of control
19 provisions of two of the executive compensation plans and
20 an enhancement to the plan for members of our management
21 group." And in parens, position grade 20 and above.
22      The enhancement is for the members of the
23 management group of Texaco. That's what this letter
24 says. And at Texaco the management group was defined as
25 Texaco position grade 20 and above.

24

1       I was a member of FAMM's -- FAMM was a
2 participant in this plan ultimately, and I was a member
3 of FAMM's management group and received all the same
4 exact benefits, executive comp and other perks, that a
5 Texaco 20 would have, and just because we used numbers
6 the same as Texaco, you can't compare FAMM's numbers to
7 Texaco's numbers.
8   Q   We can agree, can't we, you were never a
9 position grade 20 or above?
10  A   Which company?
11  Q   Either company.
12  A   That's correct. My number was never a 20.
13  Q   At Texaco, the highest grade you were was a
14 17, correct? I'm sorry. 18.
15  A   I think it was an 18.
16  Q   Texaco, the highest grade you had was 18 when
17 you were at TFAMM?
18  A   Correct.
19  Q   And at FAMM you were a 19?
20  A   A FAMM 19, which is a different grading
21 system.
22  Q   You don't have any basis to say it was a
23 different -- that the FAMM grading system -- or that FAMM
24 graded its positions differently than Texaco did, do you?
25  A   Yes.

---

**25**

1   Q    What's the basis for you being able to say
2 FAMM graded its positions differently than Texaco?
3   A    Because FAMM basically graded their position
4 independently of the way Texaco -- FAMM graded their
5 positions differently than either of their parent
6 companies.  They didn't grade them the same way Chevron
7 did, they didn't grade them the same way Texaco did.
8 Plus we had different positions in FAMM.
9   Q    Well, FAMM used the same numerical numbers
10 that Texaco did, right?
11       MS. CANADAY:  Objection just to the form.
12       MR. KEE:  I'll rephrase that.
13   Q    Texaco used the same format for position
14 grading -- I'm sorry.  One more time.
15   Q    FAMM used the same format for position grading
16 that Texaco did, correct?
17   A    I would not say that's correct.
18   Q    What's incorrect about that?
19   A    I would say that Texaco used a series of
20 numbers; FAMM used a series of numbers.  Chevron used
21 numbers and letters.
22   Q    And do you have any knowledge about how FAMM
23 treated or compared -- let me rephrase that.
24       At Texaco positions were graded -- do you know
25 what the range was for positions?

---

**26**

1   A    Not offhand, no.  I don't know where they
2 started or ended.
3   Q    But there were thousands of employees at
4 Texaco, right?
5   A    Correct.
6   Q    And many different job descriptions?
7   A    Correct.
8   Q    And so many different job descriptions --
9 there might be all sorts of jobs at Texaco that were
10 position grade 18, for example?
11   A    That's possible.
12   Q    Do you know how Texaco might make a decision
13 to take a person involved in the refinery business, make
14 them a grade 18, and make you, where you were involved
15 with the accounting side of the business, a grade 18 as
16 well?
17   A    I have no knowledge how that's done.
18   Q    Do you have a general understanding of why
19 somebody would attempt to do that?
20   A    Would attempt to do what?
21   Q    Create a common grade for -- that might apply
22 to a large company so that there might be people in
23 different businesses, different types of positions, who
24 had the same pay grade.
25   A    You'd have to ask HR.  I'm not in HR.

---

**27**

1   Q    At some point, though, you're aware that FAMM
2 had a grading system.
3   A    Yes.
4   Q    And that at least it adopted numbers as part
5 of its grading system?
6   A    It did use numbers, yes.
7   Q    Do you know whether it was FAMM's intent to
8 apply that grading system the same way it had been
9 applied at Texaco?
10   A    Could you -- what do you mean by that?
11   Q    Well, do you know whether or not it was FAMM's
12 intent that a FAMM 18 -- in determining whether or not
13 someone's a FAMM 18 you would generally apply the same
14 considerations that Texaco would have applied when they
15 made someone an 18?
16   A    I do not think that was the case.
17   Q    And what's the basis for why you don't think
18 that was the case?
19   A    Because, for example, a FAMM 19, when you look
20 at their grade and compensation plan, they were
21 compensated significantly above a Texaco 19, to the
22 extent of approximately a hundred thousand dollars higher
23 than Texaco 19.  So I find it hard to believe that if
24 you're trying to equate two positions with similar
25 responsibilities, that one is paid a hundred thousand

---

**28**

1 more than the other, how they can be called the same.
2   Q    Any other reason that you don't believe they
3 were applied the same?
4   A    We graded our jobs independently, so we didn't
5 sit down with Texaco and compare job for job.  We graded
6 our jobs independently.  We even hired an outside firm to
7 come in and help us.  And then FAMM also compared their
8 grading and compensation structure to Texaco's and to
9 Chevron's.  So if we had adopted the same plan as
10 Texaco's, there would be no need to compare them.
11   Q    If Mike Bandy said that he was trying to
12 create an incentive compensation structure different than
13 that of Texaco, would you agree or disagree?
14   A    I'm sorry.  Can you restate it again?
15   Q    If Mike Bandy were to say that he was trying
16 to create a different type of incentive compensation
17 scheme at FAMM than the scheme at either Texaco or
18 Chevron, because the types of businesses were different,
19 would you agree or disagree?
20   A    I would agree.
21   Q    Because the idea of FAMM, at least as Mike
22 Bandy saw it, was a very entrepreneurial organization,
23 right?
24   A    I would agree with that.
25   Q    Competing against smaller entrepreneurial

---

29

```
 1 organizations?
 2    A    We had a lot of competitors.
 3         (Whereupon, a recess was taken.)
 4    Q    Did FAMM have certain incentive compensation
 5 plans?
 6    A    Yes.
 7    Q    So you had your base pay?
 8    A    Yes.
 9    Q    What other type of compensation did you
10 receive at FAMM?
11    A    Cash bonus, annual cash bonus; long-term
12 incentive, LTI, which included stock appreciation rate,
13 SARS, and performance units, called PUs.  In addition, we
14 had a deferral plan where we could defer some of our
15 income.  In addition, a supplemental pension plan, SUP 3,
16 which is basically pension on your bonus, which is --
17 bonus is not normally eligible for pension.
18    Q    Were those plans all specific to FAMM, the
19 ones you just described?
20    A    I believe so, yes.
21    Q    Do you know who made the decision regarding
22 what employees at FAMM would be able to participate in
23 these plans?
24    A    I don't know for sure.  I would say it was
25 likely that it was Michelle Swanson, HR director, and
```

30

```
 1 Mike Bandy, the president.  Mike had a personal hand in a
 2 lot of the executive plans.
 3    Q    And do you know how Mike determined or
 4 Michelle determined who would be eligible to participate
 5 in these plans?
 6    A    I don't know offhand.  I assume it would be,
 7 you know, people with key responsibilities, key
 8 positions, management group.
 9    Q    Do you know generally when these plans were
10 adopted?
11    A    Soon after we formed, I think.  Maybe '99.
12    Q    Now, there were other plans at Texaco similar
13 to these, correct?
14    A    Yes.
15    Q    There was a cash bonus plan, long-term
16 incentive plan --
17    A    It was different.  They gave away restricted
18 stock and options.  They were both long term in nature,
19 but they had different components, they were developed
20 differently.
21    Q    There was a SUP 3 plan?
22    A    Yes, there was.  I don't know how it compared
23 to ours, but they had one.
24    Q    Were you eligible to participate in any of the
25 Texaco incentive compensation schemes?
```

31

```
 1    A    No.  Only Texaco position grade 20 and above
 2 were eligible.
 3    Q    You've seen documents produced in this case
 4 that show that's not exactly the case, right?
 5    A    Can you explain?
 6    Q    You have seen documents that have been
 7 produced in this case that show there were people at
 8 Texaco who were not position grade 20 or above who
 9 participated in some or all of these benefits, right?
10         MS. CANADAY:  I'm just going to object to
11    the form.
12    A    There were -- I did notice in the documents
13 there were Texaco employees who received stipends.
14 However, those were kind of one-off kind of payments.
15 They were not something that you got every year.  In
16 FAMM, the benefit plans I referred to, I got every year
17 as a matter of course.
18    Q    Do you know who made the decision at Texaco
19 regarding who would participate in these plans, the
20 Texaco plans we described?
21    A    I don't know.
22    Q    Do you know the factors that they would
23 consider in determining what employees or what level of
24 employees should be able to participate in those?
25    A    You'd have to ask them.
```

