Page 1

```
 1
                 IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF CONNECTICUT
 3   LARRY A. KATZ and              *
     KENNETH M. RAFTERY,            *
 4           Plaintiffs,            *
                                    *
 5   VS.                            *  CIVIL ACTION
                                    *   NO. 302 CV 02201 (AWT)
 6   THE SEPARATION PAY PLAN OF     *
     TEXACO, INC., and TEXACO, INC.,*
 7           Defendants.            *
 8
 9   ***********************************************************
10                         ORAL DEPOSITION OF
11                          CAROLYN SELLERS
12                           APRIL 1, 2004
13   ***********************************************************
14
15   ORAL DEPOSITION OF CAROLYN SELLERS, produced as a witness at
16   the instance of the Plaintiffs, and duly sworn, was taken in
17   the above-styled and numbered cause on the 1st day of April,
18   2004, from 9:30 a.m. to 10:26 a.m., before LaRita J.
19   Cormier, Certified Shorthand Reporter in and for the State
20   of Texas, reported by stenographic means, at Riverside
21   Reporting, Inc., 6101 Southwest Freeway, Suite 200, Houston,
22   Texas  77057, pursuant to the Federal Rules of Civil
23   Procedure and the provisions stated on the record or
24   attached hereto.
25
```

RIVERSIDE REPORTING, INC.                                    (713) 662-0062

DEPOSITION OF CAROLYN SELLERS

Page 2

APPEARANCES

FOR THE PLAINTIFFS:
Mr. Scott R. Lucas
MARTIN, LUCAS & CHIOFFI, L.L.P.
177 Broad Street
Stamford, Connecticut 06901
PHONE: 203-973-5200
FAX: 203-973-5250

FOR THE DEFENDANTS:
Mr. Conrad S. Kee
JACKSON LEWIS, L.L.P.
177 Broad Street
Stamford, Connecticut 06904
PHONE: 203-961-0404
FAX: 203-324-4704

Page 3

INDEX

PAGE
APPEARANCES............................ 02
EXAMINATION
  By Mr. Lucas............................ 04
CHANGES..................................... 43
SIGNATURE.................................. 44
REPORTER'S CERTIFICATE............ 45

EXHIBIT INDEX
NO.  DESCRIPTION                        PAGE
47............................. 28
  Handwritten notes titled 4/24 Call with
  Carolyn Sellers. "Katz 00015"

48............................. 40
  Handwritten notes titled Raftery & Katz.
  "Texaco 0097"

49............................. 41
  Memo to A. Preston, R. Remley and W. Duck from
  Kwame Satchell, 6/24/02, transmitting Ron
  Boilla's file regarding Change of Control.
  K. Raftery and L. Katz. "Texaco 0007-0033"

Page 4

1  CAROLYN SELLERS,
2  having been first duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. LUCAS:
5  Q. Good morning, Ms. Sellers. As you know, my name
6  is Scott Lucas. I represent Larry Katz and Ken Raftery in a
7  federal suit they brought in the District of Connecticut
8  against Texaco and the Texaco severance plan seeking change
9  of control benefits. Have you had your deposition taken
10 before?
11 A. No, I have not.
12 Q. Okay. I'm going to ask you a series of questions,
13 and I'll be as quick as I can. If you don't understand
14 questions that I've asked you, let me know and I'll try to
15 rephrase it. I would ask that you answer audibly instead of
16 nods of the head or huh-uhs, because those don't come out
17 clearly on the record. There's also a tendency in everyday
18 conversation to know where I'm going with the question and
19 to start answering it before I've completed it. That makes
20 it difficult for the court reporter to take down because we
21 end up talking over each other. So if you'll wait until I'm
22 done with the question, I'll wait until you're done with the
23 answer before I go on. Okay? If you need to take a break
24 at any time, let me know. Okay?
25 A. Okay.

Page 5

1  Q. Are you represented by Mr. Kee here today?
2  A. In the capacity of my role on the claims
3  committee, yes.
4  Q. Okay. And what have you done in preparation for
5  today's deposition?
6  A. Had a brief meeting with Mr. Kee yesterday.
7  Q. Okay. And for how long was that meeting?
8  A. Maybe an hour and a half.
9  Q. Okay. Did you review any documents?
10 A. No, I did not.
11 Q. Okay. Are you currently employed?
12 A. Well, I -- my husband and I own a business, so I
13 assist him with that. I do some legal work for small
14 businesses, and I take care of my children.
15 Q. Okay. Can you give me your educational background
16 after high school?
17 A. I have an undergraduate degree, and I have a J.D.
18 degree.
19 Q. Okay. So bachelor's degree?
20 A. Yes.
21 Q. Okay. Any particular concentration?
22 A. Advertising.
23 Q. Okay. And then a J.D. degree?
24 A. Yes.
25 Q. When did you receive that?

DEPOSITION OF CAROLYN SELLERS

Page 6

1  A. In 1988.
2  Q. Okay.
3  A. December 1988.
4  Q. Okay. From what institution?
5  A. Texas Tech University.
6  Q. Okay. And how about your bachelor's, where was
7  that?
8  A. Texas Tech University.
9  Q. Okay. And when did you begin working at Texaco?
10 A. In October 1989.
11 Q. Okay. In what capacity?
12 A. As an attorney.
13 Q. Any particular title?
14 A. Not that I recall.
15 Q. Okay. And where were you located?
16 A. In Denver, Colorado.
17 Q. And what were your duties as attorney for Texaco
18 located in Denver, Colorado?
19 A. I did some oil and gas work, and I did some
20 employment law.
21 Q. What sort of employment law did you do? Just a
22 category.
23 A. Your basic employment law.
24 Q. Any ERISA work?
25 A. No, not in Denver.

