**Page 1**

```
                 UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
* * * * * * * * * * * * * * * *
LARRY A. KATZ and               *
KENNETH M. RAFTERY,             *                    COPY
                                *
         Plaintiffs,            *
                                *
    vs.                         *    Civil Action No.
                                *    302 CV 02201(AWT)
THE SEPARATION PAY PLAN OF      *
TEXACO, INC., and TEXACO, INC., *
                                *
         Defendants.            *
* * * * * * * * * * * * * * * *

                           Stamford, CT
                         December 16, 2003
                            10:19 a.m.
                               - - -
                 DEPOSITION OF SCOTT D.H. JEFFERY
                               - - -

APPEARANCES:

    FOR THE PLAINTIFFS:

           MARTIN, LUCAS & CHIOFFI, LLP
           BY:  MARY ALICE S. CANADAY, ESQ.
                177 Broad Street
                Stamford, CT 06901

    FOR THE DEFENDANTS:

           JACKSON LEWIS, LLP
           BY:  CONRAD S. KEE, ESQ.
                177 Broad Street
                Post Office Box 251
                Stamford, CT 06904

                      Campano & Associates
                    Court Reporting Services
```

**Page 2**

Deposition of SCOTT D.H. JEFFERY, the Witness, taken on behalf of the Plaintiffs herein, for the purpose of discovery and for use as evidence in this cause, pending in the United States District Court, District of Connecticut, pursuant to Notice, before Lynne Stein, Licensed Shorthand Reporter, No. 00110, a Notary Public within and for the State of Connecticut, at the law offices of Martin, Lucas & Chioffi, LLP, at 177 Broad Street, Stamford, Connecticut, on the 16th day of December, 2003, at 10:19 a.m., at which time counsel appeared as hereinbefore set forth . . .

Campano & Associates
Court Reporting Services

**Page 3**

Thereupon:

SCOTT D.H. JEFFERY, residing at 42 Canoe Brook Road, Trumbull, Connecticut 06611, being first duly sworn, as hereinafter certified, was examined and testified as follows:

    MR. KEE:  Reading and signing, waive notice, and waive challenges to the reporter.

    MS. CANADAY:  Right.

**DIRECT EXAMINATION BY MS. CANADAY:**

Q    Mr. Jeffery, the address you just gave the court reporter, do you own that home?

A    Yes, I do.

Q    Have you lived there for some time?

A    I've lived there for four and a half years.

Q    Do you have any present intent on moving in the future?

A    No.

Q    Have you ever had your deposition taken before?

A    No, I have not.

Q    Generally, I'm going to ask you some questions. I'd like you to answer me to the best of your ability. If you don't understand something, tell me that, or -- I'll try to rephrase it, ask it another way.

If you answer me, I'm going to assume you

Campano & Associates
Court Reporting Services

**Page 4**

understood the question.

A    Okay.

Q    Is that fair?

A    It is.

Q    We have a court reporter here, so I'll try, to the best of my ability, not to interrupt you, and you should do the same, so she can take down everything we say.

Are you on any medication today?

A    No, I'm not.

Q    Can you think of any reason you could not understand the proceedings today or answer me truthfully?

A    No.

Q    What did you do to prepare for the deposition?

A    I met with Shawn yesterday for approximately 20 minutes.

Q    Did he have you review any documents?

A    Yes.

Q    What documents did you review?

A    I reviewed the minutes of a board meeting that took place in July of 2001 and also telephonic minutes of an August meeting of that same year.

Q    Anything else?

A    Some other documents I paged through, but I have not reviewed them.

Campano & Associates
Court Reporting Services

6

Q    Have you retained Mr. Kee?
A    Not, I have not.
Q    Do you know who is paying for his services?
A    Chevron Texaco Corporation.
Q    Did you have any conversations with Mr. Kee about the merits of the case?
        MR. KEE:  Objection, privilege.
        He's testifying here to his knowledge as a former member of the board of directors of Chevron Texaco, and as such our conversations are subject to the attorney-client privilege.
Q    Mr. Jeffery, could you tell me what your employment history has been since college?
A    Yes.  Immediately after college I went to graduate school, and I worked for a part of a year with a company here in Stamford, Omega Engineering.  Went back to business school, completed my MBA in 1986, worked for Litton Microwave.
        Joined Texaco in October of 1987.  I was employed by Texaco until October of 2001.  From October 2001 to March 2002 I worked for the Texaco Alliance Trust.  And from September 3, 2002, to present I worked for Crane Co.
Q    Could you run through the positions that you've held while -- that you did hold while you were

Campano & Associates
Court Reporting Services

---

employed at Texaco for me from '87 to 2001?
A    Sure.  From 1987 to 1989, I was a finance analyst in the finance department.
Q    Do you remember what your position grade was in that job?
A    I believe I was a pay grade 12 at the beginning.
Q    Okay.
A    From 1989, I believe, to 1992, I was a senior finance analyst, also within the Finance Group of Texaco.
Q    I don't mean to interrupt.  What was your pay grade in that position?
A    I was promoted to a pay grade 15 at that time.
Q    Okay.
A    From July 1992 to September 1995, I worked for Texaco in London, England, where I was finance manager.
Q    Pay grade in that position?
A    Initially pay grade 16, promoted to pay grade 17.
Q    Okay.
A    From 1995, November 1995, to March 1997, I was back in Harrison.  I was -- what was the title . . . .
Q    I've been impressed with your memory so far.
A    Staff coordinator for -- within the Affiliate Analysis Group.

