Jun.29. 2004 7:46AM  MARTINLUCASCHIOFFI  No.2604  P. 1
Case 3:02-cv-02201-AWT  Document 51-26  Filed 06/30/2004  Page 1 of 12
DEPOSITION OF JOHN GOLDSBY

Page 1

```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF CONNECTICUT

LARRY A. KATZ and                   *
KENNETH M. RAFTERY,                 *
        Plaintiffs,                 *
                                    *
VS.                                 *   CIVIL ACTION
                                    *   NO. 302 CV 02201 (AWT)
THE SEPARATION PAY PLAN OF          *
TEXACO, INC. And TEXACO, INC.,      *
        Defendants.                 *


*********************************************************
                      ORAL DEPOSITION OF
                      JOHN W. GOLDSBY
                       APRIL 2, 2004
*********************************************************
```

ORAL DEPOSITION OF JOHN W. GOLDSBY, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 2nd day of April, 2004, from 9:20 a.m. to 10:13 a.m., before LaRita J. Cormier, Certified Shorthand Reporter in and for the State of Texas, reported by stenographic means, at the Marriott Courtyard Downtown, 916 Dallas, Sterling Room, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

```
 1           A P P E A R A N C E S
 2
 3
 4   FOR THE PLAINTIFFS:
 5      Mr. Scott R. Lucas
 6      MARTIN, LUCAS & CHIOFFI, L.L.P.
 7      177 Broad Street
 8      Stamford, Connecticut 06901
 9      PHONE: 203-973-5200
10      FAX:   203-973-5250
11
12
13
14   FOR THE DEFENDANTS:
15      Mr. Conrad S. Kee
16      JACKSON LEWIS, L.L.P.
17      177 Broad Street
18      Stamford, Connecticut 06904
19      PHONE: 203-961-0404
20      FAX:   203-961-4704
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2
 3                            PAGE
 4   APPEARANCES.........................  02
 5   EXAMINATION
 6      By Mr. Lucas.....................  04
 7   CHANGES.............................  41
 8   SIGNATURE...........................  42
 9   REPORTER'S CERTIFICATE..............  43
10
11
12
           E X H I B I T   I N D E X
13   NO.  DESCRIPTION                   PAGE
     59.........................  26
14      Handwritten notes titled Discussion with
        John Goldsby, Claim Committee Chair,
15      4-23-02. "Raftery 00041"
16   60.........................  27
        Handwritten notes 4-23-02, meeting with John
17      Goldsby and Ken Raftery. "Katz 00014"
18
19
20
21
22
23
24
25
```

Page 4

```
 1              JOHN W. GOLDSBY,
 2   having been first duly sworn, testified as follows:
 3                  EXAMINATION
 4   BY MR. LUCAS:
 5      Q. Good morning, Mr. Goldsby. My name is Scott
 6   Lucas. I represent Ken Raftery and Larry Katz in a federal
 7   suit they brought in Connecticut against Texaco and the
 8   Texaco Separation Pay Plan seeking Change of Control
 9   severance benefits. Have you had your deposition taken
10   before?
11      A. Yes.
12      Q. Okay. So you're familiar with the rules and how a
13   deposition proceeds?
14      A. Pretty much, yes.
15      Q. Okay. Are you currently employed?
16      A. No.
17      Q. When was the last time you were fully employed?
18      A. September of 2002. I retired effective September
19   1st of 2002.
20      Q. And was that from Texaco?
21      A. From ChevronTexaco.
22      Q. At some point in your career you worked for
23   Texaco; correct?
24      A. Yes, that is correct.
25      Q. When did you begin working for Texaco?
```

Page 5

```
 1      A. August of 1974.
 2      Q. And was that right out of school?
 3      A. Yes.
 4      Q. Okay.
 5      A. I went to school, went in the Service, got another
 6   degree, and then went to work for Texaco.
 7      Q. Okay. What was the first degree you received?
 8      A. B.S. in geology.
 9      Q. Okay. From what institution?
10      A. Louisiana Tech.
11      Q. And what Service did you go into?
12      A. Air Force.
13      Q. And what was your second degree?
14      A. Was in human resource management.
15      Q. From what institution?
16      A. From LSU.
17      Q. Was that a bachelor's or a master's?
18      A. That was also a bachelor's.
19      Q. And the bachelor's in human resource management,
20   did you take any employment law courses?
21      A. Took business law.
22      Q. Business law. Subsequent to graduating from LSU
23   have you had any course work in employment law?
24      A. Not that I can recall.
25      Q. Okay. When you began with Texaco in 1974, what
```

DEPOSITION OF JOHN GOLDSBY

Page 6

1 was your position?
2 A. Employee relations assistant.
3 Q. How long did you hold that position?
4 A. Would have been around two years. I'm not exactly
5 certain.
6 Q. Okay. And what was your next position?
7 A. I believe it was employee relations
8 representative.
9 Q. Okay. How long did you hold that position?
10 A. I really don't remember. Would have been a couple
11 of years.
12 Q. And after that? Just briefly take me through all
13 the titles you've had.
14 A. Yes. I would have been an employee relations
15 assistant, employee relations representative and a
16 supervisor, then a manager. And then I was manager of
17 policy and programs in the corporate office. And then I
18 became director of human resources.
19 Q. When did you become director of human resources?
20 A. It would have been around 1998, I believe.
21 Q. Okay. And to whom did you report as director of
22 human resources, what position?
23 A. I reported to the vice president of human
24 resources.
25 Q. Okay. And in the 2001-2002 time frame who was the

