Page 1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF CONNECTICUT
2  ----------------------------------------x
   LARRY A. KATZ and
3  KENNETH M. RAFTERY,
4                  Plaintiffs,
5       vs.                              Civil Action No.
                                         302 Civ. 02201
6  THE SEPARATION PAY PLAN               (AWT)
   OF TEXACO, INC. and TEXACO,
7  INC.,
8                  Defendants.
9  ----------------------------------------x
10                  April 28, 2004
                    1:07 p.m
11
12
13 Deposition of Defendant TEXACO, INC. by PATRICK J.
14 LYNCH, taken pursuant to Notice, and held at the
15 offices of Jackson Lewis, LLP, One North Broadway,
16 White Plains, New York, before Dana Chipkin, a
17 Registered Professional Reporter and Notary Public
   of the State of New York.
18
19
20
21
22
23
24
25

Page 2

APPEARANCES:

MARTIN, LUCAS & CHIOFFI, LLP
Attorneys for the Plaintiffs
177 Broad Street
Stamford, Connecticut 06901

BY: SCOTT R. LUCAS, ESQ.


JACKSON LEWIS, LLP
Attorneys for the Defendants
177 Broad Street
Stamford, Connecticut 06904-0251
BY: CONRAD S. KEE, ESQ.

Page 3

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

Page 4

PATRICK J. LYNCH, having been first duly sworn by the Notary Public (Dana Chipkin), and stating his address as 6 Lang Court, Park Ridge, New Jersey 07656, was examined and testified as follows:

oOo

EXAMINATION BY
MR. LUCAS:
Q. Please state your name for the record.
A. Patrick J. Lynch.
Q. What is your home address?
A. 6 Lang Court, Park Ridge, New Jersey 07656.
Q. Good morning, Mr. Lynch. My name is -- or good afternoon, I should say.
My name is Scott Lucas. I represent Kenneth Raftery and Larry Katz in the federal action they brought in the federal court in Connecticut against Texaco and the Texaco Pay Plan.
Are you familiar with that lawsuit?

Page 5

PATRICK J. LYNCH
A. I'm aware that there is a lawsuit.
Q. Have you read the complaint in that lawsuit?
A. No, I have not.
Q. Are you familiar with the deposition procedure?
A. Yes.
Q. You've had your deposition taken before?
A. Yes.
Q. On how many occasions?
A. Once.
Q. How long ago was that?
A. Oh, about almost 20 years ago.
Q. Okay. Well, just to refresh your recollection, I'm going to ask you some questions. You have been sworn as if you were in a court of law under penalty of perjury. I ask that you answer the questions, as best you can, with your full knowledge and if you don't understand a question, let me know and I will see if I can rephrase it. If you need to take a break at any time, let me know. As long as a question is not pending, I'll do my best to accommodate you as quickly as possible.

Page 6

```
 1          PATRICK J. LYNCH
 2       Okay?
 3    A.  Okay.
 4    Q.  Also, you have to answer audibly instead
 5  of shaking your head or nodding, and if we could
 6  try not to talk over each other, because the court
 7  reporter can't get us down at the same time.
 8       Okay?
 9    A.  Okay.
10    Q.  Great.
11       You are currently unemployed, is that
12  correct --
13    A.  That's correct --
14    Q.  -- you're retired?
15    A.  -- retired.
16    Q.  And you are represented by counsel here
17  today for Texaco?
18    A.  Yes.
19    Q.  When did you retire?
20    A.  November 1, 2001.
21    Q.  You were an employee of Texaco before
22  that?
23    A.  Yes, I was.
24    Q.  How long were you an employee of Texaco?
25    A.  Forty years, give or take.
```

