# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 182070 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

McClure v. Bank of America Corp.
D.N.J.,2006.
Only the Westlaw citation is currently available.NOT
FOR PUBLICATION
United States District Court,D. New Jersey.
Stewart MCCLURE, John Feeney, Joseph Micali,
and James Lynch, Plaintiffs,
v.
BANK OF AMERICA CORPORATION,
Defendants.
**No. Civ.A.05-4011(SRC).**

Jan. 24, 2006.

John F. Olsen, Robertson, Freilich, Bruno & Cohen,
LLC, Newark, NJ, for Plaintiffs.
Douglas Eugene Arone, Gibbons, Del Deo, Dolan,
Griffinger & Vecchione, PC, Newark, NJ, for
Defendant.

OPINION
CHESLER, District Judge
*1 This matter comes before the Court on Plaintiffs',
Stewart McClure, John Feeney, Joseph Micali, and
James Lynch ("Plaintiffs"), Cross-Motion for
Summary Judgment (docket item # 7) on their claim
for attorneys' fees.[FN1] Having considered the parties'
written and oral arguments, and for the reasons set
forth below, the Court GRANTS Plaintiffs' Cross-
Motion for Summary Judgment as to their claim for
attorney's fees.

> FN1. Plaintiffs' cross-motion sought
> summary judgment on Plaintiffs' ERISA
> claims as well as summary judgment on
> their claim for attorneys' fees. This Court
> heard oral argument on January 17, 2006
> and, for the reasons set forth at oral
> argument, denied Plaintiff's cross-motion for
> summary judgment as to the ERISA claims.
> This opinion deals only with the attorneys'
> fees portion of Plaintiffs motion.

I. Factual Background

This action arises from the calculation of Plaintiffs'
benefits under their Termination Agreement with
Summit Bancorp ("Summit"). Plaintiffs are four

former executives of Summit who were terminated
by FleetBoston Financial Corporation ("Fleet")
following Fleet's 2001 merger with Summit. (Feeney
Aff. ¶ 2). Each Plaintiff is a party to a Termination
Agreement with Summit which provides for
enhanced retirement benefits for executives
terminated following a change in corporate control,
such as Summit's merger with Fleet.[FN2] (Id.). The
Termination Agreement also provided for the
payment of attorneys' fees incurred by an executive
in litigating a dispute under the Agreement.

> FN2. The parties submit differing
> interpretations of the language of the
> Termination Agreement at issue. The facts,
> as they relate to the interpretation of the
> Termination Agreement, are familiar to the
> parties and fully discussed during this
> Courts oral argument held on January 17,
> 2006. Only those facts pertinent to the
> instant motion for Summary Judgment on
> the issue of attorneys' fees will be discussed
> in this Opinion.

II. Discussion

A. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that
summary judgment should be granted "if pleadings,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c); see
also Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248, 106 S.Ct. 2505, 91 L.Ed.2d 202, (1986);
Kreschollek v. Southern Stevedoring Co., 223 F.3d
202, 204 (3d Cir.2000). In deciding a motion for
summary judgment, a court must construe all facts
and inferences in the light most favorable to the
nonmoving party. See Boyle v. Allegheny
Pennsylvania, 139 F.3d 386, 393 (3d Cir.1998). The
moving party bears the burden of establishing that no
genuine issue of material fact remains. See Celotex
Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct.
2548, 91 L.Ed.2d 265 (1986).

The Supreme Court has stated that in evaluating a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 2
Not Reported in F.Supp.2d, 2006 WL 182070 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

defendant's motion for summary judgment:
[t]he judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict....

Anderson, 477 U.S. at 252. A fact is "material" only if it will affect the outcome of a lawsuit under the applicable law, and a dispute over a material fact is "genuine" if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. See id.

*2 Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita, 475 U.S. at 586; see also Anderson, 477 U.S. at 247-48. The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " Celotex, 477 U.S. at 324; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992) ("to raise a genuine issue of material fact ... the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold"), cert. denied, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

### B. Plaintiff's Cross-Motion for Summary Judgment

Plaintiffs assert that, pursuant to § 6 of the Termination Agreement, they are entitled to an award of legal fees. Section 6 of the Termination Agreement provides, in pertinent part:
The Company or a Subsidiary shall pay promptly as incurred the Executive's reasonable attorneys' fees and expenses incurred in good faith by the Executive as a result of any dispute (regardless of the outcome thereof) with the Company or a Subsidiary or any other party regarding the validity or enforceability of, or liability under, any provision of this Agreement or the act of any party thereunder or any guarantee of

performance thereof and pay prejudgment interest on any delayed payment to the Executive ... *provided however,* that the Executive shall not have been found by the court to have acted in bad faith. Any finding of bad faith must be final with the time to appeal therefrom having expired and no appeal having been perfected.

In opposition, Defendants argue that New Jersey public policy prohibits the enforcement of the attorneys' fees provision unless Plaintiffs prevail on their claims. (Def.Br.12).

Generally, New Jersey has a strong policy disfavoring the shifting of attorneys' fees. See No. Bergen Rex Transp., Inc. v. Trailer Leasing Co., 158 N.J. 561, 569, 730 A.2d 843 (1999); Kellam Assocs., Inc. v. Angel Projects, LLC, 357 N.J.Super. 132, 814 A.2d 642 (App.Div.2003). Nevertheless, New Jersey law permits parties to a contract to shift liability for attorneys' fees. See Cohen v. Fair Lawn Dairies, Inc., 86 N.J.Super. 206, 214-16, 206 A.2d 585 (App.Div.1965). Such provisions, however, will be strictly construed. North Bergen, 158 N.J. at 570, 730 A.2d 843. In North Bergen, the New Jersey Supreme Court found the threshold inquiry to be whether the party seeking fee shifting was the prevailing party. The court then recited a two-pronged test to determine when a party seeking fee shifting has a prevailing party: (1) the party must demonstrate that its lawsuit was causally related to securing the relief obtained; and (2) the party must demonstrate that the relief obtained had some basis in law. Id.

*3 Neither party has pointed this Court to any New Jersey cases where a provision favoring the economically weaker party, such as the one at issue here, has been held to violate New Jersey public policy. Both parties cite Kellam Assocs., Inc. v. Angel Projects, LLC, 357 N.J.Super. 132, 814 A.2d 642 (App.Div.2003), for different propositions. Plaintiff cites Kellam, for the proposition that New Jersey law permits parties to contractually agree to pay attorneys' fees. Defendant argues that Kellam further supports their argument that a party seeking recovery of attorneys' fees must first prevail on the merits. Kellam involved an action by a landlord against tenant for failure to pay increased rent. After successfully litigating his claim, the landlord moved for attorneys' fees pursuant to a term in the lease. The Appellate Division found the landlord to be a prevailing party and thus, entitled to an award of attorneys' fees. Id. at 142, 814 A.2d 642.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 182070 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

*Kellam,* however, is not instructive to the case before this Court. The provision at issue in *Kellam* provided that, "[t]he Landlord shall be entitled to recover reasonable attorneys' fees and costs actually incurred in connection with any effort to collect past-due rent or enforce any other term of this Lease breached by Tenant." *Id.* at 137, 814 A.2d 642. The provision in *Kellam* presupposes that the landlord will have prevailed; that is, the landlord could only recover fees if he succeed on the merits by showing that the rent was, in fact, past due. Similarly, the landlord was only entitled to attorneys' fees in enforcing provisions of the lease *breached* by the tenant. This provision is unlike the provision at issue here which provides for attorneys' fees "regardless of the outcome."