32

```
 1    Q    But in either case, you weren't involved in
 2 the analyzing or decision making on who would be --
 3 whether it be Texaco or FAMM -- on what level of
 4 employees or what specific employees would be eligible to
 5 participate?
 6    A    I'm sorry.  Can you restate it?
 7    Q    Do you have any direct knowledge regarding the
 8 factors that were considered at either Texaco or FAMM as
 9 to who would participate in these plans?
10    A    At Texaco, no.  At FAMM, I would -- I've had
11 discussions -- I had had discussions with Michelle
12 Swanson over the years about who was eligible and who was
13 in them and how I was -- Larry Katz and I were in all of
14 them every year.  There were certain people who got them
15 automatically every year.  Other employees would get them
16 every now and then; depending on if they had a good year
17 they might get a cash bonus, the next year maybe not.
18    Q    Were there other 19s at FAMM besides you and
19 Larry?
20    A    I don't know for sure.  I think there may have
21 been.
22    Q    Do you know any individuals that you think may
23 have been 19s?
24    A    I couldn't even speculate.  You know, I'm not
25 privy to that information, so . . . .
```

33

```
 1   Q   Do you know any employees at FAMM who were
 2 grade 20?
 3   A   I believe Peter Meade -- I thought Peter Meade
 4 was a FAMM pay grade 20 during his career with FAM. But
 5 I found out through the documents that he was promoted to
 6 a FAMM pay grade 21, but he was a FAMM pay grade 20.
 7   Q   Anybody else that you know of at FAMM that was
 8 a pay grade 20?
 9   A   I assume -- I would imagine there may have
10 been some. I don't know offhand. It was something they
11 didn't publish.
12   Q   As I understand your argument as to why you're
13 entitled to the separation pay benefits under the
14 Pennacchio letter, you believe you were entitled to those
15 benefits because you were part of the FAMM management
16 group and because you were paid or compensated comparably
17 to people at Texaco in position grade 20 or above?
18   A   That's part of it,
19   Q   But you would agree with that generalization,
20 at least part of it?
21   A   For part of it, yes.
22   Q   What other issues beyond that?
23   A   I guess I'll restate the fact that this
24 benefit is for members of our management group, and as
25 Texaco defined it, Texaco position grade 20 and above,
```

34

```
 1 FAMM was a participating company, ultimately, in this
 2 plan, and as such members of FAMM's management group, as
 3 however they defined it, would be eligible. We were
 4 defined clearly as managing group of FAMM and were
 5 afforded all of the benefits, all the executive perks,
 6 and the same compensation level as a Texaco 20.
 7   Q   You would agree that you were not part of the
 8 Texaco management group?
 9   A   I think that's a fair statement.
10   Q   At some point between the fall of 2000 and the
11 fall of 2001, you learned about the Pennacchio letter.
12   A   Correct.
13   Q   When do you start making inquiries regarding
14 your eligibility for those benefits?
15   A   Soon after we heard about it.
16   Q   And who did you talk to about that?
17   A   I believe the first person was Michelle
18 Swanson, HR director.
19   Q   What did you discuss with Michelle?
20   A   I basically asked her how -- you know, this
21 was a Texaco plan and how FAMM would, if at all,
22 participate.
23   Q   What was Michelle's --
24   A   I don't recall the exact discussions, but she
25 was going to check and find out. It was -- this letter
```

35

```
 1 was not -- was not circulated to any FAMM employees,
 2 regardless of their pay grade. The only reason this was
 3 obtained was somebody knew somebody and got them a copy
 4 of it. FAMM was purposely excluded from getting this
 5 letter.
 6   Q   How do you know FAMM was purposely excluded
 7 from getting this letter?
 8   A   Because no employees of FAMM were officially
 9 given this letter. There are several people that I spoke
10 to at grades above 20 even, FAMM grade 20, who had not
11 received the letter. We did not receive it through
12 official channels.
13   Q   You checked with Michelle. Did Michelle
14 ultimately come back and give you an answer?
15   A   At some point I believe she did.
16   Q   What was the answer she gave you?
17   A   That we would be receiving -- because FAMM was
18 in charge of administering the second two benefits in the
19 Pennacchio letter, stock incentive and deferred
20 compensation, we would be getting those. But because
21 Texaco was in charge of administering the first,
22 separation pay, the enhanced benefit with separation pay,
23 we would not.
24   Q   When you look, by the way, under the second
25 two benefits, there doesn't appear to be anything under
```

36

```
 1 those second two benefits which state they're conditional
 2 on a person's pay grade, right?
 3      MS. CANADAY:  Objection.
 4   A   The whole letter says -- I'll read it again --
 5 it's enhancement to the plan for members of our
 6 management group. So that introductory, it is pay grade.
 7   Q   So Michelle came back at some point. And do
 8 you recall approximately when this was?
 9   A   I really don't.
10   Q   And says, "Sorry, you're not getting the
11 separation pay."
12      We're here today, so we know you didn't drop
13 it at that point. So what happened next in terms of your
14 attempts to get the separation pay benefit?
15   A   We had a discussion about this, about the fact
16 that we had not -- you know, FAMM had not gotten this
17 through official channels. The people, Steve Pennacchio,
18 who this letter is from, and people on his staff,
19 including Tom Lynch, had always -- didn't like what FAMM
20 was doing in terms of executive compensation, and there
21 was strong suspicion that that's the reason we were not
22 even sent this letter. And that because they were in
23 charge of administering the first section, they were not
24 about to let FAMM have that benefit.
25   Q   Let me stop you there for a minute, if I may.
```

37

```
1        Had you ever met Stephen Pennacchio?
2    A   Yes.
3    Q   Do you have any firsthand knowledge regarding
4 any problems or animosity between him and FAMM?
5    A   What do you mean by firsthand knowledge?
6    Q   Well, I'm trying to understand. You said
7 there was a strong suspicion that they didn't --
8 intentionally didn't send this letter over to FAMM --
9    A   Correct.
10   Q   -- because there had been -- I don't want --
11   A   A history of animosity.
12   Q   Okay. I'm trying to understand what the basis
13 for your --
14   A   Sure.
15   Q   -- statement that there had been a history of
16 animosity,
17   A   I had had, while I was employed at FAMM,
18 probably over a dozen conversations with Michelle
19 Swanson, Mike Bandy, and I believe Peter Meade, as to
20 some of the history of what had gone on with Steve
21 Pennacchio and Tom Lynch, yelling, harassing, and
22 literally screaming at Michelle over what she was trying
23 to do on behalf of FAMM in terms of setting up an
24 executive compensation plan, with the help of outside --
25 with the help of outside consultants, the Hay Group.
```

38

```
1 There were stories she got into a fight with him in the
2 lunchroom. Lots of stories where they just hated what we
3 were doing.
4        As a matter of fact, at one point when this
5 separation pay plan first came out, Stephen Pennacchio
6 developed a list of companies that he wanted to exclude
7 from participating in this plan. He took the list of
8 companies to Peter Bijur and asked Peter to approve to
9 exclude these companies, indicating these were companies
10 that didn't have any employees, just more like name
11 companies. Peter signed it. And FAMM was on that list.
12       So Stephen intentionally tried to make sure
13 that FAMM did not participate in this pay plan. We
14 surreptitiously found out somehow from somebody that that
15 had been done, and our general counsel, Jim Baker,
16 contacted Deval Patrick about this issue. I know that to
17 be the case because I actually one day saw Deval Patrick
18 in Jim Baker's office. I asked the secretary, what was
19 that about. I had never seen Deval in FAMM before.
20       She said she did not know. I found out after
21 the meeting that we were soliciting Deval's, Deval
22 Patrick's, help in including FAMM in the separation pay
23 plan. And when he went to Peter Bijur, he had it
24 reversed, because Peter was unaware that we were being
25 excluded.
```