Page 7

1  Q. Okay. Employment agreements?
2  A. No.
3  Q. How about discrimination?
4  A. Yes.
5  Q. Anything else that I haven't mentioned with regard
6  to employment law that you did in Colorado?
7  A. Not that I recall a laundry list of them.
8  Q. Okay.
9  A. If you want to go down your laundry list, that
10 will help jog my memory.
11 Q. Okay. What was your next position in Texaco?
12 A. Do you mean the next location or --
13 Q. Well, let me go this way. How long were you with
14 Texaco, October '89 until when?
15 A. Until November 2001.
16 Q. So just after the merger with Chevron?
17 A. That's correct.
18 Q. Okay. What pay grade were you at when you left in
19 November of 2001?
20 A. Pay Grade 20.
21 Q. Okay. When did you become a Pay Grade 20?
22 A. I don't recall the exact time that I became a Pay
23 Grade 20.
24 Q. Okay. Do you know what pay grade you were as an
25 attorney in Denver, Colorado?

Page 8

1  A. No, I don't recall that.
2  Q. Okay. Was your title attorney throughout your
3  tenure at Texaco?
4  A. No, it was not.
5  Q. Okay. After you occupied the position of
6  attorney, what was your next position with Texaco?
7  A. They kept changing the title; so that's why I'm
8  not clear as to when the titles may have changed.
9  Q. Did your duties change instead of titles changing?
10 A. I changed locations a few times when I was with
11 Texaco.
12 Q. And when you changed locations, did your duties
13 change?
14 A. Sometimes.
15 Q. Okay. Why don't you just take me briefly -- not
16 going to spend too much time on this, but where did you go
17 after Denver?
18 A. I moved to corporate headquarters to New York.
19 Q. Harrison, New York?
20 A. That's correct.
21 Q. Do you recall when that was?
22 A. The summer of 1991.
23 Q. Okay. And did you have a title change incident to
24 that move?
25 A. I don't believe so.

Page 9

1  Q. What were your duties in Harrison, New York?
2  A. I did employment law again.
3  Q. Any employment law other than what you told me you
4  did in Denver?
5  A. By the time I moved there, I started doing some
6  ERISA work.
7  Q. Okay. What else?
8  A. I did corporate law.
9  Q. Okay. Anything else?
10 A. And I did intellectual property.
11 Q. Do you recall what your pay grade was when you
12 moved to Harrison, New York, initially?
13 A. No, I don't recall that. They weren't really
14 telling you in my early days with Texaco.
15 Q. All right. And what sort of ERISA work were you
16 doing when you began in Harrison in 1991?
17 A. Assisting the plan administrator with research and
18 interpretations of the ERISA law, things of that nature.
19 Q. Plan interpretation?
20 A. Well, more so the law as it related to the plan.
21 Q. Okay.
22 A. Of course the plan administrator was responsible
23 for doing the interpretation of the plan.
24 Q. Okay. Who was the plan administrators? Was it
25 one plan administrator you worked with or several?

DEPOSITION OF CAROLYN SELLERS

Page 10

1   A. When I was in New York, I believe it was just one.
2   Q. Okay. Was that an individual?
3   A. It was an individual.
4   Q. And who was that, if you recall?
5   A. I've gone blank. I don't recall his name.
6   Q. Okay. What was your next location that you worked
7   at for Texaco?
8   A. I did a temporary assignment in Texaco's London
9   office.
10  Q. Okay. When was that? What time period?
11  A. It was in 1995.
12  Q. And when that was completed, did you come back to
13  the United States?
14  A. I came back to the United States.
15  Q. When was that?
16  A. The beginning of 1996.
17  Q. And where did you work upon your return in 1996 to
18  the United States?
19  A. My husband also worked for Texaco. His department
20  transferred him to Houston, and then my department
21  accommodated my request also and moved to Houston.
22  Q. So in 1996 you moved to Houston?
23  A. That is correct.
24  Q. Did you remain in Houston from then forward?
25  A. That is correct.

Page 11

1   Q. When you moved to Houston, do you recall what your
2   job title was?
3   A. I was a senior attorney.
4   Q. Senior attorney. Do you recall what your pay
5   grade was as a senior attorney?
6   A. Pay Grade 18.
7   Q. Okay. What did you do as a senior attorney when
8   you located to Houston?
9   A. I was once again an employment attorney, and I
10  continued to do some intellectual property work.
11  Q. Did you continue to do ERISA work?
12  A. Not as much.
13  Q. Okay. What was your focus -- in the employment
14  area, what did you focus primarily on?
15  A. Assisting the managers and human resource
16  department managers with employee issues.
17  Q. Okay. And did your title change between 1996 and
18  2001, or did you remain senior attorney?
19  A. Between what time period? I'm sorry.
20  Q. 1996, when you became senior attorney and moved to
21  Houston, and when you ceased to be an employee in 2001.
22  A. Yes, my title did change.
23  Q. Okay.
24  A. At some point I became senior counsel.
25  Q. And what were your duties as senior counsel?

Page 12

1   A. I was section chief of the labor and employment
2   law group.
3   Q. And what did you do as section chief for the labor
4   and employment law group?
5   A. The day-to-day duties pretty much stayed the same.
6   Your general helping managers and HR professionals with
7   employment type issues, but also was the go-to management
8   person for the other labor employment law attorneys and the
9   paralegals and the secretaries.
10  Q. So you were the head boss in the labor area, so to
11  speak?
12  A. Yes. Of course I had bosses, but yes.
13  Q. To whom did you report as senior counsel?
14  A. The associate general counsel of regulatory. I
15  believe that was his title. I'm not positive.
16  Q. Okay. And do you recall what your pay grade was
17  as senior counsel?
18  A. It was Pay Grade 20.
19  Q. At some point were you a Pay Grade 19 or did you
20  skip Pay Grade 19?
21  A. I believe I skipped Pay Grade 19.
22  Q. Did you have any other title besides senior
23  counsel prior to your leaving in 2001?
24  A. Other than the senior counsel section chief, no.
25  Q. That was the last job that you held?