Campano & Associates
Court Reporting Services

---

7

Q    Pay grade there?
A    Pay grade 16.
     From March 1997 to June 1998, I was director of affiliated analysis.  I was at pay grade 19.
     From that time until September 1999, I was alliance manager in the Alliance Management Group.  And from October 1999 to October 2001, I was director of Alliance Management Group.
Q    Do you recall your pay grade as alliance manager?
A    It was pay grade 19, same as before.
Q    What about director?
A    Pay grade 21.
Q    Do you recall, as a pay grade 19, approximately what your total comp was in the 1998-1999 range?
A    I would say it would have been around $130,000, plus or minus.
Q    That was your total comp, not just your salary?
A    That was total comp.  Salary plus bonus.
Q    Did you receive any other benefits as a pay grade 19 other than bonus?
A    401(k) contributions were the only other thing that were -- and that was the same for everybody.

Campano & Associates
Court Reporting Services

---

8

Q    Regardless of grade?
A    That's right.  It was a 401(k) program open to all employees.
Q    As a director from October '99 to October 2001, did you have employees that you supervised or managed?
A    Yes, I did.
Q    How many employees did you manage?
A    Four alliance managers and an administrative assistant.
Q    Do you have knowledge of what their pay grades were?
A    Yes.
Q    What were they?
A    One of the managers was a pay grade 19.  Two of the managers, I believe, were pay grades 17.  One was a 16.  And the administrative assistant, I believe, was a pay grade 10.
Q    For the one manager that was a 19, do you recall what his or her total comp was during that time?
A    During which period of time?  There was a two-year period.
Q    From any time -- well, let's say in that 2001 time frame.
A    Base salary would have been around 120,000.

Campano & Associates
Court Reporting Services

10

1  bonus -- cash bonus would have been approximately 25,000.
2      Q    Did that person receive any sort of stock
3  options or any benefit under like a deferred comp plan?
4      A    No.
5      Q    Are you aware of any Texaco pay grade 19s that
6  received benefits under a stock option plan or deferred
7  comp plan?
8      A    Other than the two plaintiffs?
9      Q    Yes.
10     A    I'm not personally aware of that.
11     Q    When did you become a member of the FAMM Board
12 of Directors?
13     A    January 2001.
14     Q    Is that a position that you're appointed to?
15 How does that come about?
16     A    Yes, appointed to that position.
17     Q    Who appointed you?
18     A    I believe I was nominated by Glenn Tilton at
19 the time and accepted by the board.
20     Q    Is that something that the shareholders have
21 to vote on, do you know?
22     A    The public shareholders of Texaco?
23     Q    Yes.
24     A    No.
25     Q    What was Glenn Tilton's title?

Campano & Associates
Court Reporting Services

1      A    At that time he was Senior Vice President,
2  Global Businesses.
3      Q    For Texaco?
4      A    Yes.
5      Q    What was the makeup of the FAMM Board of
6  Directors in January of 2000 in terms of Texaco people,
7  FAMM people, any outside people?
8      A    The board consisted of four people, two from
9  Chevron and two from Texaco.
10     Q    Who were the two from Chevron?
11     A    Joe Geagea, last name is spelled G-e-a-g-e-a.
12 And Matthew Foehr. I believe his name is spelled
13 F-o-e-h-r.
14     Q    The two from Texaco?
15     A    Myself and George Batavick, B-a-t-a-v-i-c-k.
16     Q    What was Mr. Batavick's title?
17     A    He was comptroller of Texaco, Inc.
18     Q    How long did you serve on the board for FAMM?
19     A    From January 2001 until the merger was
20 effective in October 2001.
21     Q    Did the makeup of the board change at all
22 during that time period?
23     A    No.
24     Q    On a board of directors -- you'll have to
25 forgive me, I'm not that knowledgeable about board of

Campano & Associates
Court Reporting Services

11

1  directors -- are there positions within the board, senior
2  positions, junior positions? Is there a leader?
3           MR. KEE: I assume you mean on the FAMM
4      board.
5      A    The only position that was different among the
6  directors, there was an elected chairman.
7      Q    Who was that?
8      A    At the time -- I can't recall.
9      Q    Okay. Can you recall at any time who the
10 elected chairman was?
11     A    During my nine months on the board, I cannot.
12     Q    Can you recall who the elected chairman was
13 either prior to your becoming a member of the board or
14 after?
15     A    I believe before I was on the board, Tom
16 Neslage, who was the other Texaco director, that I
17 replaced. I think he was the chair.
18          Prior to that, I believe Peter McCrae, who was
19 from Chevron, was the first chairman after FAMM was
20 formed.
21     Q    Was there anyone on the board out of the four
22 people you mentioned during your nine months that seemed
23 to exert more influence over the board than the others,
24 in your opinion?
25     A    No.

Campano & Associates
Court Reporting Services

12

1      Q    How often would the board meet, or hold a
2  meeting, let's say, either in person or over the phone?
3      A    I believe they had scheduled about five board
4  meetings per year.
5      Q    How many meetings did you participate in in
6  your nine months?
7      A    I believe there were three physical meetings
8  that I attended and one teleconference.
9           MS. CANADAY: Lynne, can I have this
10     marked as Plaintiff's 1.
11          (Whereupon, the Document headed Action by
12 Unanimous Written Consent of the Members, dated
13 October 1, 2002, was marked as Plaintiff's Exhibit 1 for
14 identification.)
15     Q    Mr. Jaffery, I'm going to show you what's just
16 been marked as Plaintiff's Exhibit 1 and ask you if you
17 recognize that document.
18     A    I've not seen this before.
19     Q    Do you recognize what it is?
20     A    It looks to me as if it's an enabling
21 resolution that also includes various elections of
22 various officers to take effect at the merger date.
23     Q    So when you refer to the election of various
24 officers, you're referring to the list of people that
25 starts on the first page and continues to the second

Campano & Associates
Court Reporting Services

14

page?