Page 7

1 VP of human resources?
2 A. Would have been Janet Stoner.
3 Q. What were your duties as director of human
4 resources?
5 A. I was the director of what was called global human
6 resource support. This was the group of human resource
7 people that provided support to the various directors in the
8 departments that were over compensation, over training, over
9 affirmative action. So they were the group that pretty much
10 did the work for the various directors.
11 Q. For the employees who reported to the directors,
12 in other words, down the line?
13 A. They reported to me, okay, but we did work on
14 behalf of the other directors. It was a matrix
15 organization.
16 Q. Right.
17 A. And the various directors had no one reporting to
18 them.
19 Q. Okay.
20 A. The people reported to me, and I was the one
21 that — I was responsible for allocating the work.
22 Q. Okay. Just so I understand, these individuals
23 supported those directors in dealing with HR issues in the
24 areas they were in charge of, correct?
25 A. That is correct.

Page 8

1 Q. Okay. And would that include support and
2 application of benefit plans, interpreting of benefit plans,
3 that type of thing?
4 A. Yes.
5 Q. And you were also on the Change of Control Claims
6 Committee at some point; correct?
7 A. That is correct.
8 Q. Okay. When did you begin to work on that
9 committee?
10 A. At the time it was formed.
11 Q. Which was when?
12 A. Which would have been right around the time of the
13 merger, which was October of 2001.
14 Q. Okay. You were the chairman?
15 A. I was the chair, yes.
16 Q. Did you form that committee?
17 A. No.
18 Q. Okay. So who appointed you to be on the committee
19 and as chairman of the committee?
20 A. Janet Stoner.
21 Q. And did you have any hand in selecting the
22 individuals who were on the committee?
23 A. I believe I would have been asked about if I had
24 any recommendations, yes.
25 Q. And did you?

Page 9

1 A. Yes.
2 Q. And do you know who you recommended?
3 A. I don't recall.
4 Q. Carolyn Sellers was on the committee; correct?
5 A. That is correct.
6 Q. Glenn Phillips?
7 A. Yes.
8 Q. Yourself?
9 A. Yes.
10 Q. Kwame Satchell?
11 A. Yes.
12 Q. Rebecca Roberts?
13 A. Yes.
14 Q. Richard Loving?
15 A. Yes.
16 Q. Ron Boilla?
17 A. Yes.
18 Q. Anyone else?
19 A. At the very beginning we had a person by the name
20 of Linda Ryan.
21 Q. Did she resign?
22 A. She resigned and did not want to stay on the
23 committee.
24 Q. Okay. Did the committee meet on a scheduled
25 basis?

DEPOSITION OF JOHN GOLDSBY

Page 10

1  A. We tried a regular schedule at times when we had
2  enough cases to hear on a regular basis. We also called
3  special meetings if we needed to. As time went on and we
4  had fewer claims, we would wait until we had sufficient
5  numbers to have a meeting.
6  Q. What would you consider a sufficient number to
7  have a meeting? How many claims would you consider at a
8  time, typically?
9  A. Well, it would vary anywhere from one to four or
10 five. We also had to be concerned about the timeliness of
11 the claim and make certain that we heard it in the proper
12 time frame.
13 Q. What was the proper time frame? Do you recall?
14 A. Well, we were supposed to give a reply, if
15 possible, within 90 days from receiving the claim.
16 Q. And did that committee just hear claims under the
17 Separation Pay Plan?
18 A. Under the Change of Control plan, yes, uh-huh.
19 Q. Okay. There's a Change of Control provision in
20 the Separation Pay Plan of Texaco; correct?
21 A. Correct.
22 Q. Was the committee also responsible for
23 interpreting Change of Control issues under other plans?
24 A. No. I'm not aware of any other plans.
25 Q. Okay. So it was just the Separation Pay Plan that

Page 11

1  you were dealing with?
2  A. That is correct.
3  Q. Okay. And approximately how many claims in total
4  do you believe the committee handled?
5  A. It would be around 600.
6  Q. 600?
7  A. Uh-huh.
8  Q. Are you familiar with the claims of Mr. Raftery
9  and Mr. Katz?
10 A. Yes.
11 Q. Okay. And when did you first learn of their claim
12 to be entitled to additional severance pay under the Change
13 of Control provision?
14 A. I'm not certain exactly when, but I believe it
15 would have been early in 2002.
16 Q. Do you recall how you heard?
17 A. I believe that one of the two called and asked me
18 some questions, and then I met briefly with them on a couple
19 of occasions, and then as I recall they submitted their
20 claim in March 2002 time frame.
21 Q. Let me show you what's been marked previously as
22 Exhibit 6. Are you familiar with that document without the
23 handwriting?
24 A. Yes, I've seen this.
25 Q. Okay. And what is that document?

Page 12

1  A. It's a letter that was sent to people in Position
2  Grade 20 and above from Steve Pennacchio, who was the
3  executive director of Executive Comp and Benefits, regarding
4  enhanced benefits to the Change of Control separation plan.
5  Q. Was it sent outside Texaco, do you know?
6  A. I'm not familiar with who all it went to.
7  Q. Okay. So you don't know whether it was sent to
8  employees of FAMM; is that correct?
9  A. No, I don't.
10 Q. Do you know whether the content of Exhibit 6 also
11 appeared in the benefits newsletter Focus on Benefits?
12 A. I'm not certain. It may not have because it would
13 only be applying to a certain group of people.
14 Q. Let me show you Exhibit 36 and ask if you
15 recognize that document.
16 A. Did you ask me a question?
17 Q. Do you recognize that document?
18 A. Yes.
19 Q. What is it?
20 A. It's a copy of the Separation Pay Plan.
21 Q. This document has in the lower left-hand corner of
22 each page what appears to be a date, 5/2001. Is this the
23 version that you worked with in your role as chairman of the
24 Benefits Center and Change of Control Committee?
25 A. We were working with the latest version, which I