Page 7

```
 1          PATRICK J. LYNCH
 2    Q.  What was the last position you had with
 3  Texaco?
 4    A.  Chief financial officer.
 5    Q.  How many years were you chief financial
 6  officer?
 7    A.  Five years.
 8    Q.  What was your Texaco pay grade as a CFO?
 9    A.  I do not know.
10    Q.  Do you know if it changed during your
11  last five years?
12    A.  It would have changed when I became CFO,
13  yes.
14    Q.  But it remained constant once you were a
15  CFO?
16    A.  I do not know that.
17    Q.  What is the last pay grade at Texaco you
18  do recall having?
19    A.  23 or 24.
20    Q.  And for what position was that?
21    A.  That was the president of Texaco Europe.
22    Q.  When did you hold that position?
23    A.  1996, '95, '96.
24    Q.  Is that the last position you held
25  before you became CFO?
```

Page 8

```
 1          PATRICK J. LYNCH
 2    A.  Yes.
 3    Q.  Just briefly, what positions did you
 4  hold before that?
 5    A.  President of Texaco Latin America, vice
 6  president and comptroller.
 7    Q.  Of?
 8    A.  Of a corporation, of Texaco Inc.
 9    Q.  Okay.
10       Any other positions?
11    A.  Well, I go all the way back. Forty
12  years is a long time.
13    Q.  When were you vice president and
14  comptroller of Texaco?
15    A.  From 19 -- the middle of 1988 to the
16  beginning of '94, 1994.
17    Q.  Do you recall what your pay grade was as
18  VP and comptroller?
19    A.  No, I do not.
20    Q.  What have you done in preparation for
21  today's deposition?
22    A.  Talked to counsel here about a half hour
23  ago.
24    Q.  Anything else?
25    A.  That's all.
```

Page 9

```
 1          PATRICK J. LYNCH
 2    Q.  Did you review any documents?
 3    A.  No, I have not.
 4    Q.  No transcripts or anything?
 5    A.  None.
 6    Q.  Are you a member of the change of
 7  control committee of Texaco?
 8    A.  Yes.
 9    Q.  When was that committee formed?
10    A.  November of 2001.
11    Q.  Were you one of the original members?
12    A.  Yes.
13    Q.  Is that committee still in existence
14  today?
15    A.  Yes.
16    Q.  Who are its members today?
17    A.  Janet Stoner, Michael Rudy, John
18  Bethancourt, and Rosemary Moore.
19    Q.  Those are the original members as
20  well --
21    A.  They were --
22    Q.  -- in other words, the membership hasn't
23  changed?
24    A.  No, that's right, they were the original
25  members.
```

Page 10

1      PATRICK J. LYNCH
2    Q. And that's the membership as it exists
3 today as well?
4    A. Yeah, mm-hmm.
5    Q. Who is the chairman of the committee?
6    A. Janet Stoner.
7    Q. Are you aware that my clients have made
8 a claim to change of control to enhance severance
9 pay?
10   A. I am aware your clients submitted a
11 claim.
12   Q. When was the first time you learned of
13 that claim? I'm not talking about the lawsuit
14 itself, I'm talking about the claim, the
15 administrative claim.
16   A. My guess would be early 2002.
17   Q. Is that before a claim was formally made
18 to the committee of which you are -- you were a
19 member?
20   A. I don't know.
21   Q. How do you recall becoming aware of the
22 claim?
23   A. It was on a -- an agenda, or a list of
24 claims that were pending.
25   Q. This was a written list of claims?

Page 11

1      PATRICK J. LYNCH
2    A. It was a list that would have been gone
3 over during a meeting, how many claims and --
4    Q. A change of control meeting?
5    A. Change of control meeting, yeah.
6    Q. Of the committee?
7    A. Of the committee.
8    Q. Okay.
9    A. I can't say whether it's all-inclusive,
10 but --
11   Q. Okay.
12      Do you know how that list was compiled?
13   A. No. It would have come through the
14 claims committee of the change of control.
15   Q. The subcommittee?
16   A. Well, there's -- I think the change of
17 control committee is the committee I'm on and then
18 there is a claims committee in which people
19 support the change of control committee.
20   Q. Is that the one that John Goldsby was a
21 chairman of?
22   A. Yes.
23   Q. Is it your understanding that you got
24 notice of a claim as a member of the change of
25 control committee at the time it was submitted to