Defendants rely on *Curby v. Solutia, Inc.,* 351 F.3d 868 (8th Cir.2003). *Curby* involved claims for both ERISA benefits and attorneys' fees and there, like here, the relevant agreement provided for reimbursement of reasonable attorneys' fees "regardless of the outcome." The court rejected plaintiff's claim for benefits, and denied her claim for attorneys' fees. The court interpreted the phrase "reasonable attorneys' fees" to require both the time spent on the litigation and the plaintiff's litigation position to be reasonable. In *Curby,* the plaintiff brought a frivolous lawsuit. Plaintiff sued under a termination agreement which required a change of corporate control to trigger severance benefits. The court rejected her claims noting that, "[i]t [was] undisputed no change of control occurred," and therefore the claimed attorneys' fees were not "reasonably" incurred. *Id.* at 872-73. The contract at issue here likewise would bar a recovery of attorneys' fees by Plaintiff if Plaintiffs' litigation position was "frivolous." The contract requires that the claim be brought in "good faith," and obviously a frivolous claim is not one brought in good faith.

The facts of *Curby,* therefore, are not applicable to the instant case. Here, Plaintiffs are clearly entitled to benefits under the relevant Termination Agreement. The only issue in dispute in this case is as to the amount of benefits to which they are entitled. Plaintiffs' claims are not the type of frivolous or "unreasonable" litigation that would render a contractual attorneys' fees provision, such as the one here, inapplicable. Defendant's argument that this Court should measure "reasonableness" by the degree of success achieved in the litigation would render the phrase "regardless of the outcome" meaningless.

*4 Defendants also heavily rely on *North Bergen.* *North Bergen,* however, involved an attorneys' fees

provision contained in a commercial lease which entitled the lessor to fees incurred in "enforcing the covenants of [the] Lease." *North Bergen,* 158 N.J. at 566, 730 A.2d 843. The provision in *North Bergen* does not embody what is at stake here. The plain language of the agreement here essentially holds that, absent bad faith, the executive is entitled to reasonable attorneys fees "regardless of the outcome." Nowhere does the provision call for a requirement that Plaintiffs need to be the prevailing party in order to collect attorneys' fees.

Even given New Jersey's strong public policy, it does not call upon this Court to negate the arms length agreement reached here. This is especially true in light of the fact that the provision at issue was placed into the contract by the economically stronger party for the benefit of the economically weaker party to serve a particular purpose. This provision stood to create a scenario in which an individual was empowered to challenge actions of the economically stronger party on equal footing.[FN3]

> FN3. The genesis of New Jersey's public policy against fee-shifting provisions has largely grown out of a rejection of provisions in the form of boilerplate contracts used by businesses against consumers, individuals, or other weaker parties. *See Cohen v. Fair Lawn Dairies, Inc.,* 86 N.J.Super. at 213, 206 A.2d 585 (noting the hostility to such provisions is "[g]enerally out of concern for the unequal bargaining position of the parties and the possibilities of overreaching ...."); *see also Dare v. Freefall Adventures, Inc.,* 349 N.J.Super. 205, 793 A.2d 125 (App.Div.2002).

Giving this provision the strict scrutiny required by New Jersey law, this Court finds the attorneys' fees provision here reasonable and enforceable. The parties contract, which specifies attorneys' fees to be paid regardless of the outcome, obviates the need for this Court to first determine whether Plaintiffs have prevailed. According to the parties' own agreement, Plaintiffs are therefore entitled to the payment of reasonable attorneys' fees.

*CONCLUSION*

For the foregoing reasons, the Court will GRANT Plaintiffs' motion for summary judgment on the issue

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2006 WL 182070 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

of attorneys' fees. An appropriate form of order will
be filed herewith.

D.N.J.,2006.
McClure v. Bank of America Corp.
Not Reported in F.Supp.2d, 2006 WL 182070
(D.N.J.)

END OF DOCUMENT

# **EXHIBIT 2**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 758634 (D.Conn.), 59 UCC Rep.Serv.2d 330
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

C

National Eastern Corp. v. Vegas Fastener MFG
D.Conn.,2006.

United States District Court,D. Connecticut.
NATIONAL EASTERN CORP., Plaintiff,
v.
VEGAS FASTENER MFG, Defendant.
**No. 3:04CV706 (JBA).**

March 24, 2006.

Lawrence G. Rosenthal, Rogin, Nassau, Caplan, Lassman & Hirtle, Hartford, CT, for Plaintiff.
Jeffrey Clyde Kestenband, Moriarty & Paetzold, Glastonbury, CT, for Defendant.

RULING ON PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT [DOC. # 39]
ARTERTON, J.

*1 Plaintiff National Eastern Corporation ("National Eastern") instituted this diversity action against defendant Vegas Fastener MFG ("Vegas Fastener") alleging breach of contract and bad faith for delivery of non-conforming nuts and bolts to plaintiff for use in a state bridge construction project, causing plaintiff financial damage for removal and replacement. *See* First Amended Complaint "FAC" [Doc. # 21]. Plaintiff's Motion for Summary Judgment [Doc. # 39] contends that there is no dispute that defendant provided plaintiff with non-conforming goods and thus breached the contract. The parties agree that Connecticut law is to be applied. For the reasons that follow, plaintiff's motion is granted in part and denied in part.

I. FACTUAL BACKGROUND

The undisputed facts show that plaintiff National Eastern was a subcontractor to Cianbro Corporation ("Cianbro") providing stainless steel products for Cianbro's construction of the Tomlinson Bridge, located in New Haven, Connecticut, for the Connecticut Department of Transportation. *See* Agreement Plaintiff's Local Rule 56(a)(1) Stmt. [Doc. # 41] at ¶ ¶ 1-5. In September 2001, National Eastern entered into a contract with Vegas Fastener for the purchase of various materials (including nuts and bolts) of Type 316 steel. *Id.* at ¶ ¶ 6 & Ex. 1(A)

(purchase order). Vegas Fastener thereafter provided materials to National Eastern with two Certificates of Compliance stating that the materials met the specification for Type 316 steel, along with test results. *Id.* at ¶ 7 & Ex. 1(B).

In actuality, and unbeknownst to National Eastern when it accepted the materials, most of the materials supplied by Vegas Fastener were not of Type 316 steel, but of Type 304. *Id.* at ¶ ¶ 8, 12.[FN1] After Cianbro used the materials in the bridge project, it was discovered that the materials had corroded, and as a result it was also discovered that they were nonconforming to state specifications. The Connecticut Department of Transportation, as owner of the bridge project, demanded that the nonconforming materials be removed and replaced with the specified Type 316 steel products.[FN2] *Id.* at ¶ 9. Cianbro, as the general contractor on the project, bore the costs of removal and replacement and passed on the costs to plaintiff in the form of back charges. *Id.* at ¶ 10, 14-15. Plaintiff challenged the amount of these back charges in an arbitration, which determined that Cianbro was entitled to $98,146.00 in back charges.[FN3] *See* Arbitration Award [Doc. # 50] at 1. Defendant does not dispute, or offer any evidence to contest, that it received notice of nonconformity within a reasonable time after plaintiff's discovery, but only asserts that plaintiff's statement that National Eastern and Cianbro contacted the defendant "almost immediately" upon discovery of the nonconformity is an opinion, not a statement of fact. *See* Def's Local Rule 56(a)(2) Stmt. at ¶ 13.

> FN1. After discovery and replacement of the nonconforming materials, defendant informed plaintiff that "[t]he raw material that we purchased for this order was 316 SS. However, our vendor supplied us with 304 SS and a 316 raw material certificate." *See* Pl's Local Rule 56(a)(1) Stmt. at Ex. 1(C).