39

```
1    Q   Let me go back here to a bit of that.
2        Earlier you testified that FAMM had adopted
3 its own executive compensation plans, that being the cash
4 bonus, long-term incentive, deferral plan, and SUP 3.
5 Right?
6    A   Correct.
7    Q   And you talked about this history of
8 animosity. Is it fair to say you understood from your
9 discussions that this history of animosity related to
10 FAMM's adoption of these plans?
11   A   That was part of it.
12   Q   Do you know when these plans were adopted?
13   A   I think you asked me that. I believe it was
14 soon after FAMM was formed, '99.
15   Q   So '98, '99 time frame?
16   A   Yeah.
17   Q   What else was part of it besides that?
18   A   Part of what?
19   Q   Part of this history of animosity besides
20 FAMM's adoption of these plans in late '98, early '99.
21   A   Just the fact we were forming a separate
22 company and Stephen Pennacchio and Tom Lynch --
23 Pennacchio and Tom Lynch were in charge of all the
24 executive comp plans at Texaco. We were the first -- we
25 were taking control of those plans for FAMM. This was
```

40

```
1 going to be, I believe, the first time that they would
2 not have control over this joint venture between Texaco
3 and Chevron, and they did not like to give up control.
4 They wanted control.
5    Q   Okay. Now, do you know when this issue with
6 taking FAMM off eligibility for the separation pay plan
7 benefits occurred?
8    A   I don't recall the exact time frame. I would
9 suspect it was sometime after the merger was announced
10 and before the merger was complete, obviously, but -- I
11 believe other people have testified to that fact.
12   Q   But in terms of your information regarding the
13 history of animosity, that information comes from
14 Michelle Swanson and Mike Bandy?
15   A   And Peter Meade and Christina Toto. Christina
16 Toto works for Michelle Swanson. She used to work in
17 Pennacchio's and Tom Lynch's group. She still had
18 connections over there. So I had personal discussions
19 with Christina about how they felt and how they did not
20 like what FAMM was doing. It was no secret.
21   Q   All right. So we were talking earlier about
22 your attempts to get benefits. Michelle came back, said,
23 no, you're not going to get them, the separation pay
24 plan.
25   A   Right.
```

**41**

```
 1   Q    I'm sorry.  Separation pay enhancement?
 2   A    Enhancement, right.
 3   Q    And then we were talking about what your
 4 attempts were after that --
 5   A    Right.
 6   Q    -- to get the benefit.
 7   A    Contacted the ombudsperson, who was Carol
 8 Young at the time, explained the situation to her.
 9 Somehow Dennis -- we got involved with Dennis Crilly, who
10 was also part of this executive comp program, though he
11 supported, I believe, the European operations.  But he
12 was still involved with the executive comp group.  We had
13 several meetings, discussions with them.
14       There was -- to my knowledge, there was no
15 attempt to understand the difference between FAMM's
16 grading compensation structure and Texaco's.  They
17 blindly looked at numbers instead of -- you know, they
18 basically -- Carol was supportive of what we were trying
19 to do, but they never explored the differences and how
20 FAMM had a separate compensation grading system than
21 Texaco did.  So we got no satisfaction.
22       Ultimately she rolled off and Al Swensen
23 became the new ombudsperson responsible -- you know, who
24 was responsible for ombud issues.  We contacted him.  He
25 did do a little bit more digging.  He did investigate a
```

**42**

```
 1 little bit more, to my knowledge.  And he felt that we
 2 absolutely deserved these benefits.  His role was an
 3 intermediary role.  He's not a decision maker.
 4   Q    So you first you talked to Michelle.  She
 5 comes back and says no?
 6   A    No, no.
 7   Q    She came back and said she investigated and
 8 the answer is no.  Right?
 9   A    Correct.
10   Q    You went through the ombuds process --
11   A    Let me rephrase that.
12       She came back and she asked at first blush
13 would we be getting these benefits.  And they said, well,
14 no.  It wasn't like they had done a review and said --
15 they just said -- whatever they decided, they just said
16 no.
17   Q    What you understood what Michelle was saying,
18 the reason you weren't entitled to these benefits is
19 because, whether right or wrong, the people at Texaco had
20 said you're not a grade 20, you don't get it.  Right?
21   A    Effectively that's correct.
22   Q    And so you started using the ombuds process?
23   A    Right.
24   Q    What was the outcome of that process?
25   A    It just died on the vine.
```

**43**

```
 1   Q    What happened next in terms of your attempt to
 2 get these benefits?
 3   A    Then we started bringing the issue in front of
 4 some other executives at the company, Pat Woertz, Glen
 5 Tilton.  I think that was it.  I had more discussions
 6 with Bandy about it.  He supported us getting the
 7 benefits.
 8   Q    Any particular outcome of communicating with
 9 other Texaco executives?
10   A    Not -- other than those two?  Not that I had
11 any communication with.  I believe those were the only
12 two.
13   Q    Who was Glen Tilton?
14   A    At the time, I guess he was president of
15 Texaco, Inc.
16   Q    And Pat Woertz --
17   A    Oh, wait, wait a second.
18       I guess -- was it Pat Woertz?  You can ask me
19 who Pat Woertz was.
20   Q    Who's Pat Woertz?
21   A    She was Mike Bandy's boss -- at the time she
22 wasn't.  I think I'm getting my dates confused.
23   Q    Couple of things we can agree on.
24       Glen Tilton and Pat Woertz were both in the
25 Texaco organization, not the FAMM organization.
```

**44**

```
 1   A    No.  Pat Woertz was in the Chevron
 2 organization.  Glen Tilton was in the Texaco.  Neither
 3 was in the FAMM organization.
 4   Q    And both were senior executives in their
 5 organizations?
 6   A    Yes.
 7   Q    So you didn't get any satisfaction out of
 8 that.
 9   A    Well, there never -- they never did anything.
10 They didn't act on anything.
11   Q    What happened next?
12   A    We continued to have discussions with Michelle
13 and Mike Bandy about the fact that we deserved this.
14 They agreed we were entitled to this.  It was kind of a
15 fairness issue, we should be getting this.  And
16 understanding that people were not understanding the fact
17 that just because FAMM uses a series of numbers and
18 Texaco used a series of numbers, you can't compare them.
19 And lamenting how we wish we chose the Chevron way, we'd
20 be a B-4 and they'd be forced to compare them.  It was a
21 totally different system.
22       Somebody suggested maybe you can just become a
23 FAMM 20, people over at Texaco, they wouldn't have to
24 bother to try to understand the differences.  They could
25 blindly look at the number without regard to anything
```

45

1 else. So Mike offered, he said, "Well, all right, try to
2 get that done."
3    Q    Let me go back a minute.
4         Earlier you testified that FAMM had worked
5 with an outside compensation group.
6    A    Correct.
7    Q    That was the Hay Group?
8    A    Correct.
9    Q    Was Hay involved in evaluating compensation
10 issues or position grading issues or what?
11   A    I don't know for sure. I believe it was the
12 whole package. Grading -- grades never really mattered
13 at FAMM. It was all about your position and package.
14 Numbers didn't really mean anything. That was part of
15 the entrepreneurial spirit. Texaco, the numbers were
16 huge. At FAMM, numbers didn't really matter.
17   Q    If there was testimony or evidence that the
18 Hay Group didn't look at people's position grades, would
19 you have any reason to disagree with that?
20   A    I would not have an opinion.
21   Q    So Mike Bandy said, "Maybe we can get you
22 promoted to 20 and that will eliminate the whole issue."
23 Right?
24   A    Maybe we can get the board to make us a FAMM
25 20, because -- and then Texaco wouldn't -- yeah. Texaco

46

1 would blindly see the number 2-0 and say they get it,
2 without having to go through the real work, which was
3 comparing our compensation grading structures.
4    Q    So do you recall when that discussion took
5 place?
6    A    I believe it was the summer of '01.
7    Q    What happened in regard to that issue?
8    A    At the time -- at the time I didn't know what
9 exactly had happened. Board meetings were kept secret.
10 Since then, I see in the documents that there was perhaps
11 some discussion, but that there was no action. There was
12 no agenda item before the board, so they made no
13 decision.
14   Q    Have you read Scott Jeffery's deposition
15 testimony?
16   A    A while ago.
17   Q    Did you ever speak to Scott Jeffery regarding
18 the issue of whether or not you should be promoted to a
19 grade 20?
20   A    No, I don't believe I did.
21   Q    Did you know whether or not Larry was?
22   A    I believe he had, yes.
23   Q    And were the two of you -- well, were you and
24 Larry working together on this issue?
25   A    Yes.