Page 13

1   A. That is correct.
2   Q. Okay. As senior counsel did you become familiar
3   with the benefit compensation and benefit plans of Texaco?
4   A. In what regard? I'm sorry.
5   Q. Did you become familiar with what plans Texaco had
6   in place for its employees, things such as the Supp 3 plan,
7   the Long Term Incentive Plan, bonus plan?
8   A. Yes.
9   Q. Okay. As a Pay Grade 18, do you recall other than
10  salary what comprised your compensation, in other words,
11  what compensation plans, benefit plans you were enrolled in?
12  A. They had some bonus programs for employees, but
13  other than that I'm not sure what you're asking me.
14  Q. Okay. Let's focus on 2001.
15  A. Okay.
16  Q. Texaco had a Cash Bonus Plan, did it?
17  A. In 2001?
18  Q. Right.
19  A. Yes.
20  Q. Okay. And were you a participant in that as a Pay
21  Grade 20?
22  A. Yes.
23  Q. Were you a participant in that when you were a Pay
24  Grade 18?
25  A. Not that plan, no.

Page 14

1  Q. Texaco had a Cash Bonus Plan, did it not, that
2  kicked in at grade level 20 and above?
3  A. That's correct.
4  Q. And if you were -- it also had a bonus plan that
5  you could participate in if you were under Pay Grade 20, did
6  it not, that gave stipends of some sort?
7  A. That's my understanding but not my experience.
8  Q. Okay. Your experience is that the Texaco cash
9  bonus plan you had to be Pay Grade 20 or above to
10 participate; is that correct?
11 A. For the Executive Compensation Program, that was
12 my knowledge.
13 Q. Okay. And what other plans, compensation plans
14 did you have to be Pay Grade 20 or above to participate in
15 at Texaco in 2001?
16 A. I'm not sure.
17 Q. Okay. How about the Supp 3 plan? Did you have to
18 be a Pay Grade 20 or above to participate in that, if you
19 recall?
20 A. I don't know.
21 Q. Did you know at one point, do you think, or you
22 just forgot, can't recall, or you never knew?
23 A. I'm not sure. I don't recall.
24 Q. Okay. Did you participate in the Supp 3 plan?
25 Supp 3 is a non-qualified supplement to the retirement plan.

Page 15

1  A. Right. I'm aware of what it is, and I'm not sure
2  the extent of what elections that I made.
3  Q. Okay. Do you know when you were able to make an
4  election to participate in it, whether it was before or
5  after you became Pay Grade 20?
6  A. It was when I became Pay Grade 20.
7  Q. Okay. How about the deferral -- there was a
8  deferral plan at Texaco; correct?
9  A. That's correct.
10 Q. Did you have to be Pay Grade 20 to participate in
11 that?
12 A. That's when it became part of my personal
13 experience.
14 Q. Okay. So as far as you know you did, but you
15 don't have a broad base knowledge, just your own personal
16 experience? Is that correct?
17 A. That I can recall right now. I don't recall
18 working on a case where that was an issue.
19 Q. Okay. And how about -- was there a Long Term
20 Incentive Plan that was available only to Pay Grade 20s and
21 above?
22 A. Once again, that was my experience when it became
23 available to me.
24 Q. Okay. As senior counsel did you work at all with
25 the Separation Pay Plan of Texaco?

Page 16

1  A. Yes, I did, but it was even before I was senior
2  counsel.
3  Q. Okay. Let's go back, then. When did you first
4  start working on the Separation Pay Plan of Texaco?
5  A. I'm sorry. Can you specify what you mean by
6  working on the Separation Pay Plan of Texaco?
7  Q. Sure. When did you start working with that
8  document, whether creating it or interpreting it or
9  otherwise addressing legal issues involved with it?
10 A. Of the Separation Pay Plan?
11 Q. Right.
12 A. I think you're going to have to narrow it down a
13 little bit more for me because in my day-to-day work, there
14 could be all kinds of issues that may come up related to the
15 Separation Pay Plan, and I'm not sure how far back someone
16 from HR may have asked me a question about that particular
17 plan.
18 Q. Okay. Let me show you Exhibit 36.
19 A. Okay.
20 Q. And that, as the cover indicates, is a copy of the
21 Separation Pay Plan of Texaco; and as you'll see, it's as of
22 2001. So I'm not representing this is any version other
23 than the one that existed, it looks like, as of May 2001.
24 Do you recognize the document?
25 A. Yes, I do.

Page 17

1  Q. And did you in your job, at any of your jobs as
2  attorney, senior attorney, have to work with this document
3  or prior versions of this document?
4  A. Yes.
5  Q. Okay. In what way did you have to work with this
6  document? What sort of things did you have to do?
7  A. Do you want to give me a time period?
8  Q. At any time at Texaco, do you have any specific
9  recollection of working with this document or its
10 predecessors, in other words, a version of the Separation
11 Pay Plan?
12 A. Well, I was on a Separation Pay Plan committee.
13 Q. Okay.
14 A. So that was where I dealt with the document the
15 most.
16 Q. Okay. Do you recall whether you dealt with the
17 document outside of your role as a member of the committee?
18 A. I'm sure there were times. No specific time comes
19 to mind.
20 Q. Okay. So you may have; you just don't
21 specifically recall?
22 A. I don't recall a specific instance where I can
23 give you name, date, who the HR person was.
24 Q. Okay. I'm not looking for quite that specific.
25 I'm just looking for the nature of the work you might have

DEPOSITION OF CAROLYN SELLERS

Page 18

1 done in connection with it.
2  A. The nature of the work usually stemmed around
3 eligibility requirements.
4  Q. Okay.
5  A. When would the plan administrator need to answer,
6 getting extensions of time to make answers, those kinds of
7 general things.
8  Q. Okay. And let me show you -- and this is a poor
9 copy. I apologize -- but what's been marked as Exhibit 6.
10 You can ignore the handwriting on there. Have you seen that
11 document before?
12  A. I believe I have, yes.
13  Q. Okay. What is that document?
14  A. It says it's the Texaco Separation Pay Plan. It
15 was given to all Position Grade 20 and above employees.
16  Q. I know what it says, but have you seen it prior to
17 today?
18  A. Prior to today, I believe I have.
19  Q. Okay.
20  A. It looks familiar.
21  Q. When do you think you first saw this document?
22  A. Well, I'm thrown off a little bit because it has a
23 date on it, June 2nd, 1999, but it would have been around
24 the time that the ChevronTexaco merger was in the works.
25  Q. Did you have any hand in its creation?