A  That's correct.

Q  These are officers of FAMM?

A  That is what this appears to be.

Q  Do you see on the top of the second page where it lists Scott D. Hannen as comptroller?

A  Yes, I do.

Q  Was that the position that Ken Raftery held prior to his leaving?

A  I believe he held the same position in FAMM, entitled comptroller.

Q  This is not something you recall participating in creating during your tenure on the FAMM Board Of Directors?

A  No.

Q  When you first came on to the board of directors, or actually at any time in your nine months when you were on the board of directors, did you ever have any conversations with anyone, either on the board or off, about the relationship between Texaco and FAMM and whether there was any animosity between the two companies?

A  Could you make that a little more specific?

Q  During your tenure on the board -- of the FAMM Board Of Directors, did you ever have any discussions

Campano & Associates
Court Reporting Services

---

with anyone where the relationship between FAMM and Texaco was discussed, and if there was any bad faith or animosity running between the two companies of any type?

A  When you say Texaco and FAMM, do you mean individuals from those companies or the entities themselves?

Q  The entities themselves. Obviously the entities are run through individuals. So what I'm trying to get at is whether there was any animosity running between the two companies. Obviously it would be coming through individuals.

A  As far as I'm aware, Texaco is very pleased with its investment of FAMM, its performance of FAMM. And I -- the answer is, no, to your question.

Q  Okay. Did you ever become aware -- I'm not sure this would have happened in your nine months on the board -- that Steve Pennacchio -- am I pronouncing that correctly?

A  Pennacchio.

Q  His desire was to cut FAMM employees out of any change-of-control benefits?

A  I heard something about that at one time.

Q  What did you hear?

A  I heard that he tried to eliminate FAMM from certain aspects of benefits. I can't recall which. And

Campano & Associates
Court Reporting Services

---

15

that it was -- he actually presented to the CEO of Texaco to approve. It was initially approved but then withdrawn when it was found out that the CEO didn't have the full story.

Q  Steve Pennacchio had given Peter Bijur a list of companies that would not be entitled to change-of-control benefits, and FAMM was within that list? Was that your understanding?

A  I don't recall that, what it had to do with.

Q  Did you ever have any discussions with anyone regarding Steve Pennacchio's desire to deny FAMM change-of-control benefits?

A  No.

Q  Does FAMM operate as an independent entity, independent from Texaco?

   MR. KEE:  Did it?

Q  Did it.

A  FAMM was a joint venture in which Texaco held a 64 percent interest. There was a great deal of autonomy, but it was a very important part of Texaco's business in that aspect of the downstream.

Q  Do you know who held the other 36 percent?

A  That would be Chevron Corporation.

Q  And as far as you're aware, did FAMM have a separate compensation scheme, separate and apart from

Campano & Associates
Court Reporting Services

---

16

Texaco?

A  Could you be more specific with regard to compensation?

Q  In terms of total comp; they had their own salary scheme, and at least in terms of bonuses, as far as long-term incentive terms and stock options, they had their own plans.

   MR. KEE:  Could you break that down into separate questions?

Q  As far as you're aware, did FAMM have an independent salary structure for its employees?

A  From my knowledge, FAMM had a salary structure that was analogous to Texaco's.

Q  What about in terms of benefit plans such as a long-term incentive plan or stock option plan? Did FAMM have independent plans for those types of compensation?

A  From my understanding, FAMM had an executive compensation plan that went to lower pay grades, could go to lower pay grades, than with Texaco.

Q  While you were employed with Texaco and on the FAMM Board Of Directors, did you ever have occasion to compare the responsibilities and duties of the employees at Texaco and the employees at FAMM that may have held the same position grade?

A  I did not.

Campano & Associates
Court Reporting Services

18

Q   Did you have an opinion as to whether a FAMM pay grade 19 had lower, the same, or higher duties and responsibilities as a Texaco pay grade 19?

A   I did not.

Q   Do you have an opinion as to that now?

A   No.

Q   Were you involved in the decision to hire the Hay Group to perform a compensation study? I believe it was in 1999 or 2000.

A   No, I was not.

Q   Were you aware that a study was being conducted by the Hay Group?

A   No.

Q   Are you aware now that a study had been conducted by the Hay Group comparing compensation for FAMM employees to its parent companies?

A   If you're -- only, through your questioning, I'm assuming that there might be such a study.

Q   When you were part of the board of directors, did you ever discuss a possible promotion for Ken Raftery and Larry Katz?

A   The issue came up in two board meetings.

Q   And in the first board meeting, how did the issue come up?

A   The CEO, Michael Bandy, said that two

Campano & Associates
Court Reporting Services

---

individuals were concerned about their placement within a pay grade within FAMM and were looking to be promoted.

Q   Is this something that someone has to present to the board? Is that how that works? Or -- like was Mr. Bandy presenting this as an objective person or was he presenting it to the board as something he wanted or he supported?

A   He presented it just as a matter of fact. I never got the fact that he was supporting those actions.

Q   And then once he presented it, what steps did the board take?

A   In the first meeting, no step was taken because it was provided as an informational piece.

Q   When we spoke earlier, you said you reviewed board meetings from July with Mr. -- or he showed you board meetings from July?

A   From July, that's correct.

Q   2001?

A   Yes.

        MS. CANADAY: Shawn, do you know if those have been provided to us?

        MR. KEE: From July 2001?

        MS. CANADAY: Yes.

        MR. KEE: Yes, I gave those to you.

Q   Then you said it came up at a second board

Campano & Associates
Court Reporting Services

---

19

meeting. When was that?

A   In August of 2001, a teleconference board meeting.