Page 13

1  believe was the May 2001.
2  Q. Okay. And in determining the claims of
3  Mr. Raftery and Mr. Katz, did you look to this document,
4  Exhibit 36, to determine the applicable terms of the plan?
5  A. We may have looked at that in part.
6  Q. Okay. And what else did you look at? Just for
7  the applicable terms of the plan now? Did you look at
8  Exhibit 6?
9  A. We may have. I don't recall precisely what we
10 looked at. It's been a couple years.
11 Q. Okay.
12 A. We very likely would have either looked at
13 Exhibit 6 or would have discussed it, someone would have
14 been aware of it and discussed it.
15 Q. So you don't recall if the committee actually had
16 a copy of Exhibit 6 in front of it when you were discussing
17 the claims of Mr. Raftery and Mr. Katz?
18 A. We do teleconferences, so I wouldn't be aware of
19 what anyone had in front of them.
20 Q. Prior to a teleconference would there be a
21 distribution of pertinent material available to a claim to
22 be considered?
23 A. What we tried to do is provide any information
24 that we felt would be pertinent to the committee. We would
25 send committee members a copy of the claim. They may

DEPOSITION OF JOHN GOLDSBY

Page 14

1  request certain information. We tried to make certain they
2  had everything they needed to make a decision.
3      Q. Do you know with regard to Mr. Katz and
4  Mr. Raftery what information was circulated to committee
5  members?
6      A. I don't -- I don't recall precisely, no.
7      Q. Do you recall what you had in front of you when
8  you were considering the claims of Mr. Raftery and Mr. Katz?
9      A. I would have had their letter requesting the
10 benefits, and I would have had a copy of the Separation Pay
11 Plan.
12     Q. Exhibit 36?
13     A. Yes.
14     Q. Okay. And would you also have Exhibit 6?
15     A. This was part of the files that I had. I don't
16 recall if I had it in front of me at the time we were
17 discussing it.
18     Q. Okay. If I wanted to make an independent
19 assessment of Mr. Katz' and Mr. Raftery's entitlement to the
20 Change of Control severance that they're seeking and wanted
21 to look at the applicable plan terms, is there any document
22 I would have to look at other than Exhibit 36 and Exhibit 6?
23         MR. KEE: Regarding their claim?
24         MR. LUCAS: Yes.
25     A. I don't recall if we looked at anything else.

Page 15

1      Q. (BY MR. LUCAS) So as best you can recall, those
2  would be the two controlling documents for the plan terms?
3      A. From a document standpoint. There may have been
4  a -- I can't recall if we looked at a more detailed version
5  of the separation plan. I don't think that we did, but we
6  may have. I'm not certain.
7      Q. Is there a more detailed version in existence?
8      A. No, I don't think so. I'm trying to remember if
9  we looked at anything else, and I simply can't remember.
10     Q. Okay. So I'm clear, you had Exhibit 6 in your
11 files; you're not sure if you looked at it with regard to
12 Mr. Katz and Mr. Raftery's claim. Is that accurate?
13     A. Yes. I would have been familiar with the contents
14 of it.
15     Q. Right. And the same with Exhibit 36; right?
16     A. Yes.
17     Q. And you can't recall if there's anything else as
18 you sit here today?
19     A. From a document standpoint, no.
20     Q. Right. And other than those two documents, in
21 deciding Mr. Katz's and Mr. Raftery's claims, what other
22 documents did you look at?
23     A. Again, I don't recall looking at any other
24 documents.
25     Q. And you don't recall what, if anything, was

Page 16

1  distributed to other members incident to deciding Mr. Katz'
2  and Mr. Raftery's claims; is that correct?
3      A. No, I don't.
4      Q. Are you aware that certain officers of Texaco had
5  severance agreements with Change of Control benefits in
6  them?
7      A. Yes.
8      Q. Do you know whether those severance agreements
9  were in existence prior to the negotiations with Chevron
10 regarding the merger?
11     A. I don't recall.
12     Q. I guess what I'm asking, you don't know whether
13 those agreements were created incident to the merger?
14     A. I don't know when they were created.
15     Q. Okay. Did you have such an agreement?
16     A. No.
17     Q. So do I understand your testimony that you first
18 learned of the claims of Mr. Katz and Mr. Raftery because
19 one of them called you and discussed it with you?
20     A. Yes.
21     Q. Is that the first you learned of it?
22     A. I believe so, yes.
23     Q. Do you know whether it was Mr. Katz or
24 Mr. Raftery?
25     A. I'm not positive. I believe that it was Ken

Page 17

1  Raftery.
2      Q. Had you met Ken before he called you to talk about
3  the claim?
4      A. Very likely would have seen him in the building or
5  may have been in meetings with him, but I didn't know him.
6      Q. Okay. And can you tell me, as best you can
7  recall, what he said to you and you said to him on that
8  phone call?
9      A. Not specifically. It was just he was calling and
10 indicating that he felt they were entitled to receive the
11 benefits of a Position Grade 20 because he felt they were
12 treated as Position Grade 20s within the FAMM organization,
13 and I would expect that he would have been discussing the
14 process that he would have to go through to receive those
15 benefits.
16     Q. Okay. Do you recall what you said to him?
17     A. I spoke with him several times, as I recall; and I
18 can't remember specifically what was discussed in each phone
19 conversation, or we also met personally. I just don't
20 remember the specifics.
21     Q. Okay. So you had several phone calls with Ken and
22 a personal meeting prior to the claim being formally
23 submitted to the Benefit Center Change of Control Committee?
24     A. Would have either been prior to or prior to the
25 committee actually hearing it. Somewhere in that time