Page 12

1      PATRICK J. LYNCH
2 the committee Mr. Goldsby was chairman of, or at
3 or about that time?
4    A. I would say it would be later than that,
5 usually when it's coming up to our committee, not
6 necessarily when it's received by the -- by the
7 claims committee.
8    Q. Does it make the list before a formal
9 claim is submitted -- a formal appeal is submitted
10 to your committee?
11   A. It's an in-progress-type list of kind of
12 what they are working on.
13   Q. "They" being the --
14   A. Goldsby's committee.
15   Q. So, as a member of the change of control
16 committee, you may become aware of a claim that is
17 making its way en route to you but has not yet
18 formally been submitted; is that correct?
19   A. Normally it would be after they have
20 accepted or rejected the claim --
21   Q. But not necessarily --
22   A. -- in terms of total count, not every --
23 not every employee that has submitted a claim
24 during this period.
25   Q. So is it your testimony that you learned

Page 13

1      PATRICK J. LYNCH
2 of Mr. Raftery's and Mr. Katz's claim after
3 Mr. Goldsby's committee ruled on it?
4    A. I do not recall that.
5    Q. So maybe, maybe not?
6    A. Maybe, maybe not.
7       Actually, Mr. Raftery called me and told
8 me that they were involved in -- I don't know
9 whether it was in litigation at that point or we
10 were going to file a claim.
11   Q. Before it was submitted with
12 Mr. Goldsby's claim?
13   A. I don't know exactly what -- what the
14 timing was, but he at one time called me.
15   Q. This is Mr. Raftery?
16   A. Yes.
17   Q. What do you recall about that
18 conversation?
19   A. I remember telling Mr. Raftery that
20 since I was on the change of control committee,
21 that it was not appropriate for me to have a
22 conversation with him.
23   Q. So you didn't talk about the merits of
24 his claim?
25   A. Did not.

Page 14

```
 1              PATRICK J. LYNCH
 2      Q.   Did you talk about the merits of the
 3   claim with anyone on Mr. Goldsby's committee at
 4   any time?
 5      A.   I can't recall, but the normal procedure
 6   would be if I was in -- at the meeting, that
 7   the -- Goldsby's committee would review when
 8   submitting the claim up and giving their case as
 9   to why the claim was turned down. Obviously, if
10   they accepted the claim, then it would never come
11   to our committee.
12      Q.   So a claim that was rejected by
13   Mr. Goldsby's committee -- and that's referred to
14   now as the benefits center change of control
15   committee?
16      A.   I think that's right.
17      Q.   -- when that committee basically rejects
18   a claim, is it your testimony that they then brief
19   your committee, the change of control committee,
20   as to its rationale?
21      A.   Yes.
22      Q.   And is that incident to the list that
23   you were referring to earlier?
24      A.   Yes.
25      Q.   How often did your change of control
```

Page 15

```
 1              PATRICK J. LYNCH
 2   committee meet -- does it meet, I'm sorry?
 3      A.   There was no predetermined scheduling as
 4   required.
 5      Q.   And are the meetings recorded?
 6      A.   No, there's no minutes, if that's what
 7   you are asking.
 8      Q.   How about a tape recorder?
 9      A.   No.
10      Q.   No minutes, no tape recorder?
11      A.   No.
12      Q.   Any notes, that you know of, taken?
13      A.   Not that I'm aware of.
14      Q.   You never take any notes at these
15   meetings?
16      A.   I do not.
17      Q.   Other than the list you referred to --
18   well, actually, let me explore the list for a
19   minute.
20           What's on the list other than the
21   identity of the claim?
22      A.   I don't know. We don't see the list.
23   Goldsby goes through and he'll talk about the
24   number of cases, those that are pending, those
25   that have been resolved, those that have been
```