> FN2. Defendant concedes that most of the materials provided were of Type 304, and not Type 316, steel, and that the Connecticut Department of Transportation thus demanded that the materials be removed and replaced, but "denies that the materials did not conform for the purpose for which they were used," *see* Def. Local Rule 56(a)(2)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 758634 (D.Conn.), 59 UCC Rep.Serv.2d 330
(Cite as: Not Reported in F.Supp.2d)

Page 2

Stmt. [Doc. # 45] at ¶ 9, arguing that Types 304 and 316 steel are "substantially similar for their intended use." *See id.* at 3, ¶ 1.

FN3. In the summary judgment briefing, prior to the issuance of the arbitration award, the parties disputed the amount of damages suffered by plaintiff as a result of defendant's breach of the contract. Plaintiff submitted materials purporting to document damages in the amount of $95,487.94. *See* Pl's Local Rule 56(a)(1) Stmt. at Ex. 1(E) (letter to defendant providing documentation of cost of removal and replacement); Ex. 2 (Muckenhirn Affidavit) at ¶ ¶ 16-17. Defendant referred to a July 2003 letter from Cianbro to Vegas Fastener stating that the cost of removal and replacement was estimated to be $73,720.00. *See* Def's Opposition Br. [Doc. # 44] at 12, Ex. 2. In light of the arbitration award, however, the amount of damages incurred by plaintiff in the form of back charges from Cianbro appears now to be established, as discussed below.

## II. STANDARD

*2 Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Gibbs-Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir.2002) (internal quotation omitted). "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "If reasonable minds could differ as to the import of the evidence ... and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997) (internal quotation, citation, and alteration omitted).

## III. DISCUSSION

### A. Breach of Contract Claim (Count I)

Because the parties' contract was one for the sale of goods, Article 2 of the Uniform Commercial Code ("UCC"), Conn. Gen.Stat. § 42a-2-101 *et seq.,* applies. Plaintiff argues that defendant is liable for plaintiff's damages caused by the nonconformity of the materials tendered pursuant to UCC § 2-601, which provides that if goods tendered "fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest," *see* Conn. Gen.Stat. § 42a-2-601, and UCC § § 2-607(3), 2-714, which provide that where a tender has been accepted and the buyer has notified the seller within a reasonable time after it discovered or should have discovered any breach, the buyer "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach." *See* Conn. Gen.Stat. § § 42a-2-607(3), 42a-2-714(1).

Defendant believes that UCC § 2-608 applies, and argues that plaintiff may only recover damages for a nonconformity that substantially impaired the value of the goods to plaintiff. Because defendant proffers an expert opinion regarding the similarity of Types 304 and 316 steel, it contends that a genuine issue of material fact exists as to whether the value of the goods to plaintiff was substantially impaired because it can prove that the Type 304 goods and Type 316 goods were substantially similar for the purposes used. *See* Def's Opposition Br. at 5-7 & Ex. 1 (expert report of David. E. Hendrix, P.E.) (stating that for the intended purpose materials of Type 304 steel are substantially similar to materials of Type 316 steel, and materials of Type 316 steel would have corroded in the same manner as the Type 304 materials provided to plaintiff).

*3 The UCC provides multiple remedies for buyers of nonconforming goods. First, a buyer may reject a tender of goods at the outset if those goods "fail in any respect to conform to the contract." *See* Conn. Gen.Stat. § 42a-2-601. If the buyer has already accepted the goods, as here, the buyer may revoke his acceptance pursuant to UCC § 2-608 and recover the contract purchase price, or the buyer may elect to sue for damages resulting from the non-conformity pursuant to UCC § 2-607(3). *See* Conn. Gen.Stat. § § 42a-2-607(3), 608; *Comind, Companhia de Seguros v. Sikorsky Aircraft,* 116 F.R.D. 397, 410-11

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 758634 (D.Conn.), 59 UCC Rep.Serv.2d 330
(Cite as: Not Reported in F.Supp.2d)

(D.Conn.1987) (describing the various recovery options available to a buyer of nonconforming goods); *Superior Wire & Paper Prods., Ltd. v. Talcott Tool & Machine, Inc.,* 184 Conn. 10, 13-14, 441 A.2d 43, 45 (Conn.1981) ("If the buyer can demonstrate that he has been damaged by the nonconformity of the goods that he has accepted, he is entitled to recover such damages as he can prove.... Alternatively, if the buyer can demonstrate that the goods are substantially nonconforming, he is entitled, with some qualifications, to revoke his acceptance and recover the purchase price."). Whether a buyer who has accepted nonconforming goods chooses to revoke his acceptance or to sue for damages, that buyer is required to give notice to the seller "within a reasonable time after he discovers or should have discovered" the nonconformity. *See* Conn. Gen.Stat. § § 42a-2-607(3), 608; *Superior Wire,* 184 Conn. at 12-16, 441 A.2d at 45-47.

If the buyer attempts to revoke its acceptance of the goods pursuant to UCC § 2-608, it must "show that their 'nonconformity substantially impairs [their] value to [it]' and that they were initially accepted because the buyer reasonably expected the seller to cure any defects or because the buyer could not immediately discover such defects." *Superior Wire,* 184 Conn. at 16, 441 A.2d at 46 (citing Conn. Gen.Stat. § 2-608). Alternatively, a buyer who has accepted the goods may sue for damages under UCC § § 2-607(3) and 2-714(1) for losses shown to result from *"any* nonconformity of tender." Conn. Gen.Stat. § 2-714(1) (emphasis added).[FN4]

> FN4. *See also Superior Wire,* 184 Conn. at 15, 441 A.2d at 46 (explaining that a buyer must prove "measurable damages," *i.e.,* "losses resulting in the ordinary course of events from the seller's breach," often "measured by the difference between the value of the goods accepted and the value they would have had if they had been as warranted," "augmented [where proven] by incidental or consequential damages").

In this case, National Eastern could not return the goods upon discovery of nonconformity because they were already used in the bridge project, and does not seek to revoke its acceptance of the goods and recover the purchase price, effectively rescinding the contract, but rather seeks to recover consequential damages for the losses it incurred as a result of the nonconformity. Thus, this claim for damages for breach of contract is one pursuant to UCC § § 2-

607(3) and 2-714, and not UCC § 2-608. *See Superior Wire* and *Comind, supra.* Accordingly, the substantial impairment requirement of UCC § 2-608 is not applicable to plaintiff's claim.[FN5] Because plaintiff's claim is one for damages, plaintiff may recover losses resulting from "any nonconformity," *see* Conn. Gen.Stat. § 42a-2-714(1), and is not required to meet "the higher standard of showing that the nonconformity of the goods 'substantially impairs their value to [it],' which is the statutory standard governing revocation of acceptance." [FN6] *See Stelco Indus., Inc. v. Cohen,* 182 Conn. 561, 564, 438 A.2d 759, 761 (Conn.1980) (citing Conn. Gen.Stat. § 42a-2-608).