47

1    Q    So you might plan out, "Hey, you know this
2 person, maybe you can talk to them"?
3         MS. CANADAY: Objection.
4    Q    Would that be --
5    A    We did things independently as well as working
6 together.
7    Q    Let me show you Exhibits 2 and 3. Are these
8 documents that you've seen in the course of discovery in
9 this case?
10   A    Yes.
11   Q    These were not documents you saw at the
12 time --
13   A    No.
14   Q    -- you were at FAMM?
15   A    No.
16   Q    You'll see that both Exhibit 2 and Exhibit 3
17 appear to be dated August 22 of 2001.
18   A    Correct.
19   Q    And if they are to be -- if they're accurate,
20 they seem to be saying that there was a special meeting
21 of the board to deal with HR issues.
22   A    Well, this one, Exhibit 2, isn't signed, so I
23 don't know what this is.
24   Q    Okay. Well, if you look at Exhibit 3, it does
25 say there was a special meeting of the board.

48

1    A    Correct.
2    Q    And it says the board confirmed one action
3 that it had taken during the July 31 meeting, and that
4 Mr. Bandy then presented issues two employees had with
5 the pay grades. Right?
6    A    Yes. That's what it says.
7    Q    Now, if we turn over to Exhibit 2 --
8    A    Um-hum.
9    Q    -- if this is accurate, it would seem to say
10 that there was -- these three human resource discussions
11 involved you, Larry, and Peter Meade.
12   A    I don't know that to be -- I don't know when
13 this was prepared.
14   Q    I understand. But if that's accurate, it
15 would seem to indicate there were --
16   A    That's fair.
17   Q    Okay. And it is true that in August of -- or
18 the summer of 2001, you and Larry were looking to get
19 your pay grade increased from PG-19 to PG-20?
20   A    We were looking for the board to make us FAMM
21 pay grade 20 to facilitate the benefits that we deserved
22 even as FAMM pay grade 19s. It would just make the
23 process easier.
24   Q    If you look at Exhibit 2, you'll see there's a
25 discussion of you in there.

**49**

1   A   I see that.
2   Q   Are these the basic reasons why you were
3 talking about you should get promoted to a pay grade 20
4 from a pay grade 19?
5   A   The first is accurate.
6       The third is -- or the second one is fine.
7       The third one is not accurate. I'm eligible
8 for a 21 month severance as a pay grade 19, so that's
9 inaccurate.
10   Q   What might be accurate about it? If you were
11 graded a 20, Texaco would agree you would be eligible for
12 24 months?
13   A   Well, you know, at this point we're
14 unofficially told we weren't getting it. So I was under
15 the impression I deserved it and I would be getting.
16 They said no. But I hadn't seen anything in writing to
17 say that.
18   Q   Maybe I should rephrase it here. I'm not
19 asking you to agree that you weren't eligible for it,
20 because I understand you don't agree on that.
21       At least one of the reasons you were looking
22 to become a pay grade 20 is to eliminate any dispute
23 regarding your eligibility?
24   A   I was looking to become a FAMM pay grade 20 to
25 allow Texaco to not have to do an analysis of the two

**50**

1 compensation structures, grading compensation structures.
2 But if they use this, this is inaccurate.
3   Q   And D?
4   A   I don't know which pay grade they're referring
5 to.
6   Q   Okay.
7   A   Let me just read it again.
8       They don't distinguish here between which pay
9 grade they're talking about, FAMM or Texaco.
10   Q   All right. Do you have any reason to believe
11 that the board, in August of 2001, of FAMM, didn't
12 actually sit down and meet and discuss these issues?
13   A   I don't know what they did. I wasn't at the
14 meeting.
15   Q   Did you get any feedback about what had
16 happened from the board process of trying to get you
17 promoted?
18   A   If I recall correctly, in one of the
19 depositions they -- I don't know if it was -- in one of
20 the depositions, I believe -- that the board was made up
21 of two Texaco people, two Chevron people. The two
22 Chevron people basically deferred to Texaco on this. And
23 -- because we originated from Texaco.
24       The two Texaco people, from what I understand,
25 went back to Pennacchio and Tom Lynch, who had a

**51**

1 historical animosity about this, and of course they said
2 no.
3       They were not looking -- we were looking to
4 facilitate the process to get what we deserved from the
5 very beginning. They were looking to block the process
6 at every step. So this allowed them to block the
7 process.
8   Q   What's the basis for your belief that the two
9 Texaco people went back to Tom Lynch?
10   A   I believe that was in one of the depositions.
11 They said they went back to executive comp, and that
12 would be Pennacchio and Tom Lynch.
13   Q   Do you know when Stephen Pennacchio left
14 Texaco?
15   A   I do not.
16   Q   Well, my question, though, is not what you had
17 read during deposition testimony. My question is what
18 you learned at the time you were there at FAMM regarding
19 what the board had done.
20   A   I didn't -- what the board had done?
21       We had many discussions. I can't recall
22 exactly -- exactly what we discussed about it. I mean,
23 we -- they did not change our pay grade.
24   Q   Okay.
25   A   So I guess we knew they had not decided to

**52**

1 change the pay grade. But it wasn't until after I read
2 this, that there was no proposal before the board, so
3 they never acted either way.
4   Q   I don't see anything in Exhibits 2 or 3 which
5 suggests, by the way, that the board at least considered
6 the FAMM pay grade system to be different than the Texaco
7 pay grade system, do you?
8   A   No. They don't refer to it in here. But I
9 know it was testified to by Michelle Swanson and Mike
10 Bandy, who would know better than the board, that there
11 was a separate compensation grading structure.
12   Q   So we get to the fall of 2001 --
13   A   Right.
14   Q   -- and it sounds like you're still getting the
15 message of you're not going to get this severance pay
16 enhancement.
17   A   To be honest, we heard nothing. I wouldn't
18 characterize it as we kept getting no's. We just kept
19 hearing nothing.
20   Q   Michelle told you that the word she got was
21 no, right?
22   A   Michelle told us -- that's correct.
23   Q   And there must have been some understanding in
24 the summer of 2001, before this issue, hey, let's get
25 promoted to grade 20s and that will possibly resolve the

53

1 whole issue, that the answer was no?
2     A    Well, I would say that based on what I see in
3 the documents, that was not at all the case. They never
4 acted on it. They never made a decision; no yes, no no.
5     Q    The answer -- what's the effect, by the way,
6 of not making a decision? Was that to keep your pay
7 grade at 19?
8     A    By default? Sure. But that did not require
9 any action on their part.
10    Q    To keep your pay grade at 19 didn't require
11 any action?
12    A    Correct.
13    Q    To change your pay grade from 19 to 20 did
14 require an action?
15    A    Correct.
16    Q    And they didn't take any action?
17    A    They didn't take any action.
18    Q    But it would appear from what you've seen that
19 they at least considered it?
20    A    I think --
21         MS. CANADAY: Objection.
22    A    Considered what?
23    Q    Considered whether or not you should be 20.
24    A    Well, this document isn't signed, so I can't
25 talk to that one, document 3. So I have no idea who

54

1 typed that.
2         MS. CANADAY: Exhibit 2.
3     Q    Exhibit 2.
4     A    Sorry, sorry. Exhibit 2.
5         I'm not sure. This one is signed by three of
6 the four people. I'm not sure why it was not signed.
7 Perhaps somebody objected. So if somebody objected,
8 maybe it was not accurate.
9     Q    Why didn't Mike Bandy just make you a grade
10 20?
11    A    Apparently he didn't have the authority.
12    Q    What's the basis for your belief he didn't
13 have the authority?
14    A    I think he said he -- I think he told me he
15 didn't have the authority.
16    Q    So --
17    A    Otherwise I believe he would have.
18    Q    Is it accurate to say that by the end of 2001
19 you believed that you would not receive the severance pay
20 enhancement?
21    A    Strictly because Michelle, a year ago,
22 basically, when we started this whole thing, had said
23 that Texaco's position on this -- or I should say the
24 executive comp people who had the animosity with us were
25 not about to let that happen. It was personal.