Page 19

1  A. No, I did not.
2  Q. Did you participate in any discussions regarding
3 its creation or distribution?
4  A. I don't recall that, no.
5  Q. Okay. Were amendments to the Separation Pay Plan
6 something that you would typically be involved in in your
7 capacity in the legal department? Other than as a committee
8 member, I'm talking about your official duty as an attorney
9 or senior attorney.
10  A. It could at some point, yes.
11  Q. Okay.
12  A. Can we go back to this document, Exhibit 6?
13  Q. Sure.
14  A. Maybe I -- I don't know that I got this one, June
15 2nd, 1999. There may be another version of this one from
16 2000. I'm not sure.
17  Q. Okay.
18  A. June seems to be a little early for me to have
19 gotten it.
20  Q. So you don't specifically recognize that document,
21 Exhibit 6?
22  A. I recognize a document that looks very similar to
23 this, so I'm not sure if I got this particular document.
24  Q. Did you ever see a Focus on Benefits newsletter
25 that contained the substance of Exhibit 6?

Page 20

1  A. Do you have one for me to see?
2  Q. I don't. I don't know if one ever existed.
3 That's why I'm asking you what do you recall ever seeing.
4  A. I don't recall ever seeing one with this memo in
5 it.
6  Q. Okay. When did you become -- you were part of the
7 Benefit Center Change of Control Committee; is that correct?
8  A. I was a final member of the claims committee.
9  Q. Okay. And is that different than the Benefit
10 Center Change of Control Committee?
11  A. I'm not sure. We called it the Change of Control
12 Claims Committee, then you have the Change of Control
13 Committee.
14  Q. Okay. The claims committee was the first level of
15 claims review; is that correct?
16  A. That is correct.
17  Q. Okay. And when did you become a member of that
18 committee?
19  A. The committee was formed before I left Texaco, but
20 I don't believe we had a meeting until after I left Texaco.
21 So I knew I was a member of the claims committee before I
22 left in November 2001.
23  Q. Okay. And who appointed you to that committee?
24  A. I believe Janet Stoner, a member of the Change of
25 Control Committee.

Page 21

1  Q. And did she tell you what your duties would be as
2 a member of the claims committee?
3  A. I'm trying to think if she told me directly or if
4 I got it through some other means. I don't recall if she
5 and I had a verbal conversation.
6  Q. Okay. At some point you gained an understanding
7 as to what your duties were as a member of the Claims
8 Committee?
9  A. That is correct.
10  Q. Okay. And what was your understanding as to what
11 your duties were as a member of the Claims Committee?
12  A. As claims came in to the claim center, as part of
13 that committee, to review the claims and look at whatever
14 documentation the claimant provided to the committee and
15 apply the information that we had to the eligibility
16 requirement set forth in the change of control provisions
17 under the Separation Pay Plan.
18  Q. Okay. And do you recall how many times you had to
19 engage in that activity, that is, administering the claims
20 in the fashion you just described?
21  A. Oh, I don't remember.
22  Q. Do you know whether it was more than five times?
23  A. Yes, it was more than five times.
24  Q. Okay. And would the committee meet for each claim
25 separately, or would it deal with several claims in one

Page 22

1 meeting?
2  A. We're talking about the Claims Committee; correct?
3  Q. Yes.
4  A. We would have a teleconference, and during that
5 teleconference there could be several claims that we
6 reviewed during one call.
7  Q. And was there a scheduled period for these
8 teleconference calls?
9  A. Yes, there was.
10  Q. And what was that?
11  A. It changed over time, so I'm not quite sure, but
12 it would be something like Tuesday, 2 o'clock Central time.
13  Q. Okay. And you continued to participate in this
14 committee even after you were no longer a Texaco employee?
15  A. That is correct.
16  Q. And were you compensated for this work?
17  A. Yes.
18  Q. Okay. And how would you learn about claims that
19 were made after you were no longer at Texaco?
20  A. As a member of the Claims Committee, I would
21 either receive an e-mail note saying we do have a meeting on
22 whatever date it was scheduled and the time, here are the
23 items we will be discussing. Or it might come in an
24 overnight mail package if it was voluminous amount of
25 materials to review.

Page 23

1  Q. Okay. So sometimes documents would be attached as
2 e-mail attachments, and sometimes they'd come to you hard
3 copy?
4  A. That is correct.
5  Q. Okay. And were there minutes kept of these
6 teleconferences? Do you recall?
7  A. I did not keep any minutes.
8  Q. Was it your habit to take any notes?
9  A. Sometimes I would.
10  Q. And if you did take notes, what would you do with
11 them after you -- after the conference was finished?
12  A. After we'd finish the call, if everything on my
13 list was completed that day, I would -- may keep the notes
14 'til the next call, but by the next call I would discard the
15 notes.
16  Q. So you just threw them away?
17  A. Yes.
18  Q. Okay. You didn't maintain them in any sort of
19 file or anything?
20  A. I did not.
21  Q. Okay. Do you know if other people took notes?
22  A. It was a teleconference. I'm not sure what other
23 people did. I was never in the same room with anyone on the
24 call.
25  Q. So there was no set procedure?