Q   What happened in that meeting with regard to Raftery and Katz?

A   Do you have copies of those minutes that I may refer to?

Q   I do. I have --

        MS. CANADAY: Why don't we mark these Plaintiff's 2 and 3.

        (Whereupon, the FAMM Board of Directors Meeting minutes dated August 22, 2001, two pages, Bates nos. Texaco 0137 and 0138, was marked as Plaintiff's Exhibit 2 for identification.)

        (Whereupon, the FAMM Board of Directors Meeting minutes dated August 22, 2001, one page, Bates no. Texaco 0139, was marked as Plaintiff's Exhibit 3 for identification.)

Q   Mr. Jeffery, I'm showing you what has been marked as Plaintiff's Exhibits 2 and 3.

        Exhibit 2 is a two-page document, Bates-stamped Texaco 0137 to 0138, appears to be -- it's entitled Minutes Of A Meeting Of The Board Of Directors Of Fuel And Marine Marketing, LLC, Held Via Teleconference, 22nd August 2001. However, if you look

Campano & Associates
Court Reporting Services

---

20

at the second page, it's not signed nor initialed.

        Exhibit 3 is a one-page document, Bates-stamped Texaco 0139, with the same title. However, it appears to be signed by Michelle Swanson and initialed by three out of four individuals.

        Is this the date of the second board meeting that you were referring to earlier?

A   Yes, it is.

Q   Can you explain to me why there are two sets of minutes for that meeting?

A   There's only actually one minute. Your Exhibit Number 3 are the minutes from that meeting.

Q   Why don't we talk about that first. Then I'll ask you some questions about Exhibit 2.

        You wanted to refer to this to refresh your recollection of what happened with regard to Katz and Raftery at the August 22nd meeting of the board of directors.

A   Yes.

Q   Does this refresh your recollection?

A   Yes, it does.

Q   Okay. Can you tell me what occurred at that meeting with regard to Katz and Raftery?

A   Mike Bandy again raised an issue that both Messrs. Katz and Raftery wished to be promoted. Again,

Campano & Associates
Court Reporting Services

22

he presented some facts. A proposal was never forthcoming.

Q Do you recall what facts he presented? If not specifically, the general type of facts.

A Just that, in the case of both, they felt that they were doing functions that were equivalent to a higher pay grade. Those kinds of things, subjective items.

Q Did you have a personal opinion at that time as to whether Mr. Katz or Mr. Raftery deserved a promotion?

A Based on the conversation between the directors, I did form a view.

Q What was your view?

A That they were properly graded at their current pay grade.

Q Did you ever express a different opinion to Mr. Katz?

A No.

Q You never told Mr. Katz that you supported him in his opinion that he deserved to be a pay grade 20?

A No.

Q Did you used to go jogging with Mr. Katz during lunch sometimes when you were employed together?

A I occasionally did.

---

Q Do you ever recall having discussions during those jogs about his desire to be promoted?

A Yes, I do.

Q And you don't recall ever expressing to him that you agreed with his position that he should be promoted to a 20?

A No.

Q Do you recall any discussions concerning a Mr. Meade and a Mr. Rieder, I believe it is, and their desire to be promoted?

A I remember discussions about Messrs. Meade and Rieder. It wasn't presented as their desire to be promoted, but it came as a proposal from Mike Bandy.

Q Those two promotions were in fact confirmed; is that correct?

A That's correct.

Q Was there ever any discussion with regard to the promotions of any of these individuals, Meade, Rieder, Katz, or Raftery, about the impact on the payment of enhanced benefits a promotion would have?

A With respect to Messrs. Meade and Rieder, no. With respect to Messrs. Raftery and Katz, there was an understanding that that promotion would have resulted in additional payments.

Q Was there ever any discussion about the fact

---

23

that such payments would come out of the general assets of Texaco or one of its affiliated companies?

A No.

Q Was there any discussion during a board meeting or that you had outside of a board meeting concerning the fact that the promotions were denied to avoid paying any enhanced benefits?

A No.

Q If you look at Plaintiff's Exhibit 2, it appears to be minutes from that same board meeting, where these minutes indicate that Mr. Raftery and Mr. Katz were denied their promotions. Do you know why this version of the minutes was created? Is this something that was drafted ahead of time?

A I believe it was a draft of the minutes. But the only minutes, the only final minutes, were Exhibit 3.

Q Do you know if these were drafted prior to the meeting, anticipating what would occur at the meeting?

A I have no knowledge of that.

Q Had you seen this version of the minutes before this morning?

A Yes.

Q When had you seen them before?

A Sometime subsequent to the 22nd August 2001. Probably within a day or two.

---

24

Q In what capacity would you have seen these minutes?

A As a member of the board.

Q Do you know who drafted them?

A Not sure. I would guess Michelle Swanson.

Q Was this draft provided to members of the board initially for signature or for initialing?

A It was provided as a draft for consideration as to whether those should be the minutes.

Q Okay. And did you refuse to accept these as the minutes for that meeting?

A Yes.

Q Do you know if anybody else did as well?

A All of the directors that were on the call saw that draft and decided not to sign that.

Q Is there any particular reason you decided not to sign it?

A There were two major reasons.

Q What were those?

A First reason was that the minutes of a board meeting should be more summary than detailed. And the second, there was never a proposal brought to the board with respect to Messrs. Raftery and Katz to promote them.

Q So I understand the dynamics, Mr. Bandy presents it and someone has to make a formal proposal?

26

A   Mr. Bandy could have proposed that the board consider promotion of these two guys.

Q   Okay. And that would be supporting -- that would be him supporting the promotion?

A   Correct.

Q   Okay.