DEPOSITION OF JOHN GOLDSBY

Page 18

1 frame. It's difficult to remember back that far.
2  Q. Okay. Let me show you what was marked earlier as
3 Exhibit 55. I'm going to ask you about the second
4 paragraph, but feel free to read the whole thing.
5  A. Okay.
6  Q. In that second paragraph Mr. Raftery refers to an
7 initial meeting with you on Wednesday, March 27th, 2002.
8 Does that refresh your recollection as to when you had the
9 first meeting?
10  A. No. It may -- it may well have been then. It may
11 have been earlier than that. I don't know.
12  Q. Okay. Is it your testimony you had a phone call
13 before actually meeting with him?
14  A. Yes. I think he -- he would have called to set up
15 a meeting.
16  Q. Okay. Do you know whether in that initial phone
17 call he explained to you what his position was?
18  A. I believe that he did, yes.
19  Q. And I think you indicated you don't recall how you
20 responded in that initial phone call?
21  A. No, I don't.
22  Q. Okay. Do you recall actually meeting with him,
23 whether it was on or about March 27th or not?
24  A. I remember meeting with him, yes.
25  Q. Okay.

Page 19

1  A. Again, if he says that was the date, it may very
2 well have been.
3  Q. Right. I understand you have no independent
4 recollection of the date. What do you recall discussing in
5 that face-to-face meeting?
6  A. Again, he was discussing his position as to what
7 he qualified for. There was a meeting that also Larry Katz
8 attended. I can't recall if that was prior to this or after
9 this, but it's difficult to remember exactly what was
10 discussed in a particular meeting, but he would have been
11 discussing his belief that he was qualified for the benefits
12 of a Position Grade 20.
13  Q. Okay. Do you recall saying to him, as indicated
14 in Exhibit 55, that you believed you would be contacting
15 Mike Bandy, Michele Swanson, or Peter Meade to get their
16 views on the issue?
17  A. It's possible that we would have said that,
18 depending on what they provided us and what information we
19 needed to verify.
20  Q. To your knowledge, did the committee ever do that
21 in connection with deciding the claims of Mr. Katz and
22 Mr. Raftery?
23  A. I didn't personally investigate the claims. We
24 had a person that did that for us. And I don't recall
25 whether he spoke with Mike or Michele or not.

Page 20

1  Q. Okay.
2  A. What you're trying to do, if you have a question
3 as to the validity of information, you're trying to verify
4 whether it's correct or not. In their case there would have
5 been probably different means of doing that. What we would
6 have been trying to do is verify their position grade.
7  Q. Okay. And do you know whether -- is John Burgess
8 the investigator?
9  A. That's correct.
10  Q. And do you know whether he did an investigation in
11 connection with the Katz and Raftery claim?
12  A. I don't recall specifically what he would have had
13 to do in regard to that.
14  Q. Is it possible he didn't do anything?
15  A. No. It would be very unlikely that he didn't do
16 anything. He would have verified their position grades and
17 so forth.
18  Q. And would he have prepared some sort of report for
19 the committee?
20  A. Not in a written fashion. What he would do is
21 brief the committee during the meeting as to what he found.
22  Q. Do you know what Mr. Burgess's investigation
23 consisted of with regard to the Katz and Raftery claims?
24  A. No; I don't recall.
25  Q. And you don't recall what he said in the

Page 21

1 teleconference in which the committee was deciding the Katz
2 and Raftery claims; right?
3  A. No, not specifically.
4  Q. Do you know for sure he was on the telephone
5 conference?
6  A. Yes.
7  Q. Was he on every telephone conference the committee
8 had?
9  A. Yes.
10  Q. Was every member other than Linda Ryan on the
11 conference call when the committee was deciding the Katz and
12 Raftery claims?
13  A. That, I don't know.
14  Q. What was the rule regarding a quorum for a
15 decision on a claim?
16  A. I don't think we ever had less than five members
17 present.
18  Q. Okay. And did the committee take any notes of
19 these conference calls?
20  A. I don't know what they did individually. Again,
21 since they're all on the telephone, I don't know what
22 they're doing.
23  Q. Okay. Did you take any notes, that you recall, on
24 the Katz and Raftery --
25  A. No. I generally don't take notes.

DEPOSITION OF JOHN GOLDSBY

Page 22

1   Q. Okay. So you didn't take notes as a general rule?
2   A. Right.
3   Q. And there's no minutes prepared; correct?
4   A. There are no official minutes.
5   Q. And the meetings were not tape-recorded; right?
6   A. No, not that we're aware of.
7   Q. In the first paragraph of Exhibit 55 is a
8   reference to Mr. Lynch, Tom Lynch. Do you know who Mr. Tom
9   Lynch is?
10  A. Yes; uh-huh.
11  Q. And what was his position in April of 2002? Do
12  you recall?
13  A. He worked in executive compensation. I don't
14  recall his title.
15  Q. Was he higher or lower than you on the
16  organizational chart?
17  A. I believe he was in a lower position grade.
18  Q. Okay. Did -- I'm sorry. What was the department
19  you said he was in?
20  A. Executive compensation.
21  Q. Is that part of HR?
22  A. It generally was separate from HR. There was a
23  point at which it was brought into HR. I can't recall
24  exactly when that was. It was probably in the year 2000,
25  2001.