Page 16

```
 1              PATRICK J. LYNCH
 2   accepted by their group, and those that are coming
 3   up to ours, and then how many that we've accepted
 4   or rejected.
 5      Q.   I see.
 6           So is it your testimony that that
 7   briefing process you are describing by Mr. Goldsby
 8   is the first time you learned of the claims of
 9   Mr. Katz and Mr. Raftery other than, perhaps, that
10   telephone call?
11      A.   I can't say for -- for certain, because
12   we do get, you know, information prior to the
13   meetings --
14      Q.   I see.
15      A.   -- as to what the -- some of the
16   correspondence that goes back and forth between
17   Goldsby and the committee, and I -- I just don't
18   know the exact timing of when we would have
19   received that, but I was -- I was aware that --
20   that Katz and Raftery had a claim in.
21      Q.   Mr. Goldsby indicated there had been
22   some exploration by both committees as to the
23   propriety of exchanging information of a claim
24   pending before Mr. Goldsby's committee and he had
25   determined that that was perfectly appropriate.
```

Page 17

```
 1              PATRICK J. LYNCH
 2      Is that consistent with your
 3   understanding?
 4      A.   I do not recall that discussion at all.
 5      Q.   So, to your knowledge, did the change of
 6   control committee ever explore the propriety,
 7   vis-a-vis the appeal process, of exchanging
 8   information with the benefits center change of
 9   control committee before the claim actually
10   reached the change of control committee?
11      A.   There was -- there was never any
12   discussion on that.
13      Q.   Mr. Goldsby also indicated he, from time
14   to time, might talk with Ms. Stoner about the
15   claims that are still pending before his
16   committee.
17      A.   Mm-hmm.
18      Q.   Did you ever have discussions with
19   anyone on the benefits center change of control
20   committee about the merits of a claim still
21   pending before the benefits center change of
22   control committee?
23      A.   No.
24      Q.   Do you know whether anyone else on the
25   change of control committee engaged in such
```

Page 18

PATRICK J. LYNCH

2 discussions?
3    A.   Other than Ms. Stoner?
4    Q.   Right.
5    A.   No, I do not know.
6    Q.   Do you know that Ms. Stoner did?
7    A.   I know she had conversations prior to
8 meetings to -- as chair of the committee, to
9 become familiar with what --
10    Q.   Okay.
11    A.   -- the meeting was going to be about.
12    Q.   When a change of control committee
13 meeting was held, was there any set protocol for
14 those meetings?
15    A.   It would be to go through the individual
16 cases that were -- were coming up, just, like,
17 five cases, six cases, three cases.
18    Q.   Was there any set amount of cases that
19 had to be pending before a meeting would be
20 called?
21    A.   No.
22    Q.   Was there any particular time frame that
23 would be too long, if you will, before a meeting
24 would be called; in other words, "It's been two
25 months, we have to meet," that type of thing?

Page 19

PATRICK J. LYNCH

2    A.   I don't recall.
3    Q.   Let me approach it from a different
4 angle. What would determine when a meeting would
5 be called?
6    A.   Availability of -- of the committee
7 and -- and cases to be dealt with.
8    Q.   Those two factors?
9    A.   Mm-hmm.
10    Q.   And then would Ms. Stoner use her
11 judgment when to call a meeting utilizing those
12 two factors?
13    A.   Yes.
14    Q.   Would these meetings be face-to-face?
15    A.   No, telephonic.
16    Q.   Was there a procedure for sharing
17 information -- for sharing or exchanging
18 information, about a claim that would be
19 considered, other than what you have already
20 testified to about Mr. Goldsby's briefing?
21    A.   Material would be sent out in advance of
22 the meeting.
23    Q.   Who would send out the material?
24    A.   I believe, I don't know who actually
25 sent it, but it would have emanated from the

Page 20

PATRICK J. LYNCH

2 benefits control committee.
3    Q.   Was there any standard set of material
4 that needed to be included in the packages
5 distributed to the change of control committee?
6    A.   No.
7    Q.   So some claims would have more
8 documentation than others?
9    A.   Correct.
10    Q.   Do you know what documents the change of
11 control committee considered vis-a-vis the claims
12 of Mr. Raftery and Mr. Katz?
13    A.   Not specifically, no.
14    Q.   Do you recall whether any documents were
15 specifically looked at by the committee?
16    A.   No, I do not.
17    Q.   Do you know whether you, yourself,
18 looked at any documents in deciding the claims of
19 Mr. Katz and Mr. Raftery?
20    A.   No, I do not.
21    Q.   Do you recall the meeting in which the
22 claims of Mr. Katz and Mr. Raftery were discussed?
23    A.   No, I do not.
24    Q.   So you have no recollection at all?
25    A.   No.