> FN5. The cases cited by defendant in its opposition are likewise distinguishable from this case because they involve claims for revocation of acceptance, where a plaintiff returned nonconforming goods and sought to recover the contract price, rather than claims for damages resulting from a nonconformity. *See D.P. Tech. Corp. v. Sherwood Tool, Inc.,* 751 F.Supp. 1038, 1041-42 (D.Conn.1990) (concerning a buyer's attempted rejection of tender for untimely delivery, not a suit for damages for losses resulting from a nonconformity, noting that in the case of attempted rejection/rescission, "the perfect tender rule [in Connecticut] requires a substantial nonconformity to the contract before a buyer may rightfully reject the goods"); *Web Press Servs. Corp. v. New London Motors, Inc.,* 203 Conn. 342, 343-46, 525 A.2d 57, 59-60 (Conn.1987) (concerning plaintiff's return of the nonconforming vehicle and attempt to revoke its acceptance and recover the purchase price pursuant to UCC § 2-608, Conn. Gen.Stat. § 42a-2-608); *Conte v. Dwan Lincoln-Mercury, Inc.,* 172 Conn. 112, 117-24, 374 A.2d 144, 147-49 (Conn.1976) (discussing the substantial impairment requirement for revocation of acceptance of goods and recovery of purchase price pursuant to UCC § 2-608, Conn. Gen.Stat. § 42a-2-608, where plaintiff returned nonconforming vehicle to defendant 14 months after purchase); *Franklin Quilting Co. v. Orfaly,* 1 Conn.App. 249, 250-52, 470 A.2d 1228, 1229 (Conn.App.Ct.1984) (discussing the substantial nonconformity "interpretation" of the perfect tender rule, in a case where

Not Reported in F.Supp.2d                                                                        Page 4
Not Reported in F.Supp.2d, 2006 WL 758634 (D.Conn.), 59 UCC Rep.Serv.2d 330
**(Cite as: Not Reported in F.Supp.2d)**

plaintiff informed defendant that it no longer wanted defective machinery and, in face of defendant's silence, sold the machinery and sought to rescind the contract).

FN6. Even if plaintiff were required to show that the nonconformity resulted in a substantial impairment of the value of the goods to plaintiff, plaintiff meets this higher standard. Defendant's arguments that the Type 304 and Type 316 steel are substantially similar for the purposes supplied, and that there is a genuine issue of material fact as to whether materials of Type 316 steel would also have corroded as did the Type 304 materials, are inapposite. The value of the goods to plaintiff was substantially impaired not because the Type 304 materials corroded, but because the Type 304 materials were not the Type 316 materials specified by plaintiff in its contract with defendant and required by Cianbro and the Connecticut Department of Transportation for the bridge project, and thus the Connecticut Department of Transportation and Cianbro were entitled to charge plaintiff for the removal and replacement of the nonconforming materials.

*4 UCC § 2-714, Conn. Gen.Stat. § 42a-2-714, provides:
Where the buyer has accepted goods and given notification as provided in subsection (3) of section 42a-2-607 he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

Conn. Gen.Stat. § 42a-2-714(1).[FN7] The section further provides that "[i]n a proper case any incidental and consequential damages under [Section 2-715] may also be recovered." See Conn. Gen.Stat. § 42a-2-714(3). Thus, pursuant to UCC § § 2-607 and 2-714, in order to recover damages for the nonconformity of the goods supplied to plaintiff, plaintiff must prove: (1) that within a reasonable time after it discovered or should have discovered any breach it notified defendant of the breach, see Conn. Gen.Stat. § 42a-2-607(3); and (2) that plaintiff suffered losses in the ordinary course of events resulting from defendant's breach. See Conn. Gen.Stat. § 42a-2-714(1). [FN8]

FN7. The Section states that the measure of damages is typically "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Conn. Gen.Stat. § 42a-2-714(2).

FN8. Section 2-607(4) further provides that the burden is on the buyer to establish any breach with respect to the goods accepted, but the comment thereto notes that "this rule becomes one purely of procedure when the tender accepted was non-conforming and the buyer has given the seller notice of breach under subsection (3)." Conn. Gen.Stat. § 42a-2-607, Cmt. 6.

In this case, defendant has admitted that it provided non-conforming goods to the plaintiff under to their contract, in that it provided materials made of Type 304 steel, and not of Type 316 steel as specified.[FN9] Moreover, as discussed above, while defendant denies that plaintiff notified it "almost immediately," defendant does not rebut plaintiff's evidence of notification within a "reasonable time" after discovery by offering any evidence to contradict Mr. Muckenhirn's statement that defendant was notified of the nonconformity "immediately upon its discovery." See Pl's Local Rule 56(a)(1) Stmt. at Ex. 2, ¶ 15. Thus, there is no disputed issue of material fact from which a jury could conclude that plaintiff is not entitled to damages flowing from defendant's tender of nonconforming goods.

FN9. The parties' contract included an express warranty that Vegas Fastener would supply goods of Type 316 steel. See Pl's Local Rule 56(a)(1) Stmt. at ¶ 6 & Ex. 1(A); Conn. Gen.Stat. § 42a-2-313 (express warranty created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" and by "[a]ny description of the goods which is made part of the basis of the bargain"). Vegas Fastener affirmed this warranty, and confirmed its compliance therewith, when it supplied plaintiff with certificates of compliance and test results stating that the materials provided were of Type 316 steel. See id. at ¶ 7, 470 A.2d 1228 & Ex. 1(B).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 5
Not Reported in F.Supp.2d, 2006 WL 758634 (D.Conn.), 59 UCC Rep.Serv.2d 330
**(Cite as: Not Reported in F.Supp.2d)**

As noted above, while the parties' briefing disputed the actual amount of damages, the arbitration commenced by National Eastern against Cianbro challenging the back charges amount has now concluded, entitling Cianbro to back charge plaintiff $98,146.00 for the nut and bolt removal and replacement. [FN10] *See* Arbitration Award at 1. Defendant is thus liable to plaintiff for consequential damages incurred by plaintiff as a result of the nonconformity in the amount of $98,146.00. Plaintiff is also awarded prejudgment interest at a rate of 10 percent,[FN11] from the time Cianbro deducted costs for removal/replacement from amounts otherwise due to plaintiff, *see* Muckenhirn Aff. ¶ 17, to the date of this ruling.[FN12]

> FN10. While defendant argues that the costs of removal and replacement were not necessarily caused by the nonconformity-because a genuine issue of material fact exists as to whether materials of Type 316 steel would have similarly corroded-it is the fact of the nonconformity itself that caused plaintiff to suffer losses in the form of removal and replacement costs because as a result of the nonconformity, plaintiff had failed to comply with the specifications of its contract with Cianbro. Had defendant supplied the specified materials of Type 316 steel and those materials also corroded, plaintiff would have complied with its contract with Cianbro and thus would not have incurred any loss because there would have been no basis for holding plaintiff liable.

> FN11. As the Second Circuit has acknowledged, whereas 28 U.S.C. § 1961 governs the award of postjudgment interest in federal cases, no federal statute controls the rate of prejudgment interest, *see Jones v. UNUM Life Ins. Co. of America,* 223 F.3d 130, 139 (2d Cir.2000), and the Second Circuit "has not expressly endorsed a particular interest rate," *Shorter v. Hartford Fin. Servs. Group, Inc.,* 03cv149 (WIG), 2005 WL 2234507, at *6 (D.Conn. May 31, 2005). However, "when the court's jurisdiction is based upon diversity, an award of prejudgment interest is governed by state law." *See Charts v. Nationwide Mut. Ins. Co.,* 397 F.Supp.2d 357, 385 (D.Conn.2005). The applicable Connecticut

statute provides that "interest at the rate of ten percent a year, and no more, may be recovered ... as damages for the detention of money after it becomes payable." Conn. Gen.Stat. § 37-3a(a).

> FN12. The Court is unable to determine from the documentation in the summary judgment record the actual date of Cianbro's backcharging.