55

1     Q    Well, not personal to you, was it?
2     A    No. Personal to the people in FAMM.
3     Q    What happened next in your attempt to obtain
4 the severance pay benefits?
5     A    I believe we received a statement -- I
6 received a statement telling me what my benefits would
7 be, and they were missing 12 months.
8         (Whereupon, a document was marked as
9 Defendant's Exhibit 69 for identification.)
10    Q    Let me show you Exhibit 69 and ask if that's a
11 document you recognize.
12    A    Yes, something like this.
13    Q    At some point you got a document which looks
14 something like this while you were at FAMM telling you
15 how much severance pay you would receive.
16    A    Agreed.
17    Q    If this document is accurate, it would seem to
18 say that upon your separation you were going to get a
19 payment of about $122,600.
20    A    Correct.
21    Q    Did you get a payment of about that amount?
22    A    About that amount.
23    Q    And that in 2003 and 2004 you would receive
24 payments of about 61,000 each.
25    A    Correct.

56

1     Q    Did you receive those payments?
2     A    Yes, I did.
3     Q    And it would also appear to say that you
4 received 13 years credit?
5     A    Correct.
6     Q    So if we were trying to figure out the
7 difference between what you claim under the Pennacchio
8 letter and what you actually received --
9     A    Right.
10    Q    -- it would really be an additional 11 months?
11    A    For the period under the Pennacchio letter, an
12 additional 11 months.
13         MS. CANADAY: I'm sorry. You said 13
14 years credit?
15         THE WITNESS: We got 13 months, one month
16 per year.
17         MS. CANADAY: Sorry. Got you.
18    Q    Showing you Exhibit 65, do you recognize that?
19    A    Yes, I do.
20    Q    What is that?
21    A    It's something I prepared. It shows the
22 benefits that Larry Katz and I were entitled to and did
23 not receive.
24    Q    Can you tell me how you made these
25 calculations?

57

1    A    Sure. For me, I was entitled to the
2 additional 11 years -- 11 months of severance, as we just
3 described, under the Pennacchio letter. In addition, in
4 relation to the officers receiving an additional 12
5 months of severance related to the -- incident to the
6 change of control, I was entitled to the additional 12
7 months, for a total of 23 months.
8         And Larry was due -- he received, I believe,
9 12 months credit. He was due the additional 12 because
10 of the Pennacchio letter. In addition, he was due an
11 additional 12 because of the officers of Texaco, Inc.,
12 incident to the merger, received an additional 12 months
13 of credit as well.
14    Q    Going back to Exhibit 69 for a minute, at some
15 point, perhaps late 2001, early 2002, you received
16 Exhibit 69, or something like --
17    A    Yeah. Time frame again?
18    Q    Well, I'm trying to figure out -- at some
19 point --
20    A    It was sometime -- well, sometime around the
21 merger.
22    Q    And had you been offered the opportunity to
23 relocate to Houston?
24    A    Yes.
25    Q    And you turned that down?

58

1    A    Yes, I did.
2    Q    How far in advance of July 2002 did you know
3 that that would be your last day?
4    A    Oh, months.
5    Q    A long time before then?
6    A    Yeah.
7    Q    So at some point you got a document like
8 Exhibit 69, and that at least confirmed your
9 understanding that you weren't going to get the enhanced
10 separation pay benefit --
11    A    Or the officers pay.
12    Q    Did you know at that time there was any
13 officers pay?
14    A    Yes. Well, I knew after the -- when the
15 Pennacchio letter came out, which -- when the Pennacchio
16 letter came out and people started talking about that,
17 around that same time I also heard officers were getting
18 an additional enhancement on top of that, which I believe
19 to be one year. Later on I found out that the
20 enhancement -- there was the Separation Pay Plan Of
21 Texaco, then the enhancement, which was done outside of
22 that pay plan, just for the kind of the people they
23 wanted to give it to. And also outside of the pay plan
24 was the officer sweetheart deal, where the officers got
25 another year on top of the enhancement. It was all done

59

1 outside of the plan.
2    Q    There's a plan, and then you said the
3 enhancement for certain people. By that, you meant --
4    A    The Pennacchio letter, correct.
5    Q    If one looks at the Pennacchio letter, it does
6 appear to state that this is done within the Texaco
7 separation pay plan. Right?
8    A    I believe that is not the case, I see that
9 the letter says that. Hold on, let me read it.
10       It doesn't say -- it just says that they're
11 modifying the change of control provisions. But I
12 believe this was not incorporated in the pay plan, nor
13 was the officers sweetheart deal.
14    Q    But in terms of skipping ahead through the
15 appeal process that you used to try to get these
16 benefits, nobody ever told you, "Oh, gosh, this isn't
17 under the separation pay plan," right?
18    A    No. That never came up.
19    Q    So at some point you get a document like
20 Exhibit 69. What do you do next to try to get the
21 severance plan?
22    A    We were told that there is a change of control
23 claims committee we could file a claim with. This was
24 the first we had ever -- this was the first time Texaco
25 had officially told us we were not getting it, because

60

1 Texaco was administering it, despite the fact that FAMM
2 felt we deserved it. Because Texaco was administering
3 it, they chose, according to this, not to give it to us.
4    Q    But that was no surprise based on what you'd
5 known for the past --
6    A    No. I think that's fair to say. I had some
7 hope they would do the right thing and give us what we
8 were entitled to, but that did not materialize.
9    Q    So you were told there was a claims process
10 that you could --
11    A    Yes.
12    Q    -- go through?
13    A    Yes.
14    Q    Who told you that?
15    A    I don't even remember who told me that. It
16 was maybe Michelle, maybe Al Swensen, the ombudsperson.
17 I don't recall.
18    Q    Let me ask you to take a look at Exhibit 64.
19    A    Big exhibit.
20    Q    Big exhibit.
21       Can I ask you to take a look at 81. See the
22 page numbers down at the bottom?
23    A    Yes, I do. I see it.
24    Q    Page 81 and page 82, are these documents that
25 you recognize?

61

1   A   Yes, they are.
2   Q   What are these pages?
3   A   I believe they're -- these are pages that
4 Larry Katz and I put together.
5   Q   So the two of you put together pages 81 and
6 82. And did you submit this to the claim committee for
7 review?
8   A   I believe this is what we submitted.
9   Q   Can I ask you to take a look at page 80, right
10 in front of it. Is that something you recognize?
11   A   Yeah. It looks like an e-mail I sent filing
12 the claim.
13   Q   It looks to me like you sent the e-mail at
14 page 80, and you attached the pages at 81 and 82, to the
15 claims committee.
16   A   Yeah, although, to be honest, this e-mail
17 would say if something was attached, which it does not.
18 But I believe that they got these sheets.
19   Q   And you do recall this is an e-mail that you
20 wrote?
21   A   I don't recall the e-mail specifically, but I
22 know we sent -- I believe we sent them these two pages,
23 81 and 82, to review.
24   Q   And you believe you sent that to them around
25 the end of March of 2002?

62

1   A   Yes, I do.
2       THE WITNESS: When you get to a good
3   breaking point, I can use a break again.
4       MR. KEE: This is fine.
5       (Whereupon, a recess was taken.)
6   Q   So you submitted this in March. And can I ask
7 you to take a look at pages 78 and 79.
8   A   Yes.
9   Q   Did you get an answer back on or about
10 April 22 by e-mail followed up by a signed letter to your
11 house?
12   A   Yeah, I believe so.
13   Q   Again, at that point, at least, you understood
14 that the claims committee determined your status as a
15 position grade 19 makes you ineligible for the enhanced
16 benefits available?
17   A   Yeah. They make no differentiation to a
18 Texaco or FAMM pay grade. There's no such thing as just
19 a pay grade. There's got to be a company in front of it.
20   Q   You got this back in April. What did you do
21 next?
22   A   What did I do next? I know I had a discussion
23 with John Goldsby. That maybe happened before this -- it
24 did happen before this, actually, and I think you got the
25 notes there, right?