Page 24

1  A. No.
2  Q. Okay. And were you ever told that there would be
3 no official minutes taken of the teleconference call?
4  A. I don't recall that.
5  Q. Okay. Do you recall whether the telephone
6 conferences were recorded?
7  A. I don't believe they were recorded.
8  Q. Okay. No one ever told you they were?
9  A. No one ever told me they were recorded.
10  Q. Okay. How many people were on the committee, that
11 you can recall -- I'm going to ask for their names in a
12 minute and I have some names to jog your memory, but do you
13 recall how many people were on the committee at one time?
14  A. From what time period?
15  Q. Let's start with initially.
16  A. I don't have anything to write down with. My
17 guess would be six or seven. I'm not sure.
18  Q. Okay. Well, let me give you some names.
19  A. That will help.
20  Q. Okay. You were on it, obviously. Glenn Phillips?
21  A. Yes.
22  Q. John Goldsby?
23  A. Yes.
24  Q. Kwame Satchell?
25  A. Yes.

Page 25

1  Q. Rebecca Roberts?
2  A. Yes.
3  Q. Richard Loving?
4  A. Yes.
5  Q. Ron Boilla?
6  A. Yes.
7  Q. Anyone I've missed?
8  A. I recall there was one other person from the
9 beginning, and she left -- and she left the committee, so I
10 can't recall her name.
11  Q. Okay. Do you know when she left?
12  A. It was early on; that's why I can't recall her.
13  Q. Okay. Okay. Do you know who Larry Katz is?
14  A. I know who Larry Katz is.
15  Q. Have you met Mr. Katz?
16  A. Yes.
17  Q. Okay. And how about Mr. Raftery, do you know who
18 he is?
19  A. I don't think so.
20  Q. Okay. And so you don't think you've ever met him?
21  A. I don't think so.
22  Q. All right. Do you recall reviewing a claim of
23 both of theirs as a member of the Claims Committee?
24  A. Yes, I do.
25  Q. Okay. How did you learn of the claim? When I say

DEPOSITION OF CAROLYN SELLERS

### Page 26

1  the claim, because the two are together as far as I know; is
2  that correct, they were treated as one for purposes of
3  analysis by the committee?
4     A. That is correct.
5     Q. Okay. So the claim of both of them, how did you
6  become aware of it?
7     A. The official claim I became aware of it just like
8  any other claim. It was part of a notice of a meeting in
9  an e-mail.
10    Q. So for that claim you recall it being an e-mail as
11 opposed to a hard copy?
12    A. Well, I'm not sure. Even if the hard copy came,
13 the notice that that would be discussed would have come in
14 that e-mail.
15    Q. Okay.
16    A. So I don't recall the paperwork that came with it.
17    Q. All right. Were you aware of the claim before it
18 was presented to the Claims Committee as a formal claim?
19    A. Yes. I was not surprised when the claim came
20 through.
21    Q. Okay. And what was the source of your information
22 prior to the claim coming through?
23    A. Seemingly out of the blue, I guess, my husband
24 received a call from Larry Katz.
25    Q. Okay. Was your husband with Texaco at the time?

### Page 27

1     A. Yes.
2     Q. Okay. What was his title?
3     A. Well, at the time of the call, I think both of us
4  had left Texaco.
5     Q. Oh, okay. But Larry Katz, did he know your
6  husband?
7     A. Yes. They worked together.
8     Q. I see. So Mr. Katz called your husband?
9     A. Well, I think that's how it happened. They did
10 speak.
11    Q. Okay. Did Mr. Katz ask to speak with you or just
12 with your husband?
13    A. I don't know how it all transpired, but eventually
14 I was given the phone.
15    Q. Okay. And when you got on the phone, what did
16 Mr. Katz say to you?
17    A. I don't remember the exact words, but it was more
18 along the lines of some issue that he had with the amount of
19 change of control that he was set to receive or had received
20 or whatnot.
21    Q. Okay. Is it your recollection that was before you
22 received the formal claim?
23    A. That's my recollection.
24    Q. Let me show you Exhibit 4. Have you ever seen --
25 there's two documents that comprise Exhibit 4. Have you

### Page 28

1  ever seen either of those documents before? They're not
2  dated.
3     A. I believe this is the document that was submitted
4  to start the review process.
5     Q. Okay. The top document or both documents?
6     A. I'm not sure. I would say at least the top
7  document.
8     Q. Okay.
9     A. I just can't be positive.
10    Q. Okay. Let me show you some notes I'm marking --
11 it's Bates number Katz 15.
12      (Exhibit No. 47 was marked for
13      identification and is attached hereto.)
14    Q. (BY MR. LUCAS) That is Exhibit 47, the notes of
15 Mr. Katz. Have you ever seen that document before?
16    A. I've not seen this document, no.
17    Q. Okay. Let me ask you about your telephone call
18 with Mr. Katz. This looks to be notes of a call between you
19 and Mr. Katz, and I want to ask your recollection whether
20 these things were covered by you. So if we could start with
21 the first paragraph. It says "FAMM board reviewed the 19 to
22 20 issue three times and did not make the change." Do you
23 recall discussing that topic with Mr. Katz?
24    A. No, I don't recall that. Is that information he
25 gave me?

### Page 29

1     Q. I don't know what that represents. I'm just going
2  through the notes with you to test your recollection. Why
3  don't we do this; put the note aside. Tell me what you
4  recall Mr. Katz talking to you about in that telephone call.
5     A. Basically all I remember was he wasn't happy about
6  the amount of his change of control that he had gotten or
7  was set to receive. I don't remember the specifics of it.
8  And that he should have been treated as a Pay Grade 20 and
9  he was a Pay Grade 19.
10    Q. Okay. He was an employee of FAMM; correct?
11    A. That's what everything seems to be pointing to.
12 I'm not -- I'm not positive of that. I lost track of Larry,
13 so I wasn't exactly sure where he was.
14    Q. Okay. So at that time of the phone call you
15 weren't sure where he was; correct?
16    A. I'm sure he told me.
17    Q. Yeah, okay. And is that the extent of your
18 recollection of the phone call with Mr. Katz as you sit here
19 today, without looking at anything else?
20    A. But I also know that I told him there was a
21 process for making a claim for your benefits, there was an
22 appeal process, and I encouraged him to follow that process.
23    Q. Okay. When the Claims Committee reviewed their
24 claims, the claims of Mr. Raftery and Mr. Katz, do you
25 recall whether that was the only claim dealt with in that