A   And also it's the way that the items came to the board for approval. Either Mr. Bandy or one of his vice presidents would propose something that required board approval and the board would opine.

Q   Did anyone, in your opinion, who was on the board at that time have a strong opinion concerning Messrs. Katz and Raftery?

A   I think all directors were of a mind that the positions were currently and adequately graded and that the two men were properly placed.

Q   Would you agree with me that Messrs. Katz and Raftery, in their positions as treasurer and comptroller, were officers of FAMM?

A   I don't know. That's a matter of fact.

Q   We looked at the list earlier on Plaintiff's Exhibit 1, which listed positions, and I believe it was your terminology that these were officers of FAMM.

A   I said that's what they appear to be, that these people were being appointed as officers. What we

Campano & Associates
Court Reporting Services

---

don't have is the LLC agreement itself which states what are officers from that standpoint.

Q   The positions of treasurer and comptroller are on the second page of this document; is that correct?

A   Yes, that's correct.

Q   In your opinion, would the positions of treasurer and comptroller be part of the management group of the company, any company?

A   Most companies with which I'm familiar, yes.

Q   How about for FAMM specifically?

MR. KEE:   Let me object to the term "management group."

MS. CANADAY:   Just in his knowledge as a corporate -- high-level corporate employee.

A   I would say no.

Q   And why is that?

A   At the three board meetings and the teleconference board meeting I attended, neither Larry nor Ken ever presented anything there.

Q   And it would be your position that to be part of the management group you would have to present things to the board of directors on occasion?

A   The presentations that were made to the board for various business considerations were made by other officers, vice presidents of FAMM and the CFO.

Campano & Associates
Court Reporting Services

---

27

Q   I'm sorry. You said presentations were made by officers of FAMM and the CFO?

A   The vice presidents and the CFO.

Q   Okay. Do you recall what other officers made presentations to the board?

MR. KEE:   Can we change it -- his answer was vice presidents.

Q   It was just vice presidents?

A   Vice presidents and the CFO.

Q   I'm sorry.

A   Without referring to any other board minutes, I can recall -- I cannot recall any at this point. I know they were in attendance.

Q   Are you familiar with the claims that Messrs. Katz and Raftery are bringing against Texaco and the Separation Pay Plan of Texaco?

A   Not in detail. I have not seen anything.

Q   Generally, are you aware that they believe they were entitled to enhanced severance as part of the change of control?

A   That, I am, yes.

Q   Did you ever discuss with them, either of them, their entitlement to the enhanced severance?

A   I had conversations with Mr. Katz in the last year, not with regard to entitlement, but with regard to

Campano & Associates
Court Reporting Services

---

28

process; would I have to take time out from my day to be sitting across the table here.

Q   You never expressed to him an opinion as to whether you believed he was entitled or not to the enhanced severance?

A   No.

Q   Were their claims to enhanced severance ever discussed at any board of directors meeting where you were present?

A   There were no claims at that time because when I was a board member the merger had not taken place yet.

Q   Was the topic of whether Mr. Katz or Mr. Raftery should be entitled to enhanced severance ever brought up at a board of directors meeting?

A   I don't think directly.

Q   What about indirectly?

A   Simply through the standpoint that they had issues -- that they wished to be considered to be promoted to a pay grade 20 and there were ramifications that flowed from that.

Q   Which would be the payment of the enhanced severance?

A   Yes.

Q   I'm going to show you --

MS. CANADAY:   Let's first get it marked

Campano & Associates
Court Reporting Services

Page 30

```
 1      as Plaintiff's 4.
 2              (Whereupon, the Document headed Submittal to
 3      Claim Committee for Review was marked as Plaintiff's
 4      Exhibit 4 for identification.)
 5              (Whereupon, the Letter dated June 18, 2002,
 6      from Martin, Lucas & Chioffi, was marked as Plaintiff's
 7      Exhibit 5 for identification.)
 8         Q    Mr. Jeffery, I'm going to show you what's been
 9      marked as Plaintiff's Exhibit 4 and ask you if you've
10      ever seen that document before.
11         A    I have not seen this before.
12         Q    You never reviewed this as part of -- in any
13      board of directors meeting?
14         A    No. Do we have the date of this letter?
15         Q    I don't. I believe it was --
16              MR. KEE: It had to have been post
17      October.
18         A    Then it would never have come before the board
19      when I was a director.
20         Q    I'm going to show you what's been marked as
21      Plaintiff's Exhibit 5 and ask you if you've ever seen
22      that document before.
23         A    No, I've not seen this, either.
24         Q    Did you ever have discussions with anyone
25      regarding either of these two documents, although you've
```

Campano & Associates
Court Reporting Services

```
 1      never seen them before, that you're aware of?
 2         A    Not specifically. What I knew is that they
 3      were proceeding with a -- with legal proceedings.
 4         Q    Did you ever have any discussions outside of
 5      the board of directors meetings with Mr. Batavick
 6      concerning either the plaintiffs' promotions or their
 7      claims for enhanced benefits?
 8         A    I don't recall having any conversations with
 9      George.
10         Q    Were you on the board of directors when -- and
11      I'm not sure when this happened. Evidently FAMM -- the
12      board of directors for FAMM had approved a bonus for FAMM
13      employees, and George Batavick subsequently knocked that
14      bonus plan down across the board by 25 percent
15      unilaterally?
16         A    I don't recall that. I don't believe that was
17      during the time that I was on the board.
18         Q    And you never recall hearing that?
19         A    No.
20         Q    Who was Al Swensen, if you know?
21         A    I know I should know Al Swensen. I'll be
22      darned if I can picture him right now.
23         Q    I believe that Al Swensen is an independent
24      individual who reviewed the claims of Raftery and Katz in
25      some manner.
```