Page 23

1   Q. And it remained in HR until the merger?
2   A. That's correct.
3   Q. Okay. So would that mean Mr. Lynch, although you
4   were a matrix organization, was in a department that you
5   were a director of?
6   A. No. Executive compensation, for obvious reasons,
7   pretty much remained separate.
8   Q. Okay. Do you recall having any discussions with
9   Mr. Lynch about Mr. Raftery's and Mr. Katz's claims? This
10  is Tom Lynch now.
11  A. Right. I can't recall that we had a conversation.
12  It would not have been unusual for me to ask him a question,
13  but I don't remember if I did or not. I don't remember
14  having a specific conversation with him.
15  Q. Okay. The committee, according to this memo, had
16  not made its decision, your committee, as of April 10th,
17  2002. Is that accurate?
18  A. We would not have made a decision until we had the
19  Claims Committee meeting. I don't recall the date of the
20  claims control meeting.
21  Q. Okay. Would it have been unusual for Mr. Lynch to
22  be aware of how the Claims Committee was leaning prior to
23  its actually deciding?
24  A. Yes. I don't know how he would have any
25  information at all on that.

Page 24

1   Q. Okay. So if this memo is accurate and Tom had
2   told Mr. Bandy that the issue was a slam dunk and that the
3   company felt it was on very solid ground, you would have no
4   knowledge as to how he would have that information; is that
5   correct?
6   A. No, I wouldn't.
7   Q. Okay. Pat Lynch is his brother; correct?
8   A. That is correct.
9   Q. And he's on the -- or he was on the Change of
10  Control Committee?
11  A. Still is.
12  Q. And that's the appeal committee from the committee
13  you're the chairman of?
14  A. That is correct.
15  Q. And did your committee discuss claims it had
16  before it with the Change of Control Committee before your
17  committee decided the issue?
18  A. Very rarely.
19  Q. Do you know if you did in the instance of
20  Mr. Raftery and Mr. Katz?
21  A. No, we didn't.
22  Q. So it's your testimony that nobody from your
23  committee discussed the Katz and Raftery claims with anyone
24  on the Change of Control Committee prior to your
25  subcommittee discussing the issue?

Page 25

1   A. We didn't discuss it with the committee as a whole
2   It's possible that I discussed it with Janet Stoner, who was
3   on the Change of Control Committee. I don't know if I did
4   or not, but it would not have been unusual for me to discuss
5   a case with Janet.
6   Q. Janet was the chairman of that Appeals Committee?
7   A. That's correct.
8   Q. And why would you have discussions with Ms. Stoner
9   about claims that your committee was deciding?
10  A. We had discussions where I briefed her on cases
11  that were going before her committee. She may ask questions
12  about do you have very many in the network or very many
13  coming in. Also I might discuss something with her because
14  she has particular knowledge of something that I may need an
15  answer to. So far as did we discuss this one, I don't have
16  any idea.
17  Q. Okay. And does it cause you any concern that the
18  integrity of the appeal process may be compromised by you
19  discussing the merits with Ms. Stoner before she has the
20  claim actually before her committee?
21  A. We've actually had conversations as to whether it
22  would be proper. We've had legal guidance. The Claims
23  Committee is actually working on behalf of the Change of
24  Control Committee, and it was felt like there is absolutely
25  no concern with discussing things.

7 (Pages 22 to 25)

RIVERSIDE REPORTING, INC.                                    (713) 662-0062

DEPOSITION OF JOHN GOLDSBY

Page 26

1   Q. Okay.
2       (Exhibit No. 59 was marked for
3       identification and is attached hereto.)
4   Q. (BY MR. LUCAS) Show you Exhibit 59. I don't know
5   if you can read it or not. These are handwritten notes of
6   Mr. Raftery.
7   A. Okay.
8   Q. It's dated April 23rd, and it's titled up in the
9   right-hand corner "Discussion with John Goldsby, Claim
10  Committee chair." And in quotes on the first line it says
11  "FAMM should address," close quote. Underneath that,
12  "didn't belong in our committee." Underneath that, "didn't
13  discuss merits at all once decided they couldn't address
14  this issue." Underneath that in quotes "it's Mike's
15  decision," close quote. "We are separate. They should stay
16  out of our business." And then "subsequent to 4/23
17  discussion, John Goldsby said they were no." And do you
18  recall having any discussion with Mr. Raftery the gist of
19  which was that it was really FAMM's issue to decide who was
20  on their management team and who got the Change of Control
21  benefits?
22  A. I don't know the context of what he was asking and
23  what I was responding to. I may have been responding to a
24  particular question. For example, it may not have been the
25  committee's decision as to what their position grade was.

Page 27

1   That was probably a FAMM issue. So it's hard to know
2   without seeing the other side of what the question was --
3   Q. Okay.
4   A. -- as to why the response is what it is.
5   Q. So you don't recall the specifics of this
6   conversation that Mr. Raftery is apparently attributing
7   quotes to you?
8   A. No, I don't.
9   Q. Okay. And your committee did reject their claims;
10  correct?
11  A. That is correct.
12  Q. And what was the basis for your decision that they
13  were not entitled to the Change of Control benefits?
14  A. The committee's position was that they were in
15  Position Grade 19 and felt that the plan was clear that you
16  had to be in Position Grade 20.
17  Q. Okay. And I have one more document to show you.
18      (Exhibit No. 60 was marked for
19      identification and is attached hereto.)
20  Q. (BY MR. LUCAS) This is a note of Mr. Katz of the
21  same date as the one we just looked at, and Mr. Katz writes
22  "meeting with John Goldsby and Ken Raftery." Do you know if
23  this was the date of the meeting you said you held with both
24  of them?
25  A. I don't recall the date.