Page 21

PATRICK J. LYNCH

2         MR. LUCAS: Off the record.
3
4         (Discussion held off the record.)
5
6    Q.   I might have asked you this, sir, I
7 apologize if I did, but do you recall Mr. Goldsby
8 briefing you on the claims of Mr. Katz and
9 Mr. Raftery?
10    A.   No, I do not.
11    Q.   Do you recall any discussions with
12 anyone on the benefits center change of control
13 committee that you had about Mr. Katz and
14 Mr. Raftery's claims?
15    A.   No, I do not.
16    Q.   Do you recall any conversations you had
17 with any members of the change of control
18 committee about Mr. Katz and Mr. Raftery's claims?
19    A.   No.
20    Q.   Do you recall any discussions with
21 anyone, other than with counsel in preparation for
22 today, about Mr. Katz and Mr. Raftery's claims?
23    A.   No.
24    Q.   Have you ever seen Exhibit 4 before?
25    A.   Not to my knowledge.

6 (Pages 18 to 21)

Page 22

PATRICK J. LYNCH

Q. How about Exhibit 5?
A. No, I do not.
MR. KEE: You do not recall?
THE WITNESS: I do not recall.
Q. Have you ever seen Exhibit 6 before?
A. I would have seen this, because I would have been a recipient of it.
Q. Having looked at Exhibit 6, do you recall whether or not you looked at Exhibit 6 in determining Mr. Katz and Mr. Raftery's claims?
A. No, I do not recall.
Q. Do you know whether this was in any of the material distributed to the committee in deciding Mr. Katz and Mr. Raftery's claims?
A. No, I do not.
Q. Do you know whether the material distributed to the committee incident to deciding claims was retained or stored in any particular place?
A. No, I do not.
Q. The last position Mr. Bethancourt held with Texaco was what?
A. He was a -- at the time of the merger,

Page 23

PATRICK J. LYNCH

he was a -- a vice president of the production side of the business.
Q. Was he a senior vice president, do you know?
A. He was not a senior vice president; vice president.
Q. I'm going to just show you Exhibit 36 and in particular, page 16 of that exhibit.
First of all, have you ever seen Exhibit 36 before?
A. No, I have not.
MR. KEE: Look at the next page.
Q. Yeah, look at the next page and you could see a copy. You've probably seen that.
A. Oh, okay.

(Witness peruses document.)

A. No, I have not seen that.
Q. You've never seen the Separation Pay Plan of Texaco?
A. Oh, yes, I've seen the Separation Pay Plan of Texaco, yes.
Q. And is this that document?

Page 24

PATRICK J. LYNCH

A. Well, I mean, I can't tell just looking at it what that is.
Q. Do you know whether the last version, the version in effect at the time of the merger, was the May 2001 version of that plan?
A. I do not know that.
Q. Do you recall looking at this plan, or this particular document, Exhibit 36, when deciding the claims of Mr. Katz and Mr. Raftery?
A. No, I do not.
Q. On page 16, it indicates that "The change of control committee shall be comprised of," and it indicates individuals who have held -- and it indicates three positions there.
Do you see that?
A. Mm-hmm.
Q. Did Mr. Bethancourt ever occupy any of those positions?
A. Not senior vice president.
There was a change in the committee because of -- one of the members left the committee to go -- left ChevronTexaco, who originally went to ChevronTexaco, went to work for another company.