### B. Bad Faith Claim (Count II)

The Second Count in plaintiff's First Amended Complaint alleges that defendant breached its contract with plaintiff and did so in bad faith as follows: (1) defendant knew it was required to provide a certificate of compliance to plaintiff stating that the materials tendered conformed to those ordered, *i.e.,* Type 316 steel; (2) defendant provided certificates of compliance attaching testing results from its wholly-owned laboratory certifying that the material "as tested, conforms to the specification requirements," *see* Pl's Local Rule 56(a)(1) Stmt. at Ex. 1(B), knowing that National Eastern would rely on the veracity of that information and would provide it to others involved in the project; and (3) once the materials failed, defendant acknowledged the failure, stating in a letter that its vendor had supplied it with "304SS [steel] and a 316SS raw material certificate." FAC, Count II at ¶ ¶ 1-7. Plaintiff argues that bad faith is established by the documents in that defendant supplied false Certificates of Compliance and testing results and thereafter acknowledged that it had in fact relied on the certificate of its vendor and admitted that it had supplied nonconforming goods. Defendant contends that a genuine issue of material fact exists as to whether defendant shipped the Type 304 steel materials with an evil motive, as required for a claim of bad faith, or simply by mistake.[FN13] Defendant also argues that summary judgment is not appropriate on claims involving a party's intent or state of mind.

> FN13. *See e.g.,* Def's Opposition Br. at 14 ("[Vegas Fastener] ordered Type 316 steel from its vendor, but the vendor supplied [Vegas Fastener] with Type 304 steel and a Type 316 raw materials certificate....[Vegas Fastener's] mistake in reliance [sic] on its vendor does not constitute bad faith, but more likely mere negligence.").

*5 Under Connecticut common law, every contract

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 2006 WL 758634 (D.Conn.), 59 UCC Rep.Serv.2d 330
(Cite as: Not Reported in F.Supp.2d)

contains an implied covenant of good faith and fair dealing, the bad-faith violation of which is actionable in tort, see *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 849 A.2d 382, 387-88 (Conn.2004), and the Court construes plaintiff's "bad faith" claim as brought under this tort theory, *see Stetzer v. Dunkin' Donuts, Inc.,* 87 F.Supp.2d 104, 114 (D.Conn.2000). Courts have defined bad faith as follows:

Bad faith is the absence of good faith and generally implies "a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation not prompted by an honest mistake as to one's rights or duties.... [B]ad faith is not simply bad judgment or negligence, but rather implies the conscious doing of a wrong because of a dishonest purpose or moral obliquity ... it contemplates a state of mind affirmatively operating with furtive design or ill will.

See *Stetzer,* 87 F.Supp.2d at 115 (citing *Buckman v. People Express, Inc.,* 205 Conn. 166, 530 A.2d 596, 599-600 (Conn.1987)).[FN14] As defendant notes, "[s]ummary judgment is sparingly used where intent and state of mind are at issue." See *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

> FN14. *Accord De La Concha,* 849 A.2d at 388 ("Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.... Bad faith means more than mere negligence; it involves a dishonest purpose.") (internal quotation and citation omitted).

While defendant appears to misapprehend plaintiff's claim for bad faith-specifically, defendant contests whether it supplied the Type 304 materials in bad faith, or merely by mistake, whereas plaintiff contends that it was defendant's supplying of false compliance certificates and test results that constituted bad faith-defendant is correct that a genuine issue of material fact exists as to whether defendant acted in bad faith. While the evidence provided by plaintiff-specifically the certificates of compliance with purported test results from defendant's wholly-owned subsidiary, coupled with the subsequent letter from defendant stating that defendant relied on its vendor's raw material certificate, *see* Pl's Local Rule 56(a)(1) Stmt. at Exs.

1(B), 1(C)-does provide a basis from which a reasonable fact finder could conclude that defendant acted in bad faith, such evidence does not establish that there is no genuine issue of material fact as to whether defendant was acting with a "dishonest purpose ... a state of mind affirmatively operating with furtive design or ill will." *Stetzer,* 87 F.Supp.2d at 115. This is not a case in which plaintiff has offered evidence necessitating a conclusion that defendant's actions were motivated by a "true [dishonest] purpose." *Cf. id.* (denying defendant's motion summary judgment on plaintiff's bad faith claim where plaintiffs "offered evidence of a dishonest purpose that is more than mere conjecture or speculation" and defendant "failed to sustain its burden of showing the absence of a genuine issue of material fact," where plaintiffs submitted letters supporting an inference that defendant's "true purpose [in its actions] was anti-competitive and prompted by a dishonest purpose rather than an honest mistake as to its rights or duties").[FN15] Accordingly, plaintiff's motion for summary judgment on its bad faith claim is denied.[FN16]

> FN15. Plaintiff's argument that provision of false test certificates is a criminal violation under Connecticut law, *see* Pl's Mem. of Law at 14 (citing Conn. Gen.Stat. § 53a-157b), is unpersuasive because it begs the question whether the intent requirement of the criminal statute was met where, as noted above, defendant's intent in supplying nonconforming goods remains in dispute.

> FN16. If plaintiff prevails on its claim of bad faith at trial, the proper measure of damages would be those suffered as a result of reliance on defendant's compliance certificates and test results, namely the removal and replacement costs of the nonconforming materials, which are duplicative of the damages to which plaintiff is entitled on its breach of contract claim. However, were plaintiff to prevail on its bad faith claim, upon showing entitlement to punitive damages, plaintiff could also recover attorneys fees and costs.

## IV. CONCLUSION

*6 For the foregoing reasons, plaintiff's Motion for Summary Judgment [Doc. # 39] is GRANTED in part, as to the breach of contract claim (Count I), and plaintiff is awarded $98,146.00 in damages with

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 758634 (D.Conn.), 59 UCC Rep.Serv.2d 330
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

interest at 10%, and DENIED in part, as to the bad
faith claim (Count II). The parties shall file their Joint
Trial Memorandum within 30 days of the date of this
ruling.
IT IS SO ORDERED.


D.Conn.,2006.
National Eastern Corp. v. Vegas Fastener MFG
Not Reported in F.Supp.2d, 2006 WL 758634
(D.Conn.), 59 UCC Rep.Serv.2d 330

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 3**

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 2007 WL 1834175 (D.Conn.)
**(Cite as: Slip Copy)**

# H

Brookridge Funding Corp. v. Northwestern Human
Services Inc.
D.Conn.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Connecticut.
BROOKRIDGE FUNDING CORP., Plaintiff,
v.
NORTHWESTERN HUMAN SERVICES INC.,
Defendant.
**Civil Action No. 3:99 CV 2339(CFD).**

June 26, 2007.

Douglas M. Poulin, Pepe & Hazard, Hartford, CT,
Douglas R. Steinmetz, Pepe & Hazard, Southport,
CT, William J. Hagan, Danbury, CT, for Plaintiff.
Charles Francis Gfeller, Donald E. Frechette,
Edwards & Angell, Hartford, CT, Nicole R.
Rodrigue, Schnader, Harrison, Segal & Lewis, LLP,
Robert B. Bodzin, Kleinbard, Bell & Brecker,
Philadelphia, PA, for Defendant.