63

1   Q   Exhibit 59?
2   A   Yes.
3   Q   It would appear to me -- do you recognize
4 Exhibit 59?
5   A   Yes, I do.
6   Q   Is this your handwriting?
7   A   Absolutely.
8   Q   If this is accurate, you had a discussion with
9 John Goldsby on April 23?
10   A   Correct.
11   Q   And I presume that this took place after you
12 received the letter at page 78?
13   A   Actually, no. This discussion happened first.
14 I know the letter is dated April 22. But this discussion
15 happened first.
16   Q   Okay.
17   A   Distinctly remember that.
18   Q   Tell me about what you and John Goldsby
19 discussed in April?
20   A   He said -- we brought this up with him. I
21 wanted to talk with him about it. Larry was here as
22 well. He said this is something FAMM should address. He
23 said the Texaco separation plan, the enhancement for
24 Texaco pay grade 20 and above, is something for Texaco.
25 And he said they had never handled a FAMM request, and he

64

1 said FAMM should address this. He said it didn't belong
2 in their committee. They were a Texaco committee, not a
3 FAMM committee, although FAMM was a participating company
4 in this plan. FAMM should be doing this, FAMM should
5 administer it, it doesn't belong in our committee. He
6 also said they didn't discuss the merits of this case at
7 all once they decided they couldn't address the issue.
8 He said that's not ours to rule on, so we don't discuss
9 the merits. He said it's Mike's decision. We're
10 separate and they should stay out of our business.
11       These notes were written as I was sitting down
12 talking to them. Then what's amazing was that afternoon
13 or the next day or the day after, we received a letter
14 where they just say you're a 19, you don't get it. It
15 was completely opposite of what John had told us went on
16 at that meeting. So something -- you know . . . .
17       I won't draw a conclusion. But I was told one
18 thing and another thing happened.
19       I ought to point out that Exhibit -- I was
20 going to say -- I don't remember seeing this. But Larry
21 had taken notes at that meeting too, Exhibit 60. And he
22 basically says the same thing, it's FAMM's decision to
23 interpret.
24   Q   Do you recall what time you had your
25 conversation with John Goldsby on that day?

65

```
 1  A   What time?
 2  Q   Yes.
 3  A   I don't. I'm sorry.
 4  Q   Okay. Can I ask you to go back to Exhibit 64
 5  and look at page 71.
 6  A   Yes.
 7  Q   This would appear to be an e-mail sent to you
 8  from Cindy Flores on April 23 at 10:22 a.m. --
 9  A   Okay.
10  Q   -- saying attached is response to your recent
11  claim.
12  A   Right.
13  Q   Do you recall getting such an e-mail?
14  A   I recall getting a response. I don't recall
15  whether it was an e-mail or hard copy. But I know I got
16  a response.
17  Q   Do you know who Cindy Flores is?
18  A   No, I do not.
19  Q   Do you know Ron Boila?
20  A   Yes, I do.
21  Q   Where did Ron work?
22  A   He works somewhere in HR.
23  Q   When you spoke with John Goldsby --
24  A   Yeah.
25  Q   -- was John there in White Plains?
```

66

```
 1  A   Yes, he was.
 2  Q   Did Ron work in White Plains?
 3  A   Yes, he did -- oh, wait. I take that back.
 4  He ultimately worked in Houston -- I'm not sure at this
 5  time -- I think he was in Houston at this time.
 6  Q   At the time you were speaking with John
 7  Goldsby --
 8  A   Right.
 9  Q   -- was it fair to say John knew he was leaving
10  Texaco as well?
11  A   I think John had -- yeah, I think he was. I
12  think that's fair.
13  Q   A lot of people involved in this whole process
14  were all people who knew they were either out the door or
15  knew they were going to be out the door shortly
16  thereafter?
17  A   Actually, my understanding was the committee
18  was supposed to be represented by both Texaco and Chevron
19  employees. So the Chevron people would not be leaving.
20  Q   Do you know who else was involved in the
21  claims committee besides John?
22  A   I did at the time. I forget. If you go
23  through the list -- I forget.
24  Q   You knew Ron Boila?
25  A   Ron was on. John Goldsby was the chair.
```

67

```
 1  Q   Carolyn Sellers?
 2  A   Yes.
 3  Q   Did you know Carolyn Sellers' husband?
 4  A   I maybe had met him once when he worked in
 5  New York. I didn't know him at all.
 6  Q   Do you know whether or not Carolyn was an
 7  employee of Texaco at the time or Chevron at the time
 8  they considered your claim?
 9  A   I think so. I'm not positive.
10  Q   So you get back this response and the response
11  is no. Right?
12  A   Right.
13  Q   What's the --
14  A   Completely opposite of what I was told.
15  Q   Let me ask you to take a look at page 77.
16  A   Um-hum.
17  Q   And page 77, is that a document you recognize?
18  A   Only from the document production.
19  Q   Do you recognize whose initials are down there
20  at the bottom?
21  A   It looks to be Ron Boila. I don't know for
22  sure. I've never seen his initials before, but . . . .
23  Q   The copy I have seems to have the date cut
24  off at the top. But if this document is dated April 16,
25  2002 --
```

68

```
 1  A   Um-hum.
 2  Q   -- and accurately represents some notes, it
 3  would appear that a week before your discussion with John
 4  Goldsby people had decided not to give you this benefit,
 5  or the claims committee had decided not to give you this
 6  benefit?
 7         MS. CANADAY:  Objection to the form of
 8  the question.
 9  A   I would disagree. I think this is -- Ron
10  signed this himself. No mention of a committee. I don't
11  even know if this is his writing. I have no idea who
12  wrote this.
13  Q   But you do see the last line that says "No
14  trigger, John and Kwame to prepare letter"?
15  A   I see that.
16      I don't believe -- if they're talking about
17  Kwame Satchell, I don't believe he was on the committee.
18      I can only point out that the first line,
19  where it says FAMM's own board didn't approve these two
20  positions of the pay grades, is inaccurate.
21      The first line of this handwritten note that
22  says FAMM's own board didn't approve these two positions
23  at the PG-20 level is inaccurate. The board neither
24  approved nor disapproved. The board took no action.
25  Q   Well, taking no action on a discussion to
```

**69**

1 promote you to pay grade 20 is the same as not approving
2 it, right?
3        MS. CANADAY: Objection.
4    A    Can you restate the question?
5    Q    If you're pay grade 19 and the issue before
6 the board is whether to promote you to pay grade 20,
7 isn't the board taking no action the same as not
8 approving your promotion?
9        MS. CANADAY: Objection.
10   A    I would disagree. I think they had a
11 discussion but never reached a decision. You're implying
12 they reached a decision. I do not believe they did.
13   Q    What happened after April 23?
14   A    After that, based on my notes with John
15 Goldsby where he said it was not their decision -- may I?
16   Q    Please.
17   A    We concluded that, well, if John Goldsby says
18 it's Mike's decision, then let's see if Mike will use --
19 granted the letter didn't say that -- but he told us one
20 thing one day and then the next day or that afternoon we
21 got a letter saying something completely different, so
22 there was something going on.
23        But we decided to ask Mike, using Goldsby's
24 recommendation that it's FAMM's issue to interpret. We
25 drafted a letter for Mike to sign that basically

**70**

1 interpreted how FAMM would administer the Texaco
2 separation pay plan, including the enhancement, but
3 excluding the officers enhancement.
4    Q    You have in front of you Exhibit 63.
5    A    Yes, I do.
6    Q    And that's the letter you drafted for Mike?
7    A    Yes, it is.
8    Q    It has a signature on it, but is it accurate
9 that that's an electronic signature?
10   A    Yes, it is, I had that because I had sent
11 letters out for Mike before. It was a draft.
12   Q    You sent that over to Mike for his approval?
13   A    I believe -- there was an e-mail attached. I
14 believe I sent it to Peter Meade and Michelle saying this
15 is what we heard from Goldsby, what do you think about
16 Mike just sending this out clarifying the issue.
17   Q    What was the feedback you got on that?
18   A    I don't recall. I need to see the e-mail.
19   Q    Did you have an understanding of what the
20 answer was as to whether or not Mike would approve
21 sending that letter out?
22   A    I don't think he was comfortable doing it.
23   Q    What happened next?
24   A    What happened next? I think the next step was
25 we contacted Martin, Lucas, and Chioffi.