DEPOSITION OF CAROLYN SELLERS

Page 30

1 teleconference?
2 A. Oh, I don't recall that.
3 Q. Do you recall what documents you reviewed incident
4 to or prior to participating in the teleconference in order
5 to determine the claim of Mr. Katz and Mr. Raftery?
6 A. I think I'm comfortable in saying that I reviewed
7 at least the top part of Plaintiff's Exhibit 4.
8 Q. Okay. Anything else you can think of, any other
9 documents?
10 A. Not that I can think of, but if you have something
11 that was submitted, I'll be happy to take a look at it.
12 Q. Okay. So you're comfortable saying you looked at
13 least at the first page of Exhibit 4, and as you sit here
14 today you can't recall whether you looked at any other
15 additional documents besides that; is that correct?
16 A. Documents, I can't recall any additional
17 documents.
18 Q. Do you recall who was -- whether all the members
19 of the Claims Committee were involved in that
20 teleconference?
21 A. I don't know if anyone had missed that call.
22 Q. Okay. At some times did the Claims Committee meet
23 without all its members being in the conference, meet
24 meaning did they proceed with the teleconference despite the
25 fact all members were not present?

Page 31

1 A. Sometimes we did, yes.
2 Q. And would they take action without all the members
3 being present?
4 A. Yes. Occasionally that did happen.
5 Q. Was there any rule as to how many you needed for a
6 quorum, if you will, for an action to be effective?
7 A. Yeah. There was a procedure in place, but the
8 chairman of the committee handled that.
9 Q. Who was the chairman?
10 A. John Goldsby.
11 Q. Do you recall how long the teleconference call was
12 in which the claims of Mr. Katz and Mr. Raftery were
13 discussed?
14 A. No, I don't recall that.
15 Q. Okay. Do you recall whether a decision was
16 reached in that teleconference call, by the committee?
17 A. On this one I believe we did reach a decision.
18 Q. Okay. And do you recall what the basis for that
19 decision was?
20 A. Well, I do recall what my vote was.
21 Q. What was your vote?
22 A. My vote was they weren't eligible for additional
23 change of control benefits.
24 Q. Okay. And your reason for that vote was what?
25 A. My reason for that vote was they were Pay

Page 32

1 Grade 19.
2 Q. Okay. And did you consider any other factors, or
3 was that a determinant factor for you?
4 A. That was the main determining factor for me.
5 Q. Okay. Were there other factors you considered?
6 A. Well, I would have considered what they wrote in
7 their document.
8 Q. Okay.
9 A. And we had an investigator who would go and get
10 additional information; and if he provided additional
11 information, then that would be considered as well.
12 Q. Okay. Who was the investigator?
13 A. The investigator is John Burgess.
14 Q. And was he on the conference call?
15 A. I would imagine that he was, but I don't have a
16 direct recollection of exactly who was on the conference
17 call for this particular one.
18 Q. And do you know whether Mr. Burgess in fact
19 performed an investigation of this particular one?
20 A. I would have to say that he would have.
21 Q. Okay. What additional information did he provide?
22 A. I don't recall the exact specifics. All I know is
23 what my vote was and why I voted the way that I did.
24 Q. Okay. Your vote was no, and it was no because of
25 the pay grade; correct?

Page 33

1 A. That was -- that was the principal thing, yes.
2 Q. Okay. And did anyone else on the committee
3 express a different view, that you recall?
4 A. Not that I recall.
5 Q. So there seemed to be a consensus, as you recall?
6 A. That is my recollection.
7 Q. Do you know whether it was unanimous?
8 A. Yeah, I believe that one was unanimous.
9 Q. Okay. And did everyone articulate the same reason
10 that you did, that the pay grade was a determinant factor?
11 A. That is my recollection. Not everyone gives a
12 long discourse on each one of the things, but you do get
13 your vote, and if you want to say something more.
14 Q. Okay. Do you recall anyone saying anything more
15 than that?
16 A. No, I don't recall.
17 Q. Okay. Looking at Exhibit 47, the notes in front
18 of you, you don't recall, I take it based on your reaction
19 earlier, discussing with Mr. Katz the actions of the FAMM
20 board regarding pay grade; is that correct?
21 A. I just don't recall that.
22 Q. That's fine. And the next paragraph says "FAMM
23 could interpret its own management team, but FAMM's board
24 could have clarified and didn't. Claims Committee
25 constrained by policy." Do you recall having that as part

Page 34

1 of your discussion with Mr. Katz?
2 A. I don't specifically recall that. I really don't
3 recall using the word "constrained." That's not one of my
4 words, but I don't disagree with what's there.
5 Q. That FAMM could interpret its own management team?
6 A. Correct.
7 Q. Okay. Had FAMM -- did anyone in that meeting
8 express FAMM's position in that teleconference? Did anyone
9 say FAMM is for or against these individuals getting the
10 extra change in control benefits?
11 A. I don't specifically remember that. But as far as
12 I'm concerned, it wouldn't matter as far as how to interpret
13 eligibility requirements under the Separation Pay Plan or
14 the Change of Control plan within the Separation Pay Plan.
15 Q. Okay. The fourth paragraph down says, "Think the
16 change of control" -- I guess that's the appeal committee --
17 "will come down the same way, Goldsby and Janet discussed
18 these issues." Do you recall expressing that view or
19 discussing that with Mr. Katz?
20 A. No, I don't recall.
21 Q. Did the Change of Control Committee, the committee
22 above yours, did they discuss claims with you before they
23 formally were submitted to that committee, that Appeals
24 Committee?
25 A. Ask that question again, please.