Campano & Associates
Court Reporting Services

Page 31

```
 1         A    Hold on a second.
 2              I believe Al Swensen -- if this was a former
 3      Texaco employee, I believe he worked for the medical
 4      department as a corporate psychologist. That's my guess.
 5      He was an excellent mile runner.
 6              MR. KEE: There may be multiple Al
 7      Swensens.
 8         Q    Do you recall having any conversations with
 9      anyone named Al Swensen about Mr. Katz or Mr. Raftery?
10         A    I did not have any conversations with Al
11      Swensen about these two.
12         Q    Did you ever have any discussions with anyone
13      on the change-of-control committees regarding plaintiffs'
14      claims?
15         A    No.
16         Q    Do you believe that Mr. Katz was performing
17      duties and responsibilities equivalent to that of a
18      Texaco pay grade 20 in his position at FAMM?
19         A    I don't know. As a member of the board, we
20      did not review operational concerns. It was board level
21      items.
22         Q    What about -- same answer for Mr. Raftery?
23         A    I'd answer the same way.
24         Q    Are you aware that these two plaintiffs
25      received two out of the three enhanced benefits offered
```

Campano & Associates
Court Reporting Services

Page 32

```
 1      under the change-of-control plan?
 2         A    No.
 3         Q    They received immediate vesting of their stock
 4      options and immediate vesting of their deferred comp, but
 5      not the enhanced severance. Were you aware of that?
 6         A    No.
 7              MS. CANADAY: May I have that marked as
 8      6.
 9              (Whereupon, the Memo dated June 2, 1999, from
10      Steve Pennacchio, was marked as Plaintiff's Exhibit 6 for
11      identification.)
12         Q    Showing you what's just been marked as
13      Plaintiff's Exhibit 6, I'll ask you if you have seen that
14      document before.
15         A    I have.
16         Q    This is a memo dated June 2, 1999, from Steve
17      Pennacchio regarding Texaco's Separation Pay Plan; is
18      that correct?
19         A    That's right.
20         Q    Would you agree with me that there are three
21      basic benefits discussed here? One is separation pay,
22      one is the stock incentive plan, and the other is the
23      deferred comp.
24         A    I would agree.
25         Q    Are you aware -- you just indicated to me that
```

Campano & Associates
Court Reporting Services

34

1 you were unaware that Messrs. Katz and Raftery in fact
2 received their stock incentive and their deferred comp,
3 but not their separation pay, under this letter.
4     A    That's right. I did say that.
5     Q    Can you think of any reason why they would
6 have received two out of three, and not the third?
7     A    The stock incentive plan vesting and deferred
8 compensation vesting were items that occurred for all
9 people that had benefited from those specific plans.
10 There was no carve-out for any particular person or pay
11 grade. If you received stock options or restricted
12 stock, they vested on change of control. And if you had
13 deferred compensation, also the same.
14     Q    Are you aware of any position pay 19 employees
15 who received either stock incentive or deferred comp as a
16 result of the change of control?
17     A    I'm sorry. Can you restate the question?
18     Q    Sure. Are you aware of any employees,
19 position grade 19 or below, excluding Katz and Raftery,
20 who received benefits under the stock incentive plan or
21 the deferred comp as a result of the change of control?
22     A    I think it needs to be asked in two ways.
23 The first question is, am I aware of any pay
24 grade 19s that were beneficiary of the stock and deferred
25 compensation. To that, I would say no.

Campano & Associates
Court Reporting Services

1 The second question is, if there were any,
2 they would have benefited under these vesting provisions
3 just the same as anyone else.
4     Q    But you're not aware of any?
5     A    I'm not aware of any.
6     MS. CANADAY: Can I have that marked as
7 7, please, Lynne.
8 (Whereupon, the E-mail dated August 10, 2001,
9 from Larry Katz to Scott Jeffery, was marked as
10 Plaintiff's Exhibit 7 for identification.)
11 (Whereupon, the Handwritten notes dated 8/10
12 were marked as Plaintiff's Exhibit 8 for identification.)
13     Q    Mr. Jeffery, I'm showing you what's just been
14 marked Plaintiff's Exhibit 7, which appears to be an
15 e-mail from Mr. Katz to you dated August 10, 2001. Do
16 you recall receiving this e-mail?
17     A    Yes, I do.
18     Q    Had you had conversations with him before
19 receiving this e-mail in connection with his desire to be
20 promoted to a position grade 20?
21     A    I don't recall.
22     Q    If you look at the last sentence, it says,
23 "Scott, I appreciate your listening today and appreciate
24 your support."
25 Did you give Mr. Katz your support in this

Campano & Associates
Court Reporting Services

35

1 regard?
2     A    I believe I supported him in whatever he was
3 endeavoring to do. In this case, not specifically a
4 request to be promoted, but people are entitled to go for
5 what they think is right.
6     Q    There's an attachment here. Do you know what
7 that is?
8     A    I'm not certain. I think it was a point sheet
9 that Ken Raftery created.
10     Q    I'm going to show you what's been marked as
11 Plaintiff's Exhibit 8.
12 Just backing up a bit, I see you were
13 referring to Exhibit 4.
14     A    I was. If I had to venture a guess, I would
15 say that that attachment to Exhibit 4 was what was
16 attached to the note dated August 10th.
17     Q    It would be the second page of Exhibit 4,
18 Bates-stamped Texaco 0064?
19     A    My recollection is that's what it would have
20 been.
21     Q    Look at Plaintiff's Exhibit 8. Is this
22 something you've ever seen before?
23     A    No.
24     Q    These are handwritten notes from a telephone
25 discussion that you had with Larry Katz, I believe -- I'm