Page 28

1   Q. Was it just one meeting, though, that you had that
2   you can recall with both of them?
3   A. Yeah. I only met with both of them one time.
4   Q. Okay. And this says, "Legal opinion not to rule
5   past the Grade 20 issue. Interpret only under Texaco rules.
6   If FAMM issued its own clarification on its management team,
7   that documentation would govern. It's FAMM's decision to
8   interpret." Does any of that jog your memory as to what you
9   said to them in that meeting?
10  A. I recall a discussion where we talked about the
11  position grade. We didn't have as a committee any control
12  over what position grade they were in. For example, if they
13  felt like they were doing the work of a 20, it wasn't the
14  committee's decision to interpret. We depend on the
15  business to have people properly graded. So I think, but
16  I'm not certain, what we were talking about was whether they
17  were actually working as 20s or not; and I think the
18  committee's interpretation was it didn't matter. What
19  mattered was what position grade they were in. You depend
20  on the business to have people properly graded.
21  Q. Did the committee consider the fact that FAMM was
22  an independent company, I mean, a separate company?
23  A. Well, I mean, we were aware of the fact that they
24  were a separate company. They were a participating company
25  in our plan.

Page 29

1   Q. Right. Let me show you Exhibit 48 and ask you if
2   you recognize that handwriting.
3   A. Are you asking me if I recognize the handwriting?
4   Q. Right.
5   A. I'm not positive. I could guess.
6   Q. It's not yours?
7   A. No.
8   Q. Okay. Does it look to be an accurate recitation
9   of some of the discussions that occurred in your committee
10  with regard to the Raftery and Katz claims when it was
11  deciding this?
12  A. I recall that we discussed that there were Texaco
13  employees who were 18 and 19 that received the same benefits
14  that Katz and Raftery did.
15  Q. Okay. That was the committee's belief that there
16  were 18 and 19 pay grade Texaco employees who got the same
17  benefits as Mr. Raftery and Mr. Katz?
18  A. Yes; we would have been aware of that.
19  Q. Mr. Raftery and Mr. Katz -- which benefits were
20  you referring to?
21  A. Bonuses and long-term incentives, stock options,
22  restricted stock.
23  Q. But Texaco's plans on those topics were different
24  than FAMM's, were they not?
25  A. I'm not exactly certain what FAMM's were. I don't

DEPOSITION OF JOHN GOLDSBY

Page 30

1  know if they were different than Texaco's.
2  Q. So the committee didn't know that either when it
3  made this decision; correct?
4  A. I'm not certain exactly what each committee member
5  was aware of.
6  Q. But you at least as chairman were not aware at
7  that time, just as you're not aware now, what the difference
8  was between those FAMM bonus incentive plans, et cetera, and
9  the Texaco?
10  A. Not all of the specifics, no.
11  Q. Are you aware they are separate and different
12  plans?
13  A. I'm aware that they had their own executive comp
14  plan, yes.
15  Q. And was there any discussion among the members as
16  to the significance of that?
17  A. As I recall, there was a conversation that they
18  had a separate plan.
19  Q. Okay. And what significance was that to you?
20  A. Again, we were looking at Texaco's plan that
21  stated you had to be -- or at least in the Texaco plan you
22  had to be a Position Grade 20. We discussed their position
23  grade in FAMM, was it equivalent to Texaco position grades.
24  We felt that it was. We discussed the fact that there would
25  have been an opportunity for them to be put into Pay

Page 31

1  Grade 20 within the FAMM organization should FAMM desire to
2  do that or have desire to do that.
3  Q. What documents did you look at to determine that
4  their FAMM Grade 19 was the same as a Texaco Grade 19?
5  A. I don't recall that we looked at any documents,
6  but John Burgess, who was on our committee, was the expert
7  on assigning position grades and job descriptions. He would
8  have been very familiar with it and would have had input.
9  Q. But you don't recall what investigation he did or
10  what he said; correct?
11  A. I don't recall specifically, no.
12  Q. There's also a reference in 48, it says "Their
13  claim is for Pennacchio letter enhancements." Is that a
14  reference to Exhibit 6?
15  A. I would assume that that's what it would be
16  referring to.
17  Q. Okay. And it's really Exhibit 6 that the
18  committee was interpreting; right? Because Exhibit 6
19  doesn't appear in the plan itself.
20  A. It doesn't appear in the plan itself, no.
21  Q. So is that accurate, it was really Exhibit 6 that
22  the committee was interpreting?
23  A. As a document, probably. Also there were meetings
24  that all of us attended where the benefits were described in
25  the context of the meeting. So we would have all been

Page 32

1  familiar with the meetings, would have all attended those
2  meetings.
3  Q. Who held those meetings?
4  A. Would have been the Exec Compensation group.
5  Q. Texaco's?
6  A. Yes.
7  Q. Was anyone from FAMM in those meetings? Do you
8  know?
9  A. May very well have been. I only attended one
10  meeting, so I don't know who all attended.
11  Q. Okay. It says "Preston indicated." Who is
12  Preston? Do you know?
13  A. I would assume that's Alan Preston.
14  Q. Is he a member of the committee?
15  A. No. In fact, he's a Chevron employee.
16  Q. Oh, I see.
17  A. He's currently vice president of human resources
18  for ChevronTexaco.
19  Q. Do you know who made this comment, or was this
20  comment made, "Preston indicated these two individuals got
21  PG 19 long and short-term grants in the FAMM system"?
22  A. Do I know who made that comment?
23  Q. Right.
24  A. No. It likely would have been John Burgess, who
25  would have investigated and found that information.