Page 25

PATRICK J. LYNCH

Q. And who was that?
A. That would have been Glenn Tilton.
Q. So he was one of the original members?
A. He was one of the original members, and I believe Bethancourt may have replaced him.
Q. So when you testified earlier that the original members were the five you listed, you were mistaken, because Mr. Tilton was a member and he was replaced with Mr. Bethancourt, that's your recollection?
A. Yeah, I think that -- I think that's correct.
Q. Going to the question I asked you just a few moments ago, Mr. Bethancourt didn't hold any of those specific positions, to the best of your knowledge?
A. Not specific, no.
Q. How about Mr. Rudy?
A. He was the secretary but not the vice president. My recollection is he is the secretary. I don't believe he had vice president.
Q. How about yourself, did you occupy any of those positions?
A. I was a senior vice president, chief

Page 26

1       PATRICK J. LYNCH
2  financial officer.
3       Q.  How about Rosemary Moore, did she occupy
4  any of those positions?
5       A.  No, she did not, to my knowledge.
6       Q.  And Ms. Stoner, she was the head of HR,
7  correct?
8       A.  That's correct.
9       Q.  So she did occupy those positions?
10      A.  Yes, mm-hmm.
11      Q.  Are you aware of why the change of
12 control committee was not created consistent with
13 the description on page 16?
14      A.  I -- I do not recall any reason for the
15 changes other than availability of --
16      Q.  Okay.
17      A.  -- of people.
18      Q.  Was there any discussion to increase the
19 number of members from three to five?
20      A.  Well, there are only three Texaco
21 people, I think, that have -- four Texaco people.
22 Rosemary Moore left Texaco.
23          The idea was to have three people from
24 Texaco and three from Chevron, I believe.
25      Q.  I see.

Page 27

1       PATRICK J. LYNCH
2           And Mr. Bethancourt is from Texaco,
3  correct?
4       A.  Right.
5       Q.  And you are from Texaco?
6       A.  Right.
7       Q.  How about Ms. Stoner?
8       A.  Texaco.
9       Q.  Rosemary Moore was from Chevron?
10      A.  She was Texaco that went to Chevron and
11 left Chevron.
12      Q.  How about Mr. Rudy?
13      A.  He was Texaco.
14      Q.  So the idea was never implemented, is
15 that correct, you never had three people from
16 Chevron and three people from Texaco?
17      A.  I don't know about Chevron, but we
18 always had -- we always had Janet, and then Glenn
19 Tilton at the time, and then myself, and then
20 eventually Rudy coming on, Mike Rudy coming on.
21      Q.  Mr. Tilton was Texaco as well?
22      A.  He was Texaco.
23      Q.  Do you recognize Exhibit 48?
24      A.  Do I recognize, excuse me?
25      Q.  The handwriting on Exhibit 48.

Page 28

1       PATRICK J. LYNCH
2       A.  No, I do not.
3       Q.  I take it you've never seen Exhibit 48?
4       A.  I have not.
5       Q.  How about Exhibit 49, have you ever seen
6  that before?
7       A.  I have no -- no recollection of having
8  seen this.
9           Is there something else on there?
10          MR. KEE:  Look through it carefully.
11      A.  That one, we talked about.
12          MR. KEE:  Pointing to --
13      Q.  Exhibit 6 is part of the package,
14 so you saw that?
15      A.  Yes, the chair's letter.
16      Q.  But my question is not the individual
17 letters, whether you saw that as a packet, but
18 whether that's representative of Ron Boilla's
19 file.
20          Did you ever see Ron Boilla's file?
21      A.  No, not to my recollection.
22      Q.  Is your brother Tom Lynch?
23      A.  Yes, he is.
24      Q.  Do you recall having any discussions
25 with Tom Lynch, your brother, about Mr. Katz and

Page 29

1       PATRICK J. LYNCH
2  Mr. Raftery's claims while his claims were still
3  pending before Mr. Goldsby's committee?
4       A.  No, I do not.
5       Q.  Did he ever talk to you about a
6  discussion he had with Mr. Bandy while at the
7  Metropolitan Opera about those claims?
8       A.  No, I don't believe so.
9       Q.  Since you don't recall the committee's
10 meetings and discussions regarding Mr. Katz and
11 Mr. Raftery's claim, is it safe to say that you
12 don't recall the rationale for denying those
13 claims?
14      A.  That's correct, I do not recall the
15 rationale for denying them.
16      Q.  Let me just show you Exhibit 57.  It's
17 an email.  I particularly want to direct your
18 attention to an email from your brother Tom.  It's
19 at the bottom of the page.
20          If you would just -- you can read the
21 whole exhibit.
22
23          (Witness peruses document.)
24
25      A.  Now, your question is whether I've