### RULING ON LIABILITY, DAMAGES, AND PREJUDGMENT INTEREST

CHRISTOPHER F. DRONEY, United States District
Judge.
**\*1** This contract action comes before the Court on
remand from the U.S. Second Circuit Court of
Appeals. The dispute in this case arises out of a
financing transaction to fund the construction of a
minor league baseball stadium in Pennsylvania's
Lehigh Valley.[FN1] The case was tried before the
Court, which issued a Memorandum of Decision that
found the defendant, Northwestern Human Services,
Inc. ("NHS"), liable to the plaintiff, Brookridge
Funding Corp. ("Brookridge"), for $1,428,571.43 in
contract damages. The defendant appealed. The
Second Circuit affirmed the Court's finding that there
was a meeting of the minds with respect to the
contract at issue. Brookridge Funding Corp. v. Nw.
Human Serv., Inc., 170 Fed. Appx. 170 (2d
Cir.2006). However, the Second Circuit reversed this
Court's finding that the contract was supported by
"loss or detriment" consideration, and remanded the
case to determine whether there was consideration for
the contract or whether promissory estoppel
mandates enforcement. Id. at 172. In light of the
Second Circuit's decision the Court now revisits the
question of consideration, damages, and prejudgment

interest.

> FN1. Jurisdiction is proper under 28 U.S.C.
> § 1332. The terms of the contract at issue
> provide for the application of Connecticut
> law in any contract enforcement action, and
> the parties do not dispute this choice of law.

### *I. Findings of Fact*

With the exception of the findings vacated by the
Second Circuit's ruling, the Court adopts the factual
findings from its original Memorandum of Decision.
Familiarity with those factual findings is presumed
for purposes of this ruling. The Court now also
makes the following additional findings of fact.

### *A. Consideration*

At trial, the Court had to determine whether there
was consideration for a contract between NHS,
Brookridge, and Contracting Systems, Inc. II
("CSI"). The agreement at issue consisted of a
document entitled "Notice of Purchase of Accounts
Receivable" ("Acknowledgment") signed by all three
entities. CSI had worked as a contractor on NHS's
stadium project, but work had stalled due to
nonpayment of outstanding NHS invoices.[FN2] To
keep the stadium project moving, CSI sought
factoring services from Brookridge to pay for the
outstanding invoices. Under an agreement between
CSI and Brookridge, Brookridge would purchase two
invoices totaling $2,759,024.43 from CSI for $1
million.[FN3] Once Brookridge collected the money
owed by NHS under the invoices, Brookridge would
retain a portion of the money as its fee and pass the
balance on to CSI. The Acknowledgment signed by
Brookridge, CSI, and NHS confirmed that NHS owed
$2,759,024.43 to CSI under the invoices, explained
that CSI had assigned the invoices to Brookridge, and
affirmed that NHS would pay Brookridge, not CSI,
for the invoices. When NHS subsequently refused to
pay Brookridge for the invoices, Brookridge filed this
lawsuit. NHS refuses to pay Brookridge because
NHS contends that the Acknowledgment is
unenforceable for lack of consideration.

> FN2. Although CSI worked under a contract

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1834175 (D.Conn.)
(Cite as: Slip Copy)

with Federal Development Corp. ("Federal"), not NHS, that contract listed Federal as NHS's "agent." Records provided to Brookridge indicated that prior invoices from CSI had been paid directly by NHS, not Federal, and the unpaid invoices recited that they were due by NHS to CSI.

FN3. The Court notes that there is a discrepancy between the purchase agreement between CSI and Brookridge and the terms of the Acknowledgment. The Acknowledgment clearly assigns CSI's interest in the $2,759,024.43 of invoices to Brookridge. The terms of the collateral purchase agreement between CSI and Brookridge are not as clear, and whether Brookridge ever fully purchased the two invoices totaling $2,750,024.43 referenced in the Acknowledgment remains disputed. However, since this lawsuit deals only with NHS's obligations to Brookridge, and because the Court finds that the Acknowledgment is fully enforceable, as is discussed *infra*, the appropriate measure of damages here is $2,759,024.43, the amount CSI assigned to Brookridge in the Acknowledgment. In light of the outstanding dispute between CSI and Brookridge regarding the purchase agreement, at this time the Court declines to address whether CSI is ultimately entitled to any of these damages.

In its original memorandum of decision, the Court found the Acknowledgment enforceable. Specifically, the Court found that the Acknowledgment caused Brookridge to incur a detriment by paying $1 million to CSI. The Second Circuit vacated this finding, however, and instructed the Court to reconsider the question of consideration. For the reasons that follow, the Court finds that there was adequate consideration for the Acknowledgment, and hence it is enforceable.

**\*2** Under Connecticut law, "[c]onsideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *State Nat'l Bank of Conn. v. Dick*, 164 Conn. 523, 529 (1973) (citing *Finlay v. Swirsky*, 103 Conn. 624, 631 (1925)). In this context, the term benefit is technically defined to mean "the receiving as the exchange for a promise some performance or forbearance which the promisor was not previously entitled to receive. That the promisor desired it for

his own advantage and had no previous right to it is enough to show that it was beneficial." Richard A. Lord, 3 *Williston on Contracts § 7:4* (4th ed.1999). Although consideration must be bargained for by the parties to the agreement, "[t]he doctrine of consideration does not require ... an equal exchange between the contracting parties." *Martin Printing, Inc. v. Sone*, 89 Conn.App. 336, 345 (2005). "Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact." *Benedetto v. Wanat*, 79 Conn.App. 139, 150 (2003). Evidence outside of the contract itself "is admissible to prove whether or not there is consideration for a promise, even though the parties have reduced their agreement to a writing." Lord, 11 *Williston on Contracts*, at § 33:19; *see TIE Communications, Inc. v. Kopp*, 218 Conn. 281, (1991) (noting that the parol evidence rule "forbids only the use of such evidence to vary or contradict the terms of ... a contract").

Here, consideration supported the Acknowledgment because NHS received a benefit from its participation in the agreement. The evidence at trial established that NHS owned the land on which the stadium was to be built, and even though Federal Development Corp. ("Federal") managed the development of the stadium for NHS, NHS would become the sole owner of the stadium after its completion. NHS anticipated significant benefits from ownership of the completed stadium. As a non-profit entity involved in the development project, NHS would be eligible for a $5 million grant from the State of Pennsylvania for the stadium project, which would immediately improve NHS's financial statement and financial ratios. NHS also expected income from others' use of the stadium, positive publicity for NHS's services in a developing market, and NHS planned to pass its debt on to a subtenant. However, lack of permanent financing, overdue construction invoices, and stalled construction work threatened the project's completion and the resulting benefits to NHS. NHS participated in the factoring agreement to secure financing to help keep the stadium project from termination prior to completion. *See* NHS Board of Trustees Executive and Finance Committees Special Committee Meeting Minutes (July 2, 1999) ("[T]o date neither permanent nor interim financing has been secured, and construction has been all but stopped due to unpaid invoices.... To cover these invoices [CSI] has a proposal from Brookridge ... to purchase CSI's accounts receivable if there is verification of the accuracy of the accounts receivables by [NHS]."). The Acknowledgment's second paragraph explicitly states that NHS's warranties in that document were "to induce [Brookridge] to provide financial services

to [CSI]." The benefit NHS received from the agreement was Brookridge's promise to advance financing to CSI in lieu of NHS being required to satisfy its own debt obligations to CSI-certainly a benefit to which NHS was not entitled previously entitled.[FN4]

> FN4. The consequences of NHS's signature on the Acknowledgment confirm this benefit to NHS: Brookridge extended the $1 million of financing to CSI only after NHS signed the Acknowledgment, and the Court credits the testimony of John McNiff, Brookridge's president, and Thomas Flaherty, a member of NHS's board of trustees, in finding that CSI continued to work on the stadium project after Brookridge paid CSI. NHS's argument that there is no evidence that Brookridge's $1 million payment to CSI ever paid for work on the stadium is irrelevant to the question of whether NHS received a benefit through the Acknowledgment. NHS's need for permanent financing coupled with the burden of unpaid construction invoices threatened the stadium project's completion. Brookridge's promise of financing provided NHS with at least temporary relief from its outstanding debts and the possibility that work could fully resume. Whether CSI actually used the money on the stadium project does not affect this immediate benefit to NHS from the Acknowledgment.