**71**

1    Q    Okay. If we look back in Exhibit 64 at page
2 9, that would appear to be the beginning of a letter from
3 Scott Lucas to the change of control committee.
4    A    Correct.
5    Q    Do you recall that letter going out?
6    A    Yes, I do.
7    Q    It had a number of exhibits to it?
8    A    Yeah, because he's comparing -- he has in here
9 exhibits, so, yes, attachments.
10   Q    And you reviewed the letter and the exhibits
11 beforehand?
12   A    Yes.
13   Q    Were there any arguments that you think the
14 committee should have considered that were not contained
15 in that letter and the attached exhibits?
16   A    No, not as far as -- I don't believe so. I'd
17 have to reread the whole thing. But I believe our appeal
18 had all the arguments in it, I believe, to the best of my
19 knowledge.
20   Q    So you go out, you retain an attorney, and --
21 did you have a fee agreement with how you'd retain an
22 attorney?
23   A    Yes.
24   Q    What is your fee arrangement?
25   A    It's a written fee arrangement.

**72**

1    Q    So you have a document that describes what
2 that is?
3    A    Yes.
4    Q    So you submit this in June of 2002, and by --
5 within not too much longer after that's submitted, you
6 leave the company?
7    A    Correct, July of that year.
8    Q    Can I ask you to take a look at page 6.
9    A    I see it.
10   Q    At page 6, it appears that you received a
11 letter or that a letter was sent out to you telling you
12 that your appeal or your claim had been denied?
13   A    Correct.
14   Q    Now, I presume that you disagree with --
15 because you filed this lawsuit -- you disagree with the
16 interpretation of the -- or the decision of the board or
17 the committee. Correct?
18   A    Yes.
19   Q    Is there any reason other than what you've
20 already testified to today or are contained in the letter
21 that your attorney sent in June of 2002 why you disagree?
22   A    I think it's all in the claim. No one
23 bothered to investigate and explore the differences
24 between a Texaco grade compensation plan and a FAMM grade
25 compensation plan. It's been testified to that they're

73

1 different. We actually at one point compared the two,
2 compared FAMM against Texaco, yet they refused to
3 investigate. Nobody bothered to look at what the
4 differences were. They just blindly saw the numbers.
5   Q   Do you believe the claims committee that
6 considered your June appeal had any conflict of interest?
7       MS. CANADAY: Just objection to the form.
8       If you understand.
9   A   Can you restate it?
10  Q   Well, you understood, for example, that a
11 number of these people on the claims committee were no
12 longer associated with Texaco?
13  A   Either -- perhaps, or at some point would be
14 no longer associated. I'm not sure of the timing.
15  Q   Did you believe that they had any -- was there
16 any personal involvement or personal issues that they had
17 that was inconsistent with trying to administer the
18 claims fairly?
19  A   Yes, yes.
20  Q   What was that?
21  A   A couple. Number one, as I've testified to,
22 there was extensive animosity that several people have
23 testified to. And Pennacchio and Tom Lynch, whose boss
24 was Janet Stoner, was on the committee. Ron Boila had
25 numerous discussions with Janet Stoner.

74

1       Tom Lynch, it's been testified to that Tom
2 Lynch met with or happened to run into Mike Bandy at the
3 Metropolitan Opera at one point, before our committee had
4 met, and Tom Lynch informed Mike Bandy that he was aware
5 we had filed a claim, even though he's not on the
6 committee, and that the answer to our claim was, no,
7 we're not getting it, and they felt they were on solid
8 ground.
9       So the fact that they -- an answer to our
10 claim had been reached and communicated to Mike Bandy
11 before the committee ever met is just bad. And that also
12 goes to the animosity. So the people on this committee,
13 some of them definitely had animosity.
14      In addition, the payment of these enhanced
15 benefits would be coming out of the assets of the company
16 that they worked for, the company that they owned stock
17 in, that they owned options in. And so it would hurt the
18 company's financial performance to pay out an extra sum
19 of money.
20  Q   Who on this committee had animosity toward
21 FAMM?
22  A   Can you go over the committee members?
23  Q   Janet Stoner?
24  A   Janet Stoner in the fact that Stephen
25 Pennacchio and Tom Lynch report -- well, Tom reported to

75

1 Pennacchio, I believe, and Pennacchio reported to Stoner.
2 It's been testified to, the animosity those two had. It
3 basically came from the Texaco executive comp area. This
4 was the first time that Janet Stoner and her guys were
5 not able to control what was going on with executive
6 comp.
7   Q   Nobody, at least anything I've heard from what
8 you testified today, ever said Janet Stoner had any
9 animosity toward FAMM, right?
10  A   I didn't say Janet. I said the two people
11 that had animosity were in that department.
12  Q   Is it fair to say by August 2002 Stephen
13 Pennacchio had been gone for a fairly long time?
14  A   I have no idea when Stephen left.
15  Q   I'm not sure it's accurate, but I vaguely
16 recall somebody telling me that Stephen Pennacchio left
17 in 2001, sometime. Any reason to believe that's not
18 accurate?
19  A   I don't know when he left. I didn't know
20 Steve personally.
21  Q   So --
22  A   I'll give you another example.
23  Q   Okay.
24  A   Pat Lynch was on the committee. Pat Lynch's
25 brother was Tom Lynch. That was no secret.

76

1       You know, Tom and Pennacchio were very adamant
2 to block FAMM at every turn, and it's been testified to.
3 This was just another case of doing the same thing. It
4 was an old boys network. There was no secret it was an
5 old boys network going on and they were part of it.
6   Q   Your only knowledge of what Tom Lynch or
7 Stephen Pennacchio were doing was information that was
8 conveyed to you by Michelle Swanson, Pete Meade, and Mike
9 Bandy?
10  A   People who have had the direct conversations
11 with them, correct.
12  Q   And was the hostility that they talked about
13 or animosity they talked about, did they ever
14 specifically discuss Tom Lynch having hostility or
15 animosity?
16  A   Not as much as Pennacchio. Pennacchio was the
17 main one. But I believe it to be the case that it was
18 Tom as well.
19  Q   Do you ever recall any specific comments made
20 by Mike Bandy, Peter Meade, or Michelle Swanson to the
21 effect that Tom Lynch had any particular animosity or
22 hostility toward FAMM?
23  A   I can't recall specific comments.
24  Q   The comments you do recall, for the most part,
25 at least, related to Pennacchio?

**77**

1    A    I do not recall specific comments to either.
2 But I recall many discussions where that was discussed.
3    Q    And when you talk about what you heard from
4 Mike Bandy's conversation with Tom Lynch, is it correct
5 that that was the subject of an e-mail you sent to Larry?
6    A    I had a face-to-face discussion with Larry
7 Katz -- with Mike Bandy, and then I wanted to document
8 our discussion so I could inform Larry of it. So I went
9 back and e-mailed to Larry what our discussion was.
10   Q    I'm showing you Exhibit 55. Is that the
11 e-mail?
12   A    55? Yes. This is where we got the answer to
13 our claim before the committee met.
14   Q    So we were talking about people who, on the
15 committee, that might have some hostility to you, and
16 Janet Stoner --
17   A    Not to me.
18   Q    I'm sorry. Toward FAMM.
19   A    Correct.
20   Q    Janet Stoner, you said, because she had
21 supervised Pennacchio and Lynch.
22   A    Yes.
23   Q    Do you know whether she had supervised
24 Pennacchio and Lynch?
25   A    I believe she did. She was the head of HR and

**78**

1 they were senior people in HR. I believe Lynch reported
2 to Pennacchio, and I believe Pennacchio reported to
3 Stoner. I could be wrong, but they were part of the same
4 department. She was the ultimate head of the department.
5    Q    Again, I may have this wrong. But I have
6 heard that Pennacchio and Lynch reported directly to
7 Peter Bijur and not to Janet Stoner. Do you know whether
8 or not that is accurate?
9    A    It's possible. I don't know.
10   Q    Pat Lynch, you're saying, may have had some
11 animosity toward FAMM because of his brother?
12   A    Yes.
13   Q    Now, at least Pat Lynch had been the CFO at
14 Texaco?
15   A    Yes.
16   Q    Having worked 12 years in the finance
17 department --
18   A    I only worked eight years.
19   Q    -- eight years in the finance department and
20 then four years in which you had some contact with the
21 Texaco finance department --
22   A    Fair to say. Accounting department, not
23 finance.
24   Q    -- had you ever worked or have any personal
25 involvement with Pat Lynch?