Page 35

1 Q. I know it wasn't that artful. Did anyone on the
2 Change of Control Committee -- I'm referring to the appeal
3 committee -- discuss with you or, to your knowledge, other
4 members of your committee these various claims before they
5 were officially submitted to the Change of Control
6 Committee?
7 A. Not in my experience.
8 Q. Okay.
9 A. Now, we have the chairman of the Claims Committee
10 and the chairman of the Change of Control Committee. I'm
11 not sure what they do.
12 Q. Mr. Goldsby and Ms. Stoner?
13 A. That's correct.
14 Q. Do you recall Ms. Stoner left Texaco or Chevron?
15 A. I don't know the date.
16 Q. Do you know -- were you still on the Claims
17 Committee when Ms. Stoner departed?
18 MR. KEE: Which company?
19 MR. LUCAS: I don't know whether she ever
20 worked for Chevron, but Chevron or Texaco.
21 A. I left Texaco before Ms. Stoner severed her ties
22 with ChevronTexaco.
23 Q. (BY MR. LUCAS) And you don't know how soon after
24 that she severed her ties?
25 A. I don't recall.

Page 36

1 Q. Okay. And you don't know whether Mr. Goldsby and
2 Ms. Stoner would talk about these claims from time to time?
3 A. I'm not going to make any kind of claim as to how
4 that was handled.
5 Q. Okay.
6 A. I did not discuss any claims with Ms. Stoner in
7 that way.
8 Q. Does that mean you have no knowledge of any
9 discussion or firsthand knowledge of any discussions between
10 Mr. Goldsby and Ms. Stoner regarding any claims submitted to
11 your committee?
12 A. I had no knowledge, no.
13 Q. Has anyone informed you that they would have talks
14 about these claims while they were still pending in your
15 committee?
16 MR. KEE: And the question is while they were
17 still pending with the Claims Committee, not afterwards.
18 A. I don't recall while they were still pending.
19 Q. (BY MR. LUCAS) Okay. How about afterward?
20 A. I believe that -- you know, it's my recollection
21 that maybe the chairman of the Claims Committee would give a
22 report as to, you know, the -- these are the ones that we
23 have handled.
24 Q. Okay.
25 A. And you can expect an appeal or whatever.

Page 37

1 Q. Right. And do you know if any informal discussion
2 went along with that information?
3 A. I wasn't there, so I can't really speak to that.
4 Q. Okay. Fair enough. Do you know whether there was
5 a time when Mr. Boilla was designated to act on behalf of
6 Ms. Stoner on the Change of Control Committee?
7 A. No, I don't recall that.
8 Q. Do you know of any reason why he would act on
9 behalf of Ms. Stoner on the Change of Control Committee?
10 A. I don't know what you mean "act on behalf of
11 Ms. Stoner."
12 Q. For example, sign decision letters on her behalf
13 and on behalf of the Change of Control Committee.
14 A. I can't think of anything specific in that regard.
15 Q. Okay.
16 A. I'm not saying there would be anything wrong with
17 it.
18 Q. Okay. Looking at Exhibit 47. We stopped after
19 the fourth paragraph, but looking at the fifth paragraph it
20 says "FAMM could have come up with own plan but didn't. So
21 in Texaco plan, these are Pay Grade 19, so that's how we
22 ruled." Do you recall saying that to Mr. Katz, or words to
23 that effect?
24 A. I don't recall specifically, and I'm not sure what
25 he has been saying on the other side because it's not fair,

DEPOSITION OF CAROLYN SELLERS

Page 38

1  I didn't get to take notes, but --
2     Q.  I'm just asking your best recollection.
3     A.  I don't recall this, but I'm going to tell you I
4  don't disagree with what's here.
5     Q.  Okay. How about the rest of the paragraph, do you
6  agree or disagree with that? It says, "Pay grade is easiest
7  to go on. Yes, FAMM treated them differently, but Texaco's
8  Change of Control plan is strictly on 20. Yes, other Texaco
9  plans also strictly on 20 where FAMM's were not," and it
10 cuts off there. Do you agree with those statements?
11    A.  If I'm agreeing with them, it's based upon
12 information that Larry Katz himself would have provided that
13 he was treated differently. I do agree that Texaco's Change
14 of Control plan was based -- I don't know strictly on 20 but
15 based on pay grade. I'm not sure what "yes, other Texaco
16 plans also strictly on 20," if that's in reference to
17 something he may have said, I'm not sure.
18    Q.  Okay. And looking at the last paragraph, did you
19 talk about attorneys fees and the Steps arbitration process?
20    A.  If he asked me about that, then I would have
21 answered him. And the deal about the legal fees is based
22 on, you know -- just a minute.
23    Q.  Are you looking for the provision in Exhibit 36?
24 Let me find it for you.
25          MR. KEE: Mr. Lucas is very attuned to that

Page 39

1  provision.
2     A.  I found it under the Change of Control plan.
3  There is a clause on here "unless a court of competent
4  jurisdiction determines that your cause of action is
5  frivolous." That's where --
6     Q.  (BY MR. LUCAS) Had you been involved at all in
7  interpreting that provision?
8          MR. KEE: "That provision" being the legal
9  fees provision?
10    Q.  (BY MR. LUCAS) The legal fee provision,
11 interpreting its application to the situation.
12    A.  As far as I can recall at this point, it has not
13 come up yet.
14    Q.  Okay. And were you involved at all in the
15 decision -- in any decision to deny attorneys fees until a
16 claim has been fully litigated?
17    A.  I do recall there was an issue. I don't remember
18 what. The one issue was the fees would not be pay as you
19 go.
20    Q.  That was how Texaco interpreted that provision?
21    A.  That was the interpretation of that provision.
22    Q.  Okay.
23    A.  Are we finished with Exhibit 7? You asked me
24 about this last.
25    Q.  47, yeah. Is there something else you want to say