Campano & Associates
Court Reporting Services

36

1 sorry, Ken Raftery. Do you recognize this handwriting at
2 all?
3     A    No.
4     Q    If in Mr. Raftery's notes he has you saying --
5 if you look at about three-quarters of the way down the
6 page -- he has in quotes, "You were getting what Texaco
7 PG 20s were getting, paren, with particular aspects of
8 the deferral plan."
9 Is that something you remember saying, or
10 something to that effect?
11     A    Yes.
12     Q    Then right above that it says, "It is a
13 detriment that the pay grade system in FAMM was the same
14 as Texaco, paren, as this would almost certainly not be
15 an issue then, close paren."
16 Do you remember having a discussion with him
17 regarding that although the pay grades were not identical
18 between Texaco and FAMM, if FAMM had simply used a letter
19 pay grade it would have been a lot easier?
20     A    I don't recall that. And I also note this
21 one's not surrounded by quotation marks.
22     Q    Right. Are you aware of what Scott Hannen's
23 pay grade was when he was made comptroller?
24     A    I believe he remained a pay grade 20.
25     Q    Was he given additional duties as comptroller?

Campano & Associates
Court Reporting Services

38

```
 1    A    I don't know. He was never comptroller when I
 2  was on the board.
 3           MS. CANADAY: I think I might be very
 4  close to done if you give me five minutes to
 5  organize myself to make sure I haven't forgotten
 6  anything.
 7           (Whereupon, there was a pause in the
 8  proceedings.)
 9    Q    Mr. Jeffery, would you look at Plaintiff's
10  Exhibit 3. It's the minutes from the August 22nd board
11  meeting.
12    A    Yes.
13    Q    There's a set of initials, MJF, at the bottom,
14  and there's no manual initial by it.
15    A    Yes.
16    Q    Do you know, is that Matthew J. Foehr?
17    A    That's correct.
18    Q    Do you know why he didn't sign?
19    A    I have no idea.
20    Q    Was he on the telephone conference?
21    A    Yes, he was.
22    Q    Does everybody need to sign the minutes for
23  them to be effective, or how does that work?
24    A    Generally, I would have expected to see all
25  the present members having initialed the minutes. In
```

Campano & Associates
Court Reporting Services

```
 1  this situation, since he hasn't, I'm sure that he
 2  provides, through e-mail, confirmation of those minutes
 3  were acceptable. But I still would have expected to see
 4  his initials.
 5    Q    I know we discussed this, so just refresh my
 6  recollection.
 7           Did you testify that you never had any
 8  conversations with George Batavick outside of a board
 9  meeting concerning Mr. Raftery or Mr. Katz and their
10  promotions or enhanced benefits?
11    A    I think I testified that I don't recall ever
12  having a conversation with George outside of a board
13  meeting about those things.
14    Q    Would you agree or disagree with the
15  description that George Batavick was adamantly against
16  Mr. Katz being promoted to a position grade 20?
17    A    I'm not aware of that.
18    Q    Would you agree that he was adamantly against
19  Mr. Katz receiving the enhanced benefits he seeks?
20    A    I'm not aware of that, either.
21    Q    What about with Mr. Katz?
22    A    I'm not aware of that.
23           MR. KEE: I assume, by way of the
24  qualification, was the "adamant" part?
25           MS. CANADAY: Yes.
```

Campano & Associates
Court Reporting Services

39

```
 1    Q    Did you ever discuss with Larry Katz your
 2  opinion that he did not deserve to be promoted to a
 3  position grade 20?
 4    A    I don't recall having a conversation
 5  specifically about that, no.
 6    Q    When you say "specifically about that," you do
 7  recall having conversations with him regarding his desire
 8  to be promoted to a position grade 20; is that correct?
 9    A    Yes.
10    Q    And is it your testimony that you never gave
11  him an opinion one way or the other?
12    A    If I refer back to Exhibit 8, you were asking
13  me about the section in quotations, you were getting what
14  Texaco pay rate 20s were getting.
15           The context of that was that you're a pay rate
16  19 and you were getting benefits that generally one would
17  not get until pay grade 20. My intent there was to say
18  you've done very well as a pay grade 19.
19    Q    I'm not sure -- I understand what you're
20  saying there, but I'm not sure that answers my question
21  as to whether you ever voiced your opinion one way or the
22  other to Larry Katz.
23    A    I don't believe I ever said to Larry Katz that
24  I supported his being a pay grade 20. I'm sure I
25  supported his effort to become a pay grade 20.
```

Campano & Associates
Court Reporting Services

40

```
 1    Q    In 2001, as far as Texaco employees went, if a
 2  position grade 19 employee was receiving total comp of
 3  $250,000 a year, would that seem low, just right, or high
 4  to you?
 5    A    With respect to 2001, I'm unable to comment,
 6  because 2001 was a year where there were two cash bonuses
 7  paid and it was not a normal year.
 8    Q    What about for the year 2000?
 9    A    I think, generally speaking, even though the
10  ranges were quite wide for compensation, a total comp for
11  pay grade 19 at a quarter million dollars, I would
12  consider that to be high.
13           MS. CANADAY: No further questions.
14           MR. KEE: Just a couple of clarification
15  issues here.
16  CROSS-EXAMINATION BY MR. KEE:
17    Q    Earlier you mentioned something, that Scott
18  Hannen had remained a pay grade 20.
19    A    Yes, I did.
20    Q    Was Scott Hannen a pay grade 20 before he came
21  over to the FAMM organization?
22    A    My understanding was, yes, he was.
23    Q    August 2001 when you were participating in a
24  board meeting, did you and George Batavick know that you
25  would be leaving Texaco?
```