Page 33

1  Q. But you don't know?
2  A. I'm not positive.
3  Q. Do you know that comment was in fact made? Do you
4  recall it being made?
5  A. No. I can't remember all of the comments.
6  Q. So you don't know whose notes these are and you
7  don't recall these specific comments, as you sit here today,
8  being made in your meeting?
9  A. I'm not positive who wrote those. I --
10  Q. Do you recall the comments being made in the
11  meeting specifically?
12  A. Not specifically.
13  Q. The impact a favorable ruling for Misters Katz and
14  Raftery would have vis-a-vis Texaco Pay Grade 19s was of
15  concern to your committee, was it not, in deciding the
16  merits of Mr. Katz' and Mr. Raftery's claims?
17  A. You're talking about the amount would have been a
18  concern?
19  Q. The -- not the amount. Let me show you something
20  to maybe clarify. Let me show you Exhibit 57. It starts on
21  the second page with an e-mail to Pat Woertz and then goes
22  chronologically up to the front page.
23  A. Okay.
24  Q. If you'll look at the e-mail from Mr. Lynch that's
25  three quarters of the way down on the first page of

DEPOSITION OF JOHN GOLDSBY

Page 34

1  Exhibit 57, he indicates halfway through "there are a number
2  of Texaco employees 20 to 30 who receive both stipends and
3  long-term awards as PG 19s who do not participate in the
4  additional service accrual." Was the impact on those 20 to
5  30 individuals who were Pay Grade 19s a factor in your
6  decision to deny Mr. Katz's and Mr. Raftery's award?
7      A. Absolutely not.
8      Q. Okay. Now, Tom Lynch is sending this to Ron
9  Boilla, but it doesn't look like he's sending it to you.
10 Did you and Mr. Boilla discuss this at all?
11     A. We may have. I don't remember.
12     Q. Okay. And the next e-mail, Ron Boilla sends it to
13 you by carbon copy. Do you see that?
14     A. Yes.
15     Q. Do you recall having a discussion with him about
16 this e-mail?
17     A. No. I'm not even certain that I would have
18 received this.
19     Q. And why is that?
20     A. I did not -- my last day in the office was the end
21 of April.
22     Q. I see.
23     A. And this would probably have gone to a company
24 e-mail, and I've never checked the company e-mail since I
25 left.

Page 35

1      Q. Okay.
2      A. So I don't remember seeing this.
3      Q. Okay.
4      A. It's very possible that I haven't.
5      Q. If you'll look at the next e-mail up it says, "I
6  think the files will show that Bandy twice proposed to the
7  FAMM board that Ken and Larry be promoted to Pay Grade 20
8  and the FAMM board did not approve." Was that your
9  understanding?
10     A. Yes. I understood that at least on a couple of
11 occasions they had the opportunity to or they considered
12 whether they should promote them and did not.
13     Q. And what was the source of your understanding?
14     A. I don't remember. It could actually have been
15 either Ken or Larry that told me. It may have been John
16 Burgess who found it out in his investigation. It may have
17 been someone else. I really don't remember.
18     Q. Did you ever look at the minutes of the FAMM board
19 to see whether that was in fact the case?
20     A. I did not, no.
21     Q. Do you know if anyone did?
22     A. Possibly John Burgess. I don't know.
23     Q. And Exhibit 4, is this the claim letter you looked
24 at incident to deciding Mr. Katz's and Mr. Raftery's claim?
25     A. I believe that it is, yes.

Page 36

1      Q. Exhibit 49, the last page, is that the decision
2  issued by your committee?
3      A. Yes, I believe it is.
4      Q. The end of the first paragraph indicates, quote,
5  "The Claims Committee has determined that your status as a
6  Position Grade 19 makes you ineligible for the enhanced
7  benefits available for Position Grade 20 individuals." That
8  was the basis for the denial of Mr. Katz's and Mr. Raftery's
9  claim; is that correct?
10     A. That's correct.
11     Q. And it says Ron Boilla signing on behalf of the
12 committee. Since you were the chairman, why was Mr. Boilla
13 signing on your behalf?
14     A. Ron was located in our benefits center in Houston,
15 had administrative support. I was at home. We felt it
16 would be better for him, since he had the administrative
17 support, was actively working, to have the letters prepared
18 and to sign on behalf of the committee. I would have
19 reviewed the letter before it went out.
20     Q. So he had your authority to issue this letter?
21     A. He had the committee's authority, yes.
22     Q. The last paragraph says, "Please refer to Janet
23 Stoner's letter dated November 16th, 2001." Have you ever
24 seen that letter?
25     A. Yes.

Page 37

1      Q. What is that letter?
2      A. It was a letter that she sent out giving specifics
3  of, as I recall, how to apply for Change of Control and so
4  forth.
5      Q. I see.
6      A. It went to all employees, I believe.
7      Q. So it had to do with procedure, claims procedure?
8      A. Yes, I think so.
9      Q. It didn't amend the plan terms or anything, the
10 Stoner letter?
11     A. No, I don't think so.
12     Q. Other than at the teleconference where your
13 committee decided Mr. Raftery's and Mr. Katz's claims, did
14 you have any discussions with Ms. Sellers that you can
15 recall about the merits of those claims?
16     A. Not that I recall.
17     Q. How about Mr. Phillips?
18     A. I don't recall, no.
19     Q. All right. How about Mr. Satchell?
20     A. Again, I don't think so. I don't recall any.
21     Q. Okay. Ms. Roberts?
22     A. No.
23     Q. Mr. Loving?
24     A. No.
25     Q. How about Mr. Boilla?