Page 30

PATRICK J. LYNCH

1  seen that?
2  
3  Q. Having seen that, does that refresh your
4  recollection at all about why Mr. Katz's and
5  Mr. Raftery's claims were denied?
6  A. No, it does not.
7  Q. If you look at the top of Exhibit 57,
8  it's an email from John Bethancourt.
9     He was on your change of control
10 committee, correct?
11 A. Correct.
12 Q. And he's stating to the people on the
13 distribution list on May 30, 2002 -- look at the
14 last sentence of his email -- "Please be careful
15 how you handle this one," referring to my clients'
16 claims, "as you could set a precedent for others
17 as per Tom Lynch's note to you."
18    Do you recall discussing the setting of
19 a dangerous precedent at all in deciding Mr. Katz
20 and Mr. Raftery's claims?
21 A. No, I do not.
22 Q. And do you recall any discussions of
23 Mr. Bethancourt on that topic?
24 A. No, I do not.
25 

Page 31

PATRICK J. LYNCH

1  
2  (Plaintiffs' Exhibit 61, Letter dated
3  August 26, 2002 to Kenneth M. Raftery
4  from Ron G. Boilla, was marked for
5  identification.)
6  
7  Q. I'm showing you what I'm marking for
8  identification as Exhibit 61.
9     Have you ever seen that document before?
10 A. Not to my knowledge.
11 Q. In August of 2002, were you aware that
12 Mr. Boilla was signing on behalf of Janet Stoner
13 on behalf of the change of control committee?
14 A. I don't remember specifically, but I
15 would get copies of letters like this from time to
16 time.
17 Q. Are you aware Mr. Boilla was on
18 Mr. Goldsby's committee?
19 A. Yes, I am.
20 Q. Did you see any conflict in Mr. Boilla
21 acting on behalf of the change of control
22 committee on -- vis-a-vis claims -- the committee
23 on which he had served had already acted upon?
24 Does that make sense?
25 A. Not if he's just -- not if he's -- not

Page 32

PATRICK J. LYNCH

1  
2  if he's representing what the claims committee had
3  agreed to, change of control committee had agreed
4  to, no.
5  Q. Do you recall having any discussion
6  among the change of control committee about having
7  Mr. Boilla serve in such an administrative
8  capacity only?
9  A. No, I do not.
10 Q. Is it your understanding that was the
11 extent of his involvement, though, at the change
12 of control committee, is just signing letters
13 endorsing what the committee had already decided
14 upon?
15 A. Mr. Boilla was on Mr. Goldsby's
16 committee. He had no authority at all from the
17 claims committee's standpoint. He was just
18 carrying out what Ms. Stoner would have asked him
19 to do.
20 Q. Looking at Exhibit 61, does that refresh
21 your recollection as to why the change of control
22 committee denied my clients' claims?
23 A. No, it does not.
24 
25 (Plaintiffs' Exhibit 62, Letter dated

Page 33

PATRICK J. LYNCH

1  
2  October 21, 2002 from Larry Katz and
3  Kenneth Raftery to Ron Boilla and letter
4  dated November 6, 2002 from Ron Boilla
5  to Larry Katz and Kenneth Raftery, was
6  marked for identification.)
7  
8  Q. Plaintiffs' Exhibit 62, it's a two-page
9  document, Bates Nos. 161 and 162.
10    Have you seen any of those documents
11 before?
12 A. No, and this is not something that
13 normally would, I don't believe, come to the
14 change of control committee, because I think the
15 policy that Boilla has here applies to any legal
16 matters that we were -- that are before the
17 company.
18 Q. The claim being submitted is to
19 attorneys fees under the Separation Pay Plan
20 provisions.
21    Is it your testimony that the change of
22 control claims committee wouldn't act on those
23 requests?
24 A. There is a procedure for handling legal
25 fees and it's -- my recollection is it's pretty