*3 Connecticut law supports this conclusion. In *General Electric Capital Corp. v. Transport Logistics Corp.,* 94 Conn.App. 541 (2006), the plaintiff, General Electric Capital Corp. ("GECC"), and the corporate defendant, Transport Logistics Corp. ("Transport"), entered into an equipment leasing contract. Two years later, Gaudet, an officer for Transport, personally guaranteed Transport's present and future obligations to GECC. The guarantee agreement stated that its purpose was "[t]o induce [GECC] to enter into, purchase or otherwise acquire ... any ... documents or instruments evidencing, or relating to, any lease, loan, extension of credit, or other financial accommodation" to Transport. *Gen. Elec. Capital Corp.,* 94 Conn.App. at 544-545. Four days after Gaudet signed the guarantee, Transport leased additional pieces of equipment from GECC. When Transport later defaulted on the contract, GECC sued Gaudet, who challenged the guarantee's enforceability for lack of consideration. In rejecting

Gaudet's argument and enforcing the guarantee, the Connecticut Appellate Court found that "Gaudet's signing the guarantee induced [GECC] to lease equipment to the corporate defendant." *Id.* at 547. In light of this underlying purpose, "[GECC's] continued leasing of equipment to the corporate defendant was consideration for Gaudet's guarantee." *Id.* In other words, given the promisor's relationship to the other parties to the agreement, the guarantee's inducement of a benefit to Transport in the form of additional leases with GECC constituted sufficient benefit consideration to render Gaudet's guarantee enforceable.

Similarly, in this case, the context in which NHS signed the Acknowledgment highlights the benefit NHS received from its promises to Brookridge. NHS promised to pay Brookridge $2,759,024.43 of debt owed to CSI to induce Brookridge to provide financing to CSI. NHS benefitted from the agreement because it desperately needed financing to keep the stadium project moving, and Brookridge would not provide the funding without NHS's agreement to the deal. As in *General Electric,* the benefit of the relationship between CSI and Brookridge to NHS provided the consideration for NHS's promises in the Acknowledgment. Consequently, since the Acknowledgment was supported by consideration, it is fully enforceable against NHS.

### B. Promissory Estoppel

Alternatively, the Court also concludes that promissory estoppel renders NHS liable to Brookridge under the Acknowledgment. Under Connecticut law, "a promise is generally not enforceable unless it is supported by consideration." *Stewart v. Cendant Mobility Serv. Corp.,* 297 Conn. 96, 104 (2003) (quoting *D'Ulisse-Cupo v. Bd. of Dir. of Notre Dame High Sch.,* 202 Conn. 206, 213 (1987)). The doctrine of promissory estoppel, however, provides a significant exception to this rule. *Id.* Connecticut has adopted the doctrine as it is outlined in Section 90 of the Second Restatement of Contracts:
*4 A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*Id.* (quoting Restatement (Second) of Contracts § 90 (1981)). "A fundamental element of promissory estoppel, therefore, is the existence of a clear and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1834175 (D.Conn.)
**(Cite as: Slip Copy)**

Page 4

definite promise which a promisor could reasonably have expected to induce reliance." *Id.* (quoting *D'Ulisse-Cupo,* 202 Conn. at 213). A promisor will not be liable to a promisee "who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." *Id.* at 105 (quoting *D'UlisseCupo,* 202 Conn. at 213). The applicability of promissory estoppel is a question of fact that the Court must resolve in light of the factual context surrounding the promise. *Torosyan v. Boehringer Ingelheim Pharm., Inc.,* 234 Conn. 1, 17 n. 6 (1995).

The clarity and definiteness of a party's representation "are the determinative factors in deciding whether the statements are indeed expressions of commitment" on which reliance by a promisee is reasonable. *Stewart,* 267 Conn. at 105. To be sufficiently "clear and definite" so that reliance by a promisee is objectively reasonable, "the promise must reflect a present intent to commit as distinguished from a mere statement of intent to contract in the future." *Id.* Representations that lack clarity and definiteness are expressions of mere intent, hope, desire, or opinion, which are not binding. *Id.* at 105-06. At the same time, however, to be binding pursuant to promissory estoppel a promise need not be as specific and definite as an offer to enter a contract. *Id.* at 108.

Here, Panaccio's signature on the Acknowledgment constituted a clear and definite promise upon which Brookridge reasonably relied. The Acknowledgment is one page long, and it contains only ten short paragraphs. Its plain language promised Brookridge that NHS owed a specified amount, $2,759,024.43, to CSI, and that NHS would pay that amount to Brookridge as the assignee of NHS's debts to CSI. These provisions are explicitly stated in two indented, numbered paragraphs toward the top of the document:
1. As of the date hereof ... the amount to be paid to [Brookridge] pursuant to the obligations of the Undersigned is $2,759,024.43 [.] Such sum is owed absolutely and the Undersigned has no right of counterclaim, contraclaim, setoff, or any other right of deduction from such sum.
2. The Undersigned acknowledges that the $2,759,024.43 owing by the Undersigned to Assignor shall be paid directly to [Brookridge]. This assignment may only be released by [Brookridge] and no action of Assignor shall affect any of the Undersigned obligations to make payment direct to [Brookridge].

The subsequent portion of the Acknowledgment lists Brookridge's address for purposes of delivering the payments and provides information for alternative payments through a wire transfer. This language clearly and definitely confirms the amount of NHS's debt to CSI-$2,759,024.43-and expresses NHS's intent to pay the full amount to Brookridge as CSI's assignee. NHS's signature on the Acknowledgment constitutes its recognition of a definite obligation to pay, rather than a mere intent or desire to contract with Brookridge in the future.

**\*5** Brookridge's reliance on NHS's promise in the Acknowledgment [FN5] is also objectively reasonable. In addition to NHS's clear promise to pay Brookridge as the assignee of NHS's debt to CSI, the Acknowledgment also put NHS on notice that Brookridge would rely on NHS's promise. The Acknowledgment's second paragraph explains that the purpose of NHS's promises in the Acknowledgment is "[t]o induce [Brookridge] to provide financial services to [CSI]." This language put NHS on notice that Brookridge intended to rely on the promises contained in the Acknowledgment. Given this direct statement of purpose by Brookridge, once NHS signed the Acknowledgment it was objectively reasonable for Brookridge to rely on NHS's promises contained in it. In addition, after NHS's president signed the Acknowledgment, Brookridge's president telephoned him to confirm that NHS would be responsible for payment before Brookridge released the $1 million of financing to CSI.

> FN5. Brookridge paid CSI $1 million for the NHS invoices in reliance on the Acknowledgment.

Finally, injustice can be avoided only by enforcing NHS's promises in the Acknowledgment. Because CSI assigned the invoices to Brookridge, as the Acknowledgment explains, Brookridge is the only party with any legal right to collect the $2,759,024.43 from NHS. Although the agreement between Brookridge and CSI provides that CSI is entitled to most of any money Brookridge recovers on the invoices in excess of $1 million, Brookridge retains the sole legal right to collect from NHS pursuant to the invoices. NHS's signature on the Acknowledgment confirms that it owed a debt of $2,759,024.43 to CSI, and agreed to CSI's assignment of that debt to Brookridge. Since no entity other than Brookridge can collect on the invoices-even though CSI may still be entitled to some of the money owed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5
Slip Copy, 2007 WL 1834175 (D.Conn.)
**(Cite as: Slip Copy)**

by NHS to Brookridge on the invoices-NHS would receive an undeserved windfall at the expense of both Brookridge and CSI if the Court did not fully enforce the Acknowledgment. *See D'Ulisse-Cupo,* 202 Conn. at 213. Consequently, justice requires full enforcement of NHS's obligations under the Acknowledgment.[FN6]

> FN6. Since the Court finds NHS liable to Brookridge on the basis of the Acknowledgment, the Court need not address Brookridge's alternative theories of recovery. *See Brookridge,* 170 Fed. Appx. at 172.

### II. Damages

In light of the Court's new findings regarding liability, the Court also revisits the question of damages.

Connecticut law provides that " '[t]he general rule of damages in a breach of contract action is that the award should place the injured party in the same position as he would have been in had the contract been performed.' " *Gazo v. City of Stamford,* 255 Conn. 245, 264-65 (2001) (quoting *O'Hara v. State,* 218 Conn. 628, 242 (1991)). This means that "[t]he usual recovery for breach of a contract is the contract price or the lost profits therefrom." [FN7] *Id.* at 265. Since "promissory estoppel serves as an alternative basis to enforce a contract," the same principles apply to assessing damages in this case regardless of whether the contract is enforced on the basis of adequate consideration or under the doctrine of promissory estoppel.[FN8] *Torringford Farms Ass'n, Inc. v. City of Torrington,* 75 Conn.App. 570, 575-76 (2003) (citing *D'Ulisse-Cupo,* 202 Conn. at 213); *see Torosyan,* 234 Conn. at 33; Restatement (Second) of Contracts § 90 comment d ("A promise binding under [promissory estoppel] is a contract, and full-scale enforcement by normal remedies is often appropriate.").

> FN7. Here, lost profits are equal to the contract price. The term "lost profits," as a contract remedy, can refer to two types of damages. "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements.... When the breaching party does not perform, the non-breaching party's business is in some

way hindered, and the profits from potential collateral exchanges are 'lost.' " *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* --- F.3d ----, 2007 WL 1492468, at * 15 (2d Cir.2007). At the same time, "when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, ... the damages may still be characterized as lost profits since, had the contract been performed, the non-breaching party would have profited to the extent that his cost of performance was less than the total value of the breaching party's promised payments ." *Id.* at * 16. In the latter case, "[t]he profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed." *Id.* The Acknowledgment, through which NHS promised to pay Brookridge a specific amount of money, falls into this second category. As such, the appropriate remedy is to put Brookridge in the same position as if NHS had fully performed: the contract price less Brookridge's cost of performance. Since Brookridge's only performance obligation to NHS under the Acknowledgment was to "provide financial services to [CSI]," a cost Brookridge would recoup should NHS fully perform, this amount is still the contract price of $2,759,024.43.

> FN8. The Second Circuit's Summary Order specifically noted that basing liability on promissory estoppel does not limit the plaintiff's damages to its reliance damages rather than full expectation damages. *Brookridge,* 170 Fed. Appx. at 172.

*\*6* After reconsidering damages in light of the questions remanded by the Second Circuit, the Court concludes that Brookridge is entitled to its full expectation damages of $2,759,024.43. As Brookridge points out in its post-remand papers, the Acknowledgment is the only contract at issue in this case and the only source of obligations between NHS and Brookridge. The Purchase Agreement, through which CSI assigned to Brookridge its rights under the NHS invoices, is immaterial to Brookridge's damages for NHS's breach of the Acknowledgment. Although Brookridge advanced CSI only $1 million as payment for CSI's assignment of the NHS invoices, and, under Brookridge's separate agreement with CSI,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Brookridge would not be entitled to keep the full $2,759,024.43 specified in the Acknowledgment should it ultimately recover that amount from NHS, these facts do not alter NHS's obligations under the Acknowledgment. Since the Acknowledgment is fully enforceable against NHS, NHS's breach entitles Brookridge to damages that put Brookridge in same position as if the contract had been fully performed. *See Gazo*, 255 Conn. at 264-65; *Torosyan*, 234 Conn. at 32; Restatement (Second) of Contracts, § 347 ("[T]he injured party has a right to damages based on his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform."). The full $2,759,024.43 must be awarded to do this; awarding less would provide NHS with an undeserved windfall while undercompensating Brookridge according to the Acknowledgment's clear terms.

### III. Prejudgment Interest

The Second Circuit directed the Court to reconsider the question of prejudgment interest on remand. State law governs the award of prejudgment interest when the Court's jurisdiction is based on diversity of citizenship. *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 342 (2d Cir.1993). Brookridge seeks prejudgment interest pursuant to Conn. Gen.Stat. § 37-3a, which provides, in relevant part, that "interest at the rate of ten percent a year, and no more, may be recovered an allowed in civil actions ... as damages for the detention of money after it becomes payable." Conn. Gen.Stat. § 37-3a. Awarding prejudgment interest under Conn. Gen.Stat. § 37-3a "is a matter committed to the sound discretion of the [district] court." *Cabrera v. G.T. Constr.*, No. 3:05cv812, 2006 WL 1272618, at *1 (D.Conn. Mar. 27, 2006) (citing *Metcalfe v. Talarski*, 213 Conn. 145, 160 (1989)).

Whether to award prejudgment interest is "an equitable determination ... to be made in view of the demands of justice rather than through the application of an arbitrary rule." *Smithfield Assoc., LLC v. Tolland Bank*, 86 Conn.App. 14, 26 (2004) (citation omitted). The propriety of awarding prejudgment interest rests on " 'whether the detention of the money is ... wrongful under the circumstances.' " *O'Hara*, 218 Conn. 628, 643 (1991) (quoting *Cecio Bros., Inc. v. Feldmann*, 161 Conn 265, 275 (1971)).

Establishing wrongfulness " 'requires more than demonstrating that the opposing party detained money when it should not have done so.' " *Travelers Prop. & Cas. Co. v. Christie*, 99 Conn.App. 747, 763 (2007) (quoting *Smithfield*, 86 Conn.App. at 26). A breaching party's bad faith informs, but is not determinative of, the Court's assessment of wrongfulness. *Ferrato v. Webster Bank*, 67 Conn.App. 588, 596 (2002). Prejudgment interest is often appropriate "where a party claims that a specified sum under the terms of a contract ... has been detained by another party." *Travelers*, 99 Conn.App. at 764 (discussing *Foley v. Huntington Co.*, 42 Conn.App. 712, 739 (1996)). The party seeking prejudgment interest bears the burden of proving wrongfulness. *Id.* at 763.

*7 After considering NHS's conduct in light of these factors and the Court's additional factual findings on remand, the Court reaffirms its original conclusion that equitable considerations do not warrant a prejudgment interest award. As the Court explained in its original Memorandum of Decision, Brookridge did not prove that NHS's failure to pay was "wrongful" as that term is defined by the Connecticut courts. Although the Court now finds that the Acknowledgment obligated NHS to pay Brookridge a liquidated amount, this obligation was far less clear throughout the course of this litigation. Brookridge's request for prejudgment interest is denied.

### IV. Conclusion

The defendant, NHS, is liable to the plaintiff, Brookridge, under the Acknowledgment for $2,759,024.43. No prejudgment interest is awarded. Judgment shall enter for Brookridge in the amount of $2,759,024.43.

SO ORDERED this *26th* day of June 2007 at Hartford, Connecticut.

D.Conn.,2007.
Brookridge Funding Corp. v. Northwestern Human Services Inc.
Slip Copy, 2007 WL 1834175 (D.Conn.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.