**79**

1    A    From time to time, to say hi. Not really work
2 stuff.
3    Q    Some people might say that perhaps somebody
4 like Pat Lynch, who was the CFO, might even have a little
5 bias toward helping out other finance people.
6         MS. CANADAY: Objection.
7    A    This is not the case. His boy was George
8 Batavick.
9    Q    All right. What do you mean by that?
10   A    He was George's mentor, effectively. What's
11 the word? He was his boy, he was his mentor. He
12 protected George Batavick.
13   Q    So with Pat Lynch, Janet Stoner.
14       Mike Rudy?
15   A    I don't know Mike.
16   Q    Rosemary Moore?
17   A    Don't know her.
18   Q    Anybody else on the committee you can think of
19 had any particular animosity?
20   A    No. Did you name all the members?
21   Q    I think I have missed one.
22       Then your other issue, you said, was you
23 believe they owned shares in Chevron Texaco, I suppose.
24   A    Shares. I strongly suspect options as well.
25   Q    But you had options and shares in Chevron

**80**

1 Texaco, right?
2    A    No. I had options in -- no, I did not. I had
3 SARS as part of a FAMM -- as part of the FAMM long-term
4 incentive program, I was granted performance units and
5 SARS.
6    Q    Are there any other facts other than what
7 you've testified to or what you believe are contained in
8 the materials submitted to the change of control
9 committee that you believe support your claims in this
10 lawsuit?
11   A    I believe, to the best of my knowledge,
12 everything is included.
13   Q    What did you do after July 2002?
14   A    I took some time off, traveled, and then I
15 took a job at Premcor.
16   Q    When did you join Premcor?
17   A    November of '03.
18   Q    What's your job there at Premcor?
19   A    Director of accounting.
20   Q    I'll ask you to take a look at Exhibit 12.
21   A    Yes.
22   Q    I'll ask you if you recognize that.
23   A    Yes, I do.
24   Q    What is that?
25   A    It's an e-mail that I wrote to Tom Lynch after

81

1 I left the company.
2    Q    It would appear this is going to Tom Lynch's
3 personal e-mail account?
4    A    Correct.
5    Q    So presumably he had left the company at the
6 time as well?
7    A    Yes, he had left.
8    Q    Apparently whatever animosity you think he may
9 have had toward FAMM was not such that you didn't have
10 any discomfort with sending him an e-mail and getting a
11 response back?
12   A    That's correct. I was doing it specifically
13 for the last line of my e-mail: Were there any Texaco
14 pay grade 19s eligible for Texaco SUP 3 plan? My
15 understanding, he was not aware I was in FAMM's SUP 3
16 plan. So by him saying that -- hold on.
17       Pay grade 19s would not be eligible since
18 Texaco has never recognized pay grade 19 for this plan
19 even if they received a bonus sometimes at 40,000 plus
20 and a long-term incentive,
21       So therefore, since we did receive the FAMM
22 SUP 3, we were definitely not treated as a Texaco 19
23 because no Texaco 19 ever got this. And he thought we
24 did not have it and that's the reason I sent this e-mail,
25 was to solicit that feedback.

82

1    Q    Apparently, again, when you talk about
2 there may have been some animosity from Tom Lynch towards
3 FAMM --
4    A    Um-hum.
5    Q    -- there doesn't seem to be anything in this
6 e-mail between the two of you that suggests any
7 animosity, is there?
8        MS. CANADAY: Objection.
9    A    I disagree. He was trying to stick it to me
10 by saying pay grade 19s would not be eligible since
11 Texaco has never recognized 19 for this plan even if they
12 received a bonus. He was trying to stick it to us. But
13 it backfired because he did not know we were in the plan.
14   Q    When FAMM documented its plan, its SUP 3 plan,
15 is there any reason Mike Bandy and Michelle Swanson and
16 the board couldn't have said, "We'd like secretaries to
17 be eligible for this"?
18   A    I don't know. You'd have to ask HR. I don't
19 know how they were administered or how they reached the
20 conclusion.
21   Q    If they had decided and the board decided
22 let's let everybody in the company participate in the
23 SUP 3, everybody in FAMM, because we want to make sure a
24 receptionist and secretary have the same incentive as the
25 rest of us, would that mean they're entitled, in your

83

1 view, to the separation pay plan?
2    A    Not at all.
3    Q    Why not?
4    A    Because they did not receive all of the
5 executive perks, the annual cash bonus, the long-term
6 incentive, including SARS and performance units, the
7 deferral plan, and they were not part of the management
8 group as defined. They may have gotten one out of four
9 or five, but that doesn't make them eligible for enhanced
10 severance.
11       Also, in the Pennacchio letter they list out
12 three enhancements, three benefits. Larry and I received
13 two of them. They did not have received those two.
14 There's no reason for us to receive two -- in the same
15 letter addressed to the same group, we received two but
16 not the third.
17   Q    What if the board of FAMM had decided they
18 wanted to make all these benefits available to
19 receptionists, any employee of FAMM would be eligible for
20 all these benefits. Does that mean that they would be
21 entitled to a severance pay enhancement?
22   A    No, it does not, because they would not be
23 compensated. Pay grades, as I testified to -- the grade
24 number didn't matter at FAMM. What mattered was your
25 package, total package. My total package was a hundred

84

1 thousand dollars higher than a Texaco 19. If a
2 receptionist was in all these plans, her package would
3 probably be 150,000 lower than a Texaco 19. They would
4 still not be equal to a Texaco 20.
5    Q    Again, in your work at FAMM or Texaco, TFAMM
6 or FAMM, you didn't have any responsibilities for
7 determining people's pay grades, right?
8    A    Some of the -- I didn't determine them. They
9 started out with a pay grade and then I was responsible
10 for annual reviews. And I promoted some people to a
11 higher number.
12   Q    But your work or knowledge didn't ever,
13 whether it be at Texaco or FAMM, involve how the grading
14 system worked or the rationale for the grading system,
15 right?
16   A    Those were not part of my responsibilities.
17       MR. KEE: That's all I have.
18       MS. CANADAY: I have nothing.
19       (Whereupon, the deposition was adjourned at
20       11:28 a.m.)
21 (Defendant's Exhibits 68 and 69 were retained by Attorney
22 Kee.)
23
24
25

85

1 STATE OF CONNECTICUT

2 JUDICIAL DISTRICT OF _____

3

4

5

6

7

8                    KENNETH M. RAFTERY

9

10

11

12        KENNETH M. RAFTERY personally appeared before

13 me at _____, Connecticut, this _____ day

14 of _____, 2004, made oath and

15 acknowledged this deposition to be a true and accurate

16 transcription of his testimony.

17

18

19 My Commission Expires:

20

21

22

23                    NOTARY PUBLIC

24

25

87

1                    INDEX OF TESTIMONY

2                                        Page Line

3 Direct by Mr. Kee                        3    8

4

5

6

7

8              INDEX OF DEFENDANT'S EXHIBITS

9

10                                       Page Line

   68.   Document                          9    5

11

   69.   Document                         55    8

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

86

1            C E R T I F I C A T E

2

3 STATE OF CONNECTICUT

4 JUDICIAL DISTRICT OF ANSONIA/MILFORD

5

6        I, LYNNE STEIN, Notary Public within and for
the State of Connecticut, duly commissioned and
7 qualified, do hereby certify that pursuant to Notice,
KENNETH M. RAFTERY, the deponent herein, was by me first
8 duly sworn to testify the truth, the whole truth and
nothing but the truth of his knowledge touching and
9 concerning the matters in controversy in this case; that
he was thereupon carefully examined upon his oath and his
10 testimony reduced to writing by me; and that the
deposition is a true record, to the best of my ability,
11 of the testimony given by the witness.

12        I further certify that I am neither attorney
or counsel for, nor related to or employed by, any of the
13 parties to the action in which this deposition is taken,
and further that I am not a relative or employee of any
14 attorney or counsel employed by the parties thereto, or
financially interested in the action.

15        IN WITNESS WHEREOF, I have hereunto set my
16 hand this 31st day of May, 2004, at Milford, Connecticut.

17

18

19

20

21

22
My Commission Expires:        LYNNE STEIN, Lic. No. 00110
23 January 31, 2009             Notary Public
                              State of Connecticut
24

25