Page 40

1  about it?
2     A.  I don't recall anything about "be careful about
3  entering binding arbitration under Steps." I'm not sure
4  what that's even about.
5     Q.  So you don't recall saying anything --
6     A.  I don't recall that in reference to this. We
7  don't even have a something called Steps at Texaco, so I'm
8  not sure what that is.
9          (Exhibit No. 48 was marked for
10           identification and is attached hereto.)
11    Q.  (BY MR. LUCAS) Okay. Let me show you what I've
12 marked as Exhibit 48. They're some notes. The date is cut
13 off on top. I apologize, but that's the way it was produced
14 to me.
15    A.  Uh-huh.
16    Q.  And I don't know who wrote those notes. And my
17 question to you is, do you recognize the writing?
18    A.  Oh, I do not recognize the writing.
19    Q.  Okay. And if you would just read this, I'm going
20 to ask you whether you recall any of the items in these
21 notes being discussed as part of the teleconference in which
22 Mr. Katz and Mr. Raftery's claims were decided.
23    A.  I don't recall this.
24    Q.  Okay. Executive Change of Control Committee, is
25 that your committee or the appeals committee? If you know.

Page 41

1  Have you ever heard your committee referred to as the
2  Executive Change of Control Committee?
3     A.  No.
4     Q.  Okay. Did you ever hear of the appeal committee
5  that Change of Control Committee referred to as the
6  Executive Change of Control Committee?
7     A.  I don't recall hearing them called that, and it's
8  not what I called them. So...
9     Q.  So you don't know?
10    A.  I don't know.
11    Q.  Okay.
12         (Exhibit No. 49 was marked for
13          identification and is attached hereto.)
14    Q.  (BY MR. LUCAS) I'm going to show you what's been
15 marked as Exhibit 49, and I'm going to ask you about a few
16 of the documents in here. I'm going to show you the third
17 and fourth page, Texaco 9 and 10, also marked previously as
18 Exhibit 5. Have you ever seen that letter before?
19    A.  I'm sorry.
20    Q.  That page and the next page.
21    A.  I don't recall.
22    Q.  Oak. And then if you would turn to the last page,
23 Texaco 33. Have you seen that document before?
24    A.  I don't recall seeing the document.
25    Q.  Do you know why Mr. Boilla would be signing this

RIVERSIDE REPORTING, INC.                    (713) 662-0062

DEPOSITION OF CAROLYN SELLERS

Page 42

1  if Mr. Goldsby was the chairman?
2  A. I do recall that Mr. Boilla was signing the
3  letters on behalf of the Change of Control Claims Committee.
4  Mr. Boilla was still employed for a time with ChevronTexaco,
5  and it may have been for expediency sake.
6  Q. Do you know if Mr. Goldsby had departed as of
7  April 22nd, 2002?
8  A. I'm not exactly sure when Mr. Goldsby departed,
9  but I believe Mr. Boilla stayed longer than Mr. Goldsby.
10  Q. Did you as an attorney at Texaco work with
11  Mr. Pennacchio at all?
12  A. Actually, I didn't.
13  Q. Did you work at all with Michele Swanson?
14  A. No, not that I recall.
15  Q. Did you ever -- did you work at all with the --
16  let me rephrase that. Were you involved at all with any
17  interactions between FAMM on the one hand and Texaco on the
18  other hand regarding FAMM benefits and FAMM -- and/or FAMM
19  compensation?
20  A. I don't recall working on anything like that.
21  Q. Okay.
22  MR. LUCAS: That's it.
23  MR. KEE: Okay. I don't have anything. Read
24  and sign.
25  (Deposition concluded at 10:26 a.m.)

Page 43

1  CHANGES AND SIGNATURE
2  WITNESS NAME: CAROLYN SELLERS - DATE OF DEPOSITION: 04-01-04
3  _____
4  PAGE   LINE   CHANGE   REASON
5  _____
6  _____
(lines 7-25 blank signature lines)

Page 44

1  I, CAROLYN SELLERS, have read the foregoing deposition and
2  hereby affix my signature that same is true and correct,
3  except as noted above.
4
5  _____
6  CAROLYN SELLERS
7
8  THE STATE OF TEXAS:
9  COUNTY OF HARRIS:
10
11  Before me, _____, on this day
12  personally appeared CAROLYN SELLERS, known to me (or proved
13  to me under oath or through _____) (description
14  of identity or other document) to be the person whose name
15  is subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18
19  Given under my hand and seal of office this
20  _____ day of _____, 2004.
21
22
23  _____
24  NOTARY PUBLIC IN AND FOR
25  THE STATE OF _____

Page 45

1  STATE OF TEXAS )
                 )
2  COUNTY OF HARRIS )
3         DEPOSITION OFFICER'S CERTIFICATE
4
5  ORAL DEPOSITION OF CAROLYN SELLERS
   Taken on April 1, 2004
6
7  I, LaRita J. Cormier, Certified Shorthand Reporter in and
   for the State of Texas, hereby certify that this deposition
8  transcript is a true record of the testimony given by the
   witness named herein, after said witness was duly sworn or
9  affirmed by me.
10 I further certify that I am neither attorney nor counsel
   for, related to, nor employed by any of the parties to the
11 action in which this testimony was taken. Further, I am not
   a relative nor employee of any attorney of record in this
12 cause, nor do I have a financial interest in this action.
13 Further certification requirements pursuant to the Rules
   will be certified to after they have occurred, if
14 applicable.
15 Subscribed and sworn to on this the 19th day of April, 2004.
16
17         _____
           LaRita J. Cormier, CSR
18         Texas State Certification No. 3412
           Certification Expiration: 12-31-05
19         Firm Registration No: 368
           Riverside Reporting, Inc.
20         6101 Southwest Freeway, Suite 200
           Houston, Texas 77057
21         (713) 662-0062
           Job No.: 41067R
22
23
24
25

12 (Pages 42 to 45)

RIVERSIDE REPORTING, INC.                                    (713) 662-0062