Campano & Associates
Court Reporting Services

42

```
1     A    Yes, we did.
2     Q    Did you have any type of financial incentive
3  to avoid payment of enhanced severance benefits?
4     A    None whatsoever.
5     Q    There was also some question here about was
6  there any discussion of enhanced severance benefits in
7  the August 2001 meeting in connection with Mr. Katz and
8  Mr. Raftery's request to become 20s.
9     A    Right.
10    Q    Can you explain the context of how that
11 discussion about enhanced severance benefits came
12 forward?
13    A    It came forward in the context that that is
14 an issue that the plaintiffs raised, that in the one
15 sheet -- the one attachment that was to the August 10th
16 note, the one labeled "FAMM Comptroller Position
17 PG 2 . . . ." -- which I believe is the second page to
18 Exhibit 4 -- it was listed here as an item.
19    Q    Okay.  Did the board consider that as a factor
20 in this discussion about why they shouldn't be promoted?
21    A    It was considered, along with all the other
22 aspects that were considered, as far as the rating of the
23 position and formation, proper placement of people who
24 were in those positions currently.
25         MR. KEE:  That's all I have.
```

Campano & Associates
Court Reporting Services

```
1          MS. CANADAY:  I just have a follow-up
2  question on this topic.
3  REDIRECT EXAMINATION BY MS. CANADAY:
4     Q    From your testimony, I understood that because
5  it was never a formal proposal to promote Mr. Katz and
6  Mr. Raftery, the board never really took it up and had a
7  discussion about a possible promotion.
8     A    The board never considered -- it was never
9  proposed to the board, so the board could take no action.
10    Q    How long would you say, in this August 22nd
11 meeting, the board discussed the desire of Mr. Katz and
12 Mr. Raftery to be promoted?
13    A    If I had to venture a guess, I would say about
14 three-quarters of an hour in total.  And that was for all
15 three items that were brought before the board on that
16 day.
17    Q    Oh, the entire meeting was three-quarters of
18 an hour?
19    A    Correct.
20    Q    Do you recall how long you spent discussing
21 Mr. Raftery and Mr. Katz?
22    A    No, I don't.
23    Q    Do you recall if you reviewed any documents in
24 connection with Raftery and Katz?
25    A    I don't recall having reviewed any documents
```

Campano & Associates
Court Reporting Services

43

```
1  prior to the call.
2     Q    What about in connection with Messrs. Meade
3  and Rieder?  Do you recall how long the board spent
4  discussing their possible promotions?
5     A    Those items, I believe, were brought before
6  the board meeting in July of 2001.  In total, from
7  proposal to finish of discussion, maybe ten minutes in
8  total for the two.
9          MS. CANADAY:  No further questions.
10         MR. KEE:  Thank you.
11         (Whereupon, the deposition was adjourned at
12         11:56 a.m.)
13 (Plaintiff's Exhibits 1 through 8 were retained by
14 Attorney Canaday.)
```

Campano & Associates
Court Reporting Services

44

```
1  STATE OF CONNECTICUT
2  JUDICIAL DISTRICT OF _____
3
4
5
6
7
8          _____
           SCOTT D.H. JEFFERY
9
10
11
12         SCOTT D.H. JEFFERY personally appeared before
13 me at _____, Connecticut, this ____ day
14 of _____, 2004, made oath and
15 acknowledged this deposition to be a true and accurate
16 transcription of his testimony.
17
18
19 My Commission Expires:
20
21
22         _____
           NOTARY PUBLIC
23
```

Campano & Associates
Court Reporting Services

## CERTIFICATE

STATE OF CONNECTICUT

JUDICIAL DISTRICT OF ANSONIA/MILFORD

I, LYNNE STEIN, Notary Public within and for the State of Connecticut, duly commissioned and qualified, do hereby certify that pursuant to Notice, SCOTT D.H. JEFFERY, the deponent herein, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this case; that he was thereupon carefully examined upon his oath and his testimony reduced to writing by me; and that the deposition is a true record, to the best of my ability, of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of December, 2003, at Milford, Connecticut.

My Commission Expires:    LYNNE STEIN, Lic. No. 00110
January 31, 2009          Notary Public
                          State of Connecticut

Campano & Associates
Court Reporting Services

---

## INDEX OF TESTIMONY

|                          | Page | Line |
|--------------------------|------|------|
| Direct by Ms. Canaday    | 3    | 9    |
| Cross by Mr. Kee         | 40   | 16   |
| Redirect by Ms. Canaday  | 42   | 3    |

## INDEX OF PLAINTIFF'S EXHIBITS

|   |                                                                                                          | Page | Line |
|---|----------------------------------------------------------------------------------------------------------|------|------|
| 1. | Document headed Action by Unanimous Written Consent of the Members, dated October 1, 2002               | 12   | 13   |
| 2. | FAMM Board of Directors Meeting minutes dated August 22, 2001, two pages, Bates nos. Texaco 0137 and 0138 | 19   | 13   |
| 3. | FAMM Board of Directors Meeting minutes dated August 22, 2001, one page, Bates no. Texaco 0139          | 19   | 17   |
| 4. | Document headed Submittal to Claim Committee for Review                                                  | 29   | 3    |
| 5. | Letter dated June 18, 2002, from Martin, Lucas & Chioffi                                                 | 29   | 6    |
| 6. | Memo dated June 2, 1999, from Steve Pennacchio                                                           | 32   | 9    |
| 7. | E-mail dated August 10, 2001, from Larry Katz to Scott Jeffery                                           | 34   | 8    |
| 8. | Handwritten notes dated 8/10                                                                             | 34   | 11   |

Campano & Associates
Court Reporting Services