10 (Pages 34 to 37)

RIVERSIDE REPORTING, INC.                                    (713) 662-0062

Page 38

1    A.  It's possible, because of reviewing the letters,
2  that I may have had another conversation with Ron. And also
3  Ron at that point in time was coordinating setting up the
4  meetings, and so we may have discussed what was going to be
5  on the agenda for the meeting, since he had to send that out
6  to the committee members. So I possibly would have had a
7  conversation with Ron.
8    Q.  Other than logistics do you recall discussing with
9  Mr. Boilla outside the committee context the merits of
10 Mr. Katz' and Mr. Raftery's claim?
11   A.  I don't recall. It's possible if he had a
12 question about it, we may have, but I don't recall.
13   Q.  You don't recall?
14   A.  No.
15   Q.  All right. Same question with regard now to
16 Ms. Stoner. I think you indicated you may have had
17 discussions with her; correct?
18   A.  It's possible, but I don't recall having any.
19   Q.  Okay. How about with Mr. Bethancourt?
20   A.  No. I don't recall having conversation with John
21 at any time other than during the committee meeting.
22   Q.  How about Mr. Rudy, Mike Rudy?
23   A.  No.
24   Q.  How about with Pat Lynch?
25   A.  No.

Page 39

1    Q.  And you indicated you didn't have any discussions
2  with Tom Lynch that you can recall; correct?
3    A.  It is possible that I would have had a
4  conversation with Tom. We worked in close proximity, so we
5  could have had a conversation. I simply don't remember
6  having one.
7    Q.  Okay. So I take it, then, if you had one, you
8  don't recall when it occurred because you can't recall;
9  right?
10   A.  Right.
11   Q.  Okay. And how about Rosemary Moore?
12   A.  No.
13   Q.  Other than the conversations you've disclosed to
14 me this morning that you did have regarding the merits of
15 Mr. Katz' and Mr. Raftery's claims, the ones you had with
16 Mr. Katz and Mr. Raftery and the other individuals we just
17 reviewed, are there any other conversations that you've had,
18 other than with counsel, about the merits of Mr. Katz' and
19 Mr. Raftery's claims?
20   A.  I can't recall specifically. It's entirely
21 possible that I could have discussed it from the standpoint
22 of asking a question of Steve Pennacchio or any of the
23 people that were involved in drafting the document to ask
24 them what their intent was. I don't recall, but it wouldn't
25 have been unusual for me to have a conversation with

Page 40

1  somebody who was involved in drafting the document.
2    Q.  These are Texaco benefits people?
3    A.  They are Texaco people; not all of them are
4  benefits people.
5    Q.  Okay. Do you recall having any discussions with
6  any FAMM people other than Mr. Katz and Mr. Raftery?
7    A.  No. I don't recall.
8    Q.  Okay.
9        MR. LUCAS:  That's all I have.
10       MR. KEE:  Okay. You're done.
11
12      (Deposition concluded at 10:13 a.m.)

Page 41

1       CHANGES AND SIGNATURE
2  WITNESS NAME: JOHN W. GOLDSBY - DATE OF DEPOSITION: 04-02-04
3  _____
4  PAGE   LINE   CHANGE   REASON___
5  _____
...

DEPOSITION OF JOHN GOLDSBY

Page 42

1  I, JOHN W. GOLDSBY, have read the foregoing deposition and
2  hereby affix my signature that same is true and correct,
3  except as noted above.
4
5  _____
6        JOHN W. GOLDSBY
7
8  THE STATE OF TEXAS:
9  COUNTY OF HARRIS:
10
11       Before me, _____, on this day
12  personally appeared JOHN W. GOLDSBY, known to me (or proved
13  to me under oath or through _____) (description
14  of identity or other document) to be the person whose name
15  is subscribed to the foregoing instrument and acknowledged
16  to me that they executed the same for the purposes and
17  consideration therein expressed.
18
19       Given under my hand and seal of office this
20  _____ day of _____, 2004.
21
22
23       _____
24       NOTARY PUBLIC IN AND FOR
25       THE STATE OF _____

Page 43

1  STATE OF TEXAS  )
                   )
2  COUNTY OF HARRIS )
3        DEPOSITION OFFICER'S CERTIFICATE
4
5  ORAL DEPOSITION OF JOHN W. GOLDSBY
   Taken on April 2, 2004
6
7  I, LaRita J. Cormier, Certified Shorthand Reporter in and
   for the State of Texas, hereby certify that this deposition
8  transcript is a true record of the testimony given by the
   witness named herein, after said witness was duly sworn or
9  affirmed by me.
10 I further certify that I am neither attorney nor counsel
   for, related to, nor employed by any of the parties to the
11 action in which this testimony was taken. Further, I am not
   a relative nor employee of any attorney of record in this
12 cause, nor do I have a financial interest in this action.
13 Further certification requirements pursuant to the Rules
   will be certified to after they have occurred, if
14 applicable.
15 Subscribed and sworn to on this the 19th day of April, 2004.
16
17       _____
         LaRita J. Cormier, CSR
18       Texas State Certification No. 3412
         Certification Expiration: 12-31-05
19       Firm Registration No: 368
         Riverside Reporting, Inc.
20       6101 Southwest Freeway, Suite 200
         Houston, Texas 77057
21       (713) 662-0062
         Job No.: 41069R
22
23
24
25

12 (Pages 42 to 43)

RIVERSIDE REPORTING, INC.                                    (713) 662-0062