Page 34

1  PATRICK J. LYNCH
2  definitive, and that's how legal fees are
3  reimbursed.
4     Q.  What's the procedure?
5     A.  I can't recall it right now. We --
6  rarely would the change of control committee -- I
7  can't even remember an instance where we -- we had
8  to discuss legal fees. It was all pretty
9  well-documented.
10    Q.  Well, do you know if Mr. Boilla in this
11 case -- first of all, do you know who signed for
12 Mr. Boilla? It looks like someone signed for
13 Mr. Boilla who signed on behalf of the change of
14 control claims committee on page 2 of Exhibit 61?
15    A.  No, I do not.
16       MR. LUCAS:  Did you get the answer?
17       THE COURT REPORTER:  Yes.
18    Q.  Do you know if Mr. Boilla had the
19 authority to act on behalf of the change of
20 control claims committee in authoring and sending
21 page 2 of Exhibit 61?
22    A.  No, I do not.
23    Q.  You, as a member of the committee, did
24 you give him such an authority?
25    A.  I have no recollection of dealing with

Page 35

1  PATRICK J. LYNCH
2  legal fees at any of the committee meetings we've
3  had.
4       MR. LUCAS:  I think I'm done.
5
6  EXAMINATION BY
7  MR. KEE:
8     Q.  Mr. Lynch, if Mr. Katz and Raftery
9  had submitted a packet of information to the
10 change of control committee, do you believe you
11 would have reviewed that packet of information as
12 part of your process?
13    A.  Yes.
14       MR. KEE:  That's all I have.
15       MR. LUCAS:  Okay. Thank you.
16
17    (Time noted:  1:43 p.m.)
18
19
20
21
22
23
24
25

Page 36

1  PATRICK J. LYNCH
2
3  STATE OF NEW YORK     )
4                         ss:
5  COUNTY OF            )
6
7
8     I, PATRICK J. LYNCH, hereby certify
9  that I have read the pages of the foregoing
10 testimony of this deposition and hereby certify it
11 to be a true and correct record.
12
13            oOo
14
15       _____
16       PATRICK J. LYNCH
17
18
19
20 Sworn to before me this
21 ____day of _____, 2004.
22
23    _____
       Notary Public
24
25

Page 37

1  April 28, 2004
2
3            I N D E X
4
   EXAMINATION BY:              PAGE
5  Mr. Lucas                     4
6  Mr. Kee                      35
7
            EXHIBITS
8
   PLAINTIFFS'                   PAGE
9  61  Letter dated August 26, 2002
       to Kenneth M. Raftery from
10     Ron G. Boilla              31
11 62  Letter dated October 21,
       2002 from Larry Katz and
12     Kenneth Raftery to Ron
       Boilla and letter dated
13     November 6, 2002 from
       Ron Boilla to Larry Katz
14     and Kenneth Raftery, Bates-
       stamped 000161-000162       32
15
16
17
18
19
20
21
22
23
24
25

DALCO REPORTING & LEGAL VIDEO

Page 38

```
 1            C E R T I F I C A T I O N
 2
 3
 4   STATE OF NEW YORK    )
 5                        ) ss.
 6   COUNTY OF WESTCHESTER )
 7
 8           I, DANA CHIPKIN, Court Reporter and
 9   Notary Public within and for the County of
10   Westchester, State of New York, do hereby certify:
11           That I reported the proceedings that
12   are hereinbefore set forth, and that such
13   transcript is a true and accurate record of said
14   proceedings.
15           AND, I further certify that I am not
16   related to any of the parties to this action by
17   blood or marriage, and that I am in no way
18   interested in the outcome of this matter.
19
20           IN WITNESS WHEREOF, I have hereunto
21   set my hand.
22
23
24           DANA CHIPKIN, RPR, CRI
25
```

DALCO REPORTING & LEGAL